## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **HENNEPIN COUNTY, MINNESOTA**, 300 South 6th Street, Minneapolis, MN 55487,<br><br>**KING COUNTY, WASHINGTON**, 401 Fifth Avenue, Seattle, WA 98104,<br><br>**PLANNED PARENTHOOD OF THE HEARTLAND, INC.**, 818 5th Avenue, Des Moines, IA 50309,<br><br>**SEXUALITY INFORMATION AND EDUCATION COUNCIL OF THE UNITED STATES d/b/a SIECUS: SEX ED FOR SOCIAL CHANGE**, 1763 Columbia Road NW, Suite 175, Washington, DC 20009,<br><br>  *Plaintiffs*,<br><br>*v.*<br><br>**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**, 200 Independence Avenue SW, Washington, DC 20201,<br><br>**ROBERT F. KENNEDY JR.**, in his official capacity as Secretary of U.S. Department of Health and Human Services, 200 Independence Avenue SW, Washington, DC 20201,<br><br>  *Defendants*. | **Case No. 26-cv-2460** |

## COMPLAINT

**INTRODUCTION**

1. This case seeks to prevent Defendants from dismantling a bipartisan public health initiative that has successfully reduced teen pregnancy for more than fifteen years. The congressionally authorized Teen Pregnancy Prevention (TPP) Program has invested over $100 million annually in evidence-based education programs benefiting more than 1.4 million youth since the Program's creation. Defendants are attempting to end that progress by cutting off the existing Program and replacing it with a new version wholly divorced from what Congress directed. Defendants' actions cannot stand.

2. In 2009, Congress created the TPP Program through the annual appropriations process, conditioning federal funding on a single evidence-based standard: awardees must support "medically accurate and age appropriate programs" that have "been proven effective through rigorous evaluation" or that are being tested to determine whether they meet that objective. Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009). Congress has renewed the appropriation and these statutory criteria in every appropriations cycle since, spanning administrations of both parties and various ideologies, including this year, in the 2026 Consolidated Appropriations Act. Pub. L. No. 119-75, 140 Stat. 173, 281.

3. As outlined by Congress, the TPP Program directs the U.S. Department of Health and Human Services (HHS) to administer this evidence-based initiative through a two-tiered structure. Tier 1 funding—approximately seventy-five percent of appropriated funds—must go to "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." *Id.* Tier 2 funding—approximately twenty-five percent of appropriated funds—"shall be" used "for research and demonstration grants to develop . . . and test additional models and innovative strategies" to accomplish that same goal. *Id.* To apply for and receive Tier 1 or Tier 2

1

funding, prospective awardees must respond to a Notice of Funding Opportunity (NOFO)—the competitive solicitation through which HHS invites and evaluates applications for a given award cycle, consistent with the statutory criteria described above.

4. In July 2025, Defendants changed course. Three years into a five-year TPP award cycle, HHS published a policy notice imposing new substantive conditions on awardees—conditions with no basis in the statutory criteria Congress had set. A federal court vacated the policy notice a few months later, holding it arbitrary and capricious. *Planned Parenthood of Greater N.Y. v. HHS*, No. CV 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025).

5. Instead of abandoning this invalid approach, Defendants doubled down. In June 2026, Defendants implemented a new policy (the "2026 Policy") that rejects the Program Congress created and replaces it with one divorced from the evidence-based programs funded by the statute. Defendants implemented the Policy through two related actions. *First*, on June 23, 2026, HHS issued new fiscal year 2026 NOFOs that condition TPP funding on incorporating abstinence-only "sexual risk avoidance" education; require awardees to "align" with agency priorities that prohibit "gender ideology" and diversity, equity, and inclusion practices; and restrict discussion of teen sexual activity in a program whose statutory mandate is to reduce teen pregnancy through "medically accurate" and "age appropriate" interventions. *Second*, on June 26, 2026, HHS terminated the vast majority of existing TPP cooperative agreements, cutting off ongoing funding on the grounds that awardees' curricula failed to conform to the same agency priorities that had been introduced as program requirements in the new NOFOs three days prior.

6. The 2026 Policy is unlawful. Defendants abandoned the statutory criteria established by Congress in favor of their own policy priorities, in violation of law. Defendants relied on factors inconsistent with the statutory criteria, failed to consider important aspects of the problem of reducing teen pregnancy, and changed course without regard for the substantial reliance interests

of awardees, program beneficiaries, and the broader public. These defects render the 2026 Policy contrary to law and arbitrary and capricious under the Administrative Procedure Act (APA).

7. Plaintiffs—two local governments and one nonprofit that have received TPP funds, as well as an organization that works closely with TPP awardees—seek this Court's intervention to preserve the statutory framework of the TPP Program. As a result of the 2026 Policy, Plaintiffs and other awardees have been forced to suspend or start dismantling ongoing teen education programs, pause needed research, interrupt services to adolescents and families, lay off trained personnel and place other staff at risk of termination, and jeopardize longstanding partnerships with schools, healthcare providers, and community organizations. Organizations that partner with TPP awardees also face serious threats to their mission to support effective sexual education.

8. Those harms are ongoing and will only grow worse absent preliminary relief. Many participating schools organize programming around the academic calendar. Implementation depends upon trained personnel and established community partnerships, and interruptions in project delivery disrupt both program implementation and ongoing evaluation. Each day the challenged policy remains in effect further impairs the continuity Congress designed the TPP Program's multi-year cooperative agreements to achieve. In the end, the adolescents that the Program is designed to help will suffer as appropriated funds are redirected to programs that have not been proven to reduce teen pregnancy.

9. Plaintiffs respectfully request that this Court stay, and ultimately vacate, implementation of the 2026 Policy and order Defendants to administer the TPP Program in accordance with the law.

**PARTIES**

10. Plaintiff Hennepin County is a municipality seated in Minneapolis, Minnesota. Through its public health department, Hennepin County supports the health and wellbeing of the county's 1.27 million residents. A cornerstone of Hennepin County Public Health's adolescent health

3

programming is Better Together Hennepin, an initiative that works to help realize Hennepin County's vision of healthy, self-reliant citizens through the prevention of teen pregnancy. With funding from the TPP Program, Better Together Hennepin has placed health mentors in schools and clinics across the county, to provide classroom instruction and one-on-one support to students using evidence-based approaches to sexual health education.

11. Plaintiff King County is a municipality located in Washington State. Public Health – Seattle & King County (PHSKC) runs the county's Sexual and Reproductive Health Program, whose mission is to decrease the rate of unplanned pregnancy and improve the reproductive and sexual health of the county's more-than 2 million residents. In September 2023, PHSKC received a Tier 2 TPP Program award of $5 million over five years to rigorously evaluate the Stepping Stones program, which provides one-to-one health education to improve the sexual health outcomes of systems-involved young men.

12. Plaintiff Planned Parenthood of the Heartland (PPH) is a 501(c)(3) nonprofit organization that provides, promotes, and protects sexual and reproductive health by providing high-quality health care, education, and advocacy in Iowa and Nebraska. PPH's mission is to empower vital generations by providing and advocating for sexual and reproductive health so more people can choose their own path to a healthy and meaningful life. The provision of comprehensive sex education, including through TPP programming, is core to PPH's mission and an integral part of PPH's work. PPH was awarded a five-year Tier 1 TPP award in June 2023.

13. Plaintiff Sexuality Information and Education Council of the United States d/b/a SIECUS: Sex Ed for Social Change (SIECUS) is a 501(c)(3) nonprofit organization dedicated to promoting access to comprehensive sex education in order to improve the health and wellbeing of young people since 1964. SIECUS works to improve comprehensive sex education policies at the federal and state levels; promotes evidence-based comprehensive sex education through translating

evidence and analysis into tools and resources, including co-developing the National Sex Education Standards; and promotes public understanding of the benefits of comprehensive sex education. SIECUS also coordinates and provides technical assistance to state and local agencies through the Sex Education Policy Action Council (SEPAC), which is a coalition of organizations, state agencies, and school districts to advance inclusive and effective sex education standards. SEPAC counts many TPP Program participants as dues-paying members.

14. Defendant HHS is an "agency" within the meaning of the Administrative Procedure Act. 5 U.S.C. § 551(1). HHS is the federal agency responsible for awarding and administering funds under the TPP Program. *See* 140 Stat. at 281.

15. Defendant Robert F. Kennedy Jr. is the Secretary of the U.S. Department of Health and Human Services. He is sued in his official capacity. Secretary Kennedy is responsible for all aspects of the operation and management of HHS, including implementing and fulfilling HHS's duties under the U.S. Constitution, statutory law, and applicable regulations.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Administrative Procedure Act and the First Amendment. The Court is authorized to grant the requested declaratory and equitable relief pursuant to 5 U.S.C. §§ 702 and 706, and 28 U.S.C. §§ 2201 and 2202.

17. Venue is proper in this District under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States, the action does not involve real property, and Defendants reside in this District.

## BACKGROUND

I.    **Congress creates the Teen Pregnancy Prevention Program to fund rigorously evaluated, evidence-based teen pregnancy interventions and studies to identify such interventions.**

18. Teenage pregnancy is a "significant public health concern" in this country "because of the range of health, social, and economic effects adolescent childbearing can have on adolescents, their children, and broader society."[1] Accordingly, both Congress and the executive branch have long recognized that reducing unintended adolescent pregnancy is an important public-health objective.[2] Reducing unintended adolescent pregnancy benefits young people, their families, and the broader public by improving health, educational, and economic outcomes.

19. In the 1990s and 2000s, Congress directed most funding for sex education to programs emphasizing abstinence from sexual activity. *See Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 69 (D.D.C. 2018). Congress did not require that those programs be proven effective in reducing teen pregnancy, delaying sexual intercourse, or preventing other sexually risky behaviors.[3]

20. In 2006 and 2007, teen pregnancy rates began to climb after years of decline.[4] Congress understood this to present a public health problem that could be addressed with evidence-based interventions.

21. In response, Congress established the TPP Program through the 2010 Consolidated Appropriations Act, appropriating $110 million to HHS for "competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce

---

[1] Alexandria K. Mickler & Jessica Tollestrup, Cong. Rsch. Serv., R45184, *Teen Births in the United States: Overview and Recent Trends* 1 (2025), https://perma.cc/3HLH-F6BA.

[2] Jessica Tollestrup, Cong. Rsch. Serv., R45183, *Adolescent Pregnancy: Federal Prevention Programs* 1 (2024), https://perma.cc/3DCX-9QMW.

[3] *See* SIECUS, *History of Sex Education* 43–50, https://perma.cc/X3BA-WTNU (last visited July 6, 2026).

[4] Mickler & Tollestrup, *Teen Births in the United States*, *supra* note 1, at 2–3.

6

teen pregnancy." 123 Stat. at 3253. In creating the TPP Program, Congress sought to "maximize the impact of federal dollars by funding programs that have demonstrated evidence of effectiveness, while also funding and evaluating new programs to continue building the evidence base."[5]

22. Congress has directed that TPP Program funds be disbursed across two tiers of awards, Tier 1 and Tier 2.

23. Tier 1 awardees "replicat[e]" "medically accurate and age appropriate programs" that have already "been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." 140 Stat. at 281. For most of the Program's history, programs eligible for "replication" were identified by HHS through the agency's Teen Pregnancy Prevention Evidence Review (the "Evidence Review"), a process akin to expert peer review. As HHS explains, "[r]igorously evaluated programs that demonstrate positive outcomes are eligible to be implemented by TPP grant recipients in communities with the greatest need."[6]

24. Tier 2 awardees are responsible for "develop[ing], replicat[ing], refin[ing], and test[ing]" "additional models and innovative strategies for preventing teenage pregnancy." 140 Stat. at 281. In other words, "Tier 2 lets grantees test new programs, and programs that prove effective then become eligible for Tier 1." *Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100, 1106 (9th Cir. 2020).

---

[5] Sarah E. Oberlander & Lisa C. Trivits, Editorial, *Building the Evidence to Prevent Adolescent Pregnancy: Contents of the Volume*, 106 Am. J. Pub. Health, no. S1, 2016, at S6, https://perma.cc/KD2U-Q6M5.

[6] *About the Teen Pregnancy Prevention Program*, OASH, https://perma.cc/KVF9-RRW3 (last visited July 6, 2026).

25. For nearly fifteen years, Congress has—on a bipartisan basis—appropriated funds to ensure the TPP Program retained the same core structure described above. And the Program has been an enormous success. By 2023, the teen birth rate in the United States had reached a record low—and had decreased 68% since 2007.[7]

26. Most recently, in the 2026 Consolidated Appropriations Act, Congress funded the TPP Program for fiscal year 2026, appropriating $101 million "for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy." 140 Stat. at 281. Following the usual structure, roughly seventy-five percent of the funds are for Tier 1 programs, while roughly twenty-five percent of the funds are for Tier 2 programs. *Id.*[8]

27. The 2026 Appropriations Act separately appropriates $35 million for abstinence-only education, directing those funds for "competitive grants which exclusively implement education in sexual risk avoidance" (defined as voluntarily refraining from non-marital sexual activity), and instructing that such programs avoid "normalizing teen sexual activity." *Id.* at 282. In other words, Congress expressly designated certain other funds outside the TPP Program to be used exclusively for sexual risk avoidance—meaning abstinence-only—education.

28. By including this separate funding stream that applies only to abstinence-only education and that is subject to a different standard, Congress made clear that the funding for sexual education programs *proven effective* at reducing teen pregnancy was not intended to be limited to abstinence-only programs.

---

[7] Mickler & Tollestrup, *Teen Births in the United States*, *supra* note 1, at 3.

[8] Congress did so even though the administration sought to eliminate the TPP Program in its proposed budget for fiscal year 2026. *See* HHS, *Fiscal Year 2026 Budget in Brief* 36, https://perma.cc/46MV-KUXG (last visited July 12, 2026).

**II.    HHS issues cooperative agreements for the 2023–2028 award cycle.**

29. In 2023, HHS published NOFOs soliciting applications for a new cohort of TPP Program awardees. Ex. A (Tier 1 2023 NOFO); Ex. B (Tier 2 2023 NOFO). The 2023 NOFOs continued the Program's structure, inviting applicants to propose projects implementing or testing evidence-based interventions designed to reduce adolescent pregnancy and associated behavioral risk factors. As in prior funding cycles, the 2023 NOFOs distinguished between two principal categories of awards—Tier 1 and Tier 2—both for up to five-year project periods. Tier 1 2023 NOFO at 2; Tier 2 2023 NOFO at 2. Applications were evaluated using the criteria established in the 2023 NOFO. Tier 1 2023 NOFO at 43; Tier 2 2023 NOFO at 42. Funding was to be distributed on an annual basis, with awardees eligible to receive non-competitive continuation funding throughout the five-year project period. Tier 1 2023 NOFO at 56; Tier 2 2023 NOFO at 56.

30. In awarding cooperative agreements, HHS necessarily evaluated and approved the principal components of the proposed projects, including the intervention models to be implemented, the proposed curricula, implementation strategies, evaluation plans, organizational capacity, staffing structure, and community partnerships described in the applications.

31. Plaintiffs Hennepin County, King County, and Planned Parenthood of the Heartland (collectively, "Awardee Plaintiffs") applied for and received TPP Program awards from HHS in 2023. Implementing their projects in accordance with the terms of their cooperative agreements and HHS's programmatic guidance, they hired and trained personnel, established implementation schedules with participating schools and community organizations, entered into agreements with project partners, developed data collection and evaluation systems, and commenced delivery of evidence-based programming to adolescents in their communities. HHS worked collaboratively with the awardees through the cooperative agreement process to support implementation of the projects.

**III.    HHS unsuccessfully attempts to impose new conditions on the 2023 awardees.**

32. Awardee Plaintiffs carried out their TPP projects during the first two years of the 2023–2028 project period and, consistent with the terms of their cooperative agreements, submitted their annual continuation of funding applications. HHS approved Awardee Plaintiffs' requests, continuing to fund their projects.

33. In early 2025, however, HHS notified TPP award recipients that they should "revise their projects, as necessary, to demonstrate that the [non-competing continuation] award application is aligned with current Executive Orders." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *3.

34. Several months later, HHS published a policy notice (the "2025 Policy Notice") imposing requirements on awardees that had not previously appeared in the 2023 NOFOs or the cooperative agreements under which Awardee Plaintiffs' projects had been awarded. Ex. C (2025 Policy Notice).

35. The 2025 Policy Notice reaffirmed that awardees must "align" their programs with "all current Presidential Executive Orders" and provided, among other things, that (1) programs may not include "diversity, equity, or inclusion-related discrimination" or content reflecting "discriminatory equity ideology"; (2) awardees "are expected to provide parents advance notice (including relevant specifics) and the ability to opt out of any content or activities, especially those related to sexuality, that may burden their religious exercise"; (3) content such as "gender ideology" or content that "normalizes . . . sexual activity for minors" may be outside the scope of the TPP Program; (4) "age appropriate" was redefined to exclude "material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content"; and (5) "medically accurate" instructions were redefined as being "expected to include information on a full range of health risks," while content may not be medically accurate if it "denies the biological reality of sex or

10

otherwise fails to distinguish appropriately between males and females." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *4.

36. The 2025 Policy Notice also stated that the agency could "re-evaluate the effectiveness of programs" and "impose additional conditions on grantees" as necessary. *Id.*

37. Several affected TPP award recipients, including Plaintiff Planned Parenthood of the Heartland, filed suit in this District challenging the 2025 Policy Notice. Those plaintiffs alleged, among other things, that HHS had adopted new substantive funding criteria for the TPP Program that departed from the criteria governing the 2023 awards, failed to provide a reasoned explanation for that departure, and unlawfully altered the standards governing continued funding for ongoing cooperative agreements.

38. On October 7, 2025, the district court vacated the 2025 Policy Notice, finding it was arbitrary and capricious. The court held that the "Policy Notice's vagueness renders the new requirements imposed on TPP grant recipients largely incomprehensible and unworkable, putting in place an opaque 'we-know-it-when-we-see-it' standard for HHS to assess compliance with programming content restrictions that is susceptible to discriminatory application." *Id.* at *22. The court also concluded that HHS "did not provide any reasoning or evidence in support of its approach, seemingly relied on irrelevant ideological factors, and did not justify its change in position." *Id.* at *26. HHS did not appeal that ruling.

**IV.    HHS adopts and implements the 2026 Policy.**

39. Less than a year later, HHS again took substantially the same approach. By no later than June 23, 2026, Defendants adopted the 2026 Policy, abandoning the rigorous, evidence-based approach to teen pregnancy prevention that Congress has funded each year in favor of a new program driven by the administration's policy preferences. To implement the Policy, Defendants issued new NOFOs that require adherence to their policy preferences—notwithstanding the fact

that those preferences are incompatible with the TPP Program's purpose and Congress's mandate for the Program—and, using boilerplate language, terminated nearly every ongoing cooperative agreement based on awardees' failure to adhere to those same policy preferences.

      **a. HHS unveils the 2026 NOFOs, abandoning the statutory requirements for the TPP Program.**

40. On June 23, 2026—one week before the end of the third year of the five-year funding cycle—HHS announced a new competition for TPP funding through the 2026 Tier 1 and Tier 2 NOFOs. Ex. D (Tier 1 2026 NOFO); Ex. E (Tier 2 2026 NOFO).

41. The 2026 NOFOs reimpose—in some respects verbatim—the requirements the district court previously found arbitrary and capricious in October 2025:

    a. The NOFOs require that awardees' activities "must align with . . . executive orders," Tier 1 2026 NOFO at 45; Tier 2 2026 NOFO at 55, without any guidance on how awardees are meant to bring their programming into "alignment."

    b. The NOFOs require awardees to "align" with agency priorities "[e]nding diversity, equity, and inclusion (DEI) policies and practices." *See* Tier 1 2026 NOFO at 4 (requiring awardees to "implement any funds awarded under this NOFO to effectuate program goals and agency priorities in accordance with the Priorities of the Office of the Assistant Secretary for Health" (citing OASH Priorities, https://health.gov/priorities [https://perma.cc/LJ7U-27F2] (last visited July 1, 2026))); *accord* Tier 2 2026 NOFO at 4.[9]

---

[9] The NOFOs also mandate adherence to the broader HHS priorities, *see* Tier 1 2026 NOFO at 44; Tier 2 2026 NOFO at 55, which overlap in many areas with the OASH priorities. *See* HHS Priorities, https://www.hhs.gov/about/priorities/index.html [https://perma.cc/9HWV-6N8B] (last visited July 5, 2026) (stating that HHS will not support "DEI programs"; will "[c]ombat gender ideology"; and will "[r]eaffirm parental authority").

c. The NOFOs require awardees to "align" with agency priorities "[e]nding support for gender ideology." *Id.*

d. The NOFOs require awardees to "align" with agency priorities prohibiting any program whose content "encourages, normalizes or promotes sexual activity for minors." *Id.* Discussing teen sexual activity—which Defendants apparently equate with encouraging, normalizing, or promoting such activity—is a proven, effective method of reducing teen pregnancy, and it is all but impossible to deliver effective sexual education programming to young people without acknowledging that teens engage in sexual activity.

e. The NOFOs require awardees to "align" with agency priorities to provide information on the "full range of health risks," *id.*, without offering any guidance to awardees as to the scope of health information they are expected to provide, or even any explanation as to why this requirement applies to educators who are not prescribing or providing pharmaceuticals or making individualized health recommendations.

f. The NOFOs prohibit any "denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic." Tier 1 2026 NOFO at 45; *accord* Tier 2 2026 NOFO at 55.

g. The NOFOs dictate that awardees include "advance notice and meaningful opt-out provisions" for parents, Tier 1 2026 NOFO at 8, including "clear, accessible processes for parental opt-out of specific content or activities, particularly those related to sexuality that may burden religious exercise or conflict with sincerely held beliefs," *id.* at 1; *accord* Tier 2 2026 NOFO at 21. The NOFOs do not explain how program applicants are expected to comply with this broad and standardless parental opt-out requirement without prior analysis and testing to establish whether such programming

13

is proven effective to achieve the statutory objectives or whether it will result in more teens missing out on content.

    h. The NOFOs warn that continued funding depends on awardees' "ongoing compliance with these priorities" and threaten that any recipient who fails to "meaningfully align" with those undefined priorities may face "termination pursuant to 2 C.F.R. § 200.340(a)(4)." Tier 1 2026 NOFO at 4–5; *accord* Tier 2 2026 NOFO at 5.

42. The 2026 NOFOs also go beyond the judicially rejected 2025 Policy Notice by adding other conditions found nowhere in the congressional appropriation.

43. The NOFOs condition all funding on awardees incorporating "sexual risk avoidance" (SRA) education. Tier 1 2026 NOFO at 12. Prospective awardees must "[d]escribe how . . . SRA education will be integrated into program implementation" and are assessed on the extent to which they do so. *Id.* at 19, 37; *see also* Tier 2 2026 NOFO at 9. While some prior programming included abstinence-only content, the terms of the NOFOs now require that all programming include that content. This approach contravenes Congress's mandate in the authorizing appropriation that declined to limit TPP funding to SRA programs.

44. In addition, the NOFOs direct awardees to promote "body literacy" education—defined ambiguously as "the ability to understand how the body functions in a state of health," Tier 1 2026 NOFO at 55; Tier 2 2026 NOFO at 66—claiming that girls who receive it "are much more likely to remain abstinent compared to their body-illiterate peers." Tier 1 2026 NOFO at 6; Tier 2 2026 NOFO at 7. The NOFOs "support" these claims by citing some articles that appear not to exist at all and others that do not appear in the journals cited—and for the latter, the articles that it appears the NOFOs may have intended to cite do not support the proposition. Tier 1 2026 NOFO at 6 nn.1–4; Tier 2 2026 NOFO at 7 nn.1–2.

14

45. The mandated body literacy education includes requirements found nowhere in the TPP statute, such as dictating "two distinct educational modules" focused on "female reproductive health" and "male reproductive health," and addressing "how repeated or artificially stimulated arousal may affect neural development and behavior over time." Tier 1 2026 NOFO at 10. Awardees are also required to provide instruction that "include[s] an overview of approaches to managing menstrual health concerns, including the advantages and disadvantages of ovarian suppression compared to approaches that address root causes." *Id.*

46. The NOFOs direct awardees to affirm "marriage and parenthood as meaningful and valued components of adult life," *id.* at 11, and to provide "counseling that helps adolescents reflect on their goals related to relationships, childbearing, career, and future family formation," *id.* at 6. And—in an approach that appears to promote fertility in a program meant to reduce teen pregnancy—to "promote optimal health" by emphasizing "root-cause understanding of chronic health conditions that may impact overall health and fertility." *Id.* at 1. This language is an incorporation of "restorative reproductive medicine" principles—a priority of the "Make America Healthy Again" movement—that seek to get to the "root cause" of infertility by eschewing evidence-based approaches.

47. The NOFOs also abandon the methodology HHS has long used to identify proven-effective programs. The Tier 1 2023 NOFO had pointed applicants to the TPP Evidence Review to select permissible, evidence-based programs. Tier 1 2023 NOFO at 10–11. On information and belief, all or nearly all Tier 1 2023 awardees selected programs from that Review. The new Tier 1 NOFO does not mention the Evidence Review, does not explain its abandonment, and provides no alternative guidance as to which specific programs applicants may run. It instead awards bonus points to applicants who do not hold active TPP awards or have never received one—penalizing, rather than crediting, the very experience and track record the statute promotes. Tier 1 2026 NOFO

15

at 42; Tier 2 2026 NOFO at 52. And the Tier 1 NOFO summarily states that all programs must satisfy the criteria in Appendix A, *see* Tier 1 2026 NOFO at 9, which simply provides high-level criteria "required for a program to be considered rigorously evaluated," *id.* at 65. It does not provide any meaningful guidance to applicants who were already running "rigorously evaluated" and proven successful programs from the Evidence Review.

48. Compounding that abandonment, the new Tier 1 NOFO contemplates that awardees will modify—rather than replicate—previously approved programs to conform to the new NOFO requirements, instructing applicants to obtain permission from the original developer or copyright holder "to make any changes to the materials," and specifying that "[c]hanges may include those to ensure medical accuracy, age-appropriateness, and alignment with [agency] priorities." *Id.* at 23. Requiring applicants to alter proven programs to satisfy new and untested agency priorities is inconsistent with the statutory mandate that Tier 1 funds support replication of programs already proven effective. In particular, the NOFO fails to explain how awardees are expected to navigate circumstances where "alignment" would require some TPP awardees to make major adaptations to their programs that compromise the fidelity of the program and reduce its impact.

49. Further, the NOFOs eliminate any focus on populations most in need. The Tier 1 2023 NOFO had directed that projects "should focus on communit[ies] and population[s] that are disproportionately affected by unintended teen pregnancy and STIs," including those "adversely affected by persistent poverty and inequality," such as "LGBTQI+ youth." Tier 1 2023 NOFO at 6–7. The new NOFOs delete every reference to LGBTQ individuals and omit any consideration of the differing teen pregnancy rates among different populations. They also affirmatively add anti-DEI requirements and prohibit any "denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic," undermining any efforts to prioritize those

populations—in direct contrast to the 2023 approach. Tier 1 2026 NOFO at 45; Tier 2 2026 NOFO at 55.

50. Defendants also shifted from the established practice of five-year awards to two-year awards "with an optional competitive third year" for the Tier 1 NOFO. Tier 1 2026 NOFO at 1. This shorter award period provides less stability for applicants and beneficiaries and, as HHS itself has recognized, is not sufficient to "allow grantees enough time to form the community relationships, partnerships, and wider engagement needed to adopt a comprehensive systems-thinking approach."[10]

51. Finally, the Tier 1 NOFO instructs applicants to "[d]escribe your organization's mission and how it aligns with the goals of this NOFO, including advancing body literacy, informed consent, and optimal health." *Id.* at 20. Applications are then assessed on the extent to which they "demonstrate[] a strong alignment between the organization's mission and the goals of the NOFO." *Id.* at 38. This condition applies broadly to an awardee's "mission" and therefore is not limited to speech or activity funded by the TPP Program.

**b.  HHS effectuates a mass termination of existing cooperative agreements.**

52. On June 26, 2026—three days after the publication of the NOFOs—HHS further implemented the 2026 Policy by issuing termination letters to nearly all participants in the 2023–2028 funding cohort, including Awardee Plaintiffs.

53. Immediately preceding the terminations, Awardee Plaintiffs had been recipients in good standing under five-year cooperative agreements awarded during the 2023 funding cycle, having successfully completed approximately three years of their approved project periods in compliance with HHS reporting, performance, and oversight requirements. Awardee Plaintiffs had recently

---

[10] OPA, *Delivering Evidence-Based Programs to Prevent Teen Pregnancies and Support Adolescent Health* 54 (Nov. 2024), https://perma.cc/Y4YB-NKX9.

prepared and submitted the materials required for continuation funding for the fourth year of their approved project periods.

54. The termination letters informed recipients that their cooperative agreements were terminated effective immediately pursuant to 2 C.F.R. § 200.340(a)(4), which HHS asserted authorized termination where "an award no longer effectuates the program goals or agency priorities," as "[c]urrent program priorities . . . differ fundamentally from prior approaches." The terminations were effective the same day they were sent, purportedly "in an effort to align with many school systems' end-of-year calendar and minimize disruption."

55. The termination letters do not suggest that awardees failed to satisfy the terms and conditions of their cooperative agreements. Nor do they identify financial mismanagement, deficient reporting, failure to carry out approved project activities, or other recipient-specific failures to comply with applicable grant requirements.

56. Instead, in boilerplate language, the letters state: "After a review of all curricular content, [the agency] believes that some curricula normalize adolescent sexual activity and are not age appropriate."

57. Each letter also identifies specific content to which HHS now suddenly objects under its broadly applicable new requirements. For example, the termination letter for Plaintiff Hennepin County objects to a program because it purportedly includes "discussions that normalize adolescent sexual activity." The termination letter for Plaintiff King County objects to a program that "describes and emphasizes the effectiveness, safety, and accessibility of various forms of birth control" because it purportedly "fail[s] to identify common side effects, contraindications, or health risks associated with these methods (e.g., bleeding changes, headaches, cramping, bone density loss, hormonal imbalances, and risks for specific medical conditions or later infertility)."

18

58. The termination letters invoke and implement the same agency policy set forth in the NOFOs. One priority, the letters explain, is a "focus on programs that do not promote material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content, including content that encourages, normalizes or promotes sexual activity for minors"—even though it is effectively impossible to run an effective teen pregnancy prevention program that does not discuss sexual activity.

59. Another priority is providing "medically accurate and reliable information necessary for informed consent" by ensuring that "medically accurate materials or instructions with pharmaceutical or health-related recommendations include information on the full range of health risks"—without any explanation as to why "informed consent" is applicable to educators, who are not prescribing or providing pharmaceuticals or making individualized health recommendations.

60. In fact, the curricula identified in the termination letters were aligned with the statutory objective of supporting "medically accurate and age appropriate programs that reduce teen pregnancy." Further, for Tier 1 awardees, the curricula identified were consistent with the statute's focus on replication of programs proven effective in reducing teen pregnancy that were previously vetted and approved by HHS through the TPP Evidence Review and reviewed by Office of Population Affairs staff through other programmatic requirements including as recently as last year.

61. Nevertheless, the letters state that the agency was "adjusting its discretionary Teen Pregnancy Prevention (TPP) Program award portfolio" and decided "not to renew some of its TPP Program awards" to "better prioritize agency resources." The letters state that HHS has "discretion" to "suspend (rather than decide not to renew) an award to allow the recipient an opportunity to take appropriate corrective action." But "after review and consideration," the letters continue, HHS "has made a programmatic decision regarding continuation funding not to renew

the grant, based on the funded project during the current award period," as "[c]urrent program priorities . . . differ fundamentally from prior approaches."

* * *

62. Together, the NOFOs and the slew of notices terminating awards on near-identical grounds reflect the existence and implementation of the 2026 Policy. Existing awardees were kicked out of the TPP Program—with no regard for the efficacy of their projects—because they purportedly failed to align with vague new agency priorities inconsistent with the Program Congress funded. At the same time, future applicants must satisfy those same priorities as a condition of receiving federal funding. Through the 2026 Policy, Defendants have abandoned the evidence-based efficacy approach required by Congress and replaced it with prerogatives and priorities that contravene the TPP Program's statutory mandate and undermine its purpose.

V.    **Plaintiffs and their communities are irreparably harmed by Defendants' adoption and implementation of the 2026 Policy.**

63. Plaintiffs have already been harmed by Defendants' adoption and implementation of the 2026 Policy. Those harms will continue absent relief from this Court.

64. **<u>Hennepin County.</u>** Hennepin County's teen pregnancy prevention programming, Better Together Hennepin, was substantially funded through a cooperative agreement with HHS under the Tier 1 2023 NOFO. For the budget period from July 1, 2026, to June 30, 2027, Hennepin County had requested $1.97 million in continuation funding from HHS—which represents nearly 94 percent of the budget to support Better Together Hennepin.

65. Without that funding, Hennepin County has been forced to use other budgetary resources to provide stop-gap funding for the program through July 31, 2026. After that date, Hennepin County will be forced to either request funds from county leadership—funds that would otherwise be used to support other important county needs—to keep the program going, or to terminate the program entirely.

20

66. Hennepin County operates Better Together Hennepin through contracts with six local nonprofit and healthcare-provider partners. Those partners will be unable to keep supporting Better Together Hennepin's work without funding from Hennepin County, and most will be forced to lay off critical staff who provide direct health education and mentorship in schools and clinics across the county. Hennepin County's relationships with those longstanding partners, as well as with the schools and clinics where its programs operate, will be substantially damaged if programming is delayed or canceled for this coming school year.

67. Hennepin County has determined that it cannot seek funding under the Tier 1 2026 NOFO to continue supporting its work on Better Together Hennepin. Hennepin County does not believe it can operate an effective, evidence-based sexual health education program without talking about teens having sex. HHS's new approach to TPP programming would be particularly damaging to Better Together Hennepin's health mentor model, which relies on the ability of adults embedded in schools and clinics to develop trusting relationships with adolescents through both classroom education and one-on-one support.

68. **<u>King County.</u>** Public Health – Seattle & King County (PHSKC) runs a teen pregnancy prevention program study, Stepping Stones, funded by a Tier 2 award. PHSKC is rigorously evaluating Stepping Stones to decrease STIs, decrease unintended pregnancy, decrease intimate partner violence, and improve healthy relationships for young men involved in the legal and/or child welfare systems.

69. Because PHSKC's award was terminated, King County has been forced to expend funds to continue supporting the project for the next two months. After two months, however, PHSKC will not have sufficient funding to continue the study, meaning that its efforts over the last three years will largely go to waste. PHSKC has already been forced to pause new enrollments in the

21

study, and it cannot collect data from participants for upcoming follow-up surveys. And the longer it goes without funding, the more difficult the study is to pick back up.

70. The requirements in the Tier 2 2026 NOFO would be difficult or impossible for PHSKC to comply with when delivering Stepping Stones. For example, the incorporation of sexual risk avoidance education—another term for abstinence-only education—is not appropriate for the young men participating in the program, who are already sexually active.

71. If PHSKC were able to complete its study of Stepping Stones as expected, it would likely produce an evidence-based program eligible for replication under Tier 1. But because of the termination and the new NOFO, PHSKC will not be able to complete the study. That will be a massive loss for the young men the program is aimed at, as there are no other programs directed at young men who are systems-involved in the way that Stepping Stones is.

72. **Planned Parenthood of the Heartland.** PPH's TPP programming was fully funded by the award PPH received through the Tier 1 2023 NOFO. Without that funding, PPH has been forced to begin winding down its TPP Project entirely and announce the layoffs of the employees who were responsible for organizing and administering its TPP programming, including one who has been an educator for PPH for almost thirty years.

73. In many communities PPH serves, there is little to no access to other sources of sexual health information and resources. Without PPH's TPP program, these youth will go without vital information and resources about sexual and reproductive health.

74. Without the restoration of PPH's TPP funding, PPH will also be unable to continue supporting the work of its subawardees and subcontractors, each of whom provide information and resources to communities in Iowa and Nebraska.

75. The 2026 Policy will also have a devastating impact on PPH and the communities it serves. The Tier 1 2026 NOFO would require PPH to adopt changes to its programming that would run

counter to its core purpose and undermine PPH's mission. Administering TPP programs under this new approach would harm PPH's reputation with its community partners and prevent the communities it serves from receiving evidence-based, inclusive education about their sexual and reproductive health.

76. **SIECUS.** The 2026 Policy directly impairs SIECUS's ability to carry out its mission of promoting access to comprehensive sex education for all young people, and SIECUS will need to divert resources from other priorities to combat the harmful effects of the 2026 Policy.

77. SIECUS runs the Sex Education Policy Action Council (SEPAC), which includes many TPP Program awardees as dues-paying members. Because of the terminations, fewer organizations will be able to pay SEPAC dues and will either opt out of SEPAC entirely or seek dues waivers. The terminations will cause financial harm to SIECUS, through reduced dues payments, and will also harm SIECUS's organizational reach and influence by reducing its grass-roots network of partner organizations.

78. The termination letters and NOFOs also rest on several medically inaccurate claims and promote approaches to teen pregnancy prevention that have been proven to be ineffective. For example, the NOFOs require all programs to emphasize abstinence-only education (using the euphemism "sexual risk avoidance"), which has not only been proven to be ineffective in reducing teen pregnancy but also stigmatizing and harmful to teens. The 2026 Policy also requires programs to remove any reference to sexual orientation and gender identity, emphasizes the "health risks" of contraception, including harm to later fertility, that have no medical basis, and makes unsupported claims such as the suggestion that masturbation can affect neural development. SIECUS has already had to devote time and resources to counseling sex education organizations on the 2026 Policy, and will have to devote additional resources to combating the misinformation and false claims promoted by the 2026 Policy.

23

**CLAIMS FOR RELIEF**

**COUNT I**
**Administrative Procedure Act**
**Contrary to Law and Exceeds Statutory Authority – 2026 Policy**

79. Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

80. The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

81. The 2026 Policy is final agency action that marks the consummation of the agency's decisionmaking process and by which rights or obligations have been determined, or from which legal consequences will flow. Defendants have made a final decision to reject the evidence-based TPP Program that Congress created and replace it with one divorced from the program funded by the statute. Defendants implemented the Policy through two related actions: the issuance of the 2026 NOFOs and the mass termination of ongoing cooperative agreements.

82. The 2026 Policy exceeds statutory authority and is contrary to law.

83. Defendants lack authority to impose new criteria that transform the TPP Program into one that conflicts with the parameters set forth in its authorizing legislation.

84. By redesignating funds appropriated for the evidence-based TPP Program to abstinence-only education, the 2026 Policy violates the 2026 Appropriations Act and the Purpose Act, 31 U.S.C. § 1301(a).

85. The 2026 Policy directs funds into programs that violate Congress's command to fund programming that is "medically accurate" and "age appropriate," and in addition for Tier 1, that fail to "replicate" strategies already "proven effective."

24

## COUNT II
### Administrative Procedure Act
### Arbitrary and Capricious – 2026 Policy

86. Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

87. The APA requires courts to "hold unlawful and set aside agency action" that is arbitrary or capricious. 5 U.S.C. § 706(2)(A).

88. The 2026 Policy is final agency action that marks the consummation of the agency's decisionmaking process and by which rights or obligations have been determined, or from which legal consequences will flow. Defendants have made a final decision to reject the evidence-based TPP Program that Congress created and replace it with one divorced from the program funded by the statute. Defendants implemented the Policy through two related actions: the issuance of the 2026 NOFOs and the mass termination of ongoing cooperative agreements.

89. The 2026 Policy is arbitrary and capricious.

90. Defendants relied on factors that Congress did not intend and failed to consider how their priorities may detract from the Program's effectiveness.

91. Defendants failed to consider important aspects of the problem of ensuring that Program funding continues to effectively prevent teen pregnancy and test additional strategies for doing so.

92. Defendants' decision runs counter to the evidence, which shows that the terminated programs have been proven effective.

93. Defendants failed to reasonably explain their decision to reverse course, including by departing from the evidence-based decisionmaking that has long been the hallmark of the Program.

94. Defendants failed to account for the substantial reliance interests of the many stakeholders in the Program.

95. Defendants mandated compliance with vague policy priorities that lend themselves to arbitrary enforcement.

25

## COUNT III
### Administrative Procedure Act
### Contrary to Law and Exceeds Statutory Authority – 2026 NOFOs

96. Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

97. The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

98. The 2026 NOFOs are final agency action that mark the consummation of the agency's decisionmaking process and by which rights or obligations have been determined, or from which legal consequences will flow.

99. The 2026 NOFOs exceed statutory authority and are contrary to law.

100. Defendants lack authority to impose new criteria that transform the TPP Program into one that conflicts with the parameters set forth in its authorizing legislation.

101. By redesignating funds appropriated for the evidence-based TPP Program to abstinence-only education, the 2026 NOFOs violate the 2026 Appropriations Act and the Purpose Act, 31 U.S.C. § 1301(a).

102. The 2026 NOFOs direct funds into programs that violate Congress's command to fund programming that is "medically accurate" and "age appropriate," and for Tier 1, that fail to "replicate" strategies already "proven effective."

## COUNT IV
### Administrative Procedure Act
### Arbitrary and Capricious – 2026 NOFOs

103. Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

104. The APA requires courts to "hold unlawful and set aside agency action" that is arbitrary or capricious." 5 U.S.C. § 706(2)(A).

26

105. The 2026 NOFOs are final agency action that marks the consummation of the agency's decisionmaking process and by which rights or obligations have been determined, or from which legal consequences will flow.

106. The 2026 NOFOs are arbitrary and capricious.

107. In issuing the 2026 NOFOs, Defendants relied on factors that Congress did not intend; failed to consider important aspects of the problem; made a decision that runs counter to the evidence; failed to reasonably explain their decision to reverse course; failed to account for substantial reliance interests; and mandated compliance with vague policy priorities.

## COUNT V
### First Amendment
### Viewpoint Discrimination – Tier 1 2026 NOFO

108. Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

109. The Tier 1 2026 NOFO constitutes unlawful viewpoint discrimination, in violation of the First Amendment.

110. The Tier 1 2026 NOFO requires awardees to align their organizational mission with agency goals. In other words, it explicitly seeks to exclude from funding availability any entity that the administration determines to be out of alignment with its own policy goals. The Tier 1 2026 NOFO thus compels awardees to adopt certain views as a condition of funding.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a. Declare the 2026 Policy unlawful in violation of the 2026 Appropriations Act and the Administrative Procedure Act;

b. Stay the 2026 Policy and all actions taken in furtherance of it pursuant to 5 U.S.C. § 705 and issue all other necessary and appropriate process to preserve Plaintiffs' rights pending conclusion of judicial review proceedings;

27

c.  Vacate and set aside the 2026 Policy and all actions taken in furtherance of it;

d.  Preliminarily and permanently enjoin application of the 2026 Policy and all actions taken in furtherance of it;

e.  Declare the 2026 NOFOs unlawful;

f.  Stay the 2026 NOFOs pursuant to 5 U.S.C. § 705 and issue all other necessary and appropriate process to preserve Plaintiffs' rights pending conclusion of judicial review proceedings;

g.  Vacate and set aside the 2026 NOFOs;

h.  Preliminarily and permanently enjoin application of the 2026 NOFOs;

i.  To the extent necessary, exercise the Court's equitable discretion to preserve the funds appropriated by Congress for the TPP Program in the 2026 Appropriations Act for obligation after September 30, 2026;

j.  Award Plaintiffs their costs, reasonable attorney fees, and other disbursements deemed appropriate; and

k.  Grant such other relief as the Court deems just and proper.

Date: July 14, 2026                               Respectfully submitted,

*/s/ Michael J. Torcello*
Michael J. Torcello (DC Bar No. 90014480)
Kate Talmor (DC Bar No. 90036191)
Carrie Y. Flaxman (DC Bar No. 458681)
Robin F. Thurston (DC Bar No. 1531399)
Skye L. Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
mtorcello@democracyforward.org
ktalmor@democracyforward.org
cflaxman@democracyforward.org

28

rthurston@democracyforward.org
sperryman@democracyforward.org
*Counsel for Plaintiffs Hennepin County, King
County, and SIECUS*

Hannah Klain*
Karen Dunn (DC Bar No. 1002520)
Jeannie Rhee (DC Bar No. 464127)
Dunn Isaacson Rhee LLP
401 9th Street NW
Washington, DC 20004
Phone: (202) 240-2900
hklain@dirllp.com
kdunn@dirllp.com
jrhee@dirllp.com
*Counsel for Plaintiffs Hennepin County, King
County, and SIECUS*

Cormac Early (DC Bar No. 1033835)
Allison M. Zieve (DC Bar No. 424786)
Stephanie Garlock (DC Bar No. 1779629)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
Phone: (202) 588-1000
cearly@citizen.org
*Counsel for Plaintiffs Hennepin County, King
County, and SIECUS*

Emily Nestler (DC Bar No. 973886)
Planned Parenthood Federation of America
1100 Vermont Avenue NW
Washington, DC 20005
Phone: (202) 973-4800
emily.nestler@ppfa.org
*Counsel for Plaintiff Planned Parenthood of
the Heartland, Inc.*

Dylan Cowit*
Valentina De Fex*
Planned Parenthood Federation of America
123 William Street, 9th Floor
New York, NY 10038
Phone: (212) 261-4696
dylan.cowit@ppfa.org
valentina.defex@ppfa.org

29

30

*Counsel for Plaintiff Planned Parenthood of the Heartland, Inc.*

\* Pro hac vice motion forthcoming