## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HENNEPIN COUNTY, MINNESOTA**, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**, et al., <br><br> *Defendants.* | **Case No. 26-cv-2460 (CRC)** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
## 5 U.S.C. § 705 STAY AND PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Introduction ........................................................................................................................... 1

Background ............................................................................................................................ 3

   I.   Congress creates the TPP Program to address teen pregnancy. ......................................... 3

   II.   HHS issues cooperative agreements for the 2023–2028 award cycle. ............................... 5

   III.  HHS unsuccessfully attempts to impose new conditions on the 2023 awardees. .............. 6

   IV.  HHS adopts and implements the 2026 Policy. ................................................................. 8

      A.   HHS unveils the 2026 NOFOs, abandoning the statutory requirements for the TPP
Program. ........................................................................................................................... 8

      B.   HHS effectuates a mass termination of existing cooperative agreements. ................... 12

   V.   Plaintiffs participate in the TPP Program and are harmed by the 2026 Policy. ................ 14

Legal Standard ..................................................................................................................... 15

Argument ............................................................................................................................. 16

   I.   Plaintiffs are likely to succeed on the merits. ................................................................. 16

      A.   The 2026 Policy is unlawful. .......................................................................................... 16

         i.   The 2026 Policy is final agency action. ..................................................................... 16

         ii.   The 2026 Policy violates the statutory requirements of the TPP Program and exceeds
Defendants' statutory authority. ................................................................................ 19

         iii.  The 2026 Policy is arbitrary and capricious. ............................................................ 23

      B.   The NOFOs are independently unlawful. ...................................................................... 37

      C.   The Tier 1 2026 NOFO violates the First Amendment. ............................................... 38

      D.   This Court has jurisdiction to award relief. ................................................................... 39

   II.   Plaintiffs face irreparable harm absent emergency relief and have standing for the
same reasons. ................................................................................................................... 42

   III.  The balance of the equities and the public interest favor Plaintiffs. ................................ 44

Conclusion ........................................................................................................................... 45

**INTRODUCTION**

Congress created the Teen Pregnancy Prevention (TPP) Program in 2009 to reduce teen pregnancy rates in the United States. In doing so, Congress established an evidence-based program in which awardees must support "medically accurate and age appropriate programs" that have "been proven effective through rigorous evaluation" or that are being tested to determine whether they meet that objective. Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253. Congress has renewed the appropriation and these statutory criteria in every subsequent appropriations cycle. The Program has been an enormous success, benefiting more than 1 million youths in the years since its creation.

Defendants seek to transform the Program into something Congress would scarcely recognize. In recent weeks, Defendants have implemented a new policy (the "2026 Policy") rejecting the Program that Congress created and replacing it with one divorced from the evidence-based programs funded by the statute. Defendants have implemented the 2026 Policy through two related actions. *First*, on June 23, 2026, Defendants issued new notices of funding opportunity (NOFOs) that condition TPP funding on incorporating abstinence-only "sexual risk avoidance" education; require awardees to "align" with agency priorities that prohibit "gender ideology" and diversity, equity, and inclusion practices; restrict the provision of information about birth control options; and prevent discussion of teen sexual activity in a program whose statutory mandate is to reduce teen pregnancy through "medically accurate" and "age appropriate" interventions. *Second*, on June 26, 2026, Defendants terminated the overwhelming majority of existing TPP cooperative agreements, cutting off ongoing funding on the grounds that awardees' curricula failed to conform to the same agency priorities that had been introduced as program requirements in the new NOFOs three days prior.

The 2026 Policy is contrary to law and arbitrary and capricious under the Administrative Procedure Act (APA). Defendants abandoned the statutory criteria mandated by Congress in favor of their own policy priorities, in violation of law. Defendants also relied on factors inconsistent with the statutory criteria, failed to consider important aspects of the problem of reducing teen pregnancy, and changed course without regard for the substantial reliance interests of awardees, program beneficiaries, and the broader public.

Plaintiffs—two local governments and one nonprofit that have received TPP funds, as well as an organization that works closely with TPP awardees—seek to preserve the statutory framework of the TPP Program. As a result of the 2026 Policy, Plaintiffs and other awardees have been forced to suspend or start dismantling ongoing teen education programs, pause needed research, interrupt services to adolescents and families, lay off trained personnel and place other staff at risk of termination, and jeopardize longstanding partnerships with schools, healthcare providers, and community organizations. Organizations that partner with TPP awardees also face serious threats to their mission to support effective sexual health education. The young people in the communities served by the TPP awardees will be deprived of the education that they need to avoid unintended pregnancy as Congress intended.

Plaintiffs need relief urgently. Each passing day compounds their significant ongoing harms, and each day the new school year grows closer. This Court should stay and preliminarily enjoin the 2026 Policy as soon as is practicable, and order Defendants to administer the TPP Program in accordance with the law.[1]

---

[1] Pursuant to Local Civil Rule 65.1(d), Plaintiffs respectfully request an expedited hearing. Expedition is essential because of the urgency of the harms Plaintiffs face, as detailed below.

**BACKGROUND**

### I. Congress creates the TPP Program to address teen pregnancy.

Teenage pregnancy is a "significant public health concern" in this country "because of the range of health, social, and economic effects adolescent childbearing can have on adolescents, their children, and broader society."[2] Congress and the executive branch have long recognized that reducing unintended adolescent pregnancy is an important public-health objective.[3]

In the 1990s and 2000s, Congress directed most funding for sex education to programs emphasizing abstinence from sexual activity. *See Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 69 (D.D.C. 2018). Congress did not require those programs be effective in reducing teen pregnancy, delaying sexual intercourse, or preventing other sexually risky behaviors.[4] Then in 2006 and 2007, teen pregnancy rates began to climb after years of decline.[5]

Congress understood this to present a public health problem that could be addressed with evidence-based interventions: It established the TPP Program through the 2010 Consolidated Appropriations Act, appropriating $110 million to the Department of Health and Human Services (HHS) for "competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy." 123 Stat. at 3253. Congress sought to "maximize the impact of federal dollars by funding programs that have demonstrated

---

[2] Alexandria K. Mickler & Jessica Tollestrup, Cong. Rsch. Serv., R45184, *Teen Births in the United States: Overview and Recent Trends* 1 (2025), https://perma.cc/3HLH-F6BA.

[3] Jessica Tollestrup, Cong. Rsch. Serv., R45183, *Adolescent Pregnancy: Federal Prevention Programs* 1 (2024), https://perma.cc/3DCX-9QMW.

[4] *See* SIECUS, *History of Sex Education* 43–50, https://perma.cc/X3BA-WTNU (last visited July 6, 2026).

[5] Mickler & Tollestrup, *Teen Births in the United States*, *supra* note 2, at 2–3.

evidence of effectiveness, while also funding and evaluating new programs to continue building the evidence base."[6]

Congress has directed that TPP Program funds be disbursed across two tiers of grants, Tier 1 and Tier 2. Tier 1 awardees must "replicat[e]" "medically accurate and age appropriate programs" that have already "been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 281. For most of the Program's history, programs eligible for "replication" were identified by HHS through the agency's Teen Pregnancy Prevention Evidence Review (TPPER), a process akin to expert peer review.[7]

Tier 2 awardees are responsible for "develop[ing], replicat[ing], refin[ing], and test[ing]" "additional models and innovative strategies for preventing teenage pregnancy," that also must be "medically accurate and age appropriate." 140 Stat. at 281. In other words, "Tier 2 lets grantees test new programs, and programs that prove effective then become eligible for Tier 1." *Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100, 1106 (9th Cir. 2020).

For over fifteen years, Congress has—on a bipartisan basis—consistently appropriated funds to ensure the TPP Program retained the same core structure. And the Program has been an enormous success, benefiting more than 1.4 million young people since its creation and becoming one of the federal government's principal public health initiatives.[8] By 2023, the teen birth rate in the United States had reached a record low—and had decreased 68% since 2007.[9]

---

[6] Sarah E. Oberlander & Lisa C. Trivits, Editorial, *Building the Evidence to Prevent Adolescent Pregnancy: Contents of the Volume*, 106 Am. J. Pub. Health, no. S1, 2016, at S6, https://perma.cc/KD2U-Q6M5.

[7] Tollestrup, *Adolescent Pregnancy: Federal Prevention Programs*, *supra* note 3, at 4–6.

[8] *Teen Pregnancy Prevention Program*, OPA, https://perma.cc/WE6W-YUYN (last visited July 12, 2026).

[9] Mickler & Tollestrup, *Teen Births in the United States*, *supra* note 2, at 3.

Congress made clear that the funding for programs *proven effective* at reducing teen pregnancy is distinct from the amount earmarked for abstinence-only education. Most recently, in the 2026 Consolidated Appropriations Act, Congress appropriated $101 million "for making competitive contracts and grants . . . to fund medically accurate and age appropriate programs that reduce teen pregnancy," with roughly seventy-five percent of the funds going to Tier 1 programs, and roughly twenty-five percent to Tier 2 programs. 140 Stat. at 281. Congress did so even though the administration sought to eliminate the TPP Program in its proposed budget. *See* HHS, *Fiscal Year 2026 Budget in Brief* 36, https://perma.cc/46MV-KUXG (last visited July 12, 2026). Separately, in a neighboring provision, the Act appropriates another $35 million for abstinence-only education, directing its use for "competitive grants which exclusively implement education in sexual risk avoidance" (defined as voluntarily refraining from non-marital sexual activity), and instructing that such programs avoid "normalizing teen sexual activity." 140 Stat. at 282.

**II. HHS issues cooperative agreements for the 2023–2028 award cycle.**

HHS has carried out the TPP Program through "cohorts" of multi-year cooperative agreements. In 2023, as a cohort of cooperative agreements was ending, HHS published notices of funding opportunity soliciting applications for a new five-year cohort. The 2023 NOFOs invited applicants to propose medically accurate and age-appropriate projects replicating (Tier 1) or testing (Tier 2) evidence-based interventions designed to reduce adolescent pregnancy and associated behavioral risk factors. Compl., Ex. A (Tier 1 2023 NOFO) at 2; Compl., Ex. B (Tier 2 2023 NOFO) at 2. The NOFOs solicited applications for projects in communities and populations with the greatest unmet needs that would replicate evidence-based programs that were "culturally and linguistically appropriate, trauma-informed, and inclusive of all youth." Tier 1 2023 NOFO at 8; *see* Tier 2 2023 NOFO at 10. Applications were evaluated using the criteria in the 2023 NOFOs, including a "focus on areas of greatest need and disparities" and meeting "the diverse needs of the

5

community and population." Tier 1 2023 NOFO at 43–44 (capitalization omitted); *see* Tier 2 2023 NOFO at 42. While funding was distributed on an annual basis, awardees were eligible to receive non-competitive continuation funding for the five-year project period. Tier 1 2023 NOFO at 56; Tier 2 2023 NOFO at 56.

In awarding cooperative agreements—including to Plaintiffs Hennepin County, King County, and Planned Parenthood of the Heartland (collectively, "Awardee Plaintiffs")—HHS necessarily evaluated and approved the proposed projects, including the intervention models to be implemented, proposed curricula, implementation strategies, evaluation plans, organizational capacity, staffing structure, and community partnerships. Decl. of Ashley Johnson ¶ 11; Decl. of Andrea Gerber ¶ 14; Decl. of Virginia Miller ¶ 11.

**III. HHS unsuccessfully attempts to impose new conditions on the 2023 awardees.**

The 2023 TPP awardees carried out their projects during the first two years of the project period and, consistent with the terms of their agreements, submitted their annual continuation of funding applications. *See* Tier 1 2023 NOFO at 56. HHS approved those applications in 2024 and 2025. Johnson Decl. ¶ 21; Gerber Decl. ¶ 27; Miller Decl. ¶¶ 17, 19.

In early 2025, however, HHS notified TPP awardees that they should "revise their projects, as necessary, to demonstrate that the [non-competing continuation] award application is aligned with current Executive Orders." *Planned Parenthood of Greater N.Y. v. HHS*, No. CV 25-2453, 2025 WL 2840318, at *3 (D.D.C. Oct. 7, 2025). Months later, HHS published a policy notice (the "2025 Policy Notice") imposing requirements on awardees that were not in the 2023 NOFOs or the cooperative agreements under which projects had been awarded. Compl., Ex. C (2025 Policy Notice).

The 2025 Policy Notice reaffirmed that awardees must "align" their programs with "all current Presidential Executive Orders" and provided, among other things, that (1) programs may

not include "diversity, equity, or inclusion-related discrimination" or content reflecting "discriminatory equity ideology"; (2) awardees "are expected to provide parents advance notice (including relevant specifics) and the ability to opt out of any content or activities, especially those related to sexuality, that may burden their religious exercise"; (3) content such as "gender ideology" or content that "normalizes . . . sexual activity for minors" may be outside the scope of the TPP Program; (4) "age appropriate" was redefined to exclude "material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content"; and (5) "medically accurate" instructions were redefined as being "expected to include information on a full range of health risks," while content may be deemed not medically accurate if it "denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *4. The 2025 Policy Notice also stated that the agency could "re-evaluate the effectiveness of programs" and "impose additional conditions on grantees" as necessary. *Id.*

Affected recipients, including Plaintiff Planned Parenthood of the Heartland, filed suit in this District challenging the 2025 Policy Notice. Those plaintiffs alleged, among other things, that HHS had adopted new substantive funding criteria that departed from the criteria governing the 2023 awards, failed to provide a reasoned explanation for that departure, and unlawfully altered the standards governing continuation funding for ongoing cooperative agreements.

On October 7, 2025, the district court vacated the 2025 Policy Notice, finding the policy was arbitrary and capricious. The court held that the "Policy Notice's vagueness renders the new requirements imposed on TPP grant recipients largely incomprehensible and unworkable, putting in place an opaque 'we-know-it-when-we-see-it' standard for HHS to assess compliance with programming content restrictions that is susceptible to discriminatory application." *Planned*

*Parenthood of Greater N.Y.*, 2025 WL 2840318, at \*22. The court also concluded that HHS "did not provide any reasoning or evidence in support of its approach, seemingly relied on irrelevant ideological factors, and did not justify its change in position." *Id.* at \*26. HHS did not appeal.

### IV. HHS adopts and implements the 2026 Policy.

Less than a year later, HHS again took substantially the same approach. By no later than June 23, 2026, Defendants adopted the 2026 Policy, abandoning the evidence-based approach to preventing teen pregnancy that Congress has codified each year, in favor of a fundamentally different program driven by the administration's ideological preferences. Specifically, the 2026 Policy pivots the TPP Program from one centered on evidence-based content into one of the administration's own creation. To implement the Policy, Defendants issued new NOFOs requiring adherence to their new requirements and contemporaneously terminated nearly every existing cooperative agreement for failure to comply with those same unlawful "priorities."

### A. HHS unveils the 2026 NOFOs, abandoning the statutory requirements for the TPP Program.

On June 23, 2026—one week before the end of the third year of the five-year funding cycle—HHS announced a new competition for TPP funding through the 2026 Tier 1 and Tier 2 NOFOs. Compl., Ex. D (Tier 1 2026 NOFO); Compl., Ex. E (Tier 2 2026 NOFO). The NOFOs reimpose requirements found arbitrary and capricious in the 2025 Policy Notice. For example, the NOFOs require that awardees' activities "must align with . . . executive orders," Tier 1 2026 NOFO at 45, without any guidance on how to come into "alignment." The NOFOs also direct awardees to "align" with agency priorities that include: "[e]nding diversity, equity, and inclusion (DEI) policies and practices"; "[e]nding support for gender ideology"; deprioritizing programs whose content "encourages, normalizes or promotes sexual activity for minors"; and providing information on the "full range of health risks" when offering "health-related recommendations." OASH Priorities, https://health.gov/priorities [https://perma.cc/LJ7U-27F2] (last visited July 1,

2026) (cited in Tier 1 2026 NOFO at 4; Tier 2 2026 NOFO at 4 (both requiring awardees to "implement any funds awarded under this NOFO to effectuate program goals and agency priorities in accordance with the Priorities of the Office of the Assistant Secretary for Health")).[10]

In addition, the NOFOs prohibit any "denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic." Tier 1 2026 NOFO at 45; Tier 2 2026 NOFO at 55. They also dictate that awardees include "advance notice and meaningful opt-out provisions" for parents, Tier 1 2026 NOFO at 8, including "clear, accessible processes for parental opt-out of specific content or activities, particularly those related to sexuality that may burden religious exercise or conflict with sincerely held beliefs," *id.* at 1. And they warn that continued funding depends on awardees' "ongoing compliance with these priorities" and threaten that any recipient who fails to "meaningfully align" with those undefined priorities may face "termination pursuant to 2 C.F.R. 200.340(a)(4)." Tier 1 2026 NOFO at 4–5; Tier 2 2026 NOFO at 5.

The NOFOs also go beyond the judicially rejected 2025 Policy Notice by adding other conditions found nowhere in the appropriation. For instance, the NOFOs condition funding on "sexual risk avoidance" (SRA) education—abstinence-only programming by another name, Decl. of Calleen Simon ¶ 15. *See* Tier 1 2026 NOFO at 12. Pursuant to the NOFOs, prospective awardees must "[d]escribe how . . . SRA education will be integrated into program implementation" and are assessed on the extent to which they do so. *Id.* at 19, 37; *see* Tier 2 2026 NOFO at 9. In addition, the NOFOs direct awardees to promote "body literacy" education—defined ambiguously as "the ability to understand how the body functions in a state of health," Tier 1 2026 NOFO at 55— claiming that girls who receive it "are much more likely to remain abstinent compared to their

---

[10] The NOFOs also mandate adherence to the broader HHS priorities, *see* Tier 1 2026 NOFO at 44; Tier 2 2026 NOFO at 55, which overlap in many areas with the OASH priorities. *See* HHS Priorities, https://www.hhs.gov/about/priorities/index.html [https://perma.cc/9HWV-6N8B] (last visited July 5, 2026) (stating that HHS will not support "DEI programs"; will "[c]ombat gender ideology"; and will "[r]eaffirm parental authority").

body-illiterate peers." *Id.* at 6; *accord* Tier 2 2026 NOFO at 7. As "support" for the proposition that girls receiving "body literacy education" "remain abstinent" longer than their peers, the NOFOs cite multiple journal articles that appear not to exist. Decl. of Kate Talmor ¶¶ 7–12. Even assuming that, for some of those articles, HHS intended to cite similarly named pieces published in entirely different journals, those articles still do not support the NOFOs' assertions. *Id.*

As part of the "body literacy" requirement, HHS directs recipients to include separate female and male reproductive health modules with novel requirements. Among them, young women must be taught "the advantages and disadvantages of ovarian suppression compared to approaches that address root causes" of menstrual health concerns. Tier 1 2026 NOFO at 10. The Tier 1 NOFO claims that many young women "do not receive comprehensive information about the side effects associated with widely prescribed medications," which leads to "a healthcare approach that prioritizes pain relief and symptom suppression over root-cause evaluation and treatment for reproductive health concerns." *Id.* at 6. The NOFO requires that young men be taught "the physiology of arousal, including normal indicators of hormonal health such as waking erections or nocturnal emissions, and provide developmentally appropriate strategies for managing spontaneous arousal in ways that support self-regulation, health, and future fertility." *Id.* at 10. Specifically, young men "should" be told "how repeated or artificially stimulated arousal may affect neural development and behavior over time." *Id.* No citations or evidentiary support are provided for any of these new curricular requirements. The NOFOs go further still, directing awardees—in an approach that appears to promote fertility in a program meant to reduce teen pregnancy—to "[p]romote optimal health" by emphasizing "root-cause understanding of chronic health conditions that may impact overall health and fertility." *Id.* at 1.

The NOFOs also abandon the methodology HHS has long used to identify proven-effective programs. The Tier 1 2023 NOFO had pointed applicants to the criteria in the TPPER to select

permissible, evidence-based programs, noting that it would be updating the TPPER after it was discarded during the first Trump administration. Tier 1 2023 NOFO at 10–11. Awardee Plaintiffs and other awardees selected projects from that previously approved list, Johnson Decl. ¶ 13; Miller Decl. ¶ 14, and HHS updated the TPPER in 2023.[11] The new Tier 1 NOFO does not mention the TPPER, does not explain its abandonment, and provides no guidance as to which existing programs (if any) applicants may run. The NOFOs instead award bonus points to applicants who do not hold active TPP awards or have never received one—penalizing, rather than crediting, the experience and track record the statute promotes. Tier 1 2026 NOFO at 42; Tier 2 2026 NOFO at 52.

Compounding that abandonment, the Tier 1 NOFO contemplates that awardees will modify—rather than replicate with fidelity—evidence-based programs to conform to the new NOFO, instructing applicants to obtain permission from the developer or copyright holder "to make any changes to the materials," and specifying that "[c]hanges may include those to ensure medical accuracy, age-appropriateness, and alignment with [agency] priorities." Tier 1 2026 NOFO at 23.

Further, the NOFOs eliminate any focus on populations most in need. The Tier 1 2023 NOFO directed projects to "focus on communit[ies] and population[s] that are disproportionally affected by unintended teen pregnancy and STIs," including those "adversely affected by persistent poverty and inequality," such as "LGBTQI+ youth." Tier 1 2023 NOFO at 6–7. The new NOFOs delete every reference to LGBTQ youth and omit any consideration of the differing teen pregnancy rates among different populations. They also add anti-DEI requirements and prohibit any "denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable

---

[11] *About OPA's Research and Evaluation Activities*, OASH, https://perma.cc/6ZR5-SC5X (last visited July 14, 2026).

11

characteristic," undermining any efforts to prioritize those populations—in direct contrast to the approach of the 2023 NOFO. Tier 1 2026 NOFO at 45; Tier 2 2026 NOFO at 55.

In the new Tier 1 NOFO, Defendants also shifted from the established practice of five-year awards to two-year awards "with an optional competitive third year." Tier 1 2026 NOFO at 1. And the Tier 1 NOFO instructs applicants to "[d]escribe your organization's mission and how it aligns with the goals of this NOFO, including advancing body literacy, informed consent, and optimal health." *Id.* at 20. Applications are then assessed on the extent to which they "demonstrate[] a strong alignment between the organization's mission and the goals of the NOFO." *Id.* at 38.

### B.  HHS effectuates a mass termination of existing cooperative agreements.

On June 26, 2026—three days after the publication of the NOFOs—HHS relied on the 2026 Policy to issue termination letters to nearly all participants in the 2023 funding cohort, including Awardee Plaintiffs. Immediately preceding the terminations, Awardee Plaintiffs had been awardees in good standing, having successfully completed approximately three years of their approved project periods in compliance with HHS reporting, performance, and oversight requirements. Awardee Plaintiffs had recently prepared and submitted the materials required for continuation funding for the fourth year of their approved project periods. Johnson Decl. ¶ 23; Gerber Decl. ¶ 29; Miller Decl. ¶ 21.

The termination letters informed recipients that their cooperative agreements were terminated effective immediately pursuant to 2 C.F.R. § 200.340(a)(4), which HHS asserted authorized termination where "an award no longer effectuates the program goals or agency priorities." Johnson Decl., Ex. 2 (Hennepin County Letter); Gerber Decl., Ex. 2 (King County Letter); Miller Decl., Ex. 2 (PPH Letter). The terminations were effective the same day, purportedly "in an effort to align with many school systems' end-of-year calendar and minimize disruption." *E.g.*, Hennepin County Letter at 1.

12

The termination letters do not suggest that awardees failed to satisfy the terms and conditions of their cooperative agreements. Nor do they identify financial mismanagement, deficient reporting, failure to carry out approved project activities, or other recipient-specific failures to comply with applicable award requirements. Instead, in boilerplate language, the letters state that "[a]fter a review of all curricular content, [the agency] believes that some curricula normalize adolescent sexual activity and are not age appropriate." *E.g.*, *id.* at 1. Some letters further state that curricula "provide insufficient information on the range of health risks associated with various forms of birth control." King County Letter at 1.

Each letter also identifies content to which HHS now suddenly objects under its broadly applicable new requirements. For example, one letter objects to a program because it purportedly includes "discussions that normalize adolescent sexual activity," Hennepin County Letter at 1. Another letter objects to a program that "describes and emphasizes the effectiveness, safety, and accessibility of various forms of birth control" because it purportedly "fail[s] to identify common side effects, contraindications, or health risks associated with these methods (e.g., bleeding changes, headaches, cramping, bone density loss, hormonal imbalances, and risks for specific medical conditions or later infertility)." King County Letter at 2.

The termination letters invoke and implement the same unlawful program requirements that the agency had set forth in the 2026 NOFOs just three days earlier. One priority, the letters explain, is a "focus on programs that do not promote material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content, including content that encourages, normalizes or promotes sexual activity for minors." *E.g.*, *id.* at 1. Another priority is providing "medically accurate and reliable information necessary for informed consent" by ensuring that "medically accurate materials or instructions with pharmaceutical or health-related recommendations include information on the full range of health risks," *id.*—without any

13

explanation as to why "informed consent" is applicable to educators, who are not prescribing or providing pharmaceuticals or making individualized health recommendations.

Nevertheless, the letters state that the agency was "adjusting its discretionary Teen Pregnancy Prevention (TPP) Program award portfolio" and decided "not to renew some of its TPP Program awards" to "better prioritize agency resources." *Id.* They note that HHS has "discretion" to "suspend (rather than decide not to renew) an award to allow the recipient an opportunity to take appropriate corrective action." But "after review and consideration," the letters continue, HHS "has made a programmatic decision regarding continuation funding not to renew the grant," as "[c]urrent program priorities … differ fundamentally from prior approaches." *Id.* at 2.

\* \* \*

Together, the NOFOs and the slew of notices terminating awards on near-identical grounds reflect the existence and implementation of the 2026 Policy. Existing awardees were kicked out of the program—with no regard for the efficacy of their projects or the consequences of terminating them mid-stream with an immediate effect date—because they purportedly failed to align with vague new agency priorities untethered from the statutory purpose. At the same time, future applicants must satisfy those same priorities as a condition of receiving federal funding. Through the 2026 Policy, Defendants have abandoned the evidence-based efficacy approach required by Congress and replaced it with their own unlawful prerogatives.

## V. Plaintiffs participate in the TPP Program and are harmed by the 2026 Policy.

Until their awards were abruptly terminated, Awardee Plaintiffs were implementing their projects in accordance with the terms of their cooperative agreements and HHS's programmatic guidance. For example, Hennepin County's teen pregnancy prevention programming, Better Together Hennepin, was substantially funded through a TPP Tier 1 award. Johnson Decl. ¶ 11. The program has been extremely successful, on track to reach more than 5,000 participants and consistently receiving positive feedback from program participants, school and clinic partners, and

14

HHS program officers. *Id.* ¶¶ 17–20. The timing of the termination "has caused chaos" and thrown the future of the program into serious doubt. *Id.* ¶ 41.

Defendants also terminated PPH's Tier 1 award, which aimed to increase underserved communities' access to inclusive sexual and reproductive health information and resources, and to decrease teen pregnancy and rates of sexually transmitted infections. Miller Decl. ¶ 10. PPH has been forced to begin winding down the project and to announce the layoffs of ten employees whose salaries were funded in whole or in part by TPP funds, including one who has been an educator for PPH for almost thirty years. *Id.* ¶¶ 26–28. Without PPH's program, youths in communities PPH serves "will go without information and resources about sexual and reproductive health." *Id.* ¶ 32.

King County's Tier 2 award was terminated as well. Gerber Decl. ¶ 30. The award supported an evaluation of the Stepping Stones program, which provides one-to-one health education to improve the sexual health outcomes of young men involved in the legal system or child welfare system. *Id.* ¶ 16. Program staff were confident that the study would turn out an evidence-based program that would become eligible for replication under Tier 1, providing an "enormous benefit to the field." *Id.* ¶ 53. Instead, the study has been cut short, and the work of the last three years is likely to go to waste. *Id.* ¶ 49.

## LEGAL STANDARD

To obtain a preliminary injunction, "the moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The same standard applies to obtain a stay under 5 U.S.C. § 705. *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

**ARGUMENT**

All the requirements for preliminary relief are satisfied. Plaintiffs are likely to show that Defendants' actions are contrary to law and arbitrary and capricious in violation of the Administrative Procedure Act; Plaintiffs are suffering and will continue to suffer irreparable harm; and the balance of equities and public interest strongly favor a stay or injunction.

### I.  Plaintiffs are likely to succeed on the merits.

#### A.  The 2026 Policy is unlawful.

The APA empowers courts to review "final agency action" and set aside any action found to be "not in accordance with law" or "arbitrary [and] capricious." 5 U.S.C. §§ 704, 706(2)(A), (C). HHS's 2026 Policy constitutes final agency action that should be set aside under both of these provisions; Plaintiffs thus are likely to succeed on the first two counts of their complaint.

#### i.  The 2026 Policy is final agency action.

At the outset, the 2026 Policy is reviewable "final agency action." 5 U.S.C. § 704. Final agency actions are those (1) that mark "the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 156, 178 (1997) (internal quotation marks omitted). Courts take a "pragmatic approach . . . to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (internal quotation marks omitted).

Importantly, an agency's decision "need not be committed to writing to be final and judicially reviewable," *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020), and courts may "infer[] from a course of agency conduct that the agency has adopted a general policy, even in the face of agency denials of such policies existing," *Velesaca v. Decker*, 458 F. Supp. 3d 224, 237 n.7 (S.D.N.Y. 2020) (collecting cases); *see also Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008) (finding "the record" as a whole "leaves

16

no doubt" that a policy exists, even though "the details . . . are still unclear"); *S.F. Herring Ass'n v. DOI*, 946 F.3d 564, 577–78 (9th Cir. 2019) (ongoing course of agency conduct demonstrated finality without any written policy).

Over the course of roughly 72 hours, Defendants issued two new NOFOs abandoning the rigorous, evidence-based approach enshrined in the legislation authorizing the TPP Program while contemporaneously issuing scores of form letters terminating virtually all of the existing cooperative agreements that had received funding based on their efficacy and adherence to statutory criteria. These actions evince an agency decision to abandon the evidence-based approach to reducing teen pregnancy that Congress has funded, and to pivot the entire TPP Program to fund sexual-avoidance education curricula that violate the authorizing statute in multiple ways. The agency consummated its decision by shutting the door on the existing version of the program through its rash of abrupt discontinuations of projects that had been proven effective at reducing teen pregnancy and citing its unlawful bases in form letters. And it correspondingly consummated its decision through the NOFOs, which set the terms for TPP Program participation going forward with the agency's ideologically driven requirements that demand abstinence-only curriculums and other unlawful criteria, while sacrificing both efficacy and medical accuracy. Defendants' adoption and implementation of the 2026 Policy constitutes final agency action reviewable under the APA.

The 2026 Policy meets the first *Bennett* prong because it is a "definitive position" and not "merely tentative." *S.F. Herring Ass'n*, 946 F.3d at 578. Defendants have not merely announced that they are considering whether to tweak the criteria for cooperative agreements to fund teen pregnancy prevention, or merely proposed to terminate existing agreements due to alleged violations of existing requirements. Instead, they already have taken the concrete steps of cancelling nearly all existing projects, effective immediately, while issuing new funding

17

announcements that abandon statutory criteria and renounce the longstanding evidence-driven approach that has been the hallmark of this successful program. This pattern of conduct evidences the policy's finality because Defendants plainly have completed their decisionmaking process. *See NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) ("consummation prong" requires assessment of whether action "represents the culmination of that agency's consideration of an issue" rather than the tentative "ruling of a subordinate official" (citation omitted)); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (decision that "reflect[s] a settled agency position" is final agency action). Absent intervention from this Court, Defendants plainly have no intention of continuing to operate the TPP Program as Congress directed.

Second, it is beyond dispute that the 2026 Policy determines the rights of TPP awardees, subawardees, and the multitude of other parties that depend on services provided through its funding—including Plaintiffs—and the policy likewise has legal consequences. Agency action is final where it "has a direct and immediate effect on the day-to-day business of the subject party," especially where "immediate compliance with its terms is expected." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 987 (9th Cir. 2006) (internal alterations and quotation omitted). Defendants' decision to forsake proven programs in favor of those that align with administration priorities alters the rights of awardees to continued funding, and the abilities of the teenagers they serve to access educational content with the potential to alter the trajectory of their adolescence. And it has direct consequences, including that Awardee Plaintiffs and their partner organizations have had to lay off staff and abandon planned services for the coming academic year. Johnson Decl. ¶¶ 36–47; Miller Decl. ¶¶ 25–30; *see* Gerber Decl. ¶ 57. Likewise, the NOFOs determine rights and obligations because Plaintiffs and other applicants must comply with their requirements to be eligible for awards. *See Planned Parenthood of N.Y.C. v. HHS*, 337 F. Supp. 3d 308, 328

(S.D.N.Y. 2018) (funding opportunity announcements "create[d] 'direct and appreciable consequences' for any applicant for TPP funding" (quoting *Bennett*, 520 U.S. at 178)).

The simultaneous termination of scores of agreements citing the same policy reasons with the same boilerplate language, along with the issuance of NOFOs imposing those same terms, shows the existence of an overall policy decision that meets both *Bennett* prongs.

### ii. The 2026 Policy violates the statutory requirements of the TPP Program and exceeds Defendants' statutory authority.

The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Because HHS is a "creature of statute" and "possess[es] only the authority that Congress has provided," *Nat'l Fed'n of Indep. Bus. v. DOL*, 595 U.S. 109, 117 (2022), it lacks authority to transform the TPP Program into one that conflicts with the parameters set forth in authorizing legislation. Congress's grant of funding and authority to administer the TPP Program came with clear guardrails specifying how the money must be spent: Tier 1 funding "shall be for replicating programs that have been *proven effective through rigorous evaluation* to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." 140 Stat. at 281 (emphasis added). Tier 2 funding "shall be" used "for research and demonstration grants to develop . . . and test additional models and innovative strategies" to accomplish that same goal. *Id.* And all TPP programming must be "medically accurate and age appropriate." *Id.* The 2026 Policy jettisons those criteria in favor of the Administration's own political priorities and is contrary to law in numerous respects.

*First*, by terminating nearly every cooperative agreement that had funded evidence-based programming on the basis that the approved curricula were no longer acceptable to HHS, and explicitly limiting new applications to programs meeting criteria that contravene Congress's

19

directive instead, HHS is seeking to fund Tier 1 programs in violation of the statutory requirement to "replicat[e] programs that have been proven effective through rigorous evaluation." HHS recognizes that "replication" means "the implementation of an evidence-based program in a new setting or population while maintaining fidelity to its core components," stating that it "refers to duplicating or repeating an effective program."[12] As Plaintiffs' declarations evidence, there *are no* rigorously tested, proven-effective programs that center "body literacy" and comply with the administration's other newly imposed policy priorities. Simon Decl. ¶ 21; Johnson Decl. ¶ 33; *see* Miller Decl. ¶ 39.[13] Effectively, then, the only way applicants could run a program that complies with the new directives is by modifying a program and "integrating" the new content so that it is no longer "replicating" a program that has been "proven effective through rigorous evaluation." This violates the statute.

HHS has implicitly admitted its departure from the statute in multiple respects. For instance, the new Tier 1 NOFO recognizes that awardees will need to modify existing evidence-based programs to align them with HHS's new priorities, stating that applicants should include "any formal, written agreements (e.g., MOUs) from the developer/purveyor/copyright holder of the intervention indicating that you have permission to use and *to make any changes* to the materials." Tier 1 2026 NOFO at 23 (emphasis added). Those "[c]hanges may include those to ensure medical accuracy, age-appropriateness, and alignment with OASH priorities." *Id.* Similarly, despite *requiring* Tier 1 applicants to select programs that have been proven effective through rigorous evaluations that comply with the NOFO requirements, the administration

---

[12] *Replicating Effective Teen Pregnancy Prevention (TPP) Programs – AH-TP1-26-001: Questions and Answers*, OASH (July 9, 2026), https://perma.cc/FPX3-MNET.

[13] Notably, in response to a question from potential applicants, HHS has refused to identify any specific programs that it believes are "acceptable under the new priority of prioritizing 'body literacy' education." *Id.*

acknowledges that no such programs meet HHS's preferred criteria when they seek to fund Tier 2 applicants to *test* body literacy and other new program elements. *See, e.g.*, Tier 2 2026 NOFO at 1 ("[t]he goal of this initiative is to identify effective interventions focused on body literacy and ensuring transparency and protection of parental rights for future replication"); *id.* (applicants should "[i]mplement and evaluate a proposed intervention that promotes body literacy education and reproductive goals counseling, expanding the knowledge base of such interventions on adolescent optimal health and teen pregnancy prevention outcomes").

As several courts concluded after a previous attempt to redirect the Program in violation of the statute, requiring applicants to revise effective programs—thereby essentially implementing a new program—violates the statutory command that Tier 1 programs replicate studies proven effective. *See Planned Parenthood of Greater Wash. & N. Idaho*, 946 F.3d at 1113 (previous funding announcement "would incorrectly permit grants for programs not proven effective, contrary to the TPPP"); *Multnomah County v. Azar*, 340 F. Supp. 3d 1046, 1067–68 (D. Or. 2018) (setting aside previous Tier 1 announcement because HHS "ignore[d] the qualifier that the programs must be 'proven effective through rigorous evaluation'" (citation omitted)).

*Second*, the 2026 Policy violates the statute because it shifts both tiers of funding to abstinence-only programming. Under the NOFOs, award recipients "are expected to incorporate sexual risk avoidance (SRA) education as a component of program delivery." Tier 1 2026 NOFO at 12. The NOFOs claim that "SRA education provides adolescents with clear, evidence-informed information about the health and social benefits of avoiding sexual activity during adolescence." *Id.*; *accord* Tier 2 2026 NOFO at 9.

These requirements violate the funding scheme Congress established. In the 2026 Appropriations Act, Congress appropriated $101 million for "medically accurate and age

21

appropriate programs that reduce teen pregnancy." 140 Stat. at 281. Separately, in the next item of the statute, Congress appropriated a smaller sum for "sexual risk avoidance" education. *Id.* at 281–82 ("$35,000,000 shall be for making competitive grants which exclusively implement education in sexual risk avoidance"). This distinction tracks Congress's intent when it created the TPP Program to expand funding for sexual health education programs beyond those that implement SRA curricula. Exclusively funding abstinence-only program violates Congress's clear directive that TPP funds be used for programs proven effective at reducing teen pregnancy, distinct from the funds it separately earmarked for abstinence-only education. This effort to siphon and repurpose funds without congressional authorization violates the 2026 Appropriations Act.[14]

*Third*, HHS's opposition to content it believes to "normalize teen sex," is inconsistent with Congress's command to fund programming that is medically accurate, age-appropriate, and effective. As Plaintiffs' declarations explain, effective, age-appropriate and medically accurate sexual health education programming covers certain topics—such as contraception and consent—that necessarily acknowledge and discuss teen sexual activity. Simon Decl. ¶ 18; Johnson Decl. ¶ 32; Gerber Decl. ¶¶ 36–38; Miller Decl. ¶¶ 41–43. But HHS's priorities, incorporated in the NOFOs, explicitly direct applicants to avoid programs that, in the agency's view, "includ[e] content that encourages, normalizes, or promotes sexual activity for minors," OASH Priorities, *supra*, and the termination letters make clear that HHS defines those terms so capaciously as to sweep in broad swathes of effective content that actually educate teens on how to prevent pregnancy—as Congress intended, *e.g.*, King County Letter at 1–2 (questions about "enjoy[ing]"

---

[14] The 2026 Policy likewise violates the Purpose Statute, which commands that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). Even where "separate appropriations" "shar[e] similar purposes," appropriations for one purpose cannot be used to fund the other. *Pa. Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 154 (3d Cir. 2012).

sex constitute normalizing sexual activity). That prohibition is fundamentally at odds with age-appropriate, medically accurate, effective teen pregnancy prevention. Awardees cannot effectively implement programs that reduce teen pregnancy while pretending that teen sexual activity does not exist. *E.g.*, Gerber Decl. ¶ 38 ("[I]t is not possible to run a program that effectively reduces teen pregnancy among sexually active and/or older adolescents without some reference to sexual activity."). The 2026 Policy is thus incompatible with the statutory requirements and objectives.

### iii.  The 2026 Policy is arbitrary and capricious.

The 2026 Policy is also unlawful because it is arbitrary and capricious. The APA empowers courts to set aside agency action found to be arbitrary, capricious, or an abuse of discretion. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983). This standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Plaintiffs are likely to show that the 2026 Policy violates the APA because HHS (1) relied on factors Congress did not intend it to consider, (2) failed to consider important aspects of the issue before it, (3) proffered an explanation that runs counter to the evidence, (4) failed to recognize and reasonably explain its decision to reverse substantial past practice, and (5) failed to take into account serious reliance interests.

1.  *HHS relied on factors Congress did not intend.*

HHS's decision to overhaul the TPP Program relied on factors not intended by Congress and failed to consider how its political priorities may detract from the program's effectiveness. *State Farm*, 463 U.S. at 43. The statute indicates the "relevant factors to consider when awarding grants are: (1) whether the program is aimed at preventing teenage pregnancy; (2) whether the program is medically accurate and age appropriate; (3) whether the program has achieved proven results; and (4) whether the program represents an innovative strategy for preventing teenage

23

pregnancy." *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 659 (D. Md. 2018). HHS eschewed this guidance when it imposed requirements that undermine Congress's purpose.

For instance, HHS relied on an agency-imposed priority to "focus on programs that do not promote material that depicts, describes, exposes or presents . . . sexually explicit content, including content that encourages, normalizes, or promotes sexual activity for minors." *E.g.*, Hennepin County Letter at 1. It then relied on that priority to terminate scores of existing cooperative agreements that replicate rigorously tested, proven programs that Awardee Plaintiffs and their communities relied upon to prevent teen pregnancy. Although it is true, as HHS notes, that Congress limited funding to "age appropriate" programs, 140 Stat. at 281, each of the terminated programs already had been deemed age appropriate; besides, the statutory limitation does not give the agency *carte blanche* to decree programs ineligible because they discuss sex or purportedly normalize sexual activity. After all, the "appropriation was not an unrestricted sum of money to use for any purpose that might fall within HHS's broad mandate, but rather directs the agency to use the funds to support proven or innovative medically accurate methods of preventing teenage pregnancy." *Healthy Teen Network*, 322 F. Supp. 3d at 659. Plus, while Congress made clear in the Appropriations Act that funding for "sexual risk avoidance" programs should further the statutory goals "without normalizing teen sexual activity," 140 Stat. at 282, it included no such requirement for the TPP Program. By introducing that prohibition into the TPP Program—and attempting to turn it into an abstinence-only program—Defendants have considered factors Congress did not intend.

HHS also apparently seeks to *promote fertility*—an unexpected goal for a program intended to *reduce* teen pregnancy, but one aligned with this administration's "pronatalism" policies to

increase the national birth rate.[15] At a recent White House event, Secretary Kennedy warned of "a fertility crisis in this country right now" that poses "a threat not only to our economy" but also to "our national security."[16] As one strategy for increasing the birth rate, Secretary Kennedy and the "Make America Healthy Again," or "MAHA," movement he leads have championed a concept called "restorative reproductive medicine," a "holistic . . . philosophy" that believes "doctors can identify and treat the root causes of infertility" without resort to in-vitro fertilization (IVF).[17] "Restorative reproductive medicine" is not a recognized medical specialty; according to the American Society for Reproductive Medicine, a leading society of fertility specialists, it is "a political rather than a scientific concept."[18] Yet panelists at an HHS conference this spring on women's health touted restorative reproductive medicine, positing that U.S. "[e]ducation has become too hyperfocused on preventing pregnancy" and "coalesc[ing] around the idea that . . . [g]irls do not receive enough education on how to become pregnant or identify the warning signs of infertility."[19]

Secretary Kennedy's concern is borne out in HHS's decision; for instance, the Tier 1 NOFO requires all future recipients to "[p]romote optimal health through an upstream, preventive approach by emphasizing root-cause understanding of chronic health conditions that may impact overall health and fertility." Tier 1 2026 NOFO at 1. This obtuse language is a narrowly disguised

---

[15] Caroline Kitchener, *White House Assesses Ways to Persuade Women to Have More Children*, N.Y. Times (Apr. 21, 2025), https://perma.cc/8DWZ-HJV7.

[16] *Transcript: President Trump Holds a Maternal Healthcare Event in the Oval Office, 5.11.26*, Senate Democratic Caucus (May 11, 2026), https://perma.cc/MXU5-75RC.

[17] Aria Bendix, *A Little-Known Approach to Infertility Is Complicating the White House's IVF Push*, NBC News (Aug. 8, 2025), https://perma.cc/R7WM-GWTL.

[18] Rachael Robertson, *There Is No 'Alternative' to IVF, Ob/Gyns Warn*, MedPage Today (July 3, 2024), https://perma.cc/E9BK-C4UH.

[19] Amanda Seitz, *Birth Control Skepticism, Teen Fertility Take Center Stage at Trump's Women's Health Summit*, KFF Health News (Mar. 19, 2026), https://perma.cc/W9WE-B3MA.

incorporation of restorative reproductive medicine principles, which encourage "a nonmedical and nonpatient-centered approach." Simon Decl. ¶ 22. Although medically accurate fertility awareness is a component of evidence-based sexual education programs, *id.* ¶ 21, the 2026 Policy goes much further in directing applicants to incorporate principles that *promote* "natural fertility." Congress plainly did not intend HHS to focus on teaching young women strategies to become pregnant in a pregnancy prevention program.[20]

The 2026 Policy imposes other related requirements Congress did not intend. The Tier 1 NOFO, for instance, states that its focus is to support the replication of evidence-based programs that "strengthen adolescent body literacy." Tier 1 2026 NOFO at 8; *see also* Tier 2 2026 NOFO at 9. This emphasis on "body literacy" has no apparent connection to the statute or its central goal of reducing teen pregnancy through programming proven to be efficacious. And other requirements are even more untethered: For example, it is wholly unclear why Congress would have intended that young men should be warned that "repeated or artificially stimulated arousal may affect neural development and behavior over time." Tier 1 2026 NOFO at 10. There is no apparent connection between the values-based messaging HHS is requiring and the statutory command to implement effective programs that reduce teen pregnancy.

Finally, the 2026 Policy scraps medically accurate content regarding birth control (undeniably one of the most important components to preventing teen pregnancy) in favor of a policy preference untethered from science and fact that is aligned with Secretary Kennedy's MAHA movement, which is infamously hostile to contraception. Simon Decl. ¶ 17. The rejection

---

[20] The TPP Program is not the only program in which the administration is promoting fertility. As part of the Title X family planning program, HHS has a NOFO posted for an "Infertility Training Center," in order to "promot[e] access to robust body literacy education and fertility awareness-based methods to address root causes of infertility." HHS, *Notice of Funding Opportunity: Infertility Training Center* 5, https://perma.cc/3JBK-TF3F (last visited July 13, 2026).

of birth control plainly is not a factor Congress intended the agency to consider in implementing a teen pregnancy prevention program. But some of HHS's termination letters relied on recipients' use of curricula that, according to HHS, "describe[] and emphasize[] the effectiveness, safety, and accessibility of various forms of birth control while failing to identify common side effects, contraindications, or health risks associated with these methods." *E.g.*, King County Letter at 2. The agency will now instead require the provision of information "necessary for informed consent" through "medically accurate materials or instructions with pharmaceutical or health-related recommendations [that] include information on the full range of health risks, so that individuals, such as parents and guardians of minors, can make fully informed decisions." *Id.* at 1. The NOFOs reflect this same priority. Tier 1 2026 NOFO at 10 (instruction must "include an overview of approaches to managing menstrual health concerns, including the advantages and disadvantages of ovarian suppression compared to approaches that address root causes"). Congress ordered the agency to make decisions based on efficacy of educational strategies to reduce teen pregnancy— not based on whether programming promotes "informed consent" (among parents, no less) by highlighting the alleged risks of birth control because the administration is opposed to its widespread use. *See* Gerber Decl. ¶ 44 (role of health educators is to "help people identify whether they would like to avoid the risk of unintended pregnancy" and help facilitate taking those steps, not to provide medical advice). HHS acted arbitrarily by injecting alleged safety concerns regarding birth control into the program, particularly when the focus on purported risks of birth control openly jeopardizes the program's effectiveness and is intended to dissuade program participants from using contraceptives. *Cf. Nebraska v. Su*, 121 F.4th 1, 16 (9th Cir. 2024) ("policy justifications cannot supersede statutory text").

    2. *The 2026 Policy fails to consider important aspects of the problem.*

HHS's decision also "ignore[d]" the most "important aspect of the problem" before it: ensuring that TPP Program funding continues to effectively prevent teen pregnancy and testing additional strategies for doing so. *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (internal quotation omitted). As explained above, HHS now prohibits content that it deems "sexually explicit" or to "encourage[], normalize[], or promote[] sexual activities for minors." OASH Priorities, *supra*. Gauging from the widespread terminations of effective programs, HHS seems to interpret those terms capaciously to encompass providing any real information about sex or even talking about sex. But effective sex education indisputably requires discussion and acknowledgement of human anatomy and sex education, as Plaintiffs' declarations attest. Simon Decl. ¶ 18; Johnson Decl. ¶ 32; Gerber Decl. ¶¶ 36–38; Miller Decl. ¶¶ 41–43. HHS acted arbitrarily and capriciously in failing to account for how proven, evidence-based programming could be implemented without acknowledging the reality of sexual activity.

HHS likewise ignored the obvious fact that ordering Tier 1 recipients to modify their programming to comply with the current administration's political viewpoints runs afoul of Congress's directive that funding "replicat[e] programs that have been proven effective through rigorous evaluation." 140 Stat. at 281. Through the directives to avoid "normalizing" sexual activity, to focus on "informed consent" related to contraception, and to "emphasiz[e] root-cause understanding of . . . fertility," Tier 1 2026 NOFO at 1, HHS is mandating certain content while prohibiting other content without regard to how implementing those changes will deliver programs that reduce teen pregnancy.

The 2026 Policy similarly forces Tier 1 program applicants to comply with a broad and standardless parental opt-out requirement without prior analysis and testing to establish whether such programming is proven effective to achieve the statutory objectives or whether it will result

in more teens missing out on content. *See* Tier 1 2026 NOFO at 1, 8. HHS tied these requirements to the Supreme Court's decision in *Mahmoud v. Taylor*, 606 U.S. 522 (2025)—a decision HHS admits "relates to school programs during school hours," Tier 1 2026 NOFO at 7—but failed to explain why that school-centered decision is relevant where TPP programming is decidedly *not* limited to the school setting. And the NOFO's lack of meaningful guidance leaves the agency with wide discretion to enforce this open-ended requirement. *Cf. Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *24 (discussing lack of guidance as to opt-out requirement).

Similarly, the Tier 1 NOFO failed to consider how its changes are likely to stigmatize certain communities and eliminate any programming that addresses the gaps in curricula that account for the unique needs of certain populations with the greatest unmet need. The 2023 NOFO stated that projects should focus on "communit[ies] and population[s] that are disproportionally affected by unintended teen pregnancy and STIs," including "those that have been adversely affected by persistent poverty and inequality," such as "LGBTQI+ youth." Tier 1 2023 NOFO at 6–7. And HHS apparently still recognizes the importance of implementing TPP programs "in communities with the greatest need."[21] Yet the new NOFOs delete all references to LGBTQ individuals and omit any consideration of the varying teen pregnancy rates among different populations. They also prohibit "denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic." Tier 1 2026 NOFO at 45; Tier 2 2026 NOFO at 55. These statements "appear to reject the existence of intersex and transgender individuals, which would be not only scientifically false (and thus contrary to the statutory requirement of 'medically accurate' programming) but also would seem to inhibit—or at least not advance—the goal of

---

[21] *See* OASH, OPA, *About the Teen Pregnancy Prevention Program*, HHS, https://perma.cc/KVF9-RRW3 (last visited July 6, 2026).

29

reducing unwanted teen pregnancies." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at \*27; *see also id.* at \*27 n.18 (noting plaintiffs' declarations offered "well-accepted scientific support for the fact 'that some individuals identify on a spectrum of gender identity'" (citation omitted)). Defendants' efforts to erase more inclusive content from the TPP Program failed to consider an important aspect of the problem Congress intended to solve.

3.  *The 2026 Policy runs counter to the evidence before the agency.*

An agency acts arbitrarily and capriciously by "offer[ing] an explanation for its decision that runs counter to the evidence before" it. *State Farm*, 463 U.S. at 43. HHS violated this black-letter rule of administrative law when it ignored overwhelming evidence that the scores of programs it terminated each have been rigorously evaluated and—by HHS's own standards—determined to have been proven effective, while pivoting new funding agreements toward restrictive abstinence-only programming that mirrors the administration's policy priorities. As discussed above, the TPP Program has a remarkable history of funding evidence-based approaches to reduce teen pregnancy—yet HHS defied the evidence by scrapping tested and effective programs. Indeed, the agency effectively conceded that its new priorities have not been "proven effective" when it proposed *testing* them in new Tier 2 awards. *See* Tier 2 2026 NOFO at 1.

HHS also relied on "evidence" that does not exist. Two of the seven articles HHS cites in the NOFOs are simply made up. *See* Talmor Decl. ¶¶ 7, 10. For three others, the citation is incorrect—meaning no article by the cited author appears in the journal HHS cited. *Id.* ¶¶ 8, 9, 11. The titles for these three articles do resemble (but do not exactly match) articles that the listed author published in entirely different journals. *Id.* But even if HHS intended to cite the real articles published in different journals, they fail to support HHS's decision. One article analyzes STI rates among *adults* with multiple sexual partners, not "adolescent sexual decision-making," as HHS claims. *Compare* Talmor Decl. ¶ 9, *with* Tier 1 2026 NOFO at 6 n.2. Another one reviews the

30

efficacy of various fertility-awareness based family planning methods; it provides no support for HHS's claim that girls receiving body literacy education are more likely to remain abstinent. *Compare* Talmor Decl. ¶ 11, *with* Tier 1 2026 NOFO at 6. Given that five out of seven articles cited in the NOFOs do not exist at all, do not exist in the journal HHS cited, and/or provide no support for HHS's proposition, it is reasonable to infer these mistakes likely resulted from the use of artificial intelligence to draft the NOFOs. By failing to offer a "rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43 (citation omitted), the 2026 Policy violates the APA.

4.   *HHS failed to reasonably explain its decision to reverse course.*

New administrations have discretion, of course, to evaluate their programs and policies and even to reverse previous decisions. Here, HHS has imposed a stark departure from the evidence-based decisionmaking that has *always* been the hallmark of the TPP Program and imposed new dogmatic requirements that run counter to the evidence, marking a significant change in agency policy. Before undertaking such sweeping actions, the APA requires agencies to recognize such policy shifts and to provide "good reasons" for changing longstanding policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009). HHS was not writing "on a blank slate" and was required to "provide a more detailed justification" because it chose to "disregard[] facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16.

HHS provided no such reasoned explanation for abandoning its longstanding practice and revamping the TPP Program to align with MAHA ideology. Nowhere did the agency explain any cogent rationale for its decision to jettison the current, rigorously tested programs available for Tier 1 funding in favor of untested strategies. HHS likewise failed to explain how the statutory requirement of replication of effective programs can be met without "normalizing" teen sex or why teen-pregnancy prevention programs should be responsible for ensuring that program

31

educators provide robust information about the risks, benefits, and alternatives to using contraceptives that teens may obtain through a healthcare provider that is equipped to and required to provide teens and their parents with the individualized information necessary to make informed health care decisions. Nor did HHS provide any justification for canceling the vast majority of its funding, with no notice, shortly before a new school year is set to start—or for the equally catastrophic decision to cancel midstream all of its Tier 2 agreements, with the result that recipients must abandon testing models before completion and sacrifice the intended benefits from the evidence already gathered. *See* Gerber Decl. ¶ 49. Instead, HHS relied on the conclusory assertion that "[c]urrent program priorities, such as focusing on projects that do not normalize or promote sexual activity for minors, differ fundamentally from prior approaches." *E.g.*, King County Letter at 2; *see also id.* at 1 (asserting that "priorities[] such as focusing on projects . . . that provide medically accurate information for full informed consent[] differ fundamentally from prior approaches"). This is not reasoned decisionmaking.

HHS failed to explain other abrupt departures from past practice. For example, the 2023 Tier 1 NOFO pointed applicants to the TPPER as a tool to assist in the selection of permissible evidence-based programs. Tier 1 2023 NOFO at 10–11. For several years, HHS has used the TPPER to examine studies of teen pregnancy prevention programs and determine which have been proven effective through rigorous evaluation.[22] The new Tier 1 NOFO, however, makes no mention of the TPPER and provides no meaningful guidance as to which (if any) programs previously deemed effective qualify under the new criteria. Instead, it simply states that all programs must satisfy the criteria in Appendix A. Tier 1 2026 NOFO at 9. But Appendix A is of little use to applicants in search of a specific program that will comply with Defendants' newly

---

[22] Tollestrup, *Adolescent Pregnancy: Federal Prevention Programs*, *supra* note 3, at 4–6.

imposed requirements: It simply provides high-level criteria "required for a program to be considered rigorously evaluated." Tier 1 2026 NOFO at 65. This does not provide any meaningful guidance to applicants who were already running "rigorously evaluated" and proven successful programs from the TPPER, yet abruptly had their awards terminated, and now must guess at how they can comply with Defendants' evolving preferences. *E.g.*, Johnson Decl. ¶ 33 (Appendix A guidelines are "vague and unhelpful in identifying a curriculum that complies with the administration's policy priorities while remaining evidence-based and effective at preventing teen pregnancy").

Similarly, Defendants did not explain their decision to shift from offering Tier 1 awards on a five-year cycle, Tier 1 2023 NOFO at 2, to a two-year award period "with an optional competitive third year," Tier 1 2026 NOFO at 1. Awardees are expected to "pilot approved programs" within six months of the award's issuance, and they must "fully implement approved programs" within one year. *Id.* at 9. This reduced award period provides less certainty for applicants and beneficiaries alike. Johnson Decl. ¶ 38; Miller Decl. ¶ 44. As HHS previously recognized, a shorter award period does not "allow grantees enough time to form the community relationships, partnerships, and wider engagement needed to adopt a comprehensive systems-thinking approach."[23] Defendants did not even acknowledge this change in position, let alone offer any persuasive reason for it.

Defendants likewise did not acknowledge their decision to treat applicants with existing awards less favorably than applicants new to the program. The NOFOs include "funding priorities" that add bonus points for certain applications: Two points are added if an organization "does not hold an active award under this opportunity," and two more points are added if an organization

---

[23] OPA, *Delivering Evidence-Based Programs to Prevent Teen Pregnancies and Support Adolescent Health* 54 (Nov. 2024), https://perma.cc/Y4YB-NKX9.

"has never received an award under this opportunity." Tier 1 2026 NOFO at 41–42; Tier 2 2026 NOFO at 52. As a result, applicants such as Awardee Plaintiffs—who have participated in the program for years and have a track record of success at implementing programs that reduce teen pregnancy—are at a disadvantage relative to newcomers. Defendants' failure to recognize and reasonably explain their changes in policy is arbitrary and capricious. *See Fox*, 556 U.S. at 515.

5. *HHS failed to take into account serious reliance interests.*

The APA's mandate of reasoned decisionmaking required HHS "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020). HHS defied that requirement by enacting the 2026 Policy without taking into account the substantial reliance interests of the many stakeholders in this program. Recipients of Tier 1 funding—including Awardee Plaintiffs—are entering year four of a five-year cooperative agreement. In reliance on funding, they have formulated budgets, designed programming, hired staff, and devoted significant resources to forming partnerships with community organizations, while focusing on projects that address unmet needs. *E.g.*, Johnson Decl. ¶¶ 11–15; Miller Decl. ¶¶ 12–15. Tier 2 recipients, including King County, have designed rigorous evaluation programs and devoted resources to implementing testing methodologies that will be meaningless if the programs are abruptly terminated. Gerber Decl. ¶ 49. Schools and local communities rely on the TPP Program to deliver effective public health programming; a new school year soon will start with a giant hole in the curriculum these entities use to educate their youth. Johnson Decl. ¶¶ 41–44. And parents and teens themselves rely on TPP programming to provide medically accurate and appropriate information to help them avoid the impacts of teen pregnancy. Miller Decl. ¶ 35 ("PPH has become a trusted resource for youth and parents.").

34

HHS's terminations do not hint at any consideration of reliance interests; on the contrary, each recognizes that the agency has "discretion" to "suspend . . . an award to allow the recipient an opportunity" to correct any issues, but that the agency "made a programmatic determination" to terminate instead because its new "priorities . . . differ fundamentally from prior approaches." *E.g.*, Hennepin County Letter at 2. This is the opposite of reasoned decisionmaking. The agency explicitly recognized that it was making a 180-degree pivot but—rather than considering the combined *impact* of its changes on recipients and other stakeholders—it made "a programmatic determination" to cut off funding that already had been granted and require new applicants to "fundamentally" change their programming. This failure to weigh serious reliance interests is alone reason enough to set aside the 2026 Policy. *Regents of Univ. of Cal.*, 591 U.S. at 33.

6. *The 2026 Policy is impermissibly vague.*

Finally, an "agency's requirements must be comprehensible and give entities fair notice of what is required of them." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *23. To ensure fair notice, courts consider whether, "by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith" could "identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform." *Nissan Chem. Corp. v. FDA*, 744 F. Supp. 3d 1, 9 (D.D.C. 2024) (citation omitted).

The 2026 Policy attempts to impose—by different means—several of the same requirements struck down as vague in the July 2025 Policy Notice. For example, the NOFOs provide that awardees "must implement any funds awarded under this NOFO to effectuate program goals and agency priorities in accordance with the Priorities of the Office of the Assistant Secretary for Health." Tier 1 2026 NOFO at 4. Those priorities include "[e]nding diversity, equity, and inclusion (DEI) policies and practices"; ensuring that "medically accurate materials . . . include

information on the full range of health risks" of contraception; "[e]nding support for gender ideology"; "[e]nsuring adolescent program materials are age-appropriate," including by ensuring that programs "do not promote harmful ideologies" and deprioritizing content that "encourages, normalizes or promotes sexual activity for minors"; and "[p]rotecting parental rights to direct the religious upbringing of their children." OASH Priorities, *supra*.

All these conditions were included in the July 2025 Policy Notice, which was vacated because, among other defects, "[v]irtually every new requirement" it imposed was "fatally vague." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *23. The court observed, for instance, that "[t]he lack of agreed-upon meaning of terms like 'diversity, equity, and inclusion' ('DEI') have led other courts to deem arbitrary and capricious agency actions premised on those concepts where not adequately defined therein." *Id.* at *25 (collecting cases). The Policy Notice also excluded "gender ideology" and "discriminatory equity ideology" "without providing definitions of any of those terms in a workable way connected to TPP programming." *Id.* Similarly, it left "wide open for interpretation precisely . . . what constitutes a 'harmful ideology' that should be removed." *Id.* at *24. As for the prohibition on content that "normalizes" sexual activity, the absence of any "meaningful direction" to recipients made "compliance and fair enforcement impossible." *Id.* at *25. The parental opt-out requirement likewise provided "no guidance as to what is considered to burden religious exercise or how the opt-out mechanism should function with respect to recipients' programs." *Id.* at *24. And the directive to describe "a full range of health risks" was "up to interpretation" as well. *Id.* at *26.

Defendants have not remedied any of these vagueness issues. Instead, they have simply repackaged the conditions of the unlawful Policy Notice—which were "unworkable" and "susceptible to discriminatory application," *id.* at *22—as "agency priorities" that awardees must

36

comply with. Tier 1 2026 NOFO at 4. Defendants have thus provided no guidance as to what activity is prohibited, "leaving plaintiff[s] to guess at what is and is not permissible in the government's view, while already facing the threat of adverse actions during the guessing." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *26 (alteration in original) (citation omitted); *cf. Fox*, 567 U.S. at 253–54 ("[P]recision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way . . . [and] to ensure that ambiguity does not chill protected speech.").

Further, the NOFOs provide that awardees' activities "must align with . . . executive orders." Tier 1 2026 NOFO at 45. But they offer no guidance on how awardees should come into "alignment." Executive orders "are directed toward '*governmental* actors,' and many, such as national security EOs or those renaming public sites, have nothing to do with the TPP program." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *23. So it is unclear how awardees are to fulfill "the impossible task of divining the connection HHS saw between the executive branch priority and teen pregnancy prevention." *Id.* Because awardees have little hope of ascertaining their compliance with these vague commands, the Policy is arbitrary and capricious.

### B. The NOFOs are independently unlawful.

For the reasons explained above, the 2026 Policy violates the APA in numerous ways and should be stayed or enjoined pending final resolution of this matter. But in the alternative, if the Court is not persuaded that the 2026 Policy *as a whole* should be stayed or enjoined at this time, at a minimum the Court should grant preliminary relief as to the NOFOs. The NOFOs are clearly final agency action, as their issuance marks the consummation of Defendants' decisionmaking process. Defendants have made a final decision to change the scope of the TPP Program and to offer new awards on those terms, and the NOFOs are not interlocutory or tentative. They also resemble the types of agency action courts routinely find to be final and reviewable. *See Planned*

*Parenthood of N.Y.C.*, 337 F. Supp. 3d at 328 (TPP funding opportunity announcements were "subject to no further revision, and [were] by no means 'tentative'" (quoting *Bennett*, 520 U.S. at 178)); *see also Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *17 (policy notice was "the consummation of the agency's decision regarding applicable changes to the TPP program and imposes binding obligations on plaintiffs with clear legal consequences for noncompliance"); *R.I. Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180, 192 (D.R.I. 2025). And because the NOFOs violate the APA for all the reasons explained above, the Court should at least halt implementation of these unlawful solicitations so that Awardee Plaintiffs and other applicants can continue to seek funding according to the parameters Congress intended.

### C. The Tier 1 2026 NOFO violates the First Amendment.

The Tier 1 2026 NOFO also discriminates based on viewpoint, in violation of the First Amendment. "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). The government may not "use [its] power . . . to punish or suppress disfavored expression." *Id.* at 188. Nor can the government "deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

Defendants have sought to do just that. The Tier 1 NOFO instructs applicants to "[d]escribe your organization's mission and how it aligns with the goals of this NOFO, including advancing body literacy, informed consent, and optimal health." Tier 1 2026 NOFO at 20. Applications are assessed on the extent to which they "demonstrate[] a strong alignment between the organization's mission and the goals of the NOFO." *Id.* at 38. This condition is not limited to speech or activity funded by the TPP program because it applies broadly to an awardee's "mission."

The "mission-alignment" requirement constitutes "an ongoing condition on recipients' speech and activities." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218 (2013). Under the new requirement, applicants are treated less favorably or ineligible to receive funding entirely if their organizational mission does not conform to Defendants' ideological preferences. And combined with the NOFOs' less favorable treatment of current or previous awardees, the requirement makes clear that Defendants are attempting to funnel TPP Program funds to allies who share their policy preferences. Accordingly, the NOFO violates the bedrock First Amendment principle that the government may not "compel[] a grant recipient to adopt a particular belief as a condition of funding." *Id.*; *see also, e.g.*, *Freedom Network v. Trump*, No. 25-cv-12419, 2026 WL 1899186, at \*10–11 (N.D. Ill. Mar. 23, 2026) (NOFO certification provision likely violated First Amendment where it "'reach[ed] outside' the federal program to influence speech" (citation omitted)); *R.I. Coal. Against Domestic Violence*, 812 F. Supp. 3d at 195 (conditions likely violated First Amendment where they were "enacted as 'extrinsic, extra-statutory conditions' on top of already existing and well-established programs" (citation omitted)).

### D.  This Court has jurisdiction to award relief.

This case concerns federal cooperative agreements, and Plaintiffs' claims are founded on the Constitution and the APA, not on the text of the agreements. Indeed, this case challenges an overarching policy through which Defendants seek to overhaul the TPP Program—not individual termination decisions. Thus, unlike in some cases concerning award terminations where courts have held that the Tucker Act strips them of jurisdiction, there is no jurisdictional impediment to this Court's review of this case. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring in partial grant of application for stay) (district court likely had jurisdiction over APA challenge to internal agency guidance).

The Tucker Act grants the Court of Federal Claims jurisdiction over "contract suits against the United States." *Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1427 (Fed. Cir. 1997). Whether the Tucker Act bars district court jurisdiction over an APA claim turns on two factors: (1) "the source of the rights upon which the plaintiff bases its claims" and (2) "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Both factors support this Court's jurisdiction.

First, the agreements at issue here are not contracts. An agreement qualifies as a contract with the United States if it meets four requirements, namely an offer, acceptance, proper government authority, and consideration. *See Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997). Consideration "must render a benefit to the government," and that benefit must be "*direct*" rather than "*incidental*." *St. Bernard Parish Gov't v. United States*, 134 Fed. Cl. 730, 735–36 (2017). Merely "advanc[ing] the agency's overall mission" only indirectly benefits the government and does not constitute "consideration." *Hymas v. United States*, 810 F.3d 1312, 1328 (Fed. Cir. 2016); *see also Pa. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 791 (2001) ("By funding and regulating programs designed for the public good the U.S. is acting in its role as sovereign and the moneys promised are gifts or gratuities which do not establish any contractual obligation, express or implied, on the part of the United States." (quoting *Marshall N. Dana Constr., Inc. v. United States*, 229 Ct. Cl. 862, 864 (1982))).

Although the label is not dispositive, "how the government agency classifies or denominates an agreement has probative value in assessing the sufficiency of the consideration the agency expects." *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, 789 F. Supp. 3d 66, 87 (D.D.C. 2025). Here, the agreements are consistently described as cooperative agreements or grants, not as contracts. *E.g.*, Johnson Decl., Ex. 1 at 2; Gerber Decl., Ex. 1 at 2; Miller Decl., Ex.

40

1 at 2. And that description is consistent with background principles of federal law that distinguish between grants, used to "carry out a public purpose of support or stimulation authorized by a law of the United States," 31 U.S.C. § 6304(1), and contracts, used to acquire "property or services for the direct benefit or use of the United States government," *id.* § 6303(1). The awards at issue in this case carry out the public purpose of reducing teen pregnancy, benefiting the federal government in its sovereign capacity, and do not involve the provision of property or services for the direct benefit of the government as a market participant. They thus lack consideration and do not qualify as contracts for purposes of the Tucker Act. *See Pacito v. Trump*, 169 F.4th 895, 927 (9th Cir. 2026) (rejecting Tucker Act defense where "the State Department made a deliberate choice to proceed by cooperative agreement and not by contract," and "[n]othing in the statute or the documents indicates that the parties were entering into a contract, much less a 'procurement contract'").

Moreover, the source of Plaintiffs' claims "is not the particular agreements but rather the rights conferred by the APA and the Constitution." *Urb. Sustainability Dirs. Network v. USDA*, No. 25-cv-1775, 2025 WL 2374528, at *18 (D.D.C. Aug. 14, 2025). Plaintiffs do not claim that Defendants have violated the terms of their cooperative agreements, but rather that Defendants have unlawfully attempted to transform the TPP Program into an abstinence-only program contrary to the 2026 Appropriations Act, have acted arbitrarily and capriciously, and have attempted to coerce Plaintiffs' speech in violation of the First Amendment.

Second, the type of relief sought likewise supports this Court's jurisdiction. Plaintiffs seek declaratory and injunctive relief that would restore the TPP Program to its statutorily mandated purpose and vacate the unlawful Policy. Plaintiffs do not seek either the "explicitly contractual

remedy" of specific performance or the "prototypical contract remedy" of money damages. *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (citation omitted).

The inquiry "is even clearer" for Plaintiff SIECUS. *See Brighton Park Neighborhood Council v. McMahon*, No. CV 25-4523, 2026 WL 1707623, at *17 (D.D.C. June 12, 2026). SIECUS is "not in contractual privity with the Defendants," so it "cannot bring [its] claims in the Court of Federal Claims." *Id.* Accordingly, SIECUS "can proceed in this Court with little difficulty." *Id.*; *see also, e.g.*, *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 137 F.4th 932, 938 (9th Cir. 2025) (government's Tucker Act argument failed where plaintiff subcontractors could not sue in Court of Federal Claims).

## II. Plaintiffs face irreparable harm absent emergency relief and have standing for the same reasons.

The harm caused by the 2026 Policy is "certain and great." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (citation omitted). Without prompt relief, it will also "be beyond remediation." *Id.* (citation omitted); *see Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 175 (D.D.C. 2017) ("[A] preliminary injunction requires only a likelihood of irreparable injury, . . . Damocles's sword does not have to actually fall . . . before the court will issue an injunction." (quoting *League of Women Voters*, 838 F.3d at 8–9)). Both showings are made here.

To start, Defendants' actions "have perceptibly impaired" Plaintiffs' programs and made it "more difficult for [organizations] to accomplish [their] primary mission[s]." *Open Cmtys. All.*, 286 F. Supp. 3d at 177 (quoting *League of Women Voters*, 838 F.3d at 8–9). Following Defendants' implementation of the 2026 Policy and the resulting cancelation of its cooperative agreement, Plaintiff PPH has been forced to begin winding down its TPP project. *See* Miller Decl. ¶ 26. Among other things, PPH has had to begin the process of laying off ten staff members, who have valuable expertise and experience and in whom PPH has invested substantial training and

42

professional development resources. *See* Miller Decl. ¶¶ 27–28. Plaintiffs Hennepin County and King County, meanwhile, have had to reallocate money from other county initiatives to provide interim funding and avoid immediately shutting down their TPP programs. *See* Johnson Decl. ¶ 36; Gerber Decl. ¶ 48. Even with that stopgap funding, both counties have already seen major damage to their programming, given the uncertainty created by the 2026 Policy. For example, Hennepin County has had to cancel planned training sessions and is unable to begin the hiring and training necessary for a successful and timely launch of the program next school year. *See* Johnson Decl. ¶ 43. And King County has paused new enrollments and necessary data collection in its Tier 2 study, both of which are critical to the success and continuity of its research program. *See* Gerber Decl. ¶ 51. None of these Plaintiffs can fill the gap caused by the 2026 Policy by applying for funding for the same programs under the 2026 NOFOs. *See* Miller Decl. ¶¶ 36–45; Johnson Decl. ¶¶ 33–35; Gerber Decl. ¶¶ 35–47. And SIECUS has already devoted time and resources it could have spent elsewhere to combating the inaccurate and misleading claims advanced under the Policy. Simon Decl. ¶ 23. With such imminent—indeed, already occurring—harm, "there is a 'clear and present' need for equitable relief." *Chaplaincy of Full Gospel Churche*s, 454 F.3d at 297 (citation omitted).

Absent relief, Plaintiffs will also suffer harm that is "beyond remediation," even if the Court vacates the 2026 Policy, including the 2026 NOFOs, at the end of this litigation. *See League of Women Voters*, 838 F.3d at 8 (citation omitted). The critical program staff that PPH has needed to lay off have their last day at the organization on July 20. *See* Miller Decl. ¶ 30. Hennepin County, meanwhile, has determined that it must make a decision on whether to reallocate other county resources to support the program in the next several weeks, as the county cannot maintain its commitments to its community partners, school districts, and clinics unless full support for the

43

program is secured before the beginning of the next school year in late August or early September. *See* Johnson Decl. ¶ 44. And King County will soon suffer irreparable damage to the viability of the study it was conducting under its Tier 2 grant, meaning the last three years of research would largely go to waste. *See* Gerber Decl. ¶¶ 48–53. Moreover, Plaintiffs have seen substantial damage to their relationships with community partners and the youth with whom they work, and expect that damage to substantially deepen if the 2026 Policy and its attendant effects are not vacated soon. Miller Decl. ¶ 35; Johnson Decl. ¶ 45; Gerber Decl. ¶ 56; *see, e.g.*, *Am. Acad. of Pediatrics v. HHS*, 816 F. Supp. 3d 27, 62 (D.D.C. 2026) (reputational injury can establish irreparable harm).

**III. The balance of the equities and the public interest favor Plaintiffs.**

The final two factors—balancing the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, Plaintiffs' strong likelihood of success on the merits, discussed above, itself establishes that the equities and public interest favor preliminary relief. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks omitted). Rather, there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12 (internal quotation marks omitted). And there is "generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All.*, 286 F. Supp. 3d at 179 (internal quotation marks omitted); *see also Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("[t]he public interest is served when administrative agencies comply with their obligations under the APA").

Further, there is an enormous public interest in preventing teen pregnancy and associated risks—as Congress recognized in establishing and continuously refunding the TPP Program. Granting preliminary relief will preserve critical teen pregnancy prevention programs and pause

44

Defendants' efforts to dismantle the program Congress created. Absent relief, for example, "many communities of young people in Iowa and Nebraska will be left at risk of increased teen pregnancy rates." Miller Decl. ¶ 46. Municipalities will be forced to pause and ultimately terminate programs in which they have invested enormous time and effort over the past three years. *See, e.g.*, Johnson Decl. ¶ 45 (county will likely need to cancel program if not funded by the time the school year begins, which will damage relationships and "substantially limit the kind of work [it] can do in the future, on teen pregnancy and other pressing health problems"); Gerber Decl. ¶ 58 (termination of award is "a massive loss for the [systems-involved] young men we serve," as there are no similar programs tailored for their needs).

On the other side of the ledger, Defendants face no harm from a stay or injunction against an unlawful policy. Staying or enjoining the 2026 Policy until the Court can determine its lawfulness "preserve[s] the relative positions of the parties" as they existed prior to the Policy taking effect. *See Robertson v. Cartinhour*, 429 F. App'x 1, 2 (D.C. Cir. 2011) (citation omitted).

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion and stay and preliminarily enjoin the 2026 Policy and the actions flowing from it. In the alternative, the Court should at minimum stay and preliminarily enjoin the 2026 NOFOs.


Date: July 15, 2026                                    Respectfully submitted,


                                                       */s/ Michael J. Torcello*
                                                       Michael J. Torcello (DC Bar No. 90014480)
                                                       Kate Talmor (DC Bar No. 90036191)
                                                       Carrie Y. Flaxman (DC Bar No. 458681)
                                                       Robin F. Thurston (DC Bar No. 1531399)
                                                       Skye L. Perryman (DC Bar No. 984573)
                                                       Democracy Forward Foundation
                                                       P.O. Box 34553
                                                       Washington, DC 20043

45

Phone: (202) 448-9090
mtorcello@democracyforward.org
ktalmor@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org
*Counsel for Plaintiffs Hennepin County, King County, and SIECUS*

Hannah Klain*
Karen Dunn (DC Bar No. 1002520)
Jeannie Rhee (DC Bar No. 464127)
Dunn Isaacson Rhee LLP
401 9th Street NW
Washington, DC 20004
Phone: (202) 240-2900
hklain@dirllp.com
kdunn@dirllp.com
jrhee@dirllp.com
*Counsel for Plaintiffs Hennepin County, King County, and SIECUS*

Cormac Early (DC Bar No. 1033835)
Allison M. Zieve (DC Bar No. 424786)
Stephanie Garlock (DC Bar No. 1779629)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
Phone: (202) 588-1000
cearly@citizen.org
*Counsel for Plaintiffs Hennepin County, King County, and SIECUS*

Emily Nestler (DC Bar No. 973886)
Planned Parenthood Federation of America
1100 Vermont Avenue NW
Washington, DC 20005
Phone: (202) 973-4800
emily.nestler@ppfa.org
*Counsel for Plaintiff Planned Parenthood of the Heartland, Inc.*

Dylan Cowit*
Valentina De Fex*
Planned Parenthood Federation of America
123 William Street, 9th Floor

46

New York, NY 10038
Phone: (212) 261-4696
dylan.cowit@ppfa.org
valentina.defex@ppfa.org
*Counsel for Plaintiff Planned Parenthood of
    the Heartland, Inc.*

\* Pro hac vice motion forthcoming