UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HENNEPIN COUNTY, MINNESOTA, et al.<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,<br><br>    Defendants. | Civil Action No. 26-2460 (CRC) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND .............................................................................................................................. 2

      A.     Statutory Framework ............................................................................................... 2

      B.     Factual Allegations ................................................................................................ 3

LEGAL STANDARD ....................................................................................................................... 6

ARGUMENT ................................................................................................................................... 8

I.      Plaintiffs Are Not Likely to Succeed on the Merits .............................................................. 9

      A.     This Court Lacks Jurisdiction To Hear Plaintiffs' Cooperative Agreement
             Termination Claims. ............................................................................................... 9

      B.     Plaintiffs Lack Standing To Challenge the FY 2026 NOFOs ............................... 15

      C.     Plaintiffs Are Unlikely To Succeed on the Merits of Their APA Claims for
             Several Additional Reasons. ................................................................................. 18

             1.     The Challenged Decisions Are Committed to Agency Discretion
                      by Law. .......................................................................................... 18

             2.     The FY 2026 NOFOs Are Not Final Agency Actions ............................. 20

             3.     The Challenged Decisions Are Neither Contrary to Law nor
                      Arbitrary and Capricious .......................................................... 22

      D.     Plaintiffs' First Amendment Claim Is Not Likely To Succeed on the Merits. ..... 25

II.     Plaintiffs Fail To Demonstrate Irreparable Harm. ............................................................ 27

III.    The Remaining Stay Factors Weigh Against Injunctive Relief. ....................................... 29

IV.    The Court Should Require Plaintiff to Post Security. ........................................................ 30

V.     Any Injunction Should Be Stayed Pending Appeal. ......................................................... 30

CONCLUSION .............................................................................................................................. 31

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) ........................................................................................ 9

*All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) .................................................................................................. 16, 26

*Am. Ass'n of Physics Teachers, Inc. v. NSF*,
804 F. Supp. 3d 45 (D.D.C. 2025) ............................................................................ 12, 29

*Am. Ass'n of Pol. Consultants v. SBA*,
810 F. App'x 8 (D.C. Cir. 2020) ...................................................................................... 26

*Am. Oversight v. Hegseth*,
788 F. Supp. 3d 14 (D.D.C. 2025) ..................................................................................... 9

*Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ............................................................................................. *passim*

*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006) ......................................................................................................... 8

*Benisek v. Lamone*,
585 U.S. 155 (2018) ......................................................................................................... 8

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................................................................................................... 21

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .................................................................................. 27, 28

*Citizens Alert Regarding the Env't v. EPA*,
102 F. App'x 167 (D.C. Cir. 2004) .................................................................................. 21

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995) ............................................................................................ 8

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....................................................................................................... 17

*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2024) ..................................................................................... 27

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021) ................................................................................. 12, 14

*Crowley Gov't Servs., Inc. v. GSA*,
38 F.4th 1099 (D.C. Cir. 2022) ................................................................................... 9, 10

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ....................................................................................................... 15

*Dallas County v. Kennedy*,
Civ. A. No. 25-4242 (CRC), 2026 WL 2123225 (D.D.C. July 23, 2026) .................... 10, 27, 30

*Dalton v. Specter*,
511 U.S. 462 (1994) ....................................................................................................... 21

*Damus v. Nielsen*,
313 F. Supp. 3d 317, 326 (D.D.C. 2018) ........................................................................... 7

*Davis v. FEC*,
  554 U.S. 724 (2008) ............................................................................................... 15, 17

*Davis v. Pension Ben. Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ........................................................................................ 7

*Department of Education v. California*,
  604 U.S. 650 (2025) ........................................................................................... 11, 14, 29

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999) .......................................................................................... 30

*FAA v. Cooper*,
  566 U.S. 284 (2012) .......................................................................................................... 9

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ........................................................................................................ 24

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ................................................................................................... 24, 25

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................................................... 15, 18

*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025) ............................................................................. 16, 17, 22, 28

*Harris County v. Kennedy*,
  786 F. Supp. 3d 194 (D.D.C. 2025) ............................................................................. 12, 30

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ........................................................................................................ 19

*Hilton v. Braunskill*,
  481 U.S. 770 (1987) ........................................................................................................ 31

*Hosp. for Special Surgery v. Becerra*,
  Civ. A. No. 22-2928 (JDB), 2023 WL 5448017 (D.D.C. Aug. 24, 2023) ............................... 20

*Huisha-Huisha v. Mayorkas*,
  27 F.4th 718 (D.C. Cir. 2022) ........................................................................................... 8

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) ........................................................................................... 10

*Karst Envt'l Educ. & Prot., Inc. v. EPA*,
  403 F. Supp. 2d 74 (D.D.C. 2005) .................................................................................... 21

*Kidwell v. Dep't of Army*,
  56 F.3d 279 (D.C. Cir. 1995) ........................................................................................... 11

*Lane v. Pena*,
  518 U.S. 187 (1996) .......................................................................................................... 9

*Lewis v. Casey*,
  518 U.S. 343 (1996) ........................................................................................................ 15

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................................................................... 18, 19

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................... 14, 16, 17

*Make the Road N.Y. v. Mullin*,
  179 F.4th 16 (D.C. Cir. 2026) ........................................................................................... 7

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ............................................................................. 10, 12, 13

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002) ...................................................................... 19, 20
*Mullin v. Doe*,
  609 U.S. ___, 2026 WL 1825840 (U.S. Jun. 26, 2026) ............................................. 8
*Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*,
  468 F.3d 826 (D.C. Cir. 2006) ........................................................................ 17
*Nat'l Wrestling Coaches Ass'n v. Dep't of Education*,
  366 F.3d 930 (D.C. Cir. 2004) ........................................................................ 14
*New Mexico v. Musk*,
  824 F. Supp. 3d 80 (D.D.C. 2026) ..................................................................... 12
*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................................. 7, 29
*Planned Parenthood of Greater N.Y. v. HHS*,
  Civ. A. No. 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025) ................................... 25
*Planned Parenthood of Greater N.Y.*,
  2025 WL 1768100 ..................................................................................... 28
*Planned Parenthood of Wisc., Inc. v. Azar*,
  316 F. Supp. 3d 291 (D.D.C. 2018) ............................................................... 21, 22
*Rattlesnake Coal. v. EPA*,
  509 F.3d 1095 (9th Cir. 2007) ........................................................................ 21
*Santos v. Collins*,
  Civ. A. No. 24-1759 (JDB), 2025 WL 1823471 (D.D.C. Feb. 26, 2025) ........................... 27
*Save Long Beach Island, Inc. v. U.S. Dep't of Commerce*,
  Civ. A. No. 25-2214 (CJN), 2025 WL 2996157 (D.D.C. Oct. 24, 2025) ............................. 6
*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ......................................................................... 7
*Singh v. Carter*,
  185 F. Supp. 3d 11 (D.D.C. 2016) ...................................................................... 7
*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024) ................................................................................... 7
*Sustainability Inst. v. Trump*,
  165 F.4th 817 (4th Cir. 2026) ........................................................................ 11
*U.S. Conf. of Cath. Bishops v. Dep't of State*,
  770 F. Supp. 3d 155 (D.D.C. 2025) ............................................................ 10, 12, 13
*United States Ass'n of Reptile Keepers, Inc. v. Zinke*,
  852 F.3d 1131 (D.C. Cir. 2017) ........................................................................ 7
*Vera Inst. of Just. v. DOJ*,
  805 F. Supp. 3d 12 (D.D.C. 2025) ........................................................ 10, 12, 13, 14
*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..................................................................................... 7
*Wisconsin Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ..................................................................... 27, 28

**Statutes and Regulations**

5 U.S.C. § 701(a)(2) ..................................................................................... 18
5 U.S.C. § 702 ........................................................................................... 9

5 U.S.C. § 704 ................................................................................................................ 21

5 U.S.C. § 705 .............................................................................................................. 1, 6

28 U.S.C. § 1491 .............................................................................................................. 9

Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173 .......................... 2, 18

2 C.F.R. § 200.340(a)(4) ........................................................................................ 3, 4, 18, 24

Defendants, the U.S. Department of Health and Human Services (the "Department" or "HHS") and Robert F. Kennedy, Jr., in his capacity as Secretary of the Department, respectfully submit this opposition to Plaintiffs' Motion for 5 U.S.C. § 705 Stay and Preliminary Injunction (ECF No. 14). A proposed order is attached.

## INTRODUCTION

Plaintiffs present this case as a challenge to a single agency action. It is really two challenges, however, and each one fails for its own reasons. Plaintiffs are former recipients of Teen Pregnancy Prevention Program awards and a nonprofit organization. They challenge both the Department's decision to terminate certain cooperative agreements, as well as the Department's issuance of Notices of Funding Opportunity, which opened a new competition for future funding. Neither challenge warrants the extraordinary remedy of a preliminary injunction.

First, Plaintiffs are not likely to succeed on the merits of their claims. The first challenge belongs in the Court of Federal Claims. The Supreme Court has twice considered whether grant termination suits can be smuggled into district court disguised as Administrative Procedure Act claims, and twice concluded that they cannot. The second challenge is a premature attack on a series of award decisions that the Department has not yet made. Notices of Funding Opportunity are invitations to submit funding applications, not final agency actions, and any supposed injury arising from those Notices is speculative.

Second, Plaintiffs have not demonstrated the type of certain and imminent irreparable harm that is necessary to justify emergency relief. The cooperative agreement terminations produced at most transient economic harms to Plaintiffs and indirect harms to third parties, neither of which is cognizable in this context. The issuance of the Notices of Funding Opportunity likewise poses no risk of imminent harm, and indeed it is not even clear that Plaintiffs applied for funding.

For these reasons, and because the remaining equitable factors weigh against injunctive relief, Plaintiffs' motion should be denied.

## BACKGROUND

### A.   Statutory Framework

The Teen Pregnancy Prevention ("TPP") Program, administered by the Department's Office of Population Affairs, is a national grant program that funds various organizations working to prevent teen pregnancy and prevent sexually transmitted infections among adolescents.  The TPP Program is funded by an annual appropriation "for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy."  Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat 173, 281.

The statute establishes two funding categories, referred to as Tier 1 and Tier 2.  After program support expenses, three-quarters of the appropriation goes to Tier 1 projects for "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors."  140 Stat. at 281.  Remaining funds go to Tier 2 projects for "research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy."  *Id.*

The Department implements the TPP Program by soliciting applications through Notices of Funding Opportunity, or "NOFOs."  These NOFOs, such as the Fiscal Year (FY) 2023 NOFOs attached to Plaintiffs' Complaint, describe the authorities governing the program, the amount of funding available, and the criteria according to which applications will be scored.  *E.g.*, ECF No. 1-1 at 5–47.  Successful applicants are required to regularly submit financial and project reports and to fulfill related conditions.  *Id.* at 55–57.  After each year of performance of a multi-year award, the grantee is "required to submit a noncompeting application which includes a progress

report for the current budget year, and work plan, budget and budget justification for the upcoming year." *Id*. at 56. Award continuation is explicitly conditioned on "availability of funds, satisfactory progress of the project, grants management compliance, including timely reporting, and continued best interests of the government." *Id*.

### B.    Factual Allegations

Plaintiffs in this action are Hennepin County, Minnesota; King County, Washington; Planned Parenthood of the Heartland ("PPH"); and a non-profit organization called Sexuality Information and Education Council of the United States ("SIECUS"). Hennepin County, King County, and PPH (together, the "Awardee Plaintiffs") each applied for and received TPP Program awards based on the FY 2023 NOFOs. Compl. ¶ 31. Hennepin County received a Tier 1 grant and King Country received a Tier 2 grant. ECF No. 14-2 ¶ 11; ECF No. 14-3 ¶ 13. PPH, for its part, received a Tier 1 grant for a project titled "Community-Responsive, Youth-Driven Comprehensive Sexual and Reproductive Health Interventions to Achieve Optimal Health for Black, Indigenous, and People of Color . . . and Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, Asexual, 2 Spirit and other identities . . . Adolescents in Western Iowa and Eastern Nebraska." ECF No. 14-4 ¶ 10.

The Department issued termination letters to Hennepin County, King County, and PPH on June 26, 2026. *Id*. ¶ 52. Each termination letter indicated that the termination was pursuant to 2 C.F.R. § 200.340(a)(4), which authorizes the Department to terminate a federal award if the award "no longer effectuates the program goals or agency priorities." ECF No. 14-2 at ECF p. 33 (Hennepin County); ECF No. 14-3 at ECF p. 34 (King County); ECF No. 14-4 at ECF p. 31 (PPH). Each letter "identifies specific content," Compl. ¶ 57, supporting its conclusion that curricula employed by the Awardee Plaintiffs "are not age appropriate, as they contain overly sexually explicit or pornographic content that is not necessary to achieve the TPP program's statutory

mission." *E.g.*, ECF No. 14-2 at ECF p. 33. The Department concluded, for example, that a curriculum used by Hennepin County, "Love Notes," "normalizes and encourages sexual activity for minors" by, for example, "includ[ing] discussions about abusive pornography," "discussions that normalize adolescent sexual activity," and "overly sexually explicit roleplay exercises for minors." *Id.* (including quotations from curriculum materials). Similarly, the Department found a curriculum employed by King County, "Stepping Stones," "normalize[es] and encourage[s] . . . underage sexual activity" and also "emphasizes the effectiveness, safety, and accessibility of various forms of birth control while failing to identify common side effects, contraindications, or health risks associated with these methods," which conflicts with an OASH policy directive to provide medically accurate materials. ECF No. 14-3 at ECF p. 35. Finally, the Department concluded that the PPH program curriculum, "Safer Choices," "includes roleplay scenario exercises that describe and normalize sexual intercourse of minors." ECF No. 14-4 at ECF p. 31. Each Awardee Plaintiff's use of these curricula, the Department concluded, did not align with "[c]urrent program priorities, such as focusing on projects that do not normalize or promote sexual activity for minors." *Id*. at ECF pp. 31–32.

Also in June 2026, the Department issued new Notices of Funding Opportunity better aligned with the Administration's priorities. The FY 2026 NOFOs, issued on June 23, 2026, indicate that the Department intends to make available up to approximately $63.4 million for an estimated fifty-two Tier 1 grant awards, and approximately $8.3 million for an estimated nine Tier 2 grant awards. ECF No. 1-4 ("2026 Tier 1 NOFO") at 1; ECF No. 1-5 ("2026 Tier 2 NOFO") at 1. The Tier 1 NOFO states that Tier 1 recipients will be expected to "[r]eplicate evidence-based programs that strengthen adolescent body literacy, informed consent, and optimal health"; "[i]ntegrate body literacy education and reproductive life goals counseling into program delivery";

"provid[e] advance notice to parents or guardians that includes relevant details about program content"; and "[p]romote optimal health through an upstream, preventive approach by emphasizing root-cause understanding of chronic health conditions that may impact overall health and fertility." 2026 Tier 1 NOFO at 1–2; *see also id*. at 8–13. The Tier 2 NOFO states that Tier 2 grantees will be expected to "[i]mplement and evaluate a proposed intervention that promotes body literacy education and reproductive goals counseling"; "[e]valuate the impact of a proposed intervention that prioritizes ensuring transparency for parents and guardians"; "[d]ocument and package the intervention to be implementation-ready"; and "[d]isseminate research findings and lessons learned to inform future studies." 2026 Tier 2 NOFO at 1. Each FY 2026 NOFO advises that award recipients "must implement any funds awarded under this NOFO to effectuate program goals and agency priorities." 2026 Tier 1 NOFO at 4; 2026 Tier 2 NOFO at 4.

Complete applications that meet threshold eligibility criteria are assessed on the merits by an "independent merit review panel" comprised of "experts in their fields" "drawn from academic institutions, non-profit organizations, state and local government, and Federal government agencies." 2026 Tier 1 NOFO at 35; 2026 Tier 2 NOFO at 44. Criteria for assessment of the applications are set out at length in the FY 2026 Tier 1 NOFO under the headings "project significance," "technical approach," stakeholder engagement and sustainability," "organizational capacity and expertise," "project monitoring and evaluation," and "budget." 2026 Tier 1 NOFO at 36–40 (capitalization and emphasis omitted). For the Tier 2 NOFO, the merit review criteria fall under the headings "significance of the proposed intervention"; "evaluation design: research question and study design" and "methodology"; "implementation of the intervention and project improvement"; "project management and work plan"; and "budget." 2026 Tier 2 NOFO at 46-50.

The application due date for both FY 2026 NOFOs was July 23, 2026.  2026 Tier 1 NOFO at 32; 2026 Tier 2 NOFO at 42.  The Awardee Plaintiffs do not allege that they have applied or plan to apply for the FY 2026 funding; to the contrary, they contend that "[n]one of these Plaintiffs can fill the gap caused by the 2026 Policy by applying for funding for the same programs under the 2026 NOFOs."  Pls.' Mem. 43.  Defendants understand, however, that one Plaintiff did indeed apply for funding.

Plaintiffs filed this suit on July 15, 2026, and filed the instant motion on the same day. Plaintiffs characterize their suit as a challenge to what they term "the 2026 Policy," which they define as the TPP Program grant terminations and the FY 2026 Notices of Funding Opportunity, which Plaintiffs urge the Court to consider together.  Compl. ¶ 5.  Counts I and II assert claims under the Administrative Procedure Act ("APA") that the "2026 Policy" is contrary to law and arbitrary and capricious.  *Id*. ¶¶ 79–95.  Counts III and IV assert similar APA claims, but only with respect to the FY 2026 NOFOs.  *Id*. ¶¶ 96–107.  Count V is a claim that the 2026 Tier 1 NOFO constitutes unlawful viewpoint discrimination in violation of the First Amendment.  *Id*. ¶¶ 108-110.  Plaintiffs seek to, among other things, permanently enjoin application of the "2026 Policy" and the 2026 NOFOs.  *Id*. at 27–28 (Prayer for Relief).  Plaintiffs' Motion seeks to stay the "2026 Policy," including the terminations of the TPP Program grants and the issuance of the FY 2026 NOFOs.  Proposed Order (ECF No. 14-7) at 1-2.

## LEGAL STANDARD

Requests for a stay under 5 U.S.C. § 705 are "evaluate[d] . . . under the same post-*Winter*, four-factor framework" as requests for a preliminary injunction. *Save Long Beach Island, Inc. v. Dep't of Commerce*, Civ. A. No. 25-2214 (CJN), 2025 WL 2996157, at *3 (D.D.C. Oct. 24, 2025) (collecting cases).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To obtain such emergency relief, the movant must show that (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Id.* The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court has held that at least the second factor—irreparable harm—must be likely and "not just a possibility." *Winter*, 555 U.S. at 20.

Before *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 326 (D.D.C. 2018) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)). The D.C. Circuit has not had occasion to conclusively decide whether that sliding scale survives *Winter* and *Nken*. *Make the Road N.Y. v. Mullin*, 179 F.4th. 16, 25 (D.C. Cir. 2026). The Supreme Court has made clear, however, that "[t]he default rule is that a plaintiff seeking a preliminary injunction must make a clear showing" as to each *Winter* element. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024). Following *Winter*, courts have recognized that the sliding scale approach is no longer viable and that each of the factors is now an "independent, free-standing requirement." *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011) (Kavanaugh, J., concurring); *see also Singh v. Carter*, 185 F. Supp. 3d 11, 16-17 (D.D.C. 2016) (sliding scale approach is "highly questionable," and a plaintiff "bears the burden of persuasion on all four preliminary injunction factors").

If the Court concludes that a claim fails as a matter of law, on a point of jurisdiction or merits, then a preliminary injunction is inappropriate. *See United States Ass'n of Reptile Keepers,*

*Inc. v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017). "So in evaluating the likelihood-of-success question for the purpose of ruling on a request for interim relief, courts may consider both the likelihood that they have jurisdiction and the likelihood that the claim will succeed on the merits," and, "[i]f they conclude that a claim fails on either ground, they must deny interim relief." *Mullin v. Doe*, 609 U.S. ___, 2026 WL 1825840, at *11 (U.S. Jun. 26, 2026) (plurality op.). Indeed, if the Court "concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Because preliminary injunctions are not "awarded as of right," but "[a]s a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018). A showing of a strong likelihood of success on the merits can still lead to the denial of preliminary injunctive relief if the party fails to make a sufficient showing of irreparable injury. *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) ("Because the Plaintiffs are likely to succeed on the merits of their § 1231 claims, we apply the other preliminary injunction factors to decide whether the Plaintiffs are entitled to relief on those claims").

## ARGUMENT

Plaintiffs are not entitled to provisional relief in their challenge to the termination of their Teen Pregnancy Prevention Program awards and the issuance of the TPP Program's Notices of Funding Opportunity. They are not likely to succeed on the merits because the Court lacks jurisdiction to hear challenges to their cooperative agreement terminations, and because Plaintiffs lack standing to challenge the FY 2026 NOFOs. They also fail to demonstrate irreparable harm because their purported injuries are uncertain and primarily economic in nature. For these reasons

and for others identified below, Plaintiffs do not establish their entitlement to the "extraordinary remedy" of a preliminary injunction, *Winter*, 555 U.S. at 24, and their Motion should be denied.

## I.      Plaintiffs Are Not Likely to Succeed on the Merits.

For the reasons that follow, Plaintiffs are not likely to succeed on their APA or First Amendment claims.  The movants' likelihood of success on the merits is the "most important factor," *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014), and "a failure to show a likelihood of success on the merits alone is sufficient to defeat the motion."  *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 21 (D.D.C. 2025).

### A.      This Court Lacks Jurisdiction To Hear Plaintiffs' Cooperative Agreement Termination Claims.

The Awardee Plaintiffs and SIECUS are unlikely to succeed on the merits of the claims arising from the termination of the Awardee Plaintiffs' cooperative agreements.

Under the doctrine of sovereign immunity, the federal government is subject to suit only when it has waived that immunity.  Waivers of sovereign immunity "must be unequivocally expressed in statutory text" and any such waiver "will be strictly construed . . . in favor of the sovereign."  *Lane v. Pena*, 518 U.S. 187, 192 (1996).  As a consequence, "[a]ny ambiguities in the statutory language are to be construed in favor of immunity."  *FAA v. Cooper*, 566 U.S. 284, 291 (2012).

When plaintiffs—like the Awardee Plaintiffs here—rely on the APA's waiver of sovereign immunity for claims "seeking relief other than money damages," the court does not have jurisdiction "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702; *see Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022).  One such statute is the Tucker Act, 28 U.S.C. § 1491, which "confer[s] exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in

damages on the Court of Federal Claims." *Crowley*, 38 F.4th at 1106. As the D.C. Circuit explained in *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–71 (D.C. Cir. 1982), the Tucker Act applies—and district court jurisdiction is therefore precluded—when a claim is "essentially contractual," which turns on whether "the source of the rights" at issue and "the type of relief sought." "In assessing those factors, the court must be careful to guard against 'a disguised contract action' that seeks to avoid the Tucker Act 'merely by alleging violations of regulatory or statutory provisions rather than breach of contract.'" *Vera Inst. of Just. v. DOJ*, 805 F. Supp. 3d 12, 26 (D.D.C. 2025) (citation omitted) (first quoting *Megapulse*, 672 F.2d at 968; then quoting *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985)).[1]

Indeed, "courts are to be wary of plaintiffs artfully pleading their way around the jurisdictional strictures of the Tucker Act." *U.S. Conf. of Cath. Bishops v. Dep't of State*, 770 F. Supp. 3d 155, 162 (D.D.C. 2025); *see also Megapulse*, 672 F.2d at 967 ("[A] plaintiff whose claims against the United States are essentially contractual should not be allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute and enlarged waivers of sovereign immunity, as under the APA."). The D.C. Circuit repeatedly has "cautioned plaintiffs that this court 'prohibit[s] . . . the creative drafting of complaints,' for example, by 'disguis[ing]' a claim for money damages as one for equitable relief, to avoid the jurisdictional consequences of the Tucker Act." *Crowley*, 38 F.4th at 1107 (alterations in original) (quoting

---

[1]    An appeal of the district court's decision in *Vera* has been docketed, and the D.C. Circuit heard argument on October 14, 2025 (No. 25-5248). Also pending before the D.C. Circuit is *Climate United Fund v. Citibank, N.A.* (Nos. 25-5122 and 25-5123), which was argued before the en banc court on February 24, 2026. This Court recently observed that *Climate United* "seems poised to address . . . Tucker Act jurisdictional issues that have arisen repeatedly in recent grant termination cases." *Dallas County v. Kennedy*, Civ. A. No. 25-4242 (CRC), 2026 WL 2123225, at *3 (D.D.C. July 23, 2026).

*Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)); *see NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661–62 (2025) ("*APHA*") (Barrett, J., concurring) ("[I]f the CFC has exclusive jurisdiction over the grant terminations, the plaintiffs cannot end-run that limit simply by packaging them with a challenge to agency guidance." (citation omitted)).

The Supreme Court has twice recently addressed whether grant termination disputes cast as APA claims could avoid the Court of Federal Claims, and both times strongly suggested they could not. In *Department of Education v. California*, 604 U.S. 650 (2025), the Court considered a district court ruling "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." Holding that Plaintiffs were unlikely to succeed on their APA claims because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here," the Court granted a stay pending appeal. *Id*. at 651–52. Similarly, in *NIH v. American Public Health Association*, the Court granted another stay because a majority of the Court concluded that the APA's "'limited waiver of sovereign immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." 145 S. Ct. at 2658 (alterations and some internal quotation marks omitted) (quoting *California*, 604 U.S. 650); *accord id*. at 2661 (Barrett, J., concurring) ("[b]oth logic and law . . . support channeling challenges to the grant terminations" to the Court of Federal Claims); *id*. at 2665 (Kavanaugh, J., concurring) ("The core of plaintiffs' suit alleges that the Government unlawfully terminated their grants. That is a breach of contract claim."); *see also Sustainability Inst. v. Trump*, 165 F.4th 817, 825 (4th Cir. 2026)

(vacating injunction because the "district court lacked jurisdiction to order that relief, which was designed to enforce obligations to pay money pursuant to Plaintiffs' grants").

Consistent with the principle that the Supreme Court's "decisions regarding interim relief" "must 'inform how a [lower] court' proceeds 'in like cases,'" *APHA*, 145 S. Ct. at 2664 (Gorsuch, J., concurring), the great weight of authority in this district likewise holds that APA challenges to grant and cooperative agreement terminations are "essentially contractual" and thus are channeled to the Court of Federal Claims. *Vera*, 805 F. Supp. 3d at 28; *see also, e.g.*, *Harris County v. Kennedy*, 786 F. Supp. 3d 194, 213–19 (D.D.C. 2025) (discussing APA claims; "when the highest court in the land answers the same question now before this Court, in a similar preliminary posture and on facts materially identical to those in this case, this Court cannot but listen"); *Catholic Bishops*, 770 F. Supp. 3d at 161–66; *Am. Ass'n of Physics Teachers, Inc. v. NSF*, 804 F. Supp. 3d 45, 60–66 (D.D.C. 2025); *New Mexico v. Musk*, 824 F. Supp. 3d 80, 92–93 (D.D.C. 2026).

Here, an analysis of the Awardee Plaintiffs' cooperative agreement termination claims confirms that they are "essentially contractual." *Megapulse*, 672 F.2d at 967–68. *First*, the source of the rights at issue is contractual. The Awardee Plaintiffs submitted applications in response to the FY 2023 NOFOs and agreed to "[i]mplement[] their projects in accordance with the terms of their cooperative agreements and HHS's programmatic guidance." Compl. ¶ 31. Put differently, "Plaintiffs here 'agreed to comply with an array of requirements attached to the receipt, use, and distribution of the grant money.'" *Vera*, 805 F. Supp. 3d at 29 (quoting *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1340 (Fed. Cir. 2021). Plaintiffs then objected that the Department "attempt[ed] to impose new conditions" on them. *Id*. at 10 (heading). And they objected again when the Department "terminated nearly every ongoing cooperative agreement" on grounds that Plaintiffs see as invalid. *Id*. ¶ 39. In other words, "[t]he core of plaintiffs' suit alleges that the

- 12 -

Government unlawfully terminated" their cooperative agreements, which is "a breach of contract claim." *APHA*, 145 S. Ct. at 2665 (Kavanaugh, J., concurring).

*Second*, the "type of relief sought" with respect to the cooperative agreement terminations weighs further in favor of the conclusion that the claims are essentially contractual. *Megapulse*, 672 F.2d at 968. Plaintiffs urge the Court to "[v]acate and set aside the 2026 Policy and all actions taken in furtherance of it" and also "[p]reliminarily and permanently enjoin application of the 2026 Policy." Compl. at 28. One half of the "2026 Policy," of course, is the Department's "terminat[ion] [of] the vast majority of existing TPP cooperative agreements" on June 26, 2026. *Id*. ¶ 5. "Stripped of its equitable flair, the requested relief seeks one thing" with respect to the terminations—Plaintiffs "want[] the Court to order the Government to stop withholding the money due under the Cooperative Agreements." *Catholic Bishops*, 770 F. Supp. 3d at 163; *see also Vera*, 805 F. Supp. 3d at 32 (no likelihood of success where Plaintiffs sought "continued payment of the grants—in other words, specific performance"). The type of relief sought, like the source of the rights themselves, is essentially contractual. This part of Plaintiffs' suit belongs before the Court of Federal Claims.

Plaintiffs' half-hearted arguments to the contrary are unavailing. Pls.' Mem. 39-42. Pairing grant termination claims with APA claims in the same cause of action does not, by that artifice, confer subject-matter jurisdiction where there was none before; "the plaintiffs cannot end-run" the Tucker Act "simply by packaging [their termination claims] with a challenge" to the agency's solicitation of funding proposals. *APHA*, 145 S. Ct. at 2661–62 (Barrett, J., concurring) ("The claims are legally distinct.").

Nor can Plaintiffs avoid the Tucker Act by claiming that the cooperative agreements in question "are not contracts." Pls.' Mem. 40-41. As an initial matter, there is ample consideration:

the Awardee Plaintiffs "agreed to comply with an array of requirements attached to the receipt, use, and distribution of the grant money" that benefit the Government. *Vera*, 805 F. Supp. 3d at 29 (quoting *Columbus Reg'l*, 990 F.3d at 1340); *see, e.g.*, FY 2023 Tier 1 NOFO at 48–57 (providing for, among other things, "a royalty-free . . . right to reproduce, publish, or otherwise use" materials developed under the award, and comprehensive reporting on program effectiveness). Similarly, Plaintiffs' arguments that the agreements are "cooperative agreements or grants, not . . . contracts" or that the agreements are not Tucker Act contracts because they "do not involve the provision of property or services for the direct benefit of the government as a market participant," Pls.' Mem. 40–41, cannot be right. Those arguments do not align with *Megapulse* and its progeny and cannot be reconciled with the Supreme Court's decisions in *APHA*, 145 S. Ct. at 2658, and *California*, 604 U.S. at 650, which concluded that the Tucker Act likely applied to "research-related grants" and "education-related grants," respectively, without adopting the standards urged by Plaintiffs here. *See also Vera*, 805 F. Supp. 3d at 29.

Finally, Plaintiffs venture that there must at least be subject-matter jurisdiction to hear SIECUS's claims, because those claims cannot be channeled by the Tucker Act given that SIECUS is not in privity with Defendants. Pls.' Mem. 42. Regardless of whether that is so, SIECUS's claims have a different problem—Plaintiffs' Motion does not demonstrate how a third party like SIECUS has Article III standing or falls within the zone of interests protected by the relevant statutes or regulations. If SIECUS's standing is based on the "independent decisions" of awardees who may elect to stop paying dues to SIECUS, that injury is speculative and not "fairly traceable" to the termination decisions themselves. *Nat'l Wrestling Coaches Ass'n v. Dep't of Education*, 366 F.3d 930, 937 (D.C. Cir. 2004) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)); *see Lujan*, 504 U.S. at 560 (for standing, the injury cannot be "the result of the

- 14 -

independent action of some third party not before the court" (alterations omitted)); ECF No. 14-5 ¶ 12 (speculation regarding loss of dues). Although Plaintiffs assert that "SIECUS has already devoted time and resources it could have spent elsewhere to combating the inaccurate and misleading claims advanced under the [2026] Policy," Pls.' Mot. 43, it is well settled that an organization "cannot spend its way into standing simply by expending money to . . . advocate against the defendant's action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). So SIECUS, like the Awardee Plaintiffs, is unlikely to succeed on the merits of its claims.[2]

### B.      Plaintiffs Lack Standing To Challenge the FY 2026 NOFOs.

Like subject-matter jurisdiction, standing "is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). In other words, each plaintiff "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). A straightforward application of this rule shows that no Plaintiff likely has standing to challenge the FY 2026 NOFOs, and thus no Plaintiff is likely to succeed on the merits of their challenges to the NOFOs.

"While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis*, 554 U.S. at 734 (citation omitted). "To establish standing, the grantees must show (1) injury in fact that is concrete and particularized and actual or imminent rather than conjectural or hypothetical, (2) causation fairly traceable to the defendants' challenged actions and (3) redressability by a favorable decision that is likely as opposed to merely

---

[2]      SIECUS does not appear to advance a theory of associational standing, but if it did, such a theory would encounter the same difficulties as the Awardee Plaintiffs.

speculative." *Glob. Health Council v. Trump*, 153 F.4th 1, 11 (D.C. Cir. 2025) (citing *Lujan*, 504 U.S. at 560–61).

The vast majority of the purported injuries to Plaintiffs would arise from the cooperative agreement terminations, not the 2026 NOFOs. As a result of the terminations, Plaintiffs allege, Hennepin County "has been forced to use other budgetary resources to provide stop-gap funding for the program"; King County won't be able to continue its study, and PPH "has been forced to begin winding down its TPP Project entirely." Compl. ¶¶ 65, 69, 72. These allegations may be pertinent to a challenge to the cooperative agreement terminations, but they are not pertinent to a challenge to the 2026 NOFOs, even if those two are lumped together in the Complaint as the "2026 Policy."

That Plaintiffs lack standing with respect to the NOFO challenges is evident from their pleading. No Plaintiff alleges that it has applied for or intends to apply for funding from either of the FY 2026 NOFOs. Indeed, "Hennepin County has determined that it cannot seek funding under the Tier 1 2026 NOFO to continue supporting its work on Better Together Hennepin." Compl. ¶ 67. King County believes it would be "difficult or impossible" to comply with the 2026 Tier 2 NOFO terms using its existing program. *Id*. ¶ 70; *see* ECF No. 14-3 ¶ 45. And PPH similarly does not indicate that it has applied or intends to apply but observes that "[t]he Tier 1 2026 NOFO would require PPH to adopt changes to its programming." Compl. ¶ 75.

These allegations are insufficient to establish standing. With respect to the 2026 NOFOs, the Complaint casts Plaintiffs as bystanders—entities that wish the Administration would have issued NOFOs better aligned with their own policy preferences. As the Supreme Court has observed, "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *USAID v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). Plaintiffs'

- 16 -

spirited disagreement with the specifics of the most recent NOFOs does not absolve them of the responsibility to demonstrate an actual or imminent injury in fact that is fairly traceable to the Defendants' actions and is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560. Unlike a case where a plaintiff "may be harmed by denial of the opportunity to compete for a pool of funds for which they are able and willing to compete," *Global Health*, 153 F.4th at 12, the Awardee Plaintiffs were able to compete for funds but apparently unwilling to do so. In that sense, the resulting harm they assert would be "self-inflicted," not one that is "fairly traceable to the defendant's challenged conduct." *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006). Moreover, any allegation that Plaintiffs might be disadvantaged in a material way if they were to apply is too "speculative for Article III purposes." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("threatened injury must be *certainly impending* to constitute injury in fact," and "[a]llegations of *possible* future injury" are insufficient for standing (emphases in original)). If Plaintiffs have indeed declined to apply for funding, that choice—not Defendants' conduct—is the source of their injury.

Moreover, notwithstanding the representations in the Complaint discounting the possibility that Plaintiffs would apply, Defendants understand that one of the Awardee Plaintiffs submitted an application for funding in response to the 2026 NOFOs. (The deadline for applications was July 23, 2026, one day before this Opposition was due.) If that is true, such a development would not resolve Plaintiffs' standing difficulties. For one thing, standing is measured "when the suit was filed," *Davis*, 554 U.S. at 734, and cannot be created by some later development. For another, any Plaintiff that submitted an application—which, at this point, would not have been approved or denied—would struggle to articulate an injury in fact that is more than speculative. If the asserted injury in fact is a supposed "impairment" of Plaintiffs' programs and inability to accomplish their

- 17 -

primary missions, Pls.' Mem. 42, they are not likely to succeed on that theory either. The Supreme Court's recent opinion in *FDA v. Alliance for Hippocratic Medicine* rejected the plaintiffs' theory that the FDA had "impaired" their "ability to provide services and achieve their organizational missions," concluding that such a showing "does not work to demonstrate standing." 602 U.S. at 394. The uncertainty surrounding these developments, including the lack of clarity regarding Plaintiffs' theory of the claim, only illustrates how far Plaintiffs are from demonstrating a likelihood of success on the merits.

> **C.      Plaintiffs Are Unlikely To Succeed on the Merits of Their APA Claims for Several Additional Reasons.**

> 1.      <u>The Challenged Decisions Are Committed to Agency Discretion by Law.</u>

Even if this court had jurisdiction over Plaintiffs' challenges to the cooperative agreement terminations, those challenges would fail at the threshold because the funding decisions at issue here are committed to agency discretion by law. *See* 5 U.S.C. § 701(a)(2); 2 C.F.R. § 200.340(a)(4).

The statute at issue here earmarks funds for certain broad purposes but does not mandate that the funds be awarded to any specific organization or otherwise constrain the agency's discretion to reallocate funding to a different recipient or activity. More specifically, the Consolidated Appropriations Act, 2026 provides that, "of the funds made available under this heading, $101,000,000 shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy." Pub. L. No. 119-75, 140 Stat 173, 281.

In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under

the APA's reasoned-decisionmaking standards. *See id*. at 184–88. The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id*. at 192. Thus, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id*. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). "Of course," this discretion is not unbounded because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id*. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise, such as from regulations), courts may not "intrude." *Id*. Although *Lincoln* addressed lump-sum appropriations, the D.C. Circuit has made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations— "clearly require[] 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise.'" *Id*. at 752. And as such, these decisions are no more susceptible to judicial review under the APA's reasoned-decisionmaking framework.

These principles preclude Plaintiffs' attempt to seek APA review of the agency's decision to terminate their cooperative agreements and issue new Notices of Funding Opportunities. The statute in question provides that for the $101 million appropriated "for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants," not more than ten percent of that total "shall be for training and technical assistance, evaluation, outreach, and additional program support activities." 140 Stat 173, 281. The statute further provides that of the remaining funds, "75 percent shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, and 25 percent shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." *Id*. Nothing in the text of those statutes constrains the agency's discretion to determine how best to allocate the funds among recipients to best achieve the broad statutory goals. It is left to the agency's sound judgment how to divvy up the funds for Tier 1 programs and the funds for Tier 2 programs. *See Hosp. for Special Surgery v. Becerra*, Civ. A. No. 22-2928 (JDB), 2023 WL 5448017, at *6 (D.D.C. Aug. 24, 2023) (while funding statute "does provide some basic guardrails," agency's use of discretion was unreviewable because "none of the challenged actions relate to, let alone contravene, these basic standards"). The agency is not obligated to provide money to Plaintiffs at all, much less to continue funding their activities pursuant to grant agreements that fail to advance agency priorities.

2.   The FY 2026 NOFOs Are Not Final Agency Actions.

The Plaintiffs' APA challenges to the FY 2026 NOFOs are also likely to fail because the NOFOs are not final agency actions.

The APA generally authorizes judicial review only of a final agency action.  5 U.S.C. § 704.  The APA defines "agency action" as "includ[ing] the whole or a part of . . . relief, or the equivalent or denial thereof."  *Id.* § 551(13).  In turn, "'relief' includes the whole or a part of an agency['s] . . . grant of money."  *Id.* § 551(11)(A).  For agency action to be final, it must meet two conditions: "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) (citation omitted).  "When intermediate agency action does not bind the final decisionmaker, no final agency action has occurred."  *Planned Parenthood of Wisc., Inc. v. Azar*, 316 F. Supp. 3d 291, 302 (D.D.C. 2018) (citing *Dalton v. Specter*, 511 U.S. 462, 465, 469-70 (1994)), *vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019).

Whether a change to an agency's application process is a final agency action depends, in part, on whether that change alone is outcome determinative.  When the change involves some exercise of agency discretion, until the agency "completes its review and reaches a decision [on the award], there has been no final agency action . . . and the matter is not ripe for judicial review."  *Citizens Alert Regarding the Env't v. EPA*, 102 F. App'x 167, 168 (D.C. Cir. 2004); *see also Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007) (holding that there was no "final agency action . . . until the [agency] has reviewed a grant application and decided to disburse the funds"); *Karst Envt'l Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005) (concluding that there was no final agency action when the agency had "not yet decided whether to award the grant"), *aff'd*, 475 F.3d 1291, 1295 (D.C. Cir. 2007).

- 21 -

Here, the provisions of the FY 2026 NOFOs challenged by Plaintiffs are not final agency actions susceptible to APA review.  The NOFOs amount to "a new competition for TPP funding," Compl. ¶ 40, and solicit applications from interested organizations.  Under the terms of the NOFOs, "[f]ederal staff and an independent merit review panel will assess all qualified eligible applications," which will be scored on a scale of up to 100 points.  FY 2026 Tier 1 NOFO at 36.  Then, "[t]he Office of Population Affairs will coordinate with a senior appointee to provide recommendations for funding to the Grants Management Officer."  *Id.* at 40.  The NOFOs further provide that "[n]o award decision is final until a Notice of Award is issued by the Grants Management Officer, in coordination with a senior appointee or appointee's designee, consistent with the Executive Order on 'Improving Oversight of Federal Grantmaking.'"  *Id.*

The NOFOs, in other words, "describe[] how an agency decision *will be* made," but do not describe "a final agency action itself."  *Planned Parenthood of Wisc.*, 316 F. Supp. 3d at 300.  The portions of the NOFOs highlighted by Plaintiffs, and the resulting scores assigned to applications, do not determine whether an applicant will receive funding or in what amount.  *See id.* (no final agency action where "no Title X grants have yet issued under the challenged review criteria").  For this straightforward reason, Plaintiffs' legal challenge to the NOFOs are likely to fail for lack of final agency action.

       3.    <u>The Challenged Decisions Are Neither Contrary to Law nor Arbitrary and Capricious.</u>

In addition, Plaintiffs cannot demonstrate a likelihood of success on the merits because they cannot show that the cooperative agreement terminations or the FY 2026 NOFOs are contrary to law or arbitrary and capricious.

*First*, Plaintiffs' premise that the FY 2026 NOFOs "abandon[] the statutory requirements for the TPP Program" rests on an elementary misunderstanding.  Compl. at 12 (heading).  The

gravamen of Plaintiff's objection is that various aspects of the NOFOs "add[] . . . conditions found nowhere in the congressional appropriation." *Id*. ¶ 42. Take, for example, Plaintiffs' grievance with "sexual risk avoidance," *id*. ¶ 43, which is "developmentally appropriate instruction on the risks associated with adolescent sexual activity, the benefits of delay, and strategies for resisting social pressure." FY 2026 Tier 1 NOFO at 12. The FY 2026 NOFOs indicate that award "[r]ecipients are expected to incorporate sexual risk avoidance (SRA) education as a component of program delivery." *Id*. Plaintiffs object that "[t]his approach contravenes Congress's mandate in the authorizing appropriation that declined to limit TPP funding to SRA programs," Compl. ¶ 43, but this is a simple logical error: Congress did not require this type of programming, but it did not prohibit it, either. The sparse wording of the appropriation leaves many gaps for the agency to address, and the 2026 NOFOs reflect the agency's judgment on how best to address them.

Plaintiffs also object that the FY 2026 Tier 1 NOFO invites applicants to "modify—rather than replicate—previously approved programs." Compl. ¶ 48. That possibility, Plaintiffs seem to suggest, runs contrary to the statutory text providing funding "for replicating programs that have been proven effective." 140 Stat at 281. However, the FY 2026 Tier 1 and Tier 2 NOFOs carefully maintain the statutory distinction to which Plaintiffs advert. The NOFOs contemplate that "[m]inor changes to an effective program to improve its fit and relevancy are more appropriate within TPP Tier 1 replication initiative awards," while "[m]ajor changes to an effective program that substantially change the model's core components, logic model, or delivery mechanism" are suitable for submission for Tier 2 funding. FY 2026 Tier 2 NOFO at 7. There is no violation of the statute here.

*Second*, the terminations of the Awardee Plaintiffs' cooperative agreements were likewise not contrary to law. Nothing in the relevant statute entitles Plaintiffs to funding for the full five-

- 23 -

year period, and the relevant regulations specifically contemplate that such awards "may be terminated" if they "no longer effectuate[] the program goals or agency priorities."  2 C.F.R. § 200.340(a)(4).  Plaintiffs do not challenge that regulation here, which the agency properly invoked in its termination letters to the Awardee Plaintiffs.  *E.g.*, ECF No. 14-2 at ECF pp. 33-34.

*Third*, Plaintiffs are unlikely to succeed in demonstrating that the cooperative agreement terminations or FY 2026 NOFOs are arbitrary and capricious.  Although a full and definitive discussion of the merits is not possible in this emergency posture, the framework for analysis is clear.  The APA's arbitrary-and-capricious standard is "deferential" and requires only that agency action be "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  *Id*.  Thus, the relevant question is not whether the Court—or Plaintiffs— would have drafted the NOFOs differently, but whether the Department acted reasonably in doing so.  That deferential standard permits the Department to revise its policy priorities; an agency changing course need not demonstrate that its new policy is "better" than the old one, only that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Against this backdrop, Plaintiffs' APA challenges are unlikely to succeed.  The Department explained its termination of the cooperative agreements with reference to a review of curricular content in light of agency priorities, including its desired "focus on programs that do not promote material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content, including content that encourages, normalizes or promotes sexual activity for minors."  ECF No. 14-2 at ECF p. 33; *see* Background, § B.  Similarly, the FY 2026 NOFOs provide applicants

extended explanations of the agency priorities, program goals, and expectations for awardees. *E.g.*, FY 2026 NOFO at 5–12.  Both the termination letters and the NOFOs acknowledged and explained their departures from the prior administration's priorities on these topics.

Plaintiffs rely heavily on *Planned Parenthood of Greater N.Y. v. HHS*, Civ. A. No. 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025), to suggest they are likely to succeed on the merits of their arbitrary and capricious claim, but that reliance is misplaced:  That decision, of course, did not relate to or examine the termination letters or Notices of Funding Opportunity currently before this Court, which reflect additional agency consideration of the policy questions at issue. Regardless, with respect, that decision did not fully manifest the appropriate deference to agency decisionmaking in considering whether the policy there at issue was "reasonable and reasonably explained."  *Prometheus*, 592 U.S. at 423.  A comprehensive review of the challenged actions in this case will show that the agency took relevant factors into account, considered the available evidence, and reasonably decided to proceed in the manner reflected in the termination letters and NOFOs.  Plaintiffs' challenge is ultimately a challenge to the policy preferences of this Administration and lacks a sound basis in the Administrative Procedure Act.

**D.      Plaintiffs' First Amendment Claim Is Not Likely To Succeed on the Merits.**

Nor are Plaintiffs likely to succeed on the merits of their First Amendment claim, which relates only to the 2026 Tier 1 NOFO.  Compl. ¶¶ 109–110.  As discussed above, no Plaintiff has standing to bring this claim because no Plaintiff even alleges that it has applied for an award under the NOFO, much less has it been rejected.  Even if one or more Plaintiffs did have standing, the claim would lack merit for the reasons that follow.

Plaintiffs assert that the 2026 Tier 1 NOFO "constitutes unlawful viewpoint discrimination" because it "requires awardees to align their organizational mission with agency goals."  Compl. ¶¶ 109–110; *see* Pls.' Mem. 38–39.  Plaintiffs take issue with language in the

NOFO that asks applicants to "[d]escribe [the applicant's] mission and how it aligns with the goals of this NOFO, including advancing body literacy, informed consent, and optimal health" as well as language indicating that applications will be scored in part on "the extent to which the applicant . . . [d]emonstrates a strong alignment between the organization's mission and the goals of the NOFO." Compl. ¶ 51.

Plaintiffs are simply mistaken when they contend that the 2026 Tier 1 NOFO "seek[s] to leverage funding to regulate speech outside the contours of the program itself." *All. for Open Soc'y*, 570 U.S. at 214–15. For starters, nothing in the NOFO prohibits or punishes any speech. The language Plaintiffs quote appears under the heading "organizational capacity and expertise" and accounts for an applicant's "meaningful presence or significant investment in the defined service area," as well as "experience and capacity to implement evidence-based teen pregnancy prevention programs that are medically accurate [and] age-appropriate." 2026 Tier 1 NOFO (ECF No. 1-4) at 38–39. As such, it reflects at most a "funding decision[]" that is "viewpoint neutral and reasonable" because it favors the selection of organizations with demonstrated experience and capacity to successfully implement TPP Programs. *Am. Ass'n of Pol. Consultants v. SBA*, 810 F. App'x 8, 10 (D.C. Cir. 2020) (affirming denial of injunction). In that regard, the FY 2026 Tier 1 NOFO is similar to its FY 2023 counterpart that Plaintiffs seek to reinstate, which favored the selection of applicants with the "capacity, experience, and expertise to execute their proposed project" and scored applicants on their ability to "[d]emonstrate how the proposed project aligns with the organization's vision and mission." 2023 Tier 1 NOFO (ECF No. 1-1) at 26, 44.

The other NOFO language quoted by Plaintiffs is even more innocuous; it merely requests that an applicant describe its "mission and how it aligns with the goals of this NOFO." 2026 Tier

1 NOFO at 20.  Plaintiffs do not explain how a requirement to describe the applicant's mission in a funding application could violate the Constitution.

For these additional reasons, Plaintiffs are not likely to succeed on the merits of their First Amendment claim.

## II.     Plaintiffs Fail To Demonstrate Irreparable Harm.

If the Court reaches the question of irreparable harm, it should conclude that the harms asserted by Plaintiffs do not justify injunctive relief, especially in light of the heightened showing required to justify mandatory injunctions.  Plaintiffs' failure to establish irreparable harm is an independent reason to deny their request for preliminary relief.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The moving party must demonstrate an injury that is "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm."  *Id*. (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  To support a claim for provisional injunctive relief, the injury must "be beyond remediation," *id*., meaning that the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2024).  In short, "irreparable harm requires not only a concrete, particularized harm, but a harm that is sufficiently serious and irremediable so as to warrant the extraordinary relief of a court's intervention in a case before factual and legal development." *Santos v. Collins*, Civ. A. No. 24-1759 (JDB), 2025 WL 1823471, at *6 (D.D.C. Feb. 26, 2025); *Dallas County*, 2026 WL 2123225, at *5 ("'[M]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a preliminary injunction are not enough' to satisfy the irreparable harm prong." (quoting *Clevinger*, 134 F.4th at 1234)).

- 27 -

In their effort to establish irreparable harm, the Plaintiffs run headlong into two basic principles of injunctive relief.  First, one of the several "well known and indisputable principles" of equity is that "economic loss does not, in and of itself, constitute irreparable harm."  *Wisconsin Gas*, 758 F.2d at 674.  Second, harms to third parties "have no role to play in determining whether Plaintiffs themselves will suffer irreparable harm absent an injunction now."  *Planned Parenthood of Greater N.Y.*, 2025 WL 1768100, at *9.

Plaintiffs' efforts to draft around these rules fail.  Hennepin County and King County each "reallocate[d] money from other county initiatives," a classic economic harm that is common fare in courts sitting in equity.  Pls.' Mot. 43.  Plaintiffs aver that they "cancel[ed] planned training sessions," "paus[ed] new enrollments," and devoted "time and resources" to opposing the Department's policy, *id*., but these are likewise not "certain and great" harms meriting the extraordinary remedy of injunctive relief.  *Chaplaincy*, 454 F.3d at 297.  Although Plaintiffs point to harms they assert are "beyond remediation," such as layoffs of staff and interruptions of a study, these harms also fall well below the bar for similar reasons.  Pls.' Mot. 43; *see* ECF No. 14-3 ¶ 49 ("After two months, we will not have sufficient funding to continue our evaluation and finish the study.").  Moreover, those proffered harms could only potentially be "beyond remediation" if they cannot obtain other funding—either from the 2026 NOFOs or other sources—to continue those programs in one form or another, but Plaintiffs do not even attempt to show that other sources of funding are not available.  *Planned Parenthood of Greater N.Y.*, 2025 WL 1768100, at *8 ("[A] temporary cessation of Plaintiffs' TPP projects is still not irreparable harm to Plaintiffs' broader mission.").

Indeed, Plaintiff's opportunity to compete for new funding from the Department forecloses as a matter of law any claim of irreparable harm.  *Global Health*, 153 F.4th at 12 ("Because the

large-scale contract terminations were not enjoined, it stands to reason that existential financial harm would already have taken place by the time that the grantees would finally receive unobligated funds for which they first had to compete.  Or, if the later opportunity to compete for additional grants could fix the harm, it would not be irreparable.").  Even if the Court were to later vacate the Department's NOFOs, "Plaintiffs would then have the opportunity to have their grant applications considered under a different set of agency priorities." *Am. Ass'n of Physics Teachers*, 804 F. Supp. 3d at 71.  "And the possibility that adequate relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id*. (citation modified).

In short, Plaintiffs have failed to establish irreparable harm warranting this Court's immediate intervention.

## III.     The Remaining Stay Factors Weigh Against Injunctive Relief.

This Court need not reach the remaining factors, which "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.  If it does, however, it should conclude that these factors tilt decisively against granting a preliminary injunction here.

Several equitable considerations weigh against an injunction here.  With respect to the cooperative agreement terminations, if Plaintiffs obtain their requested order, the government is "unlikely to recover the . . . funds once they are disbursed," *California*, 604 U.S. at 650, for the funds likely already will have been expended.  *See also APHA*, 145 S. Ct. 2658 ("[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.'").  On the other side of the ledger, Plaintiffs' asserted harms arise from recoverable economic losses.  Moreover, even if Plaintiffs have "identified tangible harms that have befallen" them as a result of the cooperative agreement terminations, "those harms are not so irremediable as to outweigh the potential risk of erroneously

ordering the government to pay grant funds at a time when the D.C. Circuit is poised to opine on key jurisdictional and merits questions that likely bear directly on the case." *Dallas County*, 2026 WL 2123225, at *6.

As to the Notices of Funding Opportunity, the expansive nature of the relief Plaintiffs seek weighs decisively against an injunction. Recall that Plaintiffs seek to enjoin "all actions taken by Defendants and their officers, employees, and agents to implement the 2026 Policy, including the issuance of the 2026 NOFOs and the June 26, 2026, terminations of Teen Pregnancy Prevention (TPP) Program awards." Proposed Order (ECF No. 14-7) at 1. Such an action would preclude the Department's review of any Teen Pregnancy Prevention Program applications at all. "[T]he equities and public interest do not support such a sweeping remedy," *Harris County*, 786 F. Supp. 3d at 222, and Plaintiffs' bid to grind the gears of government to a halt should be rejected.

## IV.    The Court Should Require Plaintiff to Post Security.

For the reasons stated above, the Court should deny Plaintiffs' motion in its entirety. Nevertheless, should the Court issue any injunctive relief, the Court should also order Plaintiffs to post security. Under Rule 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by the Government if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (a district court has "broad discretion . . . to determine the appropriate amount of an injunction bond").

## V.    Any Injunction Should Be Stayed Pending Appeal.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or, at a minimum, administratively stayed for a period of seven days to allow the United

States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized. "[T]he factors regulating the issuance of a stay are . . . : (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). These factors are substantially similar to the preliminary injunction factors and thus, for the same reasons that Plaintiffs' preliminary injunction should be denied, any preliminary injunction should be stayed pending an appeal.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion.

Dated: July 24, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

PETER C. PFAFFENROTH
Chief, Civil Division

By:    */s/ Andrew J. Vaden*
    ANDREW J. VADEN, D.C. Bar # 1044860
    DIMITAR P. GEORGIEV, Bar # 1735756
    Assistant United States Attorneys
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2500
    andrew.vaden@usdoj.gov

*Attorneys for the United States of America*