**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **HENNEPIN COUNTY, MINNESOTA**, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**, et al., <br><br> *Defendants.* | **Case No. 26-cv-2460 (CRC)** |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR**
**5 U.S.C. § 705 STAY AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Introduction ................................................................................................................................. 1

Argument ..................................................................................................................................... 2

    I.    Plaintiffs are likely to establish jurisdiction. ................................................................. 2

        A.    The Tucker Act is not applicable here. ................................................................... 2

        B.    Plaintiffs have standing. .......................................................................................... 5

    II.    Plaintiffs are likely to succeed on the merits. ............................................................. 11

        A.    The 2026 Policy is unlawful. ................................................................................ 11

            i.    The 2026 Policy is final agency action. ....................................................... 11

            ii.    The 2026 Policy is not committed to agency discretion. .............................. 14

            iii.    The 2026 Policy is contrary to law, in excess of statutory authority, and arbitrary and capricious. ......................................................................................................... 17

        B.    The Tier 1 2026 NOFO violates the First Amendment. ....................................... 20

    III.    Plaintiffs are suffering irreparable harm and urgently need relief. .............................. 22

    IV.    The balance of the equities and the public interest favor Plaintiffs. ............................ 23

    V.    The Court should not require a bond or issue a stay pending appeal. ........................... 25

Conclusion ................................................................................................................................ 25

**INTRODUCTION**

Defendants do not deny that, in the middle of a five-year funding cycle, they have adopted a new policy for the Teen Pregnancy Prevention (TPP) Program. And Defendants do not deny that they abruptly implemented the 2026 Policy last month through the issuance of new notices of funding opportunity (NOFOs) and the mass termination of existing cooperative agreements. As explained in Plaintiffs' opening brief, Defendants seek to reject Congress's vision for the TPP Program and replace it with one that imposes their own policy preferences on awardees, including by mandating abstinence-only "sexual risk avoidance" programming; demanding "alignment" with vague agency priorities, many of which undermine Congress's design; and prohibiting discussion of teen sexual activity in a program designed to reduce teen pregnancy.

Defendants hardly defend the 2026 Policy on the merits. Instead, they try to evade judicial review through a host of threshold arguments that fundamentally misconstrue Plaintiffs' challenge. Those arguments fail. The Tucker Act poses no bar to review because Plaintiffs' motion asks the Court to stay a broadly applicable unlawful Policy—and Defendants' implementing actions in connection therewith, including the NOFOs and sweeping terminations—and direct Defendants to resume administering the TPP Program without reliance on the Policy's requirements. Plaintiffs have standing to challenge the Policy, which directly and concretely affects their interests in the TPP Program. The Policy is final agency action reviewable under the Administrative Procedure Act (APA): It represents the consummation of the agency's decisionmaking process as to management of the TPP Program, and it has immediate consequences for awardees, applicants, and other stakeholders, including the youth served by the Program. And the Policy does not fit within the APA's narrow carve-out for actions committed to agency discretion because—as several other courts have recognized—Congress set clear parameters for how the agency is supposed to administer the TPP Program.

1

On the merits, Defendants promise that some future review of the record will reveal that the agency engaged in reasoned decisionmaking. Defendants fail to rebut, however, the overwhelming evidence that the Policy is contrary to law and that, among other things, Defendants imposed new criteria not intended by Congress, failed to consider important aspects of the problem of reducing teen pregnancy, and changed course without accounting for the substantial reliance interests of TPP Program stakeholders.

The equitable factors also weigh decisively in favor of preliminary relief. Plaintiffs are suffering ongoing, irreparable injuries due to Defendants' actions, including being forced to lay off experienced personnel, start dismantling critical sexual health education programs, and cancel planned training sessions before the upcoming school year. By contrast, Defendants face no cognizable harm from a stay and injunction that halts the unlawful Policy and restores the status quo: administration of the TPP Program consistent with Congress's directives.

As Plaintiffs have explained, time is of the essence. Plaintiffs' harms grow every day and become more difficult to unwind. Meanwhile, the application date for the new NOFOs has passed, and Defendants' refusal to extend that date pending consideration of this motion indicates that they plan to issue new awards under those unlawful NOFOs as quickly as possible. Accordingly, the Court should stay and preliminarily enjoin the 2026 Policy as soon as is practicable.

## ARGUMENT

### I. Plaintiffs are likely to establish jurisdiction.

#### A. The Tucker Act is not applicable here.

As Plaintiffs' opening brief established, the Tucker Act does not interfere with the Court's jurisdiction in this matter: The rights Plaintiffs assert in challenging the new Policy arise out of the APA, rather than the terms of TPP cooperative agreements (which are not contracts). Mem. of Law in Supp. of Pls.' Mot. for 5 U.S.C. § 705 Stay and Prelim. Inj. (Pls.' Mem.) 39–42, Dkt. No.

2

14-1. In their opposition, Defendants try to reframe Plaintiffs' challenge as directly attacking the terminations of the cooperative agreements. *E.g.*, Defs.' Mem. in Opp. to Pls.' Mot. for Stay and Prelim. Inj. (Opp.) 9, Dkt. No. 28 ("This Court lacks jurisdiction to hear Plaintiffs' cooperative agreement termination claims." (capitalization and emphasis omitted)). But Plaintiffs do not bring "cooperative agreement termination claims"—they challenge the adoption and implementation of the 2026 Policy, which the agency merely consummated by shutting the door on the existing version of the Program through mass terminations of existing projects, while correspondingly issuing new NOFOs setting forth its unlawful replacement terms going forward.

Even putting aside Defendants' misunderstanding of Plaintiffs' claims, the Tucker Act does not divest this Court of jurisdiction for several reasons. As an initial matter, Defendants all but concede that the Tucker Act does not apply to SIECUS's claims because SIECUS is not in privity with Defendants. Opp. 14. That alone is sufficient to dispose of Defendants' Tucker Act argument. Pls.' Mem. 42; *see, e.g.*, *Dallas County v. Kennedy*, No. 25-cv-4242, 2026 WL 2123225, at *9 (D.D.C. July 23, 2026) ("a growing chorus of courts has ruled that a lack of contractual privity between a plaintiff and the federal government undermines Tucker Act channeling").[1]

In addition, application of the two-part test announced in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), shows that this case belongs in district court. Defendants agree that *Megapulse* sets forth "binding precedent to be followed by this Court" in cases concerning the Tucker Act. *Am. Acad. of Pediatrics v. HHS*, 816 F. Supp. 3d 27, 52 (D.D.C. 2026) (*AAP*); *see* Opp. 10. The *Megapulse* test considers (1) "the source of the rights upon which the plaintiff bases its claims" and (2) "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968.

---

[1] Instead, Defendants contend that SIECUS lacks standing. Opp. 14–15. As Plaintiffs show below, that argument also fails.

Defendants' reliance on the Tucker Act fails at the first step because the TPP cooperative agreements lack adequate consideration and thus are not "contracts" for Tucker Act purposes. *See* Pls.' Mem. 40–41. The Court of Federal Claims has no jurisdiction over cases concerning cooperative agreements rather than contracts, *see Hymas v. United States*, 810 F.3d 1312, 1330 (Fed. Cir. 2016), and "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006).

Defendants make two arguments to the contrary. First, they assert that "there is ample consideration" based on a single provision in the Tier 1 2023 NOFO providing for a royalty-free license to use materials developed under the award. Opp. 13–14. But Defendants do not attempt to engage with the relevant statutory language and Federal Circuit precedent distinguishing between contracts and cooperative agreements. As the Federal Circuit has explained, an agreement constitutes a contract when "the principal purpose of the instrument is to acquire . . . property or services for the direct benefit or use of the United States Government," whereas the "principal purpose" of a cooperative agreement is "to carry out a public purpose," and courts must therefore draw the line between the two based on a "fact-specific determination" of "the principal purpose of the relationship." *Hymas*, 810 F.3d at 1325, 1328 (quoting 31 U.S.C. §§ 6303, 6305). There can be no serious argument that the "principal purpose" of the TPP cooperative agreements was to provide royalty-free access to teen pregnancy prevention materials for the direct benefit or use of the federal government, rather than to advance the *public* purpose of reducing teen pregnancy.

Second, Defendants claim that the distinction between contracts and cooperative agreements "cannot be reconciled with" the Supreme Court's emergency-docket Tucker Act decisions in *Department of Education v. California*, 604 U.S. 650 (2025) (*DOE*), and *NIH v. American Public Health Ass'n*, 145 S. Ct. 2658 (2025) (*APHA*). Opp. 14. But as Judge Howell has

4

persuasively reasoned, "[n]either of the emergency-docket stay orders in *DOE* and *APHA* considered whether the grants at issue amounted to 'contracts' within the meaning of the Tucker Act, with no attention given to jurisprudence from the Court of Federal Claims and the Federal Circuit" distinguishing contracts from cooperative agreements. *AAP*, 816 F. Supp. 3d at 50 n.7. And in both cases, the lower court opinions that the Supreme Court reviewed likewise did not consider the issue. *Id.* There is thus no contradiction between the Supreme Court's preliminary conclusion that the specific grants at issue in *DOE* and *APHA* counted as contracts under the Tucker Act and the Federal Circuit's precedent requiring a "fact-specific determination" of the principal purpose of the particular instrument at issue in each case.

Because the cooperative agreements here do not trigger the Tucker Act at all, the Court need not proceed to the second *Megapulse* factor. That factor too, though, favors this Court's jurisdiction because, under Justice Barrett's controlling opinion in *APHA*, "the Tucker Act does not deprive [the Court] of jurisdiction to vacate and prospectively enjoin unlawful policies concerning such terminations." *New Mexico v. Musk*, 824 F. Supp. 3d 80, 93 (D.D.C. 2026). Defendants make no argument to the contrary. There is thus no barrier to the prospective relief that Plaintiffs seek here regardless of whether the agreements are contracts: the Court's consideration (and vacatur) of the 2026 Policy under the APA.[2]

**B. Plaintiffs have standing.**

Defendants' attack on Plaintiffs' standing likewise lacks merit. Defendants ignore the substance of Plaintiffs' claims, which challenge the 2026 Policy—a decision by the Department of Health and Human Services (HHS) to revamp the entire TPP Program away from its congressional mandate to prevent teen pregnancy and morph it into an unrecognizable conduit for

---

[2] Defendants do not argue that the Tucker Act poses any bar to Plaintiffs' alternative challenge to the NOFOs alone.

promoting administration priorities, including the promotion of *fertility. See* Pls.' Mem. 8–14; Compl. ¶¶ 39–62, Dkt. No. 1. Defendants do not deny that this overarching decision has harmed Plaintiffs concretely. Instead, Defendants contend that the "majority of the purported injuries to Plaintiffs would arise from the cooperative agreement terminations, not the 2026 NOFOs," and argue only that standing is deficient specifically for the challenge to the NOFOs. Opp. 16. This argument essentially concedes standing to challenge the 2026 Policy, which Defendants effectuated in part through the sweeping terminations.

And even if the NOFOs are considered separately, Plaintiffs are injured by those as well, as they divert funding intended for TPP programs for which Plaintiffs were eligible to compete into new programs, not consistent with Congress's directive, for which Plaintiffs cannot compete. Plaintiffs plainly have standing under the competitor standing doctrine, as several courts have concluded in previous attempts by Defendants to redirect the TPP Program through an unlawful NOFO. *See Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100, 1109 (9th Cir. 2020); *Multnomah County v. Azar*, 340 F. Supp. 3d 1046, 1055 (D. Or. 2018); *Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 320–24 (S.D.N.Y. 2018).

The "basic requirement" under the competitor standing doctrine "is that the complainant show an actual or imminent increase in competition, which increase [courts] recognize will almost certainly cause an injury in fact." *Wash. Alliance of Tech. Workers v. DHS*, 892 F.3d 332, 340 (D.C. Cir. 2018). Defendants' sole justification for departing from that well-settled rule is that "[n]o Plaintiff alleges that it has applied for or intends to apply for funding from either of the FY 2026 NOFOs." Opp. 16. As an initial matter, that is incorrect. As Defendants elsewhere acknowledge, one Plaintiff—King County—did apply for funds under the Tier 2 NOFO. *Id.* at 17. King County was forced to apply using a different program from the one Defendants terminated

6

because the terms of the new NOFO make it impossible for the county to continue evaluating its Stepping Stones program. Suppl. Decl. of Andrea Gerber ¶ 9, Dkt. No. 30-1; Decl. of Andrea Gerber ¶ 45, Dkt. No. 14-3. Thus, while King County has done its best to submit an application that attempts to comply with the new requirements, that does not obviate the harm it suffers as a result of the NOFO, Suppl. Gerber Decl. ¶¶ 8–14, nor does it change the fact that the NOFO remains unlawful for all the reasons detailed by Plaintiffs. *See also* Gerber Decl. ¶¶ 35–36, 41–42.

As for the other Awardee Plaintiffs—all of whom operated Tier 1 Programs—Defendants admit that those Plaintiffs submitted evidence that they *cannot* seek funding for their programs under the 2026 NOFOs because those programs were crafted to satisfy the statute, with which the new NOFOs conflict. *See* Opp. 16 (summarizing Awardee Plaintiffs' evidence). Defendants claim this is "insufficient to establish standing" because Awardee Plaintiffs failed to allege a specific intent to apply for funding under the new NOFOs. *Id.* But far from being "bystanders" "to the 2026 NOFOs" that are "unwilling" to compete for funding, *id.* at 16–17, Awardee Plaintiffs have demonstrated their sincere intent to continue operating within and benefiting from the TPP Program by filing this federal lawsuit to maintain it under the terms Congress mandated. Awardee Plaintiffs' inability to apply for funding under the 2026 NOFOs is not a "self-inflicted" decision to abandon the TPP Program, *contra id.* at 17, but instead results from Defendants' decision to abandon the rigorous, evidence-based criteria the statute requires. *See, e.g.*, Pls.' Mem. 20 (citing declarations evidencing that "there *are no* rigorously tested, proven-effective programs that center 'body literacy' and comply with the administration's other newly imposed policy priorities").

Defendants' suggestion that standing in this context requires a recitation of the specific intent to apply under an unlawful funding announcement is not supported by case law. On the contrary, under the competitor standing doctrine, "[a] plaintiff need not participate in the

7

competition"; so long as it is "able and ready to bid" under a lawful funding instrument, "deciding not to bid makes the injury imminent." *Planned Parenthood of Greater Wash.*, 946 F.3d at 1108. And where an agency's action impairs a plaintiff's *ability* to compete for federal funding, including by "increas[ing] competition" in a way that "tilts the playing field for parties that were already competing," the plaintiff's "injury is the increase in competition rather than the ultimate denial of an application," and "causation and redressability then derive from '[b]asic economic logic.'" *Id.* at 1108–09 (second alteration in original) (citation omitted) (upholding plaintiffs' standing to argue requirements imposed by TPP funding announcement were "statutorily impermissible").

Indeed, Defendants' argument that Plaintiffs cannot rely on the competitor standing doctrine because (with the exception of King County) they have not applied for funding under the 2026 NOFOs, and that any competitive disadvantage is "too 'speculative for Article III purposes,'" ignores binding precedent. *See* Opp. 17 (relying on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), a case with no relevance to competitor standing). In *Washington Alliance of Technology Workers*, the government made the same argument pressed here: that plaintiffs could not establish competitor standing to challenge an agency rule because they "have not 'bothered to even apply'" to participate in the relevant market "since the [challenged] Rule took effect." 892 F.3d at 339–40. The D.C. Circuit rejected that argument as "foreclose[d]" by existing precedent; plaintiffs were "not removed from the [relevant competitive] market simply because they have not filled out formal . . . applications" where "they ha[d] affirmed their desire to" compete. *Id.* at 340 (citing *Mendoza v. Perez*, 754 F.3d 1002, 1013–14 (D.C. Cir. 2014)). Contrary to Defendants' assertions, Awardee Plaintiffs here were not obligated to submit applications under unlawful funding announcements before challenging them—through this lawsuit, they seek relief that would enable them to compete under a lawfully (re)constituted TPP Program. *See Shays v. FEC*, 414 F.3d

8

76, 88 (D.C. Cir. 2005) ("[W]hen regulations illegally structure a competitive environment—whether an agency proceeding, a market, or a reelection race—parties defending concrete interests . . . in that environment suffer legal harm under Article III.").

Defendants also contend that even applying for funding under the 2026 NOFOs would not confer standing because it must be "measured 'when the suit was filed,'" not "created by some later development," whereas here the application deadline fell after Plaintiffs filed suit. Opp. 17 (citation omitted). That assertion is risible; as explained above, Awardee Plaintiffs need not apply under an unlawful funding notice to challenge its legality and certainly were not required to rush to submit applications before even filing suit. Moreover, Defendants' reliance on *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), for the proposition that an impairment of an organization's "ability to provide services and achieve [its] organizational mission[]" "does not work to demonstrate standing" is misplaced. *See* Opp. 17–18 (citation omitted). There is no comparison between Plaintiffs' position vis-à-vis the TPP Program and the organizations in *Alliance*, whose alleged injury was premised on "strong opposition to the government's conduct" and abstract "object[ion] to FDA's actions" approving a drug that the organizations' members did not use, prescribe, or recommend. 602 U.S. at 394. On the contrary, Plaintiffs here are direct participants and stakeholders in the TPP Program, and the 2026 Policy—and the NOFOs issued to implement that Policy—interferes directly with their core business activities. *E.g.*, Decl. of Virginia Miller ¶ 5, Dkt. No. 14-4 ("The provision of comprehensive sex education is core to PPH's mission and an integral part of PPH's work.").

In addition to causing competitive injury, the NOFOs directly target the conduct of Awardee Plaintiffs and control their eligibility to continue as program participants. And where "the complainant is 'an object of the action (or forgone action) at issue,'" a plaintiff's "standing to

9

seek review of administrative action is self-evident." *Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir. 2002) (citation omitted). Indeed, "[t]he Supreme Court has stated that 'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (Kavanaugh, J.) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992)); *see also Nat'l Ass'n of Home Builders v. EPA*, 786 F.3d 34, 43 (D.C. Cir. 2015) ("[R]egulated entities' standing to challenge the rules that govern them is 'normally not an issue' because regulatory constraints typically qualify as injury in fact." (internal citation omitted)). That case law applies here, where the NOFOs directly regulate TPP Program participants by prescribing rules for what they may and may not include in their curricula and determine whether participants can continue operating within the TPP Program. The NOFOs thus injure Plaintiffs in a "concrete and personal way." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (citation omitted).

Finally, Defendants argue in passing that SIECUS lacks standing and does not fall within the zone of interests. Opp. 14–15. But an organization has standing where (1) "the agency's action or omission . . . injured the [organization's] interest," and (2) "the organization used its resources to counteract that harm." *Robert F. Kennedy Hum. Rts. v. Dep't of State*, No. 25-cv-1774, 2026 WL 820811, at *5 (D.D.C. Mar. 25, 2026) (alteration in original) (quoting *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)). That is the case here. SIECUS attests, for example, that it "works directly with many TPP grantees and sub-grantees to provide technical assistance," Decl. of Calleen Simon ¶ 9, Dkt. No. 14-5, and that Defendants' changes to the TPP Program will "harm SIECUS financially," *id.* ¶ 12. SIECUS has not spent its way into standing, *contra* Opp. 15; rather, the challenged policy "directly affect[s] and interfere[s] with [its] core business activities." *See All. for Hippocratic Med.*, 602 U.S. at 395. And SIECUS has been forced to divert resources to

10

counteract Defendants' "inaccurate and misleading claims about the evidence around sexual and reproductive health education" and to "counsel[] TPP Program grantees on the effects of the 2026 Policy." Simon Decl. ¶ 23.

For similar reasons, SIECUS easily falls within the zone of interests Congress sought to protect when it established the TPP Program. The relevant test demands only that a plaintiff's grievances "arguably fall[] within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Mendoza*, 754 F.3d at 1016 (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997)). Among other things, SIECUS "provid[es] technical assistance to state and local partners to support development and implementation of local evidence-based sex education policies," and it works to "develop[] and strengthen[] partnerships with other organizations, coalitions, and initiatives to advance polices that promote comprehensive sex education as a foundation for health equity and justice." Simon Decl. ¶ 6. SIECUS's interests in the TPP Program are hardly "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Mendoza*, 754 F.3d at 1017 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).

## II. Plaintiffs are likely to succeed on the merits.

### A. The 2026 Policy is unlawful.

#### i. The 2026 Policy is final agency action.

Defendants' finality defense ignores the substance of Plaintiffs' allegations. Plaintiffs showed that the 2026 Policy is final agency action, relying on binding precedent holding that an agency's decision need not be reduced to writing to be judicially reviewable and may instead be inferred from the course of agency conduct. *See* Pls.' Mem. 16–19. Both Plaintiffs' final-agency-action and merits arguments are, accordingly, focused on challenging *the 2026 Policy*. *See id.* at 16–39. That is a classic APA challenge to a single act: the agency's summary decision to remake

11

the TPP Program in its own image without reasoned explanation, transforming a congressionally established program into an instrument of this administration's design. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001) ("Though the agency has not dressed its decision with the conventional procedural accoutrements of finality, its own behavior thus belies the claim that its interpretation is not final."). Defendants' finality challenge fails to analyze or in any way address Plaintiffs' arguments regarding the 2026 Policy. *See* Opp. 20–22. Defendants are thus subject to the "rule . . . that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded," and "[s]uch a concession 'acts as waiver.'" *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) (citation omitted). The Court should proceed to the merits of Plaintiffs' arguments.

But to the extent the Court considers Defendants' narrower contention that the 2026 NOFOs (and *only* the 2026 NOFOs) are nonfinal, that argument is meritless. Defendants cherry-pick by selectively editing the APA to suggest that it "defines 'agency action'" to include only "relief, or the equivalent or denial thereof." *See* Opp. 21 (quoting part of 5 U.S.C. § 551(13)). In truth, the APA defines "agency action" much more broadly to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). That definition "cover[s] comprehensively every manner in which an agency may exercise its power." *Whitman*, 531 U.S. at 478. The 2026 NOFOs (and, indeed, the 2026 Policy) are plainly agency actions.

The 2026 NOFOs (like the 2026 Policy) are also final. Defendants' argument that the NOFOs fail the *Bennett* finality test ignores the weight of authority considering materially identical actions. For example, the Ninth Circuit found prior NOFOs issued under the TPP Program contrary to law in *Planned Parenthood of Greater Washington*. 946 F.3d at 1112–14. And the precise

argument Defendants press here was rejected in *Multnomah County*—a previous challenge to a TPP NOFO—in which the court found that, "while additional steps must be taken to actually award grants, no further steps need to be taken to disqualify applicants such as the county from receiving grants at all." 340 F. Supp. 3d at 1057. Likewise, in *Planned Parenthood of New York City*, another challenge to a previous funding announcement under the TPP Program, the court "reject[ed] defendants' contention that there can never be 'consummation' . . . until an agency has actually issued grant awards," finding that the announcement constituted final agency action where it "implicate[d] plaintiff's eligibility for funding." 337 F. Supp. 3d at 328.

Defendants' contrary argument rests on inapposite case law. Their finality argument relies primarily on *Planned Parenthood of Wisconsin, Inc. v. Azar*, 316 F. Supp. 3d 291 (D.D.C. 2018) (cited in Opp. 21), but the D.C. Circuit vacated that decision. *See* 942 F.3d 512 (D.C. Cir. 2019). Vacatur aside, that case concerned a different funding announcement, which Judge McFadden found to be nonfinal specifically because it "involve[d] scoring criteria, *not* eligibility criteria" and governed only "an intermediate stage in the grant review process." 316 F. Supp. 3d at 301 (emphasis added). The NOFOs here, by contrast, directly determine eligibility for participation in the TPP Program and thus cannot be analogized to the announcements in *Planned Parenthood of Wisconsin*. *See, e.g.*, Tier 1 2026 NOFO at 4–5, Dkt. No. 1-4 (confirming that recipients "must demonstrate ongoing compliance" with administration's new priorities, including to "[p]romote body literacy," and that "[f]ailure to meaningfully align funded activities with the applicable requirements" will result in termination); Tier 2 2026 NOFO at 5, Dkt. No. 1-5 (similar).

Defendants' other authorities are likewise unavailing. Opp. 21. For example, *Citizens Alert Regarding the Environment v. EPA* rejected on finality grounds a claim that EPA failed to conduct a required environmental review—because the agency "[was] currently conducting the review

13

required." *See* 102 F. App'x 167, 168 (D.C. Cir. 2004). That case did not concern any agency action analogous to the NOFOs here. Even less relevant is *Rattlesnake Coalition v. EPA*, in which the court rejected an argument, not presented here, "that where Congress has earmarked federal funds for a particular project via an appropriations act, the funds should be considered dispersed and qualify as a final agency action under the APA." 509 F.3d 1095, 1103–04 (9th Cir. 2007). Finally, *Karst Environmental Education & Protection v. EPA* concerned "an expectancy that has not yet materialized," where the plaintiff believed an agency was likely to award money to another party. 403 F. Supp. 2d 74, 81 (D.D.C. 2005) (citation omitted). It likewise did not concern any agency action bearing any similarity to the NOFOs issued here.

Defendants have waived any argument that the 2026 Policy—the focus of Plaintiffs' motion—is nonreviewable, and the Court should proceed to review that decision. But even if the Court considers the finality specifically of the NOFOs, they plainly meet the *Bennett* test.

### ii. The 2026 Policy is not committed to agency discretion.

In another attempt to avoid review, Defendants argue the 2026 Policy falls under the APA's limited carve-out for action "committed to agency discretion." Opp. 18–20 (citing 5 U.S.C. § 701(a)(2))). Given the "strong presumption favoring judicial review of administrative action," the Supreme Court reads this exception "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser Co. v. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (citations omitted). The Court has "generally limited the exception to certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (internal quotation marks and citations omitted).

14

The 2026 Policy does not fit into this narrow exception because the 2026 Appropriations Act provides meaningful standards. Congress directed HHS to use Tier 1 funds "for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 281. Tier 2 funds must be used "to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." *Id.* And all programs must be "medically accurate and age appropriate." *Id.* These restrictions provide "concrete standards" that HHS must follow in administering the TPP Program. *See Mach Mining, LLC v. EEOC*, 575 U.S. 480, 488 (2015).

Unsurprisingly, courts "have reached a consensus" that this statutory language "creates meaningful standards such that judicial review of appropriations to the TPP Program is available under the APA." *Planned Parenthood of N.Y.C.*, 337 F. Supp. 3d at 325 (collecting cases). As one court explained, even if HHS has "'wide latitude' or 'broad leeway' in how to allocate TPP Program funding, Congress articulated restrictions and thus parameters as to how that funding may be allotted, and the Court may apply 'meaningful standards' by insisting that the agency follow these congressional directives." *Id.* While a court may not "second-guess[] the agency's decision to fund one program over another," it "does have the authority to ensure that when making that decision HHS considers statutory restrictions," and "in doing so the court applies manageable standards." *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 659 (D. Md. 2018); *see also Multnomah County*, 340 F. Supp. 3d at 1062 (funding opportunity announcement for TPP Program was subject to judicial review because "mandatory limitations" in appropriations act "afford a 'statutory reference point' by which the court can review" the announcement). Defendants do not grapple with any of this case law.

15

Instead, Defendants rely heavily on *Lincoln v. Vigil*, 508 U.S. 182 (1993), which involved the allocation of funds from a lump-sum appropriation. Opp. 18–19. There, the Supreme Court concluded that the Indian Health Service's termination of a program was unreviewable because the relevant appropriations acts "[did] not so much as mention the [discontinued] Program." *Lincoln*, 508 U.S. at 193–94. Those circumstances are nothing like this case, where Congress appropriated funds for a specific purpose and imposed clear parameters for the agency's administration of the TPP Program. As the *Lincoln* Court recognized, "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* at 193. That is precisely what Congress did here. *See also Multnomah County*, 340 F. Supp. 3d at 1062 (distinguishing *Lincoln* and other cases where "Congress allocated funds to lump-sum appropriations without specifically restricting the use of funds").

Nor does *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), help Defendants. Opp. 19. There, Congress directed that certain funds were to be used "to provide assistance directly to . . . dairy producers, in a manner determined appropriate by the Secretary." *Milk Train*, 310 F.3d at 751 (omission in original) (citation omitted). The statute provided "no relevant 'statutory reference point' for the court other than the decisionmaker's own views of what is . . . 'appropriate.'" *Id.* (citation omitted). Here, by contrast, the 2026 Appropriations Act provides multiple "reference points," including the requirements that programs be medically accurate and age-appropriate, that Tier 1 funds be used to replicate programs proven effective, and that Tier 2 funds be used to develop additional programs. *See also Planned Parenthood of N.Y.C.*, 337 F. Supp. 3d at 325 (statute governing appropriations for TPP Program "differs markedly" from

16

those in *Lincoln* and *Milk Train* due to "restrictions on the use of funds"). In short, there is law for this Court to apply in evaluating Plaintiffs' claims that the 2026 Policy violates the APA.[3]

### iii. The 2026 Policy is contrary to law, in excess of statutory authority, and arbitrary and capricious.

As Plaintiffs showed, the 2026 Policy is contrary to law and exceeds Defendants' statutory authority because it disregards the "replication" requirement for Tier 1 programs; shifts TPP Program funds exclusively to abstinence-only programming; and contravenes Congress's command to fund programs that are medically accurate, age-appropriate, and effective by forbidding content that acknowledges and discusses teen sexual activity. Pls.' Mem. 19–23. In addition, the Policy is arbitrary and capricious because, among other things, it relies on agency priorities not intended by Congress; fails to consider the most important aspect of the problem before the agency in ensuring that TPP Program funds continue to reduce teen pregnancy; and changes position without accounting for the substantial reliance interests of awardees, their partners, and the communities they serve. *Id.* at 23–37.

Defendants make little attempt to defend the 2026 Policy on the merits. They assert that Congress did not prohibit abstinence-only "sexual risk avoidance" content in the TPP Program, Opp. 23, but no one argues otherwise. The point is that Defendants have taken one *permissible* element of programming and rendered it *mandatory* for all awardees. For all the reasons already explained—and unrebutted by Defendants—that choice violates Congress's funding scheme, which specifically earmarks TPP funds for programs proven effective and designates a separate sum for abstinence-only programs. *See* Pls.' Mem. 21–22; *see also Pol'y & Rsch., LLC v. HHS*,

---

[3] The only other case Defendants point to, *Hospital for Special Surgery v. Becerra*, No. 22-cv-2928, 2023 WL 5448017 (D.D.C. Aug. 24, 2023), is inapposite as well. The court concluded that while the relevant statutory language provided "some limited judicially manageable standards," the plaintiff's challenge did not relate to those standards. *Id.* at *6. Plaintiffs' challenge in this case, by contrast, "relate[s] to specific statutory language" that Defendants contravened. *See id.* at *7.

17

313 F. Supp. 3d 62, 69 (D.D.C. 2018) (K.B. Jackson, J.) (in 2009, Congress shifted away from exclusively abstinence-only education to "provide[] funding that could be used for both 'abstinence-only and contraception information/services' approaches" (citation omitted)).

Next, Defendants suggest that they have not violated the statute's replication requirement because the NOFOs contemplate only "[m]inor changes to an effective program" for Tier 1 awardees. Opp. 23 (alteration in original) (quoting Tier 2 2026 NOFO at 7). But Defendants do not refute Plaintiffs' showing that there are no proven-effective programs awardees could run that comply with the administration's new policy priorities. *See* Miller Decl. ¶ 39; Decl. of Ashley Johnson ¶ 33, Dkt. No. 14-2. For example, the Tier 1 NOFO requires awardees to incorporate "body literacy," but there are no such programs that have been proven effective. *See* Simon Decl. ¶ 21; *see also Planned Parenthood of Greater Wash.*, 946 F.3d at 1113 ("To prove something effective requires a previous implementation that one can test against a standard."). And "nothing in the record indicates that fulfilling" the 2026 Policy's requirements "has ever resulted in a program proven effective through rigorous evaluation." *See Multnomah County*, 340 F. Supp. 3d at 1067; *see also Planned Parenthood of N.Y.C.*, 337 F. Supp. 3d at 337 ("proof" that a program is replicable is "what the statute requires"). The Policy therefore violates the statute by effectively eliminating the replication requirement.

Defendants rely on statements in the termination letters invoking regulations contemplating that awards may be terminated if they do not effectuate program goals or agency priorities. Opp. 23–24 (citing 2 C.F.R. § 200.340(a)(4)). That is not responsive to Plaintiffs' argument that the 2026 Policy—and implementing actions, including the termination letters—contravenes the statutory requirements of the TPP Program. Regulations cannot give the agency authority to terminate awards without consideration of legal requirements.

18

Defendants' arbitrary-and-capricious arguments fare no better. They offer few specific responses to Plaintiffs' detailed discussion of those claims. *See* Pls.' Mem. 23–37. Instead, they protest that "a full and definitive discussion of the merits is not possible in this emergency posture" and promise that "[a] comprehensive review of the challenged actions in this case" will show the agency's actions were reasonable. Opp. 24–25. Of course, as Plaintiffs have explained, it is Defendants who bear responsibility for the "emergency posture" here. *See* Dkt. No. 23 at 1. And that posture does not relieve Defendants of the obligation to show they engaged in reasoned decisionmaking. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 54–56 (D.D.C. 2025) (granting temporary restraining order on arbitrary and capricious grounds); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 766 F. Supp. 3d 74, 82–83 (D.D.C. 2025) (same).

Defendants claim that the cursory references to new agency priorities in the termination letters and NOFOs constitute sufficient explanation. Opp. 24–25. But Defendants were required to acknowledge their change in position, evaluate whether there were substantial reliance interests, and then account for those interests. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020). A passing reference to new policy priorities is hardly sufficient to satisfy those obligations. Moreover, Defendants offer no defense for the NOFOs' reliance on multiple sources that *do not exist* or do not support the stated proposition. *See* Decl. of Kate Talmor ¶¶ 7–12, Dkt. No. 14-6. And they provide no answer to Plaintiffs' showing that the 2026 Policy runs counter to the evidence before the agency. *See* Pls.' Mem. 30–31.

Defendants also take issue with Plaintiffs' reliance on *Planned Parenthood of Greater New York v. HHS*, No. 25-cv-2453, 2025 WL 2840318, at *16 (D.D.C. Oct. 7, 2025), which Plaintiffs primarily invoked in support of the point that the 2026 Policy is impermissibly vague, Pls.' Mem. 35–37. Defendants claim that, in comparison to the policy notice at issue in that case, the 2026

19

NOFOs and termination letters "reflect additional agency consideration of the policy questions at issue." Opp. 25. Even if true, that response does not cure the vagueness issues identified by Judge Howell in *Planned Parenthood of Greater New York* with respect to the 2025 policy notice, whose requirements are recycled—in some places verbatim—in the 2026 Policy. *Compare, e.g.*, Dkt. No. 1-3 at 5 (material outside scope of TPP Program may include "content that encourages, normalizes, or promotes sexual activity for minors"), *id.* (TPP Program statute does not authorize "ideological content" such as "gender ideology" or "discriminatory equity ideology"), *id.* at 6 (prohibiting "unlawful diversity, equity, or inclusion-related discrimination"), *with* OASH Priorities, https://perma.cc/LJ7U-27F2 (last visited July 1, 2026) (agency priorities include deprioritizing content that "encourages, normalizes or promotes sexual activity for minors"; "[e]nding support for gender ideology"; and "[e]nding diversity, equity, and inclusion (DEI) policies and practices" (cited in Tier 1 2026 NOFO at 4; Tier 2 2026 NOFO at 4)).

For all these reasons, the 2026 Policy is contrary to law, in excess of statutory authority, and arbitrary and capricious. And even if looked at independently, the 2026 NOFOs are unlawful for the same reasons. *See* Pls.' Mem. 37–38.

**B.  The Tier 1 2026 NOFO violates the First Amendment.**

Separately, the Tier 1 2026 NOFO violates the First Amendment. Under the NOFO, applicants must describe how their mission "aligns with the goals of this NOFO, including advancing body literacy, informed consent, and optimal health," and they are assessed on the extent to which they "[d]emonstrate[] a strong alignment between the organization's mission and the goals of the NOFO." Tier 1 2026 NOFO at 20, 38. On its face, this requirement is not limited to the contours of the TPP Program and therefore violates the First Amendment. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013) (funding conditions

20

burden First Amendment rights where they "seek to leverage funding to regulate speech outside the contours of the program itself").

Defendants insist that the mission-alignment requirement does not "prohibit[] or punish[] any speech." Opp. 26. In fact, it does just that: Applicants whose mission does not align with the agency's goals and policy priorities are treated less favorably. Courts have repeatedly struck down conditions that seek to regulate speech outside the contours of a funding program. *See, e.g.*, *Freedom Network v. Trump*, No. 25-cv-12419, 2026 WL 1899186, at \*10–11 (N.D. Ill. Mar. 23, 2026) (NOFO certification provision likely violated First Amendment where it "'reach[ed] outside' the federal program to influence speech" (citation omitted)); *R.I. Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180, 195 (D.R.I. 2025) (conditions likely violated First Amendment where they were "enacted as 'extrinsic, extrastatutory conditions' on top of already existing and well-established programs" (citation omitted)); *see also Am. Council of Learned Soc'ys v. NEH*, No. 25-cv-3657, 2026 WL 1256545, at \*51 (S.D.N.Y. May 7, 2026) (First Amendment violation where defendants "used funding leverage to penalize private speakers for failing to conform to the Government's preferred ideological position").

Defendants cannot credibly claim that the mission-alignment requirement "favors the selection of organizations with demonstrated experience and capacity to successfully implement TPP Programs." Opp. 26. The NOFOs expressly disfavor TPP Program participants with experience and a track record of success by awarding bonus points to applicants who do not hold active TPP awards or have never received one. Tier 1 2026 NOFO at 41–42; Tier 2 2026 NOFO at 52. And Defendants' attempted comparison to the Tier 1 2023 NOFO gets them nowhere. That NOFO asked applicants to "[d]emonstrate how the proposed project aligns with the organization's

vision and mission," Tier 1 2023 NOFO at 26, Dkt. No. 1-1; it did not suggest that applicants would be assessed on whether their mission aligned with the agency's priorities.[4]

### III. Plaintiffs are suffering irreparable harm and urgently need relief.

As this Court has explained, the loss of federal grant funding causes irreparable harm when it forces local governments to "lay off employees, cut public-health programming, and suspend other operations that the grants were intended to promote." *Harris County v. Kennedy*, 786 F. Supp. 3d 194, 219 (D.D.C. 2025). Plaintiffs have established such harms.

Hennepin County faces imminent closure of its Tier 1 project at the end of this month, Johnson Decl. ¶ 36, and has already had to cancel or postpone training sessions and is unable to begin the hiring and training needed to keep the program running in the upcoming school year, *id.* ¶ 43. The county's relationships with partner organizations and schools have been damaged by the uncertainty caused by the 2026 Policy and will be further harmed absent relief. *Id.* ¶ 45.

King County likewise has been forced to divert funds from other sources to avoid immediately terminating its Tier 2 study, but those funds are "working to wrap up program delivery with participants" rather than continuing the study for the two years needed to complete it. Gerber Decl. ¶¶ 48–49. After two months, the county will not have sufficient funding to finish the study. *Id.* ¶ 49. The study is the only evidence-based pregnancy and STI program specifically designed for young men involved in the legal or child-welfare systems. *Id.* ¶ 54. The county's efforts over the last three years will "largely go to waste" if it is unable to finish the study, *id.* ¶ 49, and new

---

[4] This case does not resemble *American Ass'n of Political Consultants v. SBA*, 810 F. App'x 8 (D.C. Cir. 2020). There, a regulation provided that businesses primarily engaged in political or lobbying activities were ineligible for certain loans. *Id.* at 9. But the regulation was viewpoint neutral because it "[did] not discriminate along partisan lines." *Id.* at 10. The mission-alignment requirement, by contrast, favors organizations that share this administration's ideological preferences. And for the reasons already discussed, the mission-alignment requirement leverages funding to regulate speech outside the contours of the program, which was not true in *American Ass'n of Political Consultants*. *Id.* at 9.

enrollments have already been paused, *id.* ¶ 51. Beyond the harm to the county public health department's mission to reduce the rate of unplanned pregnancies and improve the reproductive and sexual health of the county's residents, *id.* ¶ 5, the imminent cancellation of the study will harm the county's reputation and its relationships with community partners, *id.* ¶ 56.

Planned Parenthood of the Heartland (PPH) has already been forced to begin winding down its TPP project and has laid off ten staff members as of July 20. Miller Decl. ¶¶ 26–30. PPH will suffer reputational harm and harm to its relationships with community members in Iowa and Nebraska if it is unable to resume its TPP programming. *Id.* ¶ 35.

Defendants dispute none of these noneconomic harms, which Plaintiffs are already suffering and will continue to suffer. Instead, they argue only that economic loss cannot constitute irreparable harm, and that the mere possibility of securing new funding in the future is all that is needed to preclude interim relief. As this Court has explained, however, "a loss of federal funding can cause irreparable harm when it 'threatens the very existence of the [recipient's] operations.'" *Harris County*, 786 F. Supp. 3d at 219 (quoting *ABA v. DOJ*, 783 F. Supp. 3d 236, 247 (D.D.C. 2025)). When local governments, like King County and Hennepin County, have to "cut public-health programming" and "draw upon general funds" to cover the loss of cancelled grants, that suffices to establish irreparable injury. *Id.* at 219–20.

Without preliminary relief, Plaintiffs will continue to suffer economic and noneconomic harms with no prospect of later redress. These harms amply support preliminary relief.

## IV. The balance of the equities and the public interest favor Plaintiffs.

The balance of the equities and the public interest also support preliminary relief. Defendants' actions have upended longstanding, successful efforts to reduce teen pregnancy. As a result, young people will be at risk of increased teen pregnancy rates, in direct contravention of Congress's goals when it created the TPP Program. *E.g.*, Miller Decl. ¶ 46; Gerber Decl. ¶ 58. And

23

Defendants face no countervailing harm from preliminary relief that halts their unlawful practice. *See, e.g.*, *Beatty v. Trump*, No. 25-cv-4480, 2026 WL 1505646, at \*29 (D.D.C. May 29, 2026).

Defendants' arguments to the contrary are meritless. They worry that "if Plaintiffs obtain their requested order, the government is 'unlikely to recover the . . . funds once they are disbursed.'" Opp. 29 (omission in original) (citation omitted). Plaintiffs' proposed order asks the Court to stay the 2026 Policy and implementing actions, including the NOFOs and termination letters. Dkt. No. 14-7. This relief would permit awardees to draw down on the remaining funds for the short period left on the third year of their awards and would require Defendants to process applications for the fourth year without relying on the Policy. Given the irreparable harm to Plaintiffs and "the significant public interest in promoting the public health," the "relatively small financial burden on the federal government" does not tip the balance of hardships in Defendants' favor. *See Harris County*, 786 F. Supp. 3d at 222.

Defendants' reliance on *Dallas County* is also misplaced. In balancing the equities, this Court noted that the plaintiff had failed to act "with alacrity," waiting roughly nine months before filing suit. 2026 WL 2123225, at \*6 (citation omitted). Plaintiffs in this case, by contrast, swiftly sought relief less than three weeks after Defendants implemented the 2026 Policy through the new NOFOs and the mass termination of existing cooperative agreements.

Finally, Plaintiffs' proposed relief would not "grind the gears of government to a halt." Opp. 30. Instead, it would stay the unlawful Policy and restore the status quo, which is the usual remedy in an APA case. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (citation omitted)); *Coal. for Humane Immigrant Rts.*

24

*v. Noem*, 805 F. Supp. 3d 48, 74 (D.D.C. 2025) (purpose of § 705 stay is to "return[] things to the *status quo ante* while this case proceeds"). Defendants would be required to resume administering the TPP Program in accordance with Congress's directives, as they did for years before the adoption and implementation of the 2026 Policy.

### V. The Court should not require a bond or issue a stay pending appeal.

The Court should reject Defendants' request for an injunction bond of unspecified magnitude. Opp. 30. Federal Rule of Civil Procedure 65(c) "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). Here, no bond is appropriate. In light of the financial and other harms the 2026 Policy has inflicted on Plaintiffs, imposing a bond "would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025); *see also, e.g.*, *Harris County*, 786 F. Supp. 3d at 222.

The Court should also deny Defendants' premature request for a stay pending appeal or administrative stay. Opp. 30–31. Defendants satisfy none of the stay factors: As explained above, they are not likely to succeed on the merits; they suffer no harm at all—let alone irreparable harm—from preliminary relief against an unlawful policy, and the balance of equities and public interest favor Plaintiffs. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

### CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion and stay and preliminarily enjoin the 2026 Policy and the actions flowing from it. In the alternative, the Court should at minimum stay and preliminarily enjoin the 2026 NOFOs.

Date: July 29, 2026

Respectfully submitted,

*/s/ Michael J. Torcello*
Michael J. Torcello (DC Bar No. 90014480)
Kate Talmor (DC Bar No. 90036191)
Carrie Y. Flaxman (DC Bar No. 458681)
Robin F. Thurston (DC Bar No. 1531399)
Skye L. Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
mtorcello@democracyforward.org
ktalmor@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org
*Counsel for Plaintiffs Hennepin County, King
    County, and SIECUS*

Hannah Klain*
Karen Dunn (DC Bar No. 1002520)
Jeannie Rhee (DC Bar No. 464127)
Dunn Isaacson Rhee LLP
401 9th Street NW
Washington, DC 20004
Phone: (202) 240-2900
hklain@dirllp.com
kdunn@dirllp.com
jrhee@dirllp.com
*Counsel for Plaintiffs*

Cormac Early (DC Bar No. 1033835)
Allison M. Zieve (DC Bar No. 424786)
Stephanie Garlock (DC Bar No. 1779629)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
Phone: (202) 588-1000
cearly@citizen.org
*Counsel for Plaintiffs Hennepin County, King
    County, and SIECUS*

Emily Nestler (DC Bar No. 973886)
Planned Parenthood Federation of America
1100 Vermont Avenue NW

26

Washington, DC 20005
Phone: (202) 973-4800
emily.nestler@ppfa.org
*Counsel for Plaintiff Planned Parenthood of the Heartland, Inc.*

Dylan Cowit*
Valentina De Fex*
Planned Parenthood Federation of America
123 William Street, 9th Floor
New York, NY 10038
Phone: (212) 261-4696
dylan.cowit@ppfa.org
valentina.defex@ppfa.org
*Counsel for Plaintiff Planned Parenthood of the Heartland, Inc.*

* Admitted pro hac vice

27