**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **HENNEPIN COUNTY, MINNESOTA *et al.*,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES *et al.*,**<br><br>Defendants. | Case No. 26-cv-2460 (CRC) |

**MEMORANDUM OPINION**

Millions of American teenagers have sex. Resulting unplanned pregnancies impose widespread costs on affected individuals and society generally. Alarmed by the country's rising teenage birth rate, Congress funded grants through the Teen Pregnancy Prevention ("TPP") Program to support local initiatives proven to reduce teen pregnancy, as well as promising approaches that might also prove effective after further observation and study. Congress intended for these programs to employ a range of strategies, from encouragement of abstinence and delayed sexual activity to education about contraceptives. The effort seems to be working: The teen pregnancy rate has plummeted since Congress began funding the grants in 2010.[1]

[1] Recent surveys from the Centers for Disease Control and Prevention indicate that about one-third of the country's roughly 17 million high school students have had sex at least once, and one-fifth are currently sexually active. These figures are down from approximately half and one-third of high schoolers, respectively, in 2013. See Jacob Fabina, Erik L. Hernandez & Kevin McElrath, School Enrollment in the United States: 2021, U.S. Census Bureau 2 tbl.1 (June 2023), https://www.census.gov/content/dam/Census/library/publications/2023/acs/acs-55.pdf [https://perma.cc/WFR4-U86J]; Youth Risk Behavior Surveillance Sys., Youth Risk Behavior Survey Data Summary & Trends Report: 2013–2023, CDC (2024), https://www.cdc.gov/yrbs/dstr/index.html [https://perma.cc/UZ2R-6UH2].

Under the current administration, the Department of Health and Human Services ("HHS") has a different take on teen pregnancy. In its view, the money Congress has appropriated for teen pregnancy prevention should be used *only* for programs that promote abstinence and "body literacy," a nebulous concept that appears to elevate fertility and marital procreation over well-tested forms of contraception and pregnancy prevention. The agency also seeks to bar grant recipients from encouraging or "normalizing" teen sexual activity, including through "sexually explicit" content and discussion.

Despite prior judicial rebukes of components of this same policy, HHS has memorialized its new approach through official policy pronouncements, which have in turn been incorporated into recent grant solicitations known as "notices of funding opportunity" ("NOFOs"). HHS has also applied its reimagined teen pregnancy policy by terminating existing grants held by TPP Program providers across the country. Among these providers are the two local governments and one non-profit organization that filed this lawsuit, alongside a second non-profit that supports TPP programming but is not itself a grant recipient. These four Plaintiffs now seek to preliminarily enjoin the policy's implementation through the issuance of new NOFOs and mass termination of existing grant awards.

HHS is perfectly entitled to formulate its own views about how to stem teen pregnancy—or even whether it is worth preventing at all—and to pursue policy initiatives consistent with its viewpoint. But it is not at liberty, under the Administrative Procedure Act ("APA"), to impose conditions on grant recipients that Congress did not intend or that are unreasonable or unexplained. The preliminary record suggests that HHS has done just that. Through the TPP, Congress sought to fund a range of evidence-based teen pregnancy prevention strategies, not just abstinence. According to unrebutted record evidence, programs that teach abstinence to the

exclusion of all other approaches are ineffective in delaying sexual initiation and reducing adolescent pregnancy, at least as a general matter.[2] The agency's NOFOs *themselves* acknowledge a near-absence of evidence on "body literacy" approaches to pregnancy prevention. And an educational initiative that counsels teens on how to avoid pregnancy without discussing the realities of unprotected intercourse and its alternatives would seem to defy social reality, common sense, and scientific evidence alike. Yet HHS seeks to impose these and other unexplained criteria on *all* TPP grantees moving forward. As such, HHS's new TPP policy is likely arbitrary and capricious.

Having established the Court's jurisdiction over this challenge and satisfied the other requirements for preliminary relief, the grant-recipient Plaintiffs are therefore entitled to a preliminary injunction preventing HHS from implementing its new policy, including through its recently-issued NOFOs, while this lawsuit is pending. The Court declines, however, to order the interim reinstatement of existing grants at this early stage, as it is less clear that this Court, as opposed to the Court of Federal Claims, may exercise jurisdiction over those portions of Plaintiffs' APA claims that seek such relief. To be sure, that "agency guidance discusses" or memorializes "policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the [Court of Federal Claims] can hear" under a channeling statute known as the Tucker Act. Nat'l Insts. of Health v. Am. Pub. Health Ass'n ("NIH"), 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) (quoting 28 U.S.C. § 1491(a)(1)). But there is a difference between vacating an unlawful agency policy and vacating an unlawfully terminated grant, "*if* the [Court of Federal Claims] has exclusive jurisdiction" over the latter

[2] Whether that holds true for specific age groups, sub-populations, or communities is not evident on this early-stage record.

under the Act. Id. (emphasis added). Present uncertainty over that jurisdictional question counsels against enjoining enforcement of HHS's grant terminations at this time.

## I. Background

### A. The TPP Program

Teenage pregnancy is a critical public health issue in the United States, and unplanned adolescent childbearing has lasting and widely-felt health and economic consequences. Compl. ¶ 18. The federal government "has long recognized" the costs of teen pregnancy. Pol'y & Rsrch., LLC v. HHS, 313 F. Supp. 3d 62, 68 (D.D.C. 2018). Yet "its preferred method of addressing this societal concern has changed over time." Id. at 69. In the late 1990s and early 2000s, Congress focused on "abstinence-only education as the primary tool" for reducing teen pregnancy. Id. (citation omitted). In the mid-2000s, teen birth rates began to tick up after years of decline. Compl. ¶ 20. Legislators were "deeply concerned" by this upward trend, H.R. Rep. No. 111-220, at 176 (2009), and especially "alarmed" given that "America's teen birth rate" was "already high compared to other developed nations," S. Rep. No. 111-66, at 160 (2009).[3]

To address this reemerging problem, Congress created the TPP Program by way of the Consolidated Appropriations Act of 2010. The "short" and "simple" statutory language that created the Program "has remained consistent since [its] inception." Planned Parenthood of Greater Wash. & N. Idaho v. HHS ("PPGWNI"), 946 F.3d 1100, 1105 (9th Cir. 2020). Congress appropriated funds "for making competitive contracts and grants to public and private entities to fund *medically accurate* and *age appropriate* programs that *reduce teen pregnancy*."

---

[3] Despite recent improvements, the United States has one of the highest teen birth rates among industrialized countries. Its rate is over twice that of France and Canada and over five times that of Sweden. Alexandria K. Mickler and Jessica Tollestrup, Cong. Rsch. Serv., R45184, Teen Births in the United States: Overview and Recent Trends 11 (2025).

Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009) (emphasis added). Aside from a portion of TPP funds set aside for "training and technical assistance, evaluation, outreach, and additional program support activities," the remaining appropriation was to be split into two funding streams. Id. Tier 1 grants, which represent 75% of available funds, would "be for *replicating programs that have been proven effective through rigorous evaluation* to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." Id. (emphasis added). Tier 2 grants, which represent 25% of available funds, would "be available for research and demonstration grants to *develop, replicate, refine, and test additional models and innovative strategies* for preventing teenage pregnancy." Id. (emphasis added). In short, "Tier 2 lets grantees test new programs, and programs that prove effective then become eligible for Tier 1." PPGWNI, 946 F.3d at 1106.

Congress has appropriated TPP funding on a bipartisan basis since 2010, Compl. ¶ 25, supporting a variety of programs that had worked to reduce the prevalence of teen pregnancy since even before that inaugural year. If the drop in the teen birth rate—a roughly two-thirds reduction over the last two decades—is any indication, the Program has been a resounding success. Id.; see also Decl. of Ashley Johnson ("Johnson Decl.") ¶ 22.[4]

Despite this seemingly impressive track record, the Trump Administration excluded the TPP Program from its proposed budget for Fiscal Year ("FY") 2026. Compl. ¶ 26 n.8. Congress rejected that idea and once more appropriated a large sum for the initiative—$101 million, to be exact. Following the usual structure, 75% of non-administrative funds would support the "replicati[on]" of "programs that have been proven effective through rigorous evaluation to

[4] All declarations cited in this Memorandum Opinion are appended to Plaintiffs' Motion for Preliminary Injunction.

reduce teenage pregnancy," while the remaining 25% of funds would be for developing, refining, and testing "additional models and innovative strategies for preventing teenage pregnancy." Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 281 (2026).

Separately, but in the very next sentence of the appropriations act, Congress allocated $35 million to fund abstinence-only sexual education. Id. at 281–82. That pot of funding would be for "making competitive grants which exclusively implement education in sexual risk avoidance (defined as voluntarily refraining from non-marital sexual activity)," so long as such programming relied on "medically accurate information referenced to peer-reviewed publications," "implement[ed] an evidence-based approach," and taught "benefits associated with self-regulation, success sequencing for poverty prevention," and "healthy relationships," among other social objectives. Id.

Before addressing the policy changes at the heart of this suit, two brief notes on the mechanics of TPP grant disbursement. *First*, HHS allocates TPP funds through "cooperative agreements," which—as defined under the Federal Grant and Cooperative Agreement Act ("FGCAA")—are "legal instrument[s]" that the federal government uses when the "principal purpose of the relationship" between the government and the recipient "is to transfer a thing of value" to the recipient in order to "carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring . . . property or services for the direct benefit or use of the United States Government." 31 U.S.C. § 6305. Under a cooperative agreement, "substantial involvement is expected between the executive agency" and the recipient "when carrying out the activity contemplated in the agreement." Id. § 6305(2).

*Second*, HHS chooses TPP recipients "through a competitive process after issuing" a NOFO. Planned Parenthood of Greater N.Y. v. HHS ("PPGNY II"), No. 25-cv-2453 (BAH),

2025 WL 2840318, at *2 (D.D.C. Oct. 7, 2025). "The awards apply to a given 'project period,' during which HHS intends to keep funding the grant 'without requiring the project to recompete for funds.'" Id. (citing 42 C.F.R. § 52.6(c)(1)). In practice, the agency funds the project for one year, and at the start of each subsequent year, the grantee submits an application (with a progress report, budget, and work plan) for a non-competing continuation ("NCC") award. Id. HHS reviews that application and, if all is well, approves the project for its next year of funding.

B. Recent Changes to the TPP Program

*1. March 2025 Guidance*

Despite steadfast congressional commitment to reducing teen pregnancy, the TPP Program has experienced turmoil in the last year and a half. HHS issued the last round of TPP funding in 2023, with each cohort member's five-year project period slated to run from 2023 to 2028. Grantees were required to submit their NCC applications at the start of each year of the project period. In March 2025, as the cohort prepared to enter its third year of the project period, HHS released guidance clarifying that recipients were expected to "review and be aware of current Presidential Executive Orders," including those that, in the Administration's words, rejected "gender ideology extremism," "ended radical indoctrination in K-12 schooling," and "ended radical and wasteful government DEI programs and preferencing." Id. at *2–3 (cleaned up) (quoting March 2025 NCC guidance document). A handful of 2023 NOFO recipients challenged this guidance document in early 2025, arguing that the requirements associated with the Executive Orders were impossible for them to satisfy and violated their rights under the APA and the Constitution. See Planned Parenthood of Greater N.Y. v. HHS ("PPGNY I"), No. 25-cv-1334 (TJK), 2025 WL 1768100 (D.D.C. June 26, 2025). Before the plaintiffs could get their

challenge off the ground, however, their NCC applications were approved, and they voluntarily dismissed the suit. See PPGNY II, 2025 WL 2840318 at *5.

*2. July 2025 Policy Notice*

The legal tussle over the direction of the TPP Program was only just beginning. In July 2025, HHS issued a "Policy Notice" purporting to "clarify" to TPP Program grant recipients "when materials and activities are not 'medically accurate,' 'age appropriate,' do not 'reduce teen pregnancy,' or are otherwise outside the scope of the TPP Program." See Compl., Ex. C ("July 2025 Policy Notice") at 1. The Policy Notice emphasized that recipients were to "revise their projects, as necessary, to demonstrate that the NCC award application is aligned with current Executive Orders," including those alluded to above. Id. at 1–2. It specifically highlighted President Trump's Executive Order 14190, "Ending Radical Indoctrination in K-12 Schooling," id. at 2–3, and underscored that "TPP Program-funded projects should not undermine the President's clear policy directive to protect children from harmful ideologies or the constitutional rights of parents to direct the religious upbringing of their children," id. at 3, citing the Supreme Court's decision in Mahmoud v. Taylor, 606 U.S. 522 (2025). The Policy Notice went on to explain that "[p]rograms cannot be funded under the TPP Program if they include materials or activities . . . that are inconsistent with, or beyond the scope of, the statutory requirements for TPP programs," which in HHS's view included "teaching minors" about "gender ideology" or "discriminatory equity ideology," including "the radical ideological claim that boys can identify as girls and vice versa." July 2025 Policy Notice at 4–5. "Programs must be aimed at reducing teen pregnancy, not instructing in such ideological content," the agency elaborated. Id. at 5. "By the same token," the agency explained,

> material or instruction outside the scope of the TPP Program may include other content that is not related to, or counter to the aim of, reducing teen pregnancy, such as content that

> encourages, normalizes, or promotes sexual activity for minors, including anal and oral sex, or masturbation, including through sexually themed roleplay. This also may include content on the eroticization of birth control methods, creating more pleasurable sexual experiences, or foreplay techniques.

Id. at 4.

The Policy Notice further clarified HHS's understanding of the definition of key terms in the TPP Program's authorizing statute. The phrase "medically accurate" excluded "inaccurate information about methods of contraception, including associated health risks, or information that denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females, such as for the purpose of body literacy." Id. at 6. "Age appropriate" programs for minors could not "contain material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content." Id. And the agency's previous references to terms like "health equity," "inclusivity," and "adolescent-friendly services" could "not be construed . . . to permit unlawful diversity, equity, or inclusion-related discrimination." Id.

Three 2023 NOFO recipients challenged the Policy Notice as constitutionally defective, contrary to the TPP's authorizing statute, and arbitrary and capricious. See PPGNY II, 2025 WL 2840318, at *3, *5. Considering the matter on an expedited summary judgment schedule, Judge Howell concluded that the Notice's "vagueness renders the new requirements imposed on TPP grant recipients largely incomprehensible and unworkable, putting in place an opaque 'we-know-it-when-we-see-it' standard for HHS to assess compliance with programming content restrictions that is susceptible to discriminatory application." Id. at *22. She additionally found that the Notice "suffer[ed] from several of the other deficiencies plaintiffs identif[ied], including that it entirely lack[ed] reasoned explanation and justification, which independently require[d] the Policy Notice to be set aside." Id. Granting summary judgment on the plaintiffs' claim that the

Policy Notice was arbitrary and capricious, Judge Howell vacated the guidance document and barred HHS from implementing it. Id. at *30.

### *3. 2026 Policy Changes*

#### a. FY 2026 Tier 1 and Tier 2 NOFOs

That brings us to the events at the core of this case. Undeterred by the vacatur of its guidance last fall, HHS waited out the 2025–26 school year. On June 23, 2026, the agency released FY 2026 NOFOs for Tier 1 and 2 funding, respectively, which set out the parameters for a new cycle of grant-making. The NOFOs reflect an array of substantial changes to the Program.

*First*, HHS doubled down on several of the policy changes articulated in its now-vacated July 2025 Policy Notice, including the requirement that awardees "align" with agency policy priorities eschewing diversity, equity and inclusion ("DEI"), "gender ideology," the denial of the sex binary, and the "normaliz[ation]" of sexual activity among minors. Compl. ¶ 41(b)–(d), (f). The agency did so both by incorporating the policy priorities it had articulated elsewhere and by reiterating multiple of those priorities directly in the body of the NOFO. See Compl., Ex. D ("FY 2026 Tier 1 NOFO") at 4 ("The recipients of this award must . . . effectuate program goals and agency priorities in accordance with the Priorities of the Office of the Assistant Secretary for Health ["OASH"] (available at https://health.gov/priorities), and when authorized by law according to the TPP statute, regulations, legislative mandates, and additional program guidance."); id. at 44 ("In carrying out any project funded under this NOFO, the recipient must adhere to the HHS priorities (available online at: https://hhs.gov/about/priorities/index.html)[.]"), id. at 45 ("[D]iscretionary awards shall not be used to fund . . . activities where race or intentional proxies for race will be used as a selection criterion for . . . program participation; denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable

characteristic . . . . If an application does not align, the application will not receive funding to the extent permitted by law and applicable court orders."); Compl., Ex. E ("FY 2026 Tier 2 NOFO") at 4–5, 10, 22, 32, 55 (specifying the same requirements). In addition, the NOFOs echoed the July 2025 Policy Notice in mandating that grant recipients provide information about health risks associated with contraception and afford parents advance notice and the opportunity to opt out of pregnancy prevention programming on their children's behalf. Compl. ¶¶ 41, 78.

*Second*, HHS imposed new blanket requirements on TPP awardees that have not yet been judicially tested. For one thing, prospective awardees must incorporate "sexual risk avoidance" education in their programming, which the parties do not contest means an abstinence-only approach to teen pregnancy prevention. See FY 2026 Tier 1 NOFO at 12; FY 2026 Tier 2 NOFO at 9–10. For another, the NOFOs require awardees to promote "body literacy" education, which they defined as "the ability to understand how the body functions in a state of health." FY 2026 Tier 1 NOFO at 55; FY 2026 Tier 2 NOFO at 66. The concept entails, among other things, "two distinct educational modules" focused on "female reproductive health and male reproductive health" that address topics like how "repeated or artificially stimulated arousal may affect neural development and behavior over time." FY 2026 Tier 1 NOFO at 10. Under the "body literacy" heading, awardees must also provide instruction that includes "an overview of approaches to managing menstrual health concerns, including the advantages and disadvantages of ovarian suppression compared to approaches that address root causes." Id. The FY 2026 Tier 1 NOFO further directs awardees to "affirm marriage and parenthood as meaningful and valued components of adult life," id. at 11, and to provide "counseling that helps adolescents reflect on their goals related to relationships, childbearing, career, and future family formation," id. at 6.

Zooming out, the Tier 1 notice instructs applicants to describe their "organization's mission and how it aligns with the goals of th[e] NOFO, including advancing body literacy, informed consent, and optimal health." Id. at 20. Prospective grantees are assessed on the degree to which they "demonstrate[] a strong alignment between the organization's mission and the goals of the NOFO." Id. at 38. In a marked shift from the FY 2023 NOFOs, see Compl., Ex. A ("FY 2023 Tier 1 NOFO") at 6–7; Compl., Ex. B ("FY 2023 Tier 2 NOFO") at 5–8, neither FY 2026 NOFO mentions a focus on populations disproportionately affected by teen pregnancy.

HHS has additionally changed how award recipients are selected and truncated the project period length. The Tier 1 NOFO does not mention the agency's "Teen Pregnancy Prevention Evidence Review" ("TPPER"), which is a review process akin to expert peer review that HHS previously used to identify programs eligible for "replication." Compl. ¶¶ 23, 47. In fact, the new Tier 1 NOFO "awards bonus points to applicants who do *not* hold active TPP awards or have never received one," suggesting that prior experience is now a *dis*advantage in competing for funding. Id. ¶ 47 (emphasis added); see also FY 2026 Tier 1 NOFO at 42; FY 2026 Tier 2 NOFO at 52. Lastly, the Tier 1 NOFO shortens the project period from five years to two years, with an "optional competitive third year" available. FY 2026 Tier 1 NOFO at 1.

b. Mass Grant Terminations

The 2026 NOFOs are forward-looking, setting forth a multifaceted rubric against which future TPP applicants are to be assessed. But HHS did not stop there. On June 26, 2026, three days after the publication of the FY 2026 NOFOs, the agency issued termination letters to nearly all members of the 2023–2028 funding cohort, including two local governments and one non-profit that are plaintiffs in this case. Compl. ¶ 52.

"The termination letters informed recipients that their cooperative agreements would be canceled immediately pursuant to 2 C.F.R. § 200.340(a)(4)" because, in the agency's view, the projects "no longer effectuate[d] the program goals or agency priorities." Id. ¶ 54. The letters did not suggest that the awardees had failed to satisfy the terms of their cooperative agreements or that they had engaged in any misconduct warranting termination. Id. ¶ 55. Instead, the agency explained with boilerplate language, "After a review of all curricular content, [the agency] believes that some curricula normalize adolescent sexual activity and are not age appropriate." Id. ¶ 56. The letters invoked the understandings of "age appropriate" and "medically accurate" content articulated in both the 2026 NOFOs and vacated July 2025 Policy Notice. Id. ¶¶ 58–60. The letters concluded by explaining that the grantees' awards would be terminated—and not merely suspended—in order to "better prioritize agency resources" because "[c]urrent program priorities . . . differ fundamentally from prior approaches." Id. ¶ 61.

The FY 2026 NOFOs and mass grant termination decision are related in two key ways. *First*, the NOFOs mandate "[a]lignment" with the "[p]riorities" of OASH ("available at https://health.gov.priorities"), a policy document which—as noted above—the NOFOs incorporate by reference. FY 2026 Tier 1 NOFO at 4; FY 2026 Tier 2 NOFO at 4. The grant termination letters, issued just three days after the publication of the new notices, likewise justified the cancellation of the majority of TPP grants on the basis that they were inconsistent with published OASH priorities. See Johnson Decl., Ex. 2 at 1; Decl. of Andrea Gerber ("Gerber Decl. I"), Ex. 2 at 1; Decl. of Virginia Miller ("Miller Decl."), Ex. 2 at 1. *Second*, the grant terminations appear to be necessary to the issuance of the NOFOs, as HHS will fund new projects using "the same pot of appropriated funds that would have supported" the now-terminated programs "in years four and five of [their] awards." Johnson Decl. ¶ 25.

C. Procedural History

A few weeks after HHS released its 2026 NOFOs and terminated virtually all existing TPP awards, four plaintiffs—Hennepin County, Minnesota; King County, Washington; Planned Parenthood of the Heartland ("PPH"); and the Sexuality Information and Education Council of the United States ("SIECUS")—filed this lawsuit. Their complaint takes aim at HHS's "2026 Policy," which they define as a pivot away from congressionally-mandated, evidence-based programming and toward abstinence-only programming that "aligns" with ideologically-inflected agency priorities and "restrict[s] discussion of teen sexual activity." Compl. ¶ 5. Plaintiffs understand HHS to have "implemented the Policy through two related actions: the issuance of the 2026 NOFOs and the mass termination of ongoing cooperative agreements." Id. ¶¶ 81, 88. They submit that both the Policy and (independently) the new NOFOs are contrary to law, in excess of HHS's statutory authority, and arbitrary and capricious under the APA. See Compl. ¶¶ 79–85 (Count I), 86–95 (Count II), 96–102 (Count III), 103–07 (Count IV). Additionally, Plaintiffs allege that the Tier 1 NOFO constitutes unlawful viewpoint discrimination in violation of the First Amendment. See id. ¶¶ 108–10 (Count V).

As of the filing of the complaint on July 14, 2026, no Plaintiff had applied for funding under the new NOFOs. On July 18, King County submitted a Tier 2 application. See Supp. Decl. of Andrea Gerber ("Gerber Decl. II") ¶ 5. It proposed a new abstinence-only program for target populations who are not sexually active, id. ¶¶ 8–11, doing "the best [it] could to comply with the vague priorities set out in the NOFO" in launching this fledgling initiative, id. ¶ 12.

One day after filing the complaint, Plaintiffs filed a motion for a preliminary injunction and a stay of agency action under 5 U.S.C. § 705, supported by a slate of declarations from staff members who implement TPP-related programming for Plaintiffs. See generally Johnson Decl.;

Gerber Decl. I; Miller Decl.; Decl. of Calleen Simon ("Simon Decl."). HHS has opposed the motion. After an expedited briefing schedule and hearing, the motion is ripe for adjudication.

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To secure such an injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20. "[T]he movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." Abdullah v. Obama, 753 F.3d 193, 197 (D.C. Cir. 2014) (citation omitted).

Section 705 of the APA permits a court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" where "required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "[F]actors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." District of Columbia v. USDA, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

## III. Analysis

As detailed above, Plaintiffs challenge a new set of policy priorities imposed by HHS on TPP grant recipients. In analyzing their request for preliminary relief, the Court first explains its working understanding of the *object* of this challenge—which Plaintiffs characterize as HHS's singular "2026 Policy" and the government casts instead as two discrete agency actions. Next, the Court turns to Plaintiffs' likelihood of success in this case, which encompasses their chance of (1) demonstrating Article III standing, (2) establishing that the Court has jurisdiction over its

claims, and (3) proving that the agency's actions are unlawful under the APA.[5] Finally, the Court evaluates the remaining preliminary injunction factors to determine whether status-quo-preserving relief is warranted.

Before embarking on this journey, it is worth noting that "[t]entative conclusions" reached on this expedited briefing timeline and in the absence of a full administrative record "may not harden into settled judgments later." Beatty v. Trump, 830 F. Supp. 3d 25, 48 (D.D.C. 2026) (Cooper, J.). Nevertheless, in light of the governing case law and the uncontroverted evidence available for review, "at least some [preliminary] relief is now in order." Id.

A. Scoping Plaintiffs' Challenge

Let's begin by examining the object of this legal challenge. Plaintiffs contest HHS's "2026 Policy," which they say "rejects the [TPP] Program Congress created and replaces it with one divorced from the evidence-based programs funded by the statute." Compl. ¶ 5. In Plaintiffs' telling, the 2026 Policy mandates an abstinence-only approach to pregnancy prevention, promotes the amorphous concept of "body literacy," and prohibits programming that could be understood to "normalize" sexual activity among adolescents, all while requiring TPP recipients to "align" with the agency's repudiation of concepts like DEI and "gender ideology." According to Plaintiffs, the agency has implemented its new Policy "through two related actions": (1) the issuance of the FY 2026 NOFOs that condition TPP funding on these policy prescriptions and (2) the application of these prescriptions to existing TPP cooperative agreements, which led to the termination of the "vast majority" of awards. Id.

[5] As will become evident below, the Court need not, and does not, evaluate the merits of Plaintiffs' First Amendment challenge in this preliminary posture.

The APA subjects "[a]gency action" to judicial review. 5 U.S.C. § 704. Agency action, in turn, "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." Id. § 551(13). In ascertaining the contours of the agency action here, the Court is guided by two key principles. On one hand, agency action is not so broad as to encompass "continuing (and thus constantly changing) operations" of an agency that do not represent a discernible decision. Lujan v. Nat'l Wildlife Fed'n., 497 U.S. 871, 890 (1990). Rather, agency action must entail some type of "circumscribed, discrete" decision or occurrence. Norton v. S. Utah Wilderness All., 542 U.S. 55, 62 (2004). On the other hand, agency action "generally need not be committed to writing to be final and judicially reviewable," Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin., 972 F.3d 83, 100 (D.C. Cir. 2020), so long as there is a discernible course of agency conduct that reflects a discrete decision, cf. Venetian Casino Resort, LLC v. EEOC, 530 F.3d 925, 929 (D.C. Cir. 2008) (concluding that even though the "details" of the agency's policy were hazy, "the record le[ft] no doubt" that it had a "policy of disclosing confidential information"); Her Majesty the Queen in Right of Ontario v. EPA, 912 F.2d 1525, 1531 (D.C. Cir. 1990) ("[T]he absence of a formal statement of the agency's position, as here, is not dispositive[.]"). Otherwise, an agency could insulate its decisions from APA review by simply refusing to write them down.

On the unrebutted record presently before the Court, HHS has made a discernible decision to reorient TPP criteria toward the goals of abstinence and "body literacy" and away from other forms of pregnancy prevention, as well as DEI, "gender ideology," and the "normalization" of teen sexual activity. The agency's decision is evidenced both by discrete statements of policy (*i.e.*, the FY 2026 NOFOs and OASH policy priorities that the NOFOs

incorporate) and by its course of conduct (*i.e.*, the termination of almost all existing TPP programs and reallocation of that funding to future grantees).

The government, for its part, recognizes that HHS has decided to reallocate funding in this way. Although it asks the Court to treat the NOFOs and grant terminations distinctly for jurisdictional purposes (more on that in a moment), it does *not* contest that the agency has changed the TPP parameters in a decisive fashion. At the hearing on Plaintiffs' motion, the government acknowledged that the new NOFOs "reflect the administration's priorities" and "emerge" from the "same underlying considerations" as the grant termination decision. Prelim. Inj. Hr'g Rough Tr. 43:8–11. Counsel elaborated that "obviously the agency has made a shift . . . because of the incoming administration," and the agency's new funding conditions serve to "implement[] the program in a way consistent with the agency's [stated] priorities." Id. at 55:1–3, 10–12. To assess the merits of the agency's policy shift, counsel also urged, the Court should look "not just at the termination letters themselves," but also at the terms of the NOFOs, and, "of course, the HHS priority statement" released by OASH, which outlines the core "priorities that the NOFOs" and termination letters "refer to." Id. at 50:11–22. The government thereby confirms that HHS has decided to impose a new set of programmatic requirements on TPP recipients, driven by policy priorities that the agency has set down on paper.

Despite the government's recognition that the FY 2026 NOFOs and mass grant termination decision stem from the same change in agency policy, the Court cannot wholly elide the distinction between these actions. Though they both implement the 2026 Policy, the FY 2026 NOFOs and grant terminations are unique in effect: One represents HHS's forward-looking articulation of how grant funds will be allocated, while the other is a backward-looking decision to discontinue funding relationships with grant recipients based on non-compliance with

the agency's new priorities. As Justice Barrett observed in her controlling concurrence in NIH, even if guidance and grant terminations "are linked, vacating the guidance does not necessarily void decisions made under it" or automatically entail the reinstatement of a terminated grant. 145 S. Ct. at 2661 (Barrett, J., concurring). That Plaintiffs have requested a preliminary order staying the implementation of the 2026 Policy, including both "the issuance of the 2026 NOFOs and the June 26, 2026[] terminations of [TPP] Program awards," see Pls.' Proposed Order for Prelim. Inj. Mot. at 1, reinforces that they seek two distinct forms of relief.

The Court's delineation of Plaintiffs' challenge may evolve as the case develops. For purposes of resolving the present motion, however, the Court recognizes the existence of HHS's overarching 2026 Policy, which mandates that TPP grantees operate abstinence-only, "body literacy"-focused pregnancy prevention programs that do not "normalize" teen sex or otherwise promote DEI or "gender ideology." Yet it views the mass termination of existing TPP grants and issuance of the FY 2026 NOFOs as distinct, if interrelated, strategies for implementing that Policy. As we shall see, that distinction bears on the likely sweep of the Court's jurisdiction.

### B. Likelihood of Success on the Merits

#### 1. *Jurisdictional Issues*

##### a. Article III Standing

"For a lawsuit to constitute a case within the meaning of Article III, the plaintiff must have standing to sue," and "[t]o demonstrate standing, plaintiffs must answer a basic question—What's it to you?" Diamond Alt. Energy, LLC v. EPA, 606 U.S. 100, 110 (2025) (cleaned up). "In other words, plaintiffs must show that they possess a personal stake in the dispute and are not mere bystanders." Id. at 110 (cleaned up). Standing, of course, has three elements: injury in fact, causation, and redressability. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). The

first element "requires the plaintiff to demonstrate an injury that is concrete, particularized, and actual or imminent, not speculative." Diamond Alt. Energy, LLC, 606 U.S. at 111 (cleaned up). The second and third elements, "usually flip sides of the same coin," necessitate a showing that the plaintiff's injury was likely caused by the defendant, and that the injury would be redressed by judicial relief. Id. (cleaned up).

"The plaintiff 'bears the burden of establishing standing as of the time'" the lawsuit is brought. Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quoting Carney v. Adams, 592 U.S. 53, 59 (2020)). The plaintiff must support each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561. At the preliminary injunction stage, the plaintiff must make a "clear showing" that it is "likely" to establish each element of standing. Murthy, 603 U.S. at 58 (quoting Winter, 555 U.S. at 22). "When determining whether a plaintiff has Article III standing, the court must assume that [the plaintiff] will prevail on the merits." Comm. on Judiciary of U.S. House of Representatives v. McGahn, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc).

Plaintiffs have made a clear showing that they likely have Article III standing to challenge the 2026 Policy and its component parts.

*i. Hennepin County, King County, and PPH*

First, consider the three litigants whose TPP funding has been terminated ("Awardee Plaintiffs"). It is evident from their evidentiary submissions that they are injured by the cancellation of their FY 2023 awards. Hennepin County will either have to request stop-gap funds from county leadership to keep its Tier 1 program alive or end it entirely. Compl. ¶ 65; Johnson Decl. ¶¶ 36–37, 47. Within two months, King County will not have sufficient funding to continue its Tier 2 teen pregnancy prevention program study, Compl. ¶ 69, meaning that "the

efforts of the last three years" of its research into innovative pregnancy prevention strategies "will largely go to waste," Gerber Decl. ¶ 49. PPH has already begun winding down its Tier 1 TPP project and laying off staff. Compl. ¶ 72; Miller Decl. ¶¶ 28–30. Awardee Plaintiffs' programmatic harms are clearly attributable to the 2026 Policy, instantiated in the FY 2026 NOFOs and the June 26 termination letters. The requested remedy—vacatur of the Policy, the new NOFOs, and any actions taken in furtherance of them—would remediate those harms.

Even if Awardee Plaintiffs have standing to challenge the mass termination of the TPP cooperative agreements—which HHS all but concedes, see Opp'n at 16—the agency maintains that they lack standing to contest the forward-looking FY 2026 NOFOs. Plaintiffs' injuries "arise from the cooperative agreement terminations, not the 2026 NOFOs," the government's argument goes, and at the time the complaint was filed, no plaintiff "allege[d] that it ha[d] applied for or intend[ed] to apply for funding" under either Tier. Id. To the government, that makes Plaintiffs mere "bystanders" to the grant-making process, "entities that wish the Administration would have issued NOFOs better aligned with their own policy preferences." Id.

Not so fast. To begin, HHS ignores that the policy decisions enshrined in the FY 2026 NOFOs have, in effect, been applied retroactively to strip FY 2023 grantees of their funding. In its termination letters to each Awardee Plaintiff, HHS explained that "[c]urrent program priorities, such as focusing on projects that do not normalize or promote sexual activity for minors, differ fundamentally from prior approaches." Johnson Decl., Ex. 2 at 2; Gerber Decl. I, Ex. 2 at 2; Miller Decl., Ex. 2 at 1–2. And again, the decision to cancel most existing TPP grants necessarily accompanies the decision to reallocate funds according to the terms of the FY 2026 NOFOs because HHS will apparently fund new two-year projects using "the same pot of appropriated funds that would have supported" the terminated projects in their final two years.

Johnson Decl. ¶ 25. These considerations make it conceptually difficult to disentangle the harms associated with the FY 2026 NOFO from those associated with the grant terminations, as HHS asks the Court to do. But it is obvious that the interconnected components of the 2026 Policy have led to the serious consequences described by the Awardee Plaintiffs.

That aside, there is another problem with HHS's standing argument. Awardee Plaintiffs are *independently* injured by the issuance of the forward-looking FY 2026 NOFOs. Assuming they are correct on the merits, the agency has "divert[ed] funding intended for TPP programs for which Plaintiffs were eligible to compete into new programs, not consistent with Congress's directive, for which Plaintiffs cannot compete." Reply at 6. That diversion causes injury under the competitor standing doctrine, id., which "recogniz[es] that economic actors suffer an injury in fact when agencies . . . allow increased competition against them." Wash. All. of Tech. Workers v. DHS, 892 F.3d 332, 339 (D.C. Cir. 2018) (second alteration in original) (quoting Sherley v. Sebelius, 610 F.3d 69, 72 (D.C. Cir. 2010)). When a "complainant show[s] actual or imminent increase in competition" as a result of agency action, that increase "almost certainly cause[s] an injury in fact." Id. (quoting Sherley, 610 F.3d at 73). Prospective grantees are competing to win government funding to accomplish Congress's policy goals. Fundamental programmatic changes that favor certain groups of grant applicants over others create the kind of competition-related injury that is cognizable under Article III's case or controversy requirement.

HHS posits that Hennepin County and PPH cannot have Article III standing because they failed to submit grant applications by the July 23, 2026 deadline to secure FY 2026 TPP funding. See Opp'n at 16. The government overstates Plaintiffs' burden. Just as workers have standing to challenge a government regulation that increases competition in their labor market without "fill[ing] out formal job applications" for sought-after positions, Wash. All. of Tech. Workers,

892 F.3d at 340; see Mendoza v. Perez, 754 F.3d 1002, 1013–14 (D.C. Cir. 2014), Awardee Plaintiffs have standing to challenge agency action that forecloses their eligibility for federal funding. See also Global Health Council v. Trump, 153 F.4th 1, 12 (D.C. Cir. 2025) ("[A] plaintiff may be harmed by denial of the opportunity to compete for a pool of funds for which they are able and willing to compete."); Coal. of MISO Transmission Customers v. FERC, 45 F.4th 1004, 1014–16 (D.C. Cir. 2022) (holding the same).[6] Under this competitor standing theory, the injury in fact is an inability to compete on equal footing in a competitive grant application process, rather than the inability to actually secure a grant but-for some enumerated disadvantage. See Multnomah County v. Azar, 340 F. Supp. 3d 1046, 1055 (D. Or. 2018). Such an injury is not, as the government suggests, merely a "self-inflicted" wound stemming from a would-be grantee's ideological disagreement with agency policy. See Opp'n at 16–17.

Here, it is evident that Hennepin County, King County, and PPH would have continued to carry out their existing pregnancy prevention programs and/or studies under Tiers 1 and 2 through the next TPP funding cycle, but they cannot operate those initiatives while complying

[6] At the motion hearing, the government advanced a different understanding of the competitor standing doctrine. The Court asked counsel for the government, "So your conception of the competitor standing doctrine is that the decision has to let entirely new players in, not simply change the competitive landscape such that certain competitors are now better situated to compete?" Prelim. Inj. Hr'g Rough Tr. 59:7–11. Counsel responded, "I think it would have to be an injury of that magnitude." Id. 59:12–13. That conception of the competitor standing theory is unduly restrictive, as courts recognize injury in fact not only where "agencies lift regulatory restrictions on [plaintiffs'] competitors," but also where their actions "otherwise allow increased competition." La. Energy and Power Auth. v. FERC, 141 F.3d 364, 367 (D.C. Cir. 1998). In any event, Awardee Plaintiffs have established injury even under the government's narrowed recitation of the doctrine. The new NOFOs make TPP funding available to recipients whose projects would likely not have qualified under prior criteria. For instance, in prior cohorts, HHS would have been hard-pressed to fund a Tier 1 program that adopts a "body literacy" approach to preventing teen pregnancy, as there are a "near absence of body literacy education standards nationwide"—let alone any that have proven effective at reducing teen pregnancy or a related risk behavior. FY 2026 Tier 1 NOFO at 5.

with the 2026 Policy. See, e.g., Compl. ¶¶ 67, 70–71, 72–75; Johnson Decl. ¶¶ 32–35, 38; Gerber Decl. ¶¶ 36–38, 45–47, 50–53; Miller Decl. ¶¶ 31, 36–45. New entrants into the grant "market" will obtain resources for which Awardee Plaintiffs would have vied, absent allegedly unlawful eligibility criteria. That is a classic competitor injury in fact.

Awardee Plaintiffs also satisfy the causation and redressability requirements, which in this case are "flip sides of the same coin." Diamond Alt. Energy, 606 U.S. at 111 (cleaned up). The new policy prescriptions enshrined in the FY 2026 NOFOs categorically disqualify Awardee Plaintiffs from seeking funding for the TPP programs they currently run and allow newly-qualified competitors to take advantage of their absence. Assuming Plaintiffs are right on the merits of their challenge, the vacatur of the 2026 Policy, as implemented through the FY 2026 NOFOs, gives Plaintiffs a fairer opportunity to compete for TPP funding moving forward.

In summary, the plaintiffs need not have "appl[ied] for" grants they knew they could not obtain under the new rubric "just to maintain standing to bring this suit." Mendoza, 754 F.3d at 1014 n.6. Such a standard "would require plaintiffs 'to engage in a futile act,'" id. (quoting Settles v. U.S. Parole Comm'n, 429 F.3d 1098, 1102 (D.C. Cir. 2005)), and deny "commonsense economic" realities of the competitive grant process, Diamond Alt. Energy, 606 U.S. at 116, 120. This conclusion is bolstered by the opinions of other courts likewise concluding that prospective grantees have Article III standing to challenge allegedly unlawful TPP Program NOFOs. See PPPGWNI, 946 F.3d at 1108–09; Multnomah County, 340 F. Supp. 3d at 1054–55; Planned Parenthood of N.Y.C., Inc. v. HHS ("PPNYC"), 337 F. Supp. 3d 308, 319–24 (S.D.N.Y. 2018).

*ii. SIECUS*

Our fourth Plaintiff requires a separate standing analysis. "[O]rganizations may have standing to sue on their own behalf for injuries they have sustained." FDA v. All. for

Hippocratic Med., 602 U.S. 367, 393 (2024) (cleaned up). It is not enough for an organization to show a mere "setback" to its "abstract societal interests," id. at 394 (citation omitted), because it "object[s]" to a defendant's conduct, id. Nor can a group "spend its way into standing simply by expending money to gather information and advocate against" such action. Id.

SIECUS is a non-profit organization "dedicated to promoting access to comprehensive sex education in order to improve the health and wellbeing of young people." Compl. ¶ 13. It is not a TPP grantee but "works with many TPP grantees and sub-grantees to provide technical assistance and create opportunities for cross-organization learning and collaboration." Simon Decl. ¶ 9. In particular, SIECUS provides technical assistance through the Sex Education Policy Action Council ("SEPAC"), which includes several TPP Program awardees as dues-paying members. Id. It also "partners" with other organizations "to develop and promote standards elevating the provision of quality sexuality education, including co-developing and updating the National Sex Education Standards." Id. ¶ 7.

SIECUS attests that the issuance of the FY 2026 NOFOs and termination of most existing TPP cooperative agreements will cause it economic and programmatic injuries. First, "[i]n previous instances when SEPAC members have faced funding cuts, they have either paid reduced or no dues, or left SEPAC entirely," and "[b]ased on those experiences, SIECUS expects to collect lower dues for SEPAC than it would have had the TPP Program cooperative agreements not been terminated." Id. ¶ 12. These financial harms to the organization are neither speculative nor "manufactured," as SIECUS has not "spen[t] its way into standing" simply by "advocat[ing] against" HHS's actions. All. for Hippocratic Med., 602 U.S. at 394. Rather, the non-profit faces a redressable economic injury as a direct result of the agency's actions. According to SIECUS's uncontested declaration, it will likely lose dues-paying members. In

addition, the organization provides technical assistance directly to TPP grantees and develops sex education standards nationwide. HHS's new policy positions, as implemented through the FY 2026 NOFOs and grant terminations, "directly impair[] SIECUS's ability to carry out" this work by undermining proven and accurate sex education curricula and discouraging SIECUS's potential partner organizations from working on sex education programs. Simon Decl. ¶¶ 11, 13.[7] That suffices to show a likelihood of standing.

To conclude, all four Plaintiffs in this case have made a clear showing that they are likely to have Article III standing.

b. Tucker Act Jurisdiction

The next jurisdictional issue is trickier. According to the government, the Tucker Act deprives this Court of jurisdiction over that portion of Plaintiffs' APA challenge which concerns the termination of existing TPP grants. Plaintiffs counter that the Tucker Act does not apply because TPP awards are issued in the form of cooperative agreements, and such agreements are not "contracts." They add that SIECUS is not in privity with the federal government, so that group can maintain *its* challenge to the validity of the grant terminations regardless of whether the grants are Tucker Act "contracts." The parties seem to agree, and the Court concurs, that there is no Tucker Act impediment to the Court's consideration of HHS's 2026 Policy, as implemented through the FY 2026 NOFOs. Cf. NIH, 145 S. Ct. at 2661 (Barrett, J., concurring)

---

[7] Citing no case law or evidence, the government makes a drive-by suggestion that SIECUS does not fall within the "zone of interests protected by the relevant statutes or regulations." Opp'n at 14. The Court will not address that non-jurisdictional assertion here, as it was raised only in "the most skeletal way" in the government's opposition. Al-Tamimi v. Adelson, 916 F.3d 1, 6 (D.C. Cir. 2019) (quoting Schneider v. Kissinger, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)); see also CSL Plasma Inc. v. CBP, 33 F.4th 584, 588 (D.C. Cir. 2022) (confirming that the "zone of interests test is a merits issue," not a jurisdictional one); Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 196 (D.C. Cir. 1992) (noting that courts usually do not consider arguments "ignored or left undeveloped by counsel in the first round of briefing").

(explaining that the district court "was likely correct to conclude that it had jurisdiction to entertain an APA challenge to [agency] guidance," even if the guidance "discuss[ed] internal policies related to grants").

The standards governing the interrelationship between APA and Tucker Act jurisdiction are well familiar to courts in this district, even if their application has often proven elusive. The APA "provide[s] a general authorization for review of agency action in the district courts." Bowen v. Massachusetts, 487 U.S. 879, 903 (1988). The statute waives sovereign immunity where an action "seek[s] relief other than money damages." 5 U.S.C. § 702. But that waiver "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" Dep't of Ed. v. California, 604 U.S. 650, 651 (2025) (quoting 5 U.S.C. § 702). The Tucker Act is one such statute, granting the Court of Federal Claims ("CFC") jurisdiction "to render judgment upon any claim against the United States" for over $10,000 "founded . . . upon any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1). The Supreme Court recently opined that, in light of the Tucker Act's grant of jurisdiction, "the APA's limited waiver of sovereign immunity does not extend to orders 'to enforce a contractual obligation to pay money'"—but simultaneously reiterated that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside any agency's action may result in the disbursement of funds[.]" Dep't of Ed., 604 U.S. at 651 (first quoting Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212 (2002); and then quoting Bowen, 487 U.S. at 910). The high Court reaffirmed this view in NIH. 145 S. Ct. at 2658.

In Megapulse, Inc. v. Lewis, the D.C. Circuit explained that "[t]he classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of rights upon which the plaintiff bases its claims, and upon the type of relief sought (or

appropriate)." 672 F.2d 959, 968 (D.C. Cir. 1982). Although the Supreme Court's emergency docket rulings in Dep't of Ed. and NIH created a good deal of "confusion . . . in this district and others" about the circumstances under which an APA challenge to a grant termination must be channeled to the CFC pursuant to the Tucker Act, the Megapulse test "still stands as binding precedent to be followed by this Court." Am. Acad. of Pediatrics v. HHS, 816 F. Supp. 3d 27, 51–52 (D.D.C. 2026). So the Court will apply that test to the claims advanced by Awardee Plaintiffs and SIECUS, respectively, given their distinct positions respecting the grants at issue.

*i. Megapulse Test Applied to Awardee Plaintiffs*

The *first* prong of the Megapulse test queries the "source of the rights upon which the plaintiff bases its claims." 672 F.2d at 968. Plaintiffs' chief contention is that TPP cooperative agreements are not contracts at all—at least not under the Tucker Act.[8] According to the Federal

---

[8] Plaintiffs also argue that the APA and Constitution are the source of their rights, not any particular term or condition of their TPP agreements. See Mot. for Prelim. Inj. at 41. The D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the [scope of] the Tucker Act.'" Crowley Gov't Servs., Inc. v. GSA, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting Megapulse, 672 F.2d at 967–68). "[T]he mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract." Megapulse, 672 F.2d at 968. In applying the first prong of the Megapulse test, courts consider whether: "the plaintiff's asserted rights and the government's purported authority arise from statute"; the "plaintiff's rights 'exist[] prior to and apart from rights under the contract'"; and "the plaintiff 'seek[s] to enforce any duty imposed upon' the government 'by the relevant . . . contracts." Crowley Gov't Servs., 38 F.4th at 1107 (alterations in original) (first quoting Spectrum Leasing Corp. v. United States, 764 F.2d 891, 894 (D.C. Cir. 1985); and then quoting Perry Cap. LLC v. Mnuchin, 864 F.3d 591, 619 (D.C. Cir. 2017)).

The Court appreciates Plaintiffs' assertion that the rights they aim to vindicate are primarily non-contractual in nature. But that was also precisely and primarily what the respondents in Dep't of Ed. and NIH argued, and their position did not carry the day in either case. Likewise, the First Circuit observed that the plaintiffs' claims in the NIH litigation were not "premised upon the individual terms of the grant agreements," but instead upon alleged "violat[ions]" of "various federal statutes and the Constitution," Am. Pub. Health Ass'n v. Nat'l Insts. of Health, 145 F.4th 39, 51 (1st Cir. 2025), and a majority of the Supreme Court apparently did not agree with that conclusion, either. Without opining on Plaintiffs' jurisdictional argument one way or the other at this time, the Court will stay its hand, rather than risk awarding

Circuit, "any agreement can be a contract within the meaning of the Tucker Act, provided that" it reflects "mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997). Consideration, as it reflects mutual intent to contract, is the main sticking point here.

In assessing whether the TPP cooperative agreements are supported by consideration, the Court looks to another pair of guiding principles. One is that the government's decision to use a cooperative agreement, as opposed to some other funding instrument, is an informative datapoint. See, e.g., Pacito v. Trump, 169 F.4th 895, 925–26 (9th Cir. 2026); Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer, 789 F. Supp. 3d 66, 87 (D.D.C. 2025); St. Bernard Par. Gov't v. United States, 134 Fed. Cl. 730, 735 (2017), aff'd on other grounds, 916 F.3d 987 (Fed. Cir. 2019); Anchorage v. United States, 119 Fed. Cl. 709, 713–14 (2015). After all, Congress has distinguished cooperative agreements, whose "principal purpose" is to "carry out a public purpose of support or stimulation authorized by a law of the United States," 31 U.S.C. § 6305(1), from procurement contracts, whose "principal purpose" is to "acquire . . . property or services for the direct benefit or use of the United States Government," id. § 6303(1). And the Federal Circuit has emphasized that, just because an agreement confers some indirect or incidental benefit on the government does not transform a cooperative agreement into a procurement contract. Hymas v. United States, 810 F.3d 1312, 1328–39 (Fed. Cir. 2016). What emerges is a sort of "presumption that . . . cooperative agreements are not contracts" in the Tucker Act sense. Pacito, 169 F.4th at 927 n.13 (emphasis omitted). More precisely, if the government has funded

preliminary relief on a ground that has apparently not persuaded the high Court. See Harris County v. Kennedy, 786 F. Supp. 3d 194, 218 (D.D.C. 2025) (Cooper, J.).

a project to achieve some broad statutory goal, the lack of "direct, tangible benefits" to the government suggests a lack of consideration and of *bona fide* mutuality. St. Bernard Par. Gov't, 134 Fed. Cl. at 736; see also Am. Near E. Refugee Aid v. USAID, Supp. 3d 126, 133–34 (D.D.C. 2023) (Cooper, J.) (holding that a cooperative agreement did not provide "direct, tangible benefits" to government agency and thus lacked consideration); Pa. Dep't of Pub. Welfare v. United States, 48 Fed. Cl. 785, 791 (2001) (holding that a state plan implementing a federally-funded welfare program did not contain a contractual obligation because the funds at issue were akin to a "gift[] or gratuit[y]" that the government conveyed in its "role as sovereign" (quoting Marshall N. Dana Constr., Inc. v. United States, 229 Ct. Cl. 862, 864 (1982))).

Another key principle, however, is that the "cooperative agreement" label is not itself dispositive of either the presence of consideration or the existence of a Tucker Act contract. See, e.g., Pacito, 169 F.4th at 926–27 n.13 (an agreement's "classification is not determinative of whether an instrument is a contract for purposes of the Tucker Act"); San Antonio Hous. Auth'y, 143 Fed. Cl. 425, 462 (2019) ("Since the issuance of Trauma Service . . . a number of Judges of [the CFC] have noted that a contract's classification as a cooperative or grant agreement does not determine whether this court has jurisdiction over a party's breach of contract claim."). Courts therefore must venture beyond labels and examine the respective benefits and obligations contained within a particular agreement to determine whether it is a Tucker Act contract.

Without the benefit of definitive pronouncements from the Supreme Court,[9] D.C. Circuit, or Federal Circuit, courts have navigated between these two analytical guideposts in different

[9] See, e.g., Am. Acad. of Pediatrics, 816 F. Supp. 3d at 50 n.7 (observing that neither of the Supreme Court's emergency rulings in Dep't of Ed. and NIH "considered whether the grants at issue amounted to 'contracts' within the meaning of the Tucker Act"); accord Pacito, 169 F.4th at 928–29.

ways. At least one has ruled that a grantee's anodyne agreement to "comply with an array of requirements attached to the receipt, use, and distribution" of grant funds is enough consideration to qualify a cooperative agreement as a Tucker Act contract. Vera Inst. of Just. v. DOJ, 805 F. Supp. 3d 12, 28–30 (D.D.C. 2025) (quoting Columbus Reg'l Hosp. v. United States, 990 F.3d 1330, 1340 (Fed. Cir. 2021)). Others have found consideration where the government received more than a generic promise to adhere to terms and conditions, even though the predominant purpose of the grant was for recipients to carry out some important public purpose on the government's behalf. See, e.g., Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found., 804 F. Supp. 3d 45, 54, 61 (D.D.C. 2025) (finding consideration in National Science Foundation research grants where grantees promised to publish their research results and issue royalty-free licenses to intellectual property resulting from the research, among other requirements); Thermalon Indus., Ltd. v. United States, 34 Fed. Cl. 411, 415 (1995) (similar); Columbus Reg'l Hosp., 990 F.3d at 1340 (finding consideration where state grantee agreed to adhere to traditional compliance conditions *and* took on specific responsibilities borne by FEMA, including agreeing to act on FEMA's behalf in collecting erroneously disbursed sub-grantee funds and reporting employees who had committed drug offenses). Still others have refused to find standard terms and conditions of grant funding sufficient to establish consideration, where the overwhelming benefit conferred to the government was the "advanc[ement]" of "certain policy priorities, statutory goals, and the mission" of the agency. Urb. Sustainability Dirs. Network v. U.S. Dep't of Agriculture, No. 25-cv-1775 (BAH), 2025 WL 2374528, at *15–17 (D.D.C. Aug. 14, 2025).

In the face of this divergent case law, Plaintiffs offer a fitting, if not entirely satisfying, answer to the question of when a cooperative agreement bears sufficient consideration to render it a Tucker Act contract: It depends. See, e.g., Prelim. Inj. Hr'g Rough Tr. at 20:15–19 ("THE

COURT: So your position is that agreeing to the terms and conditions of grants may or may not be consideration depending on what the overarching purpose of the grant is. COUNSEL: Right."). The government offers no countervailing read on the equivocal precedent.[10]

As this long wind-up suggests, substantial uncertainty remains as to whether, and under what circumstances, a cooperative agreement qualifies as a contract under the Tucker Act. The Federal Circuit has applied the "principal purpose" test to determine whether a grant is more like a cooperative agreement or a procurement contract under the FGCAA. See Hymas, 810 F.3d at 1327–29. But that test may not necessarily apply in evaluating Tucker Act jurisdiction. See, e.g., Thermalon Indus., Ltd., 34 Fed. Cl. at 418 (questioning whether Congress's distinctions between cooperative agreements and procurement contracts in the FGCAA can be "interpreted as an indication that Congress intended for all grant agreements . . . to fall outside the scope of . . . Tucker Act jurisdiction"); cf. Laborant, LLC v. United States, 180 Fed. Cl. 76, 88 (2026) (observing that the Federal Circuit has not "endorse[d] the St. Bernard Parish court's theory that to form a contract, the government must receive a benefit that is 'direct' or otherwise tangible").[11] Adding to the uncertainty, neither side has fulsomely parsed the provisions of the cooperative agreement, examining the respective obligations it places on the parties. Lastly, the

[10] At the motion hearing, counsel declined to commit whether the government would maintain that TPP cooperative agreements are contracts if Plaintiffs were to sue HHS for breach of contract in the CFC. Prelim. Inj. Hr'g Rough Tr. at 46:1–3. The government seems to want to "have its cake and eat it too by insisting that cooperative agreements *are not* Tucker Act contracts when it does not want to litigate in the CFC but that they *are* Tucker Act contracts when—as in this case—it would rather be there." Pacito, 169 F.4th at 927.

[11] Relatedly, to the extent St. Bernard Parish could be read to say that "cooperative agreements are . . . categorically excluded" from CFC jurisdiction for lack of consideration, its holding may be in tension with the notion that "any contract, including a cooperative agreement, *could* fall within th[at] court's jurisdiction so long as the contract contains the four required elements of offer, acceptance, consideration, and proper government authority." San Antonio Hous. Auth'y, 143 Fed. Cl. at 463 (emphasis added).

D.C. Circuit may (and hopefully will) opine soon on this question, which features prominently in the pending appeals in Vera Institute and Urban Sustainability. See Vera Inst. of Just. v. DOJ, No. 25-5248 (D.C. Cir. appeal docketed July 10, 2025); Urb. Sustainability Dirs. Network v. AGRI, No. 25-5370 (D.C. Cir. appeal docketed Oct. 17, 2025).

What about the *second* prong of the Megapulse test? Uncertainty reigns on this front, as well. It is not entirely clear whether Awardee Plaintiffs seek essentially contractual relief. On one hand, they do not ask for money damages[12] or specific performance in so many words. Instead, they request the vacatur of the "2026 Policy," which has been implemented in part through the retroactive application of HHS's new TPP policy agenda to existing TPP projects. And "the Tucker Act does not deprive [a district court] of jurisdiction to vacate and prospectively enjoin unlawful policies concerning [grant] terminations or decisions to cut funds appropriated by Congress." New Mexico v. Musk, 824 F. Supp. 3d 80, 93 (D.D.C. 2026). On the other hand, a request for the government to stop withholding grant funds has been construed by some courts as an *effective* request for specific performance. See, e.g., U.S. Conf. of Cath. Bishops v. U.S. Dep't of State, 770 F. Supp. 3d 155, 163 (D.D.C. 2025). And as Justice Barrett expressed in her controlling concurrence in NIH, "if the CFC has exclusive jurisdiction over" some set of "grant terminations," plaintiffs "cannot end-run that limit simply by packaging them with a challenge to agency guidance." 145 S. Ct. at 2661–62 (Barrett, J., concurring).

Considering both Megapulse factors, and given the dynamic equilibrium of the case law, Awardee Plaintiffs may very well ultimately persuade the Court that it has jurisdiction to order relief as to the grant terminations. Given the closeness of the question, however, the Court

[12] It is "well-established that 'cooperative agreements, unlike procurement contracts, are not presumed to provide money damages.'" Crestview Clinical Lab'y, LLC v. United States, 181 Fed. Cl. 1, 21 (2026) (quoting St. Bernard Par. Gov't, 134 Fed. Cl. at 734).

cannot say with the requisite confidence that they have established a likelihood of success warranting "extraordinary" interim relief of that nature. Winter, 555 U.S. at 24.

*ii. Megapulse Test Applied to SIECUS*

Plaintiffs argue that, Awardee Plaintiffs aside, SIECUS can carry the torch on their APA claims, as that organization also seeks relief from the mass grant terminations. The source of SIECUS's rights cannot be contractual because it is not a party to any TPP agreement, nor is it in privity with the government. Instead, the group's right to challenge the grant terminations stems from the APA's prohibition on agencies acting contrary to law and arbitrarily. And SIECUS does not seek contractual relief because, again, it has not contracted with the government.

Plaintiffs have a stronger position here. As the Court recently observed, "a growing chorus of courts has ruled that a lack of contractual privity between a plaintiff and the federal government undermines Tucker Act channeling." Dallas County v. Kennedy, No. 25-cv-4242 (CRC), 2026 WL 2123225, at *9 (D.D.C. July 23, 2026) (collecting cases). If a plaintiff is not in privity with the government, the logic goes, it cannot maintain a contractual cause of action in the CFC pursuant to the Tucker Act unless some exception to the privity requirement exists. Id. at *8-9 (citing Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998); Teton Hist. Aviation Found. v. DOD, 686 F. Supp. 2d 75 (D.D.C. 2010)). If a third-party plaintiff lacks privity with the government and no exception to the privity requirement applies, the plaintiff is boxed out of the CFC. Id. at *9. At that point, the familiar principle articulated in Tootle v. Secretary of Navy kicks in: "There cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." 446 F.3d 167, 777 (D.C. Cir. 2006).

The government makes no attempt to rebut this argument or suggest that any exception to the privity requirement applies here. Although the issue has yet to be addressed by the Supreme

Court or D.C. Circuit, Plaintiffs are likely to succeed in showing that the Tucker Act does not divest the Court of jurisdiction over *SIECUS*'s challenge to its members' grant terminations. Cf. Dallas County, 2026 WL 2123225, at *10; Brighton Park Neighborhood Council v. McMahon, No. 25-cv-4523 (SLS), 2026 WL 1707623, at *17 (D.D.C. June 12, 2026) (explaining that third-party plaintiffs lacking contractual privity with the federal government have "little [Tucker Act] difficulty" proceeding in district court on their grant discontinuance-related claims).

That tentative conclusion does not magically entitle Plaintiffs to preliminary relief on the grant terminations, however. As explained further below, SIECUS has not shown that it has suffered irreparable harm. The Court cannot order the interim reinstatement of the mass-terminated TPP grants based on SIECUS's non-privity with the federal government when that Plaintiff has not demonstrated irreparable harm that would result absent preliminary relief.

To sum up, the Court may have the power to order the reinstatement of the terminated TPP grants, whether because the Program's cooperative agreements are not contracts under the Tucker Act or because SIECUS can obtain this relief through its more obviously non-contractual APA challenge. But for different reasons, the Court cannot see fit to issue preliminary relief as to the grant terminations at this time.

### 2. *Other Threshold Issues*

#### a. Committed to Agency Discretion

HHS raises two other threshold issues that the Court will consider in turn. First, it argues, the policy change decisions at issue in this case are committed to agency discretion by law and are therefore unreviewable under 5 U.S.C. § 701(a)(2). Opp'n at 18–20. Given the APA's presumption of judicial review of agency action, the Supreme Court has counseled courts to read this exception to reviewability "quite narrowly, restricting it to 'those rare circumstances

where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018) (quoting Lincoln v. Vigil, 508 U.S. 182, 191 (1993)).

This is not one of those rare circumstances. Although the TPP Program's authorizing statute is succinct, it provides clear benchmarks against which the lawfulness and reasonableness of agency action may be assessed. Awardees must offer "medically accurate" and "age appropriate" programming that serves to reduce teen pregnancy. 140 Stat. at 281. Tier 1 awardees must "replicat[e]" programs that have already "been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." Id. And Tier 2 recipients must "develop," "replicate," "refine," or "test" other "models and innovative strategies for preventing teenage pregnancy." Id. Plaintiffs' legal challenge is "directly related to [this] specific statutory language." Hosp. for Special Surgery v. Becerra, No. 22-cv-2928 (JDB), 2023 WL 5448017, at *7 (D.D.C. Aug. 24, 2023). Both the contrary-to-law and arbitrary-and-capricious claims take aim at HHS's alleged abandonment of these statutory goals and guardrails.

The government's effort to analogize this case to Lincoln v. Vigil and Milk Train, Inc. v. Veneman, 310 F.3d 747 (D.C. Cir. 2002) falls short. The statute at issue in Lincoln, which was an APA challenge to the Indian Health Service's decision to discontinue a program it had previously funded from a lump-sum appropriation, included no meaningful or legally binding restriction on how to spend the appropriated funds; in fact, the appropriations statute did "not so much as mention" the relevant program. 508 U.S. at 193–94. And the statute at issue in Milk Train directed that appropriated funds were to be used "to provide assistance directly . . . to dairy producers, *in a manner determined appropriate by the Secretary [of Agriculture]*." 310 F.3d at

751 (emphasis added). The D.C. Circuit concluded that such language "left to the Secretary the decision about how the [relevant] moneys . . . could be best distributed consistent with" the statute's other general policies and thus deprived the district court of jurisdiction to review decisions taken within the scope of that discretion. Id. at 751–52.

Per Lincoln and its progeny, the § 701(a)(2) bar on judicial review under the APA applies where Congress has left an agency with virtually "'unbounded' discretion," Shawnee Tribe v. Mnuchin, 984 F.3d 94, 100–01 (D.C. Cir. 2021) (quoting Dep't of Commerce v. New York, 588 U.S. 752, 772 (2019))—for instance, when it authorizes a lump-sum appropriation to an agency without restricting the use of funds or expressly defers to the discretion of the agency head. Under such circumstances, the "lump-sum appropriation reflects a congressional recognition that [the] agency must be allowed flexibility to shift funds within a particular appropriation" and make "necessary adjustments for unforeseen developments and changing requirements." Lincoln, 508 U.S. at 193 (cleaned up).

By contrast, the limitations in the TPP statute "afford a statutory reference point by which the court is able to review" the agency's substantial adjustments to the criteria it will use to award TPP funds. Milk Train, 310 F.3d at 752 (cleaned up). A reviewing court may have "no business second-guessing the agency's [specific] decision to fund one program over another, but [it] *does* have the authority to ensure that when making that decision HHS considers statutory restrictions," and "in doing so, the court applies manageable standards." Health Teen Network v. Azar, 322 F. Supp. 3d 647, 659 (D. Md. 2018) (emphasis added). After all, "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes," as it has done here. Lincoln, 508 U.S. at 193. The Court thus joins others "that have reached a consensus that

the [Consolidated Appropriations Act] creates meaningful standards such that judicial review of appropriations to the TPP Program is available under the APA." PPNYC, 337 F. Supp. 3d at 325–26 (collecting cases); see also Multnomah County, 340 F. Supp. 3d at 1062.

In sum, the agency actions challenged here are not judicially unreviewable as committed to agency discretion.

b. Final Agency Action

The government's second threshold obstacle is equally surmountable. HHS contends that any judicial review of the FY 2026 NOFOs is unavailable because they do not constitute final agency action, as required by 5 U.S.C. § 704. Opp'n at 20–22. Finality is determined by the familiar two-prong test set forth in Bennett v. Spear, 520 U.S. 154 (1997). The action must, first, "mark the consummation of the agency's decisionmaking process" and "not be of a merely tentative or interlocutory nature." Id. at 177–78 (cleaned up). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Id. at 178 (cleaned up).

Bracketing whether the FY 2026 NOFOs can be disentangled from the grant terminations (which are undoubtedly final), the NOFOs qualify as final agency action in their own right.

*First*, the NOFOs mark the consummation of the agency's decision-making process as to how it will allocate funds in the next round of TPP grant-making. Although the awardees are yet to be chosen, there is nothing remotely "tentative" or "interlocutory" about the *rubric* that the agency will use to select awardees. For instance, the NOFOs state that the agency "intends to make available" TPP grants, and they specify the criteria with which funded "[r]ecipients *will be expected to*" comply. FY 2026 Tier 1 NOFO at 1, 8 (emphasis added); see also FY 2026 Tier 2 NOFO at 1, 9–11. The documents provide that recipients "*must align* program design and

activities" with the specified priorities and are "*required* to administer any project that is awarded under this NOFO in accordance" with its enumerated objectives. See FY 2026 Tier 1 NOFO at 4, 9, 45 (emphasis added); FY 2026 Tier 2 NOFO at 4–5 (emphasis added). In other words, funding eligibility hinges on compliance with the guidelines articulated in the NOFOs, making clear that the notices represent the agency's "last word on the matter" of eligibility even if the final awardees have yet to be chosen. Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 478 (2001). Said yet another way, "while additional steps must be taken to actually award grants, no further steps need to be taken to disqualify applicants such as the [plaintiffs] from receiving grants at all." Multnomah County, 340 F. Supp. 3d at 1057. And "[w]aiting to see which projects are actually funded before calling this a final agency action would force the [plaintiffs] to engage in a futile exercise that would not put the parties in any meaningfully different posture than the one they are in now." Id.

*Second*, "legal consequences" plainly "flow" from the NOFOs' issuance—namely that the notices serve to disqualify would-be applicants whose programming does not conform to HHS's newly-imposed requirements. As Awardee Plaintiffs have alleged, they cannot seek funding under either the Tier 1 or Tier 2 NOFOs to support their teen pregnancy prevention initiatives, at least without transforming programming that HHS previously found to be effective and evidence-based. Compl. ¶¶ 67, 70, 75. If they were to apply to continue their current work, which HHS has blessed—over several years—as compliant with applicable law, they would be ineligible for FY 2026 funding based on the express terms of the notices. See, e.g., Tier 1 NOFO at 45 ("If an application does not align [with the enumerated policy priorities], the application will not receive funding[.]"). "[C]ourts routinely hold that agency action is final where it affects grant eligibility criteria." PPNYC, 337 F. Supp. 3d at 329 (collecting cases); see also

Multnomah County, 340 F. Supp. 3d at 1058 (finding the second prong of the Bennett test "easily satisfied" where TPP call for funding reflected HHS's "decision to deny federal funding to applicants" who did not establish their eligibility).[13]

The Court has little doubt that the FY 2026 NOFOs qualify as final agency action. That the next cohort of TPP recipients has not yet been chosen poses no obstacle to judicial review of the notices or the Policy that informs them.

*3. Merits*

Although Plaintiffs bring contrary-to-law, arbitrary-and-capricious, and First Amendment claims, they "need only show a likelihood of success on one to obtain preliminary relief, provided the other preliminary-injunction factors are satisfied." Am. Bar. Ass'n v. DOJ, 783 F. Supp. 3d 236, 242 (D.D.C. 2025) (Cooper, J.).

Aspects of the 2026 Policy appear contrary to law and in excess of HHS's authority. For instance, the TPP statute requires Tier 1 grantees "replicat[e] programs . . . proven effective through rigorous evaluation." 140 Stat. at 281. The 2026 Tier 1 NOFO requires awardees to incorporate "body literacy" into their curricula, but according to the uncontested record, there are no "curricula/programs that center [on] body literacy and the related topics as described in the NOFO" and "align" with other eligibility criteria outlined in the notice. Simon Decl. ¶ 21. HHS itself acknowledges a "near absence of body literacy education standards nationwide." FY 2026 Tier 1 NOFO at 5. If a program has "never been implemented," it necessarily "cannot be replicated." PPGWNI, 946 F.3d at 1113; see also id. ("To prove something effective requires a

[13] It is also worth noting that the 2026 NOFOs do not just determine the rights and obligations of prospective grant applicants, but they also bind the agency itself. By issuing the notices, HHS has committed to assessing applications by certain principles and metrics. Should the agency deviate from its own rubric, it is susceptible to an arbitrary-and-capricious challenge by *other* applicants who sought TPP funds on the basis of the agency's published notices.

previous implementation that one can test against a standard."). The body literacy requirement is thus seemingly irreconcilable with the statutory requirement for Tier 1 funding. That HHS seeks to "identify effective interventions focused on promoting body literacy" through *Tier 2*'s pot of experimental research funding, FY 2026 Tier 2 NOFO at 5, only reinforces that the "body literacy" framework is incompatible with the Tier 1 statutory mandate.

In addition, notwithstanding the brevity of the statutory provision that authorizes TPP funding, Congress's creation of a separate pot of abstinence-only funding in last year's appropriations law strongly suggests that TPP funding was *not* meant to fund exclusively such programming. Cf. 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."); see also Penn. Dep't of Pub. Welfare v. Sebelius, 674 F.3d 139, 154 (3d Cir. 2012) (government agency could not use funds from one program to fund another "because despite sharing similar purposes," the programs were governed by "distinct statutes with separate appropriations"); cf. United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc., 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor."); Noble v. Ass'n of Letter Carriers, AFL-CIO, 103 F.4th 45, 50 (D.C. Cir. 2024) ("The text [of a law] must be read in the context of the entire statute.").

Finally, the 2026 NOFOs require that applicants "align" themselves with HHS priorities, which, in turn, prohibit the "normali[zation]" of sexual activity for minors and even the "descri[ption]" or "present[ation]" of "sexually explicit content." Compl. ¶¶ 41(d), 58. But both common sense and the record evidence confirm the "impossi[bility]" of "implement[ing] a program that targets and seeks to modify sexual behavior" without "talking about sexual behavior." Gerber I Decl. ¶ 36; see also Johnson Decl. ¶ 32 ("We do not believe that we can effectively run a teen pregnancy prevention program without talking about teens having sex.").

If HHS's new funding notice forbids even the discussion of sexual activity by minors, one wonders how an awardee could possibly *address* the topic of teen pregnancy and related sexual risk behaviors, let alone work to prevent them as the appropriations act necessitates. As such, the "alignment" requirement seems incongruous with the TPP statute, which mandates that HHS fund programs that actually "reduce teen pregnancy." 140 Stat. at 281; cf. Khedkar v. USCIS, 552 F. Supp. 3d 1, 7–8 (D.D.C. 2021) ("An agency policy or regulation which operates to create a rule out of harmony with the statute is a mere nullity." (cleaned up)).

The Court need not, however, resolve such questions of statutory interpretation at this early juncture and on an expedited schedule. That is because Plaintiffs have demonstrated an even stronger likelihood of success on the arbitrary-and-capricious front, which is sufficient "to obtain [the] preliminary relief" they seek. Am. Bar. Ass'n, 783 F. Supp. 3d at 242.

"Agency action is arbitrary and capricious if [the agency] 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Sinclair Wyoming Refin. Co. LLC v. EPA, 114 F.4th 693, 711 (D.C. Cir. 2024) (quoting Motor Vehicle Mfrs. Aff'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). "Under this standard, an agency must engage in reasoned decision making." Id. Although the Court may not "substitute its own judgment" for that of the agency, Ameren Ill. Co. v. FERC, 58 F.4th 501, 505 (D.C. Cir. 2023) (cleaned up), the APA "requires that agency action be reasonable and reasonably explained," FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021).

At present, the Court is persuaded that the 2026 Policy, as applied through the implementation of the FY 2026 NOFOs and mass grant termination decision, is likely unreasonable and insufficiently explained in several crucial respects.

a. HHS's action is likely impermissibly vague.

An initial problem with HHS's new approach to the TPP Program, as articulated in the FY 2026 NOFO, is that several of its terms are likely impermissibly vague. "An agency's requirements must be comprehensible and give entities fair notice of what is required of them." PPGNY II, 2025 WL 2840318, at *23 (citing Gen. Elec. Co. v. EPA, 53 F.3d 1324, 1329 (D.C. Cir. 1995)). Regulated parties need "an opportunity to conform their behavior to legal rules," meaning that they require some way of identifying, "with ascertainable certainty, the standards with which the agency expects parties to conform." Nissan Chem. Corp. v. FDA, 744 F. Supp. 3d 1, 8–9 (D.D.C. 2024) (cleaned up).

As articulated in the FY 2026 NOFO, the 2026 Policy imposes requirements that are so indeterminate as to deprive regulated parties of any "ascertainable certainty" about how to comply. Moving forward, awardees must "align" with various agency priorities, which include eschewing DEI policies and practices, support for "gender ideology," and the "encourage[ment], normaliz[ation], or promot[ion] [of] sexual activity for minors." Compl. ¶ 41(b)–(d). Yet there is nothing in the NOFO documentation, termination letters, or on the OASH policy priorities webpage (which the government suggests that the Court consider) that defines "DEI," "gender ideology," or the "normalization" of sexual activity. So the "sweep" of the agency's bans on these topics is "entirely unclear," and the "lack of agreed-upon meaning of terms like [DEI] have led other courts to deem arbitrary and capricious agency actions premised on those concepts where not adequately defined therein." PPGNY II, 2025 WL 2840318, at *25 (collecting cases).

As with the July 2025 Policy Notice, HHS has made no effort in its NOFOs, termination letters, or OASH policy statement to cabin or clarify these prohibitions.

Plaintiffs' declarations illustrate the problems with vagueness. HHS terminated Hennepin County's TPP Tier 1 grant on the basis that its "*Love Notes* curriculum" "normalizes and encourages sexual activity for minors." Johnson Decl. ¶ 28. As far as the County could understand, HHS's termination letter, along with the new Tier 1 NOFO, seemed to be "suggesting that any program that talks about having sex is not age appropriate for any adolescents." Id. ¶ 32. But because the "prohibition on normalizing sexual activity [was not] clearly defined," the County could only speculate as to the reasons their grant had been terminated. Id. Other declarants expressed similar uncertainty about the basis for cancelling their TPP grants,[14] "leaving [them] to guess at what is and is not permissible in the government's view, while . . . facing the threat of adverse actions during the guessing." PPGNY II, 2025 WL 2840318, at *26 (quoting Perkins Coie LLP v. U.S. Dep't of Just., 783 F. Supp. 3d 105, 177 (D.D.C. 2025)). Declarants conveyed concern that HHS might characterize other activities—such as an initiative that aimed at increasing condom use among students who have sex or educators' answers to common questions that young people have about sexual activity—as "encouraging" teen sexual activity. See Gerber Decl. I ¶ 37; Miller Decl. ¶¶ 41–42. In short, nothing in the challenged policy documents reveals how regulated parties could meaningfully conform their behavior to the requirement that they "align" with vague agency priorities.

---

[14] See, e.g., Gerber Decl. I ¶ 36 ("This prohibition on normalizing sexual activity is not clearly defined. The agency appears to be suggesting that any programming that talks about having sex is not age appropriate for anyone under the age of eighteen."); Miller Decl. ¶ 41 ("HHS has provided no guidance on what it means to encourage, normalize, or promote sexual activity for minors or on how PPH should incorporate that into our TPP programming.").

b. HHS's action likely runs counter to the evidence, fails to consider an important part of the problem, and considers factors Congress did not intend.

Several aspects of the 2026 Policy likely run counter to the evidence before the agency; reflect HHS's failure to consider an important part of the problem; rely on factors that Congress did not intend for the agency to consider; or suffer from some combination of these deficiencies.

Start with the requirement that recipients "incorporate sexual risk avoidance . . . education as a component of program delivery," FY 2026 Tier 1 NOFO at 12; FY 2026 Tier 2 NOFO at 9, which the government does not contest is another way of mandating an abstinence-only approach to pregnancy prevention. According to the record before the Court at this early stage, abstinence-only education is not only "ineffective in delaying sexual initiation and reducing adolescent pregnancy, but also actively harmful and stigmatizing to adolescents." Simon Decl. ¶ 15. The NOFOs do not address the lackluster evidence base for abstinence-only sexual education—which is especially concerning in the Tier 1 context, as such projects *must* "replicat[e]" programs that have been "proven effective through rigorous evaluation to reduce teenage pregnancy" or related risk factors. 140 Stat. at 281. Again, that Congress separately appropriated $35 million to fund "sexual risk avoidance" programs, id. at 281–82, strongly suggests that it did not intend for HHS to apply the same requirement to the TPP Program writ large.[15] While abstinence-only education may well be appropriate for some age groups or

[15] To draw a colorful analogy developed at the motion hearing, say that Congress appropriated $100 million to support the growth of college sports programs. And say that Congress, in its next legislative breath, committed a separate $35 million to supporting the growth of college bobsled programs, specifically. Some of the original $100 million may incidentally go toward developing college bobsled programs. But an agency's decision to dedicate *all* of the general sports funding to bobsledders ignores Congress's careful decision to create two distinct programs—one deliberately general, the other deliberately specific.

communities, the agency has proffered no explanation or evidence to support its across-the-board mandate that *only* abstinence strategies be pursued.

Next, consider that both FY 2026 NOFOs mandate the promotion of "body literacy," a vague public health framework that purports to "equip young people with a clear understanding of how their bodies function in a state of health." FY 2026 Tier 1 NOFO at 10. As noted earlier, HHS *itself* highlights a "near absence of body literacy education standards nationwide." Id. at 5. On the topic of body literacy, the notices (remarkably) reference public health studies that appear either not to exist or not to support the propositions for which they are cited—a hallmark of AI-generated citations. See id. at 6–7 & nn. 1–5; FY 2026 Tier 2 NOFO at 7–8 & nn. 1–5; see also Decl. of Kate Talmor ¶¶ 6–12 ("[I]t appears that five out of seven of the NOFOs' cited articles could not be found as cited in the NOFO. Two out of the seven appear to be completely made up. Three of the seven did not publish in the cited journals but appear to have similar titles to articles published in completely different journals.") And according to the early-stage factual record, there seem to be no pregnancy prevention curricula and programs that "center [on] body literacy" and other newly-imposed TPP requirements. Simon Decl. ¶ 21. The dearth of scientific evidence supporting a "body literacy" approach to teen pregnancy prevention makes it an ill-fitting requirement for Tier 1 awardees. And even though Tier 2 funding is designed to test innovative new strategies for preventing teen pregnancy, the agency has proffered no explanation whatsoever, much less a reasonable one, for requiring *all* Tier 2 grantees to adopt a "body literacy" focus, given the myriad other "innovative" teen pregnancy prevention strategies whose development HHS has funded in the past and now abruptly abandons.

Relatedly, the NOFOs obligate grantees to inform teens of "potential health risks" associated with "widely prescribed medications for sexual and reproductive health," including by

providing an "overview of approaches to managing menstrual health concerns," such as "the advantages and disadvantages of ovarian suppression compared to approaches that address root causes." FY 2026 Tier 1 NOFO at 9–10; see FY 2026 Tier 2 NOFO at 9–10 (similar). Based partly on this new requirement, HHS cancelled King County's Tier 2 grant due to its purported "fail[ure] to identify common side effects, contraindications, or health risks" associated with various forms of birth control "(e.g., bleeding changes, headaches, cramping, bone density loss, hormonal imbalances, and risks for specific medical conditions or later infertility)." Gerber Decl. I, Ex. 2 at 2. Not only does the vagueness of HHS's requirement render it "susceptible to discriminatory application," PPGNY II, 2025 WL 2840318, at *22, the agency has apparently failed to consider that a "large body of evidence" "contradict[s]" the notion that the use of birth control "entails the risk of later infertility," Simon Decl. ¶ 17. HHS also seems to have ignored evidence that "spreading fear about [contraception's] purported risks . . . is more likely to decrease uptake of birth control and therefore increase the teen pregnancy rate." Gerber Decl. I ¶ 42. The insistence on apprising teens of detailed medical information further runs up against the reality that TPP staff are educators, "not medical providers," and not appropriately positioned to advise teens about the medical consequences of using certain methods of birth control based on "their health history or other factors." Id. ¶ 44. At bottom, apprising adolescents of full, accurate information about various forms of contraception could be a perfectly defensible policy prescription, but the agency has not defended it here with any precision or due consideration of contrary evidence.

Turn next to the requirement that future TPP grantees "provide parents or guardians with advance notice" about programming, "offer a meaningful opportunity to review such materials upon request," and provide a "clear and accessible process for parents to opt their children out of

any specific content or activities, particularly those related to sexuality, that may burden their religious exercise." FY 2026 Tier 1 NOFO at 7; see FY 2026 Tier 2 NOFO at 8–9 (similar). HHS justified this mandatory increase in parental involvement in and vetting of pregnancy prevention programs by referencing the Supreme Court's decision in Mahmoud v. Taylor, 606 U.S. 522 (2025). But as Plaintiffs fairly point out, the agency fails to "explain why that school-centered decision is relevant where TPP programming is decidedly *not* limited to the school setting." Mot. for Prelim. Inj. at 29.[16] "Further," the NOFO does not address "how such parental opt-outs, which could result in partial participation in programming by teenagers," might very well "diminish effectiveness or diverge from the statutory 'replication' requirement." PPGNY II, 2025 WL 2840318, at *24.

Aside from being vague, HHS's prohibition on content that it deems "sexually explicit" or that it considers to "normalize" sexual activity for minors is likewise contrary to evidence that was apparently before the agency and fails to consider the seeming logical impossibility of operating an effective pregnancy prevention program without some discussion of sexual activity. See Compl. ¶¶ 41(d), 57–58. Again, if common sense weren't enough, the unrebutted evidence before the Court makes clear that "a teen pregnancy prevention program" cannot be run "effectively . . . without talking about teens having sex." Johnson Decl. ¶ 32; see also Gerber Decl. I ¶ 36 ("[I]f you are implementing a program that targets and seeks to modify sexual behavior, it is impossible to do that without talking about sexual behavior."). To be sure, the

[16] The parental rights provisions in the FY 2026 NOFOs also suffer from a vagueness problem, in that they require funded programs to "be implemented in a manner that avoids compelling participation in content that conflicts with protected beliefs and does not rely on or require ideological content inconsistent with these protections." FY 2026 Tier 1 NOFO at 7; FY 2026 Tier 2 NOFO at 9. As with the July 2025 Policy Notice, the NOFOs "leave[] wide open for interpretation precisely what constitutes" "ideological content" that might "conflict[]" with parents' "protected beliefs." PPGNY II, 2025 WL 2840318, at *24.

TPP statute requires that educational content be "age appropriate," 140 Stat. at 281, and not all pregnancy prevention curricula will be appropriate for all age groups. But the government is hard-pressed to argue that Congress intended for the TPP's "age appropriateness" requirement to bar *any* discussion of teen sexual activity, no matter the target audience. Cf. Gerber Decl. I ¶ 36 (explaining that the seeming prohibition on discussing teen sex makes little sense in King County's TPP initiative, which "work[s] with young men who are already sexually active").

Finally, the NOFOs ask future TPP recipients to take an "upstream, preventive approach" to promoting "optimal health" by "emphasizing root-cause understanding of chronic health conditions that may impact overall health and fertility." FY 2026 Tier 1 NOFO at 1; see also FY 2026 Tier 2 NOFO at 8. The Tier 1 NOFO also urges that program counseling "affirm marriage and parenthood as meaningful and valued components of adult life and support adolescents in considering long-term reproductive goals." Id. at 11. These new TPP parameters imply a desire to promote fertility and marital procreation—twin aims that sit uneasily with Congress's decision to supports programs aimed at "reduc[ing]" and "preventing teenage pregnancy." 141 Stat. at 281. In any event, the unrebutted declarations cast doubt on the efficacy of a pregnancy prevention effort that focuses on fertility and marriage. See Simon Decl. ¶ 21.

Faced with this mountain of uncontroverted evidence suggesting the arbitrariness of HHS's new TPP requirements, the government has little to say. See Opp'n at 24 (explaining that a "full . . . discussion of the merits is not possible in this emergency posture"). Given a second opportunity to oppose the merits of Plaintiffs' arbitrary-and-capricious claims at the motion hearing, the government downplayed various elements of the 2026 Policy. "It is not the case that all the programming has to address abstinence or body literacy," counsel submitted. Prelim. Inj.

Hr'g Rough Tr. at 51:22–25. And TPP awardees were not barred from discussing teen sexual activity, so long as the discussion was "age [] appropriate." Id. at 52:6–9.

These qualifications may be sensible. But they were proposed by counsel, not the agency. According to the text of the FY 2026 NOFOs, Tier 1 and Tier 2 awardees are "required" and "expect[ed]" to operate their programs in a way that promotes body literacy and sexual risk avoidance. See FY 2026 Tier 1 NOFO at 1, 4, 10, 12; FY 2026 Tier 2 NOFO at 9. And the OASH policy priorities, which the FY 2026 NOFOs incorporate by reference, pronounce that the agency "*will* focus on programs that do not promote material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content, including content that encourages, normalizes or promotes sexual activity for minors." Priorities of Office of the Assistant Secretary for Health, OASH, https://health.gov/priorities [https://perma.cc/3MMA-37FK] (last visited Aug. 14, 2026). HHS does not qualify its directives, as counsel does, by applying criteria insofar as they are "age appropriate." Rather, the agency *defines* "age appropriate" programming *as* programming that does not "normalize[]" teen sex. See Simon Decl. ¶ 18.

Government counsel's attempt to soften the 2026 Policy's impositions on TPP awardees is thus unavailing. The proffered caveats are "not at all obvious or even apparent" from the policy documents the Court has before it. PPGNY II, 2025 WL 2840318, at 25. And courts may only review the "rationale actually offered by the agency" at the time it rendered its decision, Grand Canyon Air Tour Coal. v. FAA, 154 F.3d 455, 469 (D.C. Cir. 1998), rejecting "as evidence of reasoned decisionmaking a post hoc rationalization for agency action," Kansas City v. HUD, 923 F.2d 188, 194 (D.C. Cir. 1991).

c. HHS's action likely fails to acknowledge its change in policy position.

The FY 2026 NOFOs fall short in yet another respect: They depart significantly from the FY 2023 NOFOs and others that have come before them, without even recognizing the shift. For instance, the new notices abandon any reference to populations disproportionately affected by higher rates of teenage pregnancy and appear to require awardees to deny the existence of intersex and transgender individuals altogether. Compl. ¶ 49; Simon ¶ 20; FY 2026 Tier 1 NOFO at 45; FY 2026 Tier 2 NOFO at 55. HHS has apparently jettisoned the TPPER, which is the peer-review-like process by which the government assessed whether Tier 1 applicants were poised to replicate an evidence-based pregnancy prevention program. Id. ¶ 47. The agency has shortened the project period from five years to two, ignoring its previous position that a shorter award period would not be sufficient to "allow grantees enough time to form the community relationships, partnerships, and wider engagement needed to adopt a comprehensive systems-thinking approach." Id. ¶ 50. And instead of encouraging experience and tested methods for reducing teen pregnancy, the program now actively penalizes past awardees by giving bonus points to applicants who have never received a TPP award. Id. ¶ 47; FY 2026 Tier 1 NOFO at 41–42; FY 2026 Tier 2 NOFO at 52.

Agencies may, of course, change policy positions without acting arbitrarily, so long as they "display awareness that they are changing position," "provide a reasoned explanation for the change," and "consider serious reliance interests." Narragansett Indian Tribe by and through Narragansett Indian Trib. Hist. Pres. Off. v. McMaster, 176 F.4th 671, 688 (D.C. Cir. 2026) (quoting FDA v. Wages & White Lion Invs., 604 U.S. 542, 568 (2025)); see also FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). Aside from the cursory acknowledgement in HHS's boilerplate grant termination letters that "[c]urrent program priorities . . . differ

fundamentally from prior approaches," see, e.g., Johnson Decl., Ex. 2 at 2, the agency has not acknowledged that the substance and administration of the TPP Program will change dramatically under the auspices of the new NOFOs—let alone provide *any* kind of "reasoned explanation for the change."

The government retorts that the "deferential standard" laid out in Fox "permits the Department to revise its policy priorities" without showing that its new policy is "better" than the old one. Opp'n at 24. True enough. But Fox also requires agencies to give "good reasons" for changing course. 556 U.S. at 515. Here, HHS appears to have "depart[ed] from a prior policy *sub silentio*," offering no reason at all. Id.

d. Conclusion

The party seeking a preliminary injunction is responsible for establishing a likelihood of success on the merits. Plaintiffs have meticulously outlined the unlawful elements of the 2026 Policy as articulated in the FY 2026 NOFOs and applied through the grant terminations. The government responds half-heartedly, asserting that a "full and definitive discussion of the merits is not possible in this emergency posture." Opp'n at 24. An arbitrary-and-capricious challenge *does* usually entail a "full[] review" of the "entire administrative record." E.Q. v. DHS, --- F. Supp. 3d ---, 2026 WL 946181, at *18 (D.D.C. 2026) (Cooper, J.) (cleaned up). But just because a more thorough assessment will come later does not mean that the Court may *presume* the government acted reasonably at this early stage.

HHS is, of course, at liberty to design a policy approach to reducing teen pregnancy and award grant funding consistent with that policy. But it can do so neither in an unreasonable and unreasonably explained fashion, nor in a manner that conflicts with the parameters set forth by Congress. At the very least, the agency must "explain why it chose to do what it did." Tourus Records, Inc. v. DEA, 259 F.3d 731, 737 (D.C. Cir. 2001) (cleaned up). As to many of HHS's

novel TPP criteria, even a brief "statement of reasons []sufficient to permit a court to discern its rationale" seems to be lacking. Id.

Based on the unimpugned record before the Court at this stage, Plaintiffs have established that they are likely to succeed on their arbitrary-and-capricious challenge to the lawfulness of the 2026 Policy and the NOFOs and grant terminations that have implemented it.

C. Irreparable Harm

"[P]reliminary injunctive relief is never awarded as of right and, as a matter of equitable discretion, it does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." Kim v. FINRA, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) (cleaned up). Plaintiffs cannot obtain preliminary relief unless they demonstrate irreparable harm and a favorable balance of the equities.

"[T]he irreparable harm prong of the preliminary injunction analysis is no walk in the park." Dallas Cty., 2026 WL 2123225, at *4. The D.C. Circuit imposes a "high standard" for irreparable harm. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). A movant's injury must "be both certain and great," and "actual and not theoretical." Id. (quoting Wisc. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)). It must also be imminent and beyond remediation sans judicial intervention. Id.

*1. Awardee Plaintiffs*

The Awardee Plaintiffs have demonstrated that they face irreparable harm in the absence of a preliminary injunction preventing the implementation of the 2026 Policy, including both the issuance of the FY 2026 NOFOs and the termination of their grants. According to their uncontested declarations, Awardee Plaintiffs have not only had their grant funding brusquely terminated, but the new guidance effectively bars them from reapplying for TPP funding because

their programs are incompatible with the agency's new requirements. As a result, all three Plaintiffs attest to facing an existential threat to the continuation of their TPP programming. Although Hennepin County has "not yet decided whether [it] can continue to support" its TPP-funded pregnancy prevention project, if it cannot make up the shortfall in funds, the County's "program partners" will "not be able to keep health mentors in the schools and clinics where they currently work, and most would need to lay off those health mentors entirely." Johnson Decl. ¶¶ 37, 40. Even if the County could secure some stopgap funding, "operating the program without a guarantee that [it would] have funds to continue" is "not" an "option[]." Id.

The situation is reportedly even more dire for King County and PPH. The former attests that within two months, it will "not have sufficient funding to continue [its] evaluation" of its Tier 2 study, meaning that "the efforts of the last three years" of data collection "will largely go to waste." Gerber Decl. I ¶ 49. "The longer [the County] go[es] without funding, the more difficult it is to pick back up." Id. ¶ 52. But if the County "were able to complete [the] study as expected," it predicts it would "turn out another evidence-based program that would be eligible for replication under Tier 1," which would be "an enormous benefit to the field." Id. ¶ 53.

Similarly, PPH's TPP program was entirely funded by its federal grant, and "without that funding, PPH has been forced to begin winding down [its] TPP Project entirely." Miller ¶ 26. The organization reports having already begun to lay off staff members who were responsible for administering the TPP program. Id. ¶ 28. Absent even the prospect of a restoration of TPP funding, PPH's "work will not be picked up by others, at least not by others with the same level of substantive expertise or deep knowledge of the communities served by PPH's TPP Program." Id. ¶ 29. And if PPH were to re-apply for funding under the FY 2026 NOFO, it would be forced to "adopt changes to [its] programming that would run counter to its core purpose," thereby

"prevent[ing] the communities of young people in Iowa and Nebraska that PPH serves from receiving sexual and reproductive health education that has proven to be effective" and "leaving these communities at risk of increased rates of teen pregnancy." Id. ¶ 36, 38.

The significant harms faced by Awardee Plaintiffs are not, as the government contends, purely economic or merely temporary. All three entities—but especially King County and PPH—swear to the imminent dismantling of their teen pregnancy prevention initiatives, some of which has already begun. Though "economic loss" does not generally, "in and of itself, constitute irreparable harm," Wisc. Gas Co., 758 F.2d at 674, a loss of access to federal funding may cause irreparable harm when, as here, it "threatens the very existence of the recipient's operations," Harris County v. Kennedy, 786 F. Supp. 3d 194, 219 (D.D.C. 2025) (Cooper, J.) (cleaned up). Moreover, Plaintiffs' declarations make clear there is no way to operate their existing programming in line with the agency's latest funding parameters. So the government's argument that Plaintiffs' "opportunity to compete for new funding . . . forecloses as a matter of law any claim of irreparable harm" misses the point. Opp'n at 28.

Separately, enjoining the implementation of the 2026 Policy through the FY 2026 NOFOs *alone* would staunch the flow of irreparable harm, even if the Court does not order the interim reinstatement of Plaintiffs' grants. The government does not dispute that HHS plans to reallocate the now-terminated TPP awards toward projects that adhere to the agency's new policy priorities. See Johnson Decl. ¶ 25. The application period closed on July 23, 2026, and the agency could, at any moment, disburse under the new TPP rubric, which is irreconcilable with Awardee Plaintiffs' current programming. See Prelim. Inj. Hr'g Rough Tr. at 39:24–40:2. Were HHS to do so, those Plaintiffs would have no way of competing for TPP funding on an even playing field, if the Court were eventually to determine that the agency's new TPP

requirements are unlawful. In short, the harms to Awardee Plaintiffs "cannot be easily undone." Harris County, 786 F. Supp. 3d at 220.

A preliminary injunction preventing HHS from implementing the 2026 Policy by way of the FY 2026 NOFOs would preserve Awardee Plaintiffs' opportunity to seek forward-looking funding for their current TPP programs. As such, it would be a fitting "stopgap measure" aimed at "maintain[ing]" the status quo and preserving "the relative positions of the parties" until the merits of the case are finally resolved. Sherley v. Sebelius, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).

*2. SIECUS*

By contrast, the Court is not persuaded that SIECUS faces irreparable harm at this time. For starters, SIECUS faces financial harm due to the loss of its dues-paying members. See Simon Decl. ¶ 12. This injury strikes the Court as precisely the type of economic loss that courts do not consider to be irreparable. SIECUS also alludes to impairment of its technical assistance and standard development work, which seeks to prevent unintended pregnancy and promote sexual health. See id. ¶¶ 9, 13–14. While this programmatic injury is likely to satisfy Article III's case or controversy requirement, a perceptible impairment to an organizational plaintiff's operations does not necessarily demonstrate *irreparable* harm warranting preliminary relief.

At the motion hearing, Plaintiffs suggested that the D.C. Circuit held otherwise in League of Women Voters v. Newby, 838 F.3d 1 (D.C. Cir. 2016). In Plaintiffs' framing, the D.C. Circuit concluded that a voting rights group faced irreparable harm because agency action prevented them from "register[ing] voters adequately," requiring them to "divert resources and reorganize the way they did things to counteract the harm in that case." Prelim. Inj. Hr'g Rough Tr. at 23:13–18. Not exactly. The impairment to the organization's operations was enough to

establish "*injury* for purposes both of standing and irreparable harm." Newby, 838 F.3d at 9 (emphasis added). But the harm was "*irreparable* because after the registration deadlines for the [upcoming] November election pass[ed], 'there [could] be no do over and no redress.'" Id. (emphasis added) (quoting League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014)). It is far from clear that SIECUS will experience this kind of irremediable injury as a result of the 2026 Policy. The Court therefore cannot order preliminary relief based on SIECUS's showing of irreparable harm (or lack thereof).

D. Balance of the Equities

The Court at last arrives at the balance of equities and the public interest, considerations that "merge" when the government is the opposing party. Nken v. Holder, 556 U.S. 418, 435 (2009). As to the requested injunction preventing the agency from implementing its 2026 Policy—specifically through the FY 2026 NOFOs—for the pendency of this action, the balance of equities militates in Plaintiffs' favor. On one side of the ledger, the harm to Awardee Plaintiffs' operations is great and imminent. Sworn declarants aver that their TPP programs will soon shut down unless they have some reprieve or possibility of future HHS funding.

On the other side of the ledger, the harms to the government associated with temporarily enjoining the implementation of the 2026 Policy through the NOFOs are relatively minor. After Judge Howell vacated HHS's July 2025 Policy Notice last October, the agency waited the better part of a year to issue a new set of NOFOs articulating its adjusted policy preferences. It has not explained why a temporary restriction on imposing those preferences during the pendency of this action—*i.e.*, a restoration of the status quo as of just a few weeks ago—imposes any meaningful harm. Nor does it suggest why the requested relief would "preclude [HHS's] review of any

[TPP] applications at all." Opp'n at 30. HHS may, for instance, reissue the NOFOs under the previously-applied TPP guidelines and thereby achieve its statutory mandate.

The calculus is different, however, when it comes to temporarily enjoining the June 26, 2026 terminations of TPP awards, which Plaintiffs have separately requested. See Pls.' Proposed Order for Prelim. Inj. Mot. at 1. Again, whether the Court has jurisdiction to order the reinstatement of Plaintiffs' grants is an open question, and the D.C. Circuit seems likely to weigh in soon on whether, and under what circumstances, a cooperative agreement qualifies as a "contract" under the Tucker Act. Even if the Plaintiffs are likely to succeed in showing that the Tucker Act does not deprive the Court of jurisdiction over *SIECUS's* APA challenge because that group is a third-party to the TPP agreements, SIECUS does not face irreparable harm. The Court sees no route to cobbling together a preliminary injunction where the viability of a particular claim rests on a plaintiff who has not experienced the requisite magnitude of harm.

Awardee Plaintiffs, by contrast, *do* face serious existential threats to their TPP initiatives. But given the doctrinal uncertainties that plague their challenge to the grant terminations, there is a substantial risk that the Court could erroneously order the government to pay grant funds that HHS has no guarantee of recovering once disbursed. See Dep't of Ed., 604 U.S. at 651–52. At the motion hearing, Plaintiffs' counsel further implied that the threat to their TPP programming will be somewhat mitigated by a temporary injunction prohibiting the agency from implementing the 2026 Policy through the FY 2026 NOFOs. See Prelim. Inj. Hr'g Rough Tr. at 39:19–40:14. In the immediate future, the Awardee Plaintiffs may compete on an even playing field for TPP funding and perhaps reobtain funding for projects that the agency has in the past deemed consistent with program criteria.

* * *

"Crafting a preliminary injunction" is "an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579 (2017). And "because preliminary injunctions are a significant measure, any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown by the facts." North. Am. Bldg. Trades Unions v. DOD, 783 F. Supp. 3d 290, 301 (D.D.C. 2025) (cleaned up).

The Court concludes that the Plaintiffs' likelihood of success on their arbitrary-and-capricious claim, combined with the severity and irremediable harm to their programming and the balance of equities in their favor, justify the issuance of a preliminary injunction in this case. For the pendency of this action, HHS and its agents may not implement their 2026 Policy, including through the issuance of the FY 2026 NOFOs. However, the Court will not go so far as to enjoin the implementation of the grant termination letters at this early stage—unless, perhaps, some intervening legal development substantiates Plaintiffs' argument that the TPP cooperative agreements are not, in fact, Tucker Act "contracts."

E. Security and Stay Pending Appeal

*1. Security*

The government requests that the Court order Plaintiffs to post security in light of its issuance of injunctive relief. Federal Rule of Civil Procedure 65(c) requires that a PI movant "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

"Rule 65(c) gives this court broad discretion to determine the appropriate amount of an injunction bond," which may include imposing "no bond at all." North. Am. Bldg. Trades Unions, 783 F. Supp. 3d at 315 (cleaned up). HHS has not identified "quantifiable costs" it

would "incur as a result of being temporarily restrained from enforcing" the 2026 NOFO and returning to the *status quo ante*. Id. The Court can imagine some administrative costs associated with the temporary change in course. But it has no way of ascertaining those costs, especially because HHS was poised to implement the TPP Program in line with FY 2023 parameters as of a few weeks ago. In light of all this and the careful scope of the preliminary injunction, the Court finds that a nominal bond of $1.00 is appropriate. Accord Endocrine Soc'y v. FTC, No. 26-cv-512 (JEB), 2026 WL 1257289, at *15 (D.D.C. May 7, 2026).

*2. Stay*

A stay of the preliminary relief pending appeal is not warranted. As the government points out, the stay factors are "substantially similar to the preliminary injunction factors." Opp'n at 31; see also Nken, 556 U.S. at 434 ("There is substantial overlap between [the stay factors] and the factors governing preliminary injunctions."). The above application of these factors shows that it is *Plaintiffs* who are likely to succeed on the relevant aspects of their APA challenge; the government has identified no irreparable harm that could be attributed to the carefully scoped preliminary injunction the Court orders here; and the remaining equitable and public interest factors militate in Plaintiffs' favor.

## IV. Conclusion

As the saying goes, "When at first you don't succeed, try, try again." HHS has taken this adage to heart. Last year, a judge on this Court vacated an HHS guidance document that made substantial policy changes to the TPP Program, on the ground that the changes were arbitrary and capricious under the APA. Unfazed by the adverse ruling, HHS issued new NOFOs that repackaged the vacated policy changes and imposed additional grant parameters. The TPP Program now mandates an abstinence-only approach to pregnancy prevention, promotes the

nebulous concept of "body literacy," and prohibits the "normalization" of sexual activity among minors. That new policy is likely arbitrary and capricious.

Because Plaintiffs have shown that the preliminary injunction factors weigh in their favor, the Court will temporarily enjoin implementation of the policy, including the implementation of the FY 2026 NOFOs, for the pendency of this action. However, it will not order interim reinstatement of the terminated grants at this time because of lingering uncertainty over the Court's power to order such relief.

For the foregoing reasons, the Court will GRANT in part and DENY in part Plaintiff's Motion for a Preliminary Injunction. A separate Order shall accompany this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: August 19, 2026