**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **HENNEPIN COUNTY, MINNESOTA**, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**, et al.,<br><br>*Defendants*. | **Case No. 26-cv-2460 (CRC)** |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS


Introduction ..... 1

Background ..... 3

- I. Congress creates the TPP Program to address teen pregnancy. ..... 3
- II. After issuing cooperative agreements for the 2023–2028 award cycle, HHS unsuccessfully attempts to impose new conditions on the awardees. ..... 5
- III. HHS adopts and implements the 2026 Policy. ..... 5
  - A. HHS unveils the 2026 NOFOs, abandoning the statutory requirements for the TPP Program. ..... 6
  - B. HHS effectuates a mass termination of existing cooperative agreements. ..... 9
- IV. Plaintiffs are harmed by the 2026 Policy ..... 11
- V. Plaintiffs file this lawsuit and the Court grants preliminary relief. ..... 13
- VI. Defendants obligate TPP Program funds and rescind the NOFOs, while declining to abandon the 2026 Policy. ..... 14

Legal Standard ..... 15

Argument ..... 16

- I. The Tucker Act does not preclude this Court's jurisdiction. ..... 16
- II. The 2026 Policy is unlawful. ..... 22
  - A. The 2026 Policy is final agency action. ..... 22
  - B. The 2026 Policy is contrary to law and exceeds Defendants' statutory authority. ..... 23
  - C. The 2026 Policy is arbitrary and capricious. ..... 28
- III. The Court should grant Plaintiffs' requested relief. ..... 44

Conclusion ..... 45

## INTRODUCTION

For more than fifteen years, the Teen Pregnancy Prevention (TPP) Program has benefited young people across the country. The criteria established by Congress for this evidence-based program have remained consistent: awardees must support "medically accurate and age appropriate programs" that "have been proven effective through rigorous evaluation" to "reduce teen pregnancy" or that are being tested to determine whether they meet that objective. Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009); *accord* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 281.

Recently, however, Defendants decided to take the TPP Program in a different direction unmoored from Congress's command. Through two related actions, Defendants implemented a new policy (the "2026 Policy") replacing the properly run TPP Program with one divorced from the statutory requirements. First, on June 23, 2026, Defendants issued new notices of funding opportunity (NOFOs) that conditioned TPP Program funding on incorporating abstinence-only "sexual risk avoidance" education; required awardees to "align" with vague agency priorities that prohibit "gender ideology" and diversity, equity, and inclusion practices; restricted the provision of information about birth control options; and prevented discussion of teen sexual activity in a program about the effects of teen sexual activity. Second, on June 26, 2026, Defendants terminated the vast majority of TPP Program five-year cooperative agreements midcycle, claiming that the curricula awardees were using failed to conform to the agency priorities that had been included as program requirements in the new NOFOs three days prior.

Defendants rescinded the 2026 NOFOs after this Court issued a preliminary injunction, but they have declined to abandon the 2026 Policy. Plaintiffs Hennepin County, King County, and Planned Parenthood of the Heartland (PPH) (collectively, "Awardee Plaintiffs") remain terminated from the Program, unable to rely on TPP funding to provide critical sexual and reproductive health

programming. And additional actions indicate that Defendants have not abandoned the 2026 Policy, including awarding funds to pursue research about several requirements—such as "body literacy" and "sexual risk avoidance" education—mandated by the 2026 NOFOs. Especially when considered in the context of their repeated attempts over the past two years to dismantle the Program and replace its evidence-based programming with this administration's policy priorities, Defendants' actions show that they have not retreated from the 2026 Policy.

The 2026 Policy is unlawful, and the Court should grant summary judgment in Plaintiffs' favor. As the Court has observed, the Department of Health and Human Services (HHS) "is perfectly entitled to formulate its own views about how to stem teen pregnancy," but it cannot "impose conditions on grant recipients that Congress did not intend or that are unreasonable or unexplained." *Hennepin County v. HHS*, No. 26-cv-2460, 2026 WL 2426300, at *1 (D.D.C. Aug. 19, 2026). Defendants have done just that, abandoning the statutory criteria mandated by Congress in favor of their own ideologically driven policy priorities. The Court thus correctly concluded at the preliminary injunction stage that the 2026 Policy "is likely unreasonable and insufficiently explained in several crucial respects" and that "[a]spects of the 2026 Policy appear contrary to law and in excess of HHS's authority." *Id.* at *19–20. The administrative record confirms that conclusion, as it reveals no lawful or reasoned basis for the 2026 Policy.

Plaintiffs—two local governments and one nonprofit that have received TPP Program funds, as well as an organization that works closely with TPP Program awardees—have been harmed by this radical transformation of the Program. Due to the 2026 Policy, Plaintiffs and other awardees have been forced to suspend or start dismantling ongoing teen education programs, pause needed research, interrupt services to adolescents and families, lay off trained personnel and place other staff at risk of termination, and jeopardize longstanding partnerships with schools, healthcare

providers, and community organizations. Accordingly, the Court should declare unlawful, vacate, and set aside the 2026 Policy and its implementing actions, including the blanket terminations. The Court should also permanently enjoin Defendants from implementing the unlawful requirements of the 2026 Policy going forward.[1]

## BACKGROUND

### I. Congress creates the TPP Program to address teen pregnancy.

Teenage pregnancy is a "significant public health concern" in this country "because of the range of health, social, and economic effects adolescent childbearing can have on adolescents, their children, and broader society."[2] In the 1990s and 2000s, Congress directed most funding for sex education to programs emphasizing abstinence from sexual activity. *See Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 69 (D.D.C. 2018) (K.B. Jackson, J.). In 2006 and 2007, teen pregnancy rates began to climb after years of decline.[3]

To address this public health problem, Congress established the TPP Program through the 2010 Appropriations Act. Congress appropriated $110 million to HHS "for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy" and directed that the funds be disbursed across two tiers. 123 Stat. at 3253. Tier 1 awardees must "replicat[e]" "medically accurate and age appropriate programs" that have already "been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors."

[1] The Court previously "recognize[d] the existence of HHS's overarching 2026 Policy." *Hennepin County*, 2026 WL 2426300, at *8. But even in the alternative—if the Court now concludes there is no policy—the 2026 NOFOs are independently unlawful for the same reasons discussed below. That challenge remains live despite the rescission of the NOFOs. *See, e.g.*, *Washington v. HUD*, 171 F.4th 473, 485 (1st Cir. 2026) (noting district court's holding that rescission of NOFO did not moot case where agency "failed to prove that the challenged conduct would not recur").

[2] Alexandria K. Mickler & Jessica Tollestrup, Cong. Rsch. Serv., R45184, *Teen Births in the United States: Overview and Recent Trends* 1 (2025), https://perma.cc/3HLH-F6BA.

[3] Mickler & Tollestrup, *Teen Births in the United States*, *supra* note 2, at 2–3.

*Id.*[4] Tier 2 awardees are responsible for "develop[ing], replicat[ing], refin[ing], and test[ing] additional models and innovative strategies for preventing teenage pregnancy" that also must be "medically accurate and age appropriate." *Id.*

Congress has—on a bipartisan basis—consistently appropriated funds to ensure the TPP Program retained the same core structure. And the Program has been an enormous success: by 2023, the teen birth rate in the United States had reached a record low and had decreased 68% since 2007.[5] Most recently, in the 2026 Appropriations Act, Congress appropriated $101 million "for making competitive contracts and grants . . . to fund medically accurate and age appropriate programs that reduce teen pregnancy," with 75% of nonadministrative funds going to Tier 1 programs, and 25% of such funds to Tier 2 programs. 140 Stat. at 281. It did so even though HHS had sought to eliminate the TPP Program in its proposed budget. *See* HHS, *Fiscal Year 2026 Budget in Brief* 36, https://perma.cc/46MV-KUXG (last visited July 12, 2026).

Congress has made clear that TPP Program funding is distinct from funding earmarked for abstinence-only education. In a neighboring provision to the one funding the TPP Program, Congress appropriated a separate $35 million for abstinence-only education, directing its use for "competitive grants which exclusively implement education in sexual risk avoidance"—defined as "voluntarily refraining from non-marital sexual activity"—and instructing that such programs avoid "normalizing teen sexual activity." 140 Stat. at 281–82.

[4] For most of the Program's history, programs eligible for "replication" were identified by HHS through the agency's Teen Pregnancy Prevention Evidence Review, a process akin to expert peer review. Jessica Tollestrup, Cong. Rsch. Serv., R45183, *Adolescent Pregnancy: Federal Prevention Programs* 4–6 (2024), https://perma.cc/3DCX-9QMW.

[5] Mickler & Tollestrup, *Teen Births in the United States*, *supra* note 2, at 3.

## II. After issuing cooperative agreements for the 2023–2028 award cycle, HHS unsuccessfully attempts to impose new conditions on the awardees.

HHS has carried out the TPP Program through "cohorts" of multi-year cooperative agreements. In 2023, HHS published NOFOs soliciting applications for a new five-year cohort. Compl., Ex. A (Tier 1 2023 NOFO), Dkt. No. 1-1; Compl., Ex. B (Tier 2 2023 NOFO), Dkt. No. 1-2. While funding was distributed on an annual basis, awardees were eligible to receive non-competitive continuation funding for the five-year project period. Tier 1 2023 NOFO at 56; Tier 2 2023 NOFO at 56. In awarding cooperative agreements—including to Awardee Plaintiffs—HHS necessarily evaluated and approved the proposed projects. Decl. of Ashley Johnson ¶ 11, Dkt. No. 14-2; Decl. of Andrea Gerber ¶ 14, Dkt. No. 14-3; Decl. of Virginia Miller ¶ 11, Dkt. No. 14-4.

The 2023 awardees carried out their projects during the first two years of the project period and submitted annual applications for continuation of funding. HHS approved those applications for Awardee Plaintiffs in both 2024 and 2025. Johnson Decl. ¶ 21; Gerber Decl. ¶ 27; Miller Decl. ¶¶ 17, 19.

In early 2025, HHS notified awardees that they should "revise their projects, as necessary, to demonstrate that the [non-competing continuation] award application is aligned with current Executive Orders." *Planned Parenthood of Greater N.Y. v. HHS*, No. 25-cv-2453, 2025 WL 2840318, at *3 (D.D.C. Oct. 7, 2025) (citation omitted). Months later, HHS published a policy notice (the "2025 Policy Notice") imposing requirements on awardees that were not in the 2023 NOFOs or the cooperative agreements under which funds had been awarded. Compl., Ex. C (2025 Policy Notice), Dkt. No. 1-3. In October 2025, a district court vacated that policy notice as arbitrary and capricious. *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *30.

## III. HHS adopts and implements the 2026 Policy.

"Unfazed by the adverse ruling," HHS took substantially the same approach less than a year later. *Hennepin County*, 2026 WL 2426300, at *28. Defendants adopted and implemented the

2026 Policy, requiring adherence to new program requirements through the 2026 NOFOs and contemporaneously terminating nearly every existing cooperative agreement for failure to comply with those same unlawful "priorities." The 2026 Policy thus pivots the TPP Program from one centered on evidence-based content to one of the administration's own creation.

### A. HHS unveils the 2026 NOFOs, abandoning the statutory requirements for the TPP Program.

On June 23, 2026—one week before the end of the third year of the five-year funding cycle for Tier 1 agreements—HHS announced a new competition for TPP Program funding through the Tier 1 and Tier 2 2026 NOFOs. Compl., Ex. D (Tier 1 2026 NOFO), Dkt. No. 1-4; Compl., Ex. E (Tier 2 2026 NOFO), Dkt. No. 1-5; *see* AR 1–89, 90–196. "The NOFOs reflect an array of substantial changes to the Program." *Hennepin County*, 2026 WL 2426300, at *4.

To start, the NOFOs reimposed requirements found arbitrary and capricious in the 2025 Policy Notice. For example, the NOFOs required that awardees' activities "align with . . . executive orders," Tier 1 2026 NOFO at 45, and directed awardees to "align" with agency priorities that include: "[e]nding diversity, equity, and inclusion (DEI) policies and practices"; "[e]nding support for gender ideology"; deprioritizing programs whose content "encourages, normalizes or promotes sexual activity for minors"; and providing information on the "full range of health risks" when offering "health-related recommendations," OASH Priorities, https://health.gov/priorities [https://perma.cc/LJ7U-27F2] (last visited July 1, 2026) (cited in Tier 1 2026 NOFO at 4; Tier 2 2026 NOFO at 4 (both requiring awardees to "implement any funds awarded under this NOFO to effectuate program goals and agency priorities in accordance with

the Priorities of the Office of the Assistant Secretary for Health")); *see* AR 238–40 (OASH Priorities). They provided no guidance on how to come into "alignment."[6]

The NOFOs also prohibited any "denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic." Tier 1 2026 NOFO at 45; Tier 2 2026 NOFO at 55. They dictated that awardees include "advance notice and meaningful opt-out provisions" for parents, Tier 1 2026 NOFO at 8, including "clear, accessible processes for parental opt-out of specific content or activities," *id.* at 1. And they warned that funding depended on "ongoing compliance with these priorities." Tier 1 2026 NOFO at 4; Tier 2 2026 NOFO at 5.

The NOFOs then went beyond the judicially rejected 2025 Policy Notice by adding other conditions found nowhere in the appropriation. For instance, the NOFOs conditioned funding on incorporating "sexual risk avoidance" (SRA) education. *See* Tier 1 2026 NOFO at 12, 19, 37; Tier 2 2026 NOFO at 9.[7] In addition, the NOFOs directed awardees to promote "body literacy" education—defined ambiguously as "the ability to understand how the body functions in a state of health," Tier 1 2026 NOFO at 55—claiming that girls who receive it "are much more likely to remain abstinent compared to their body-illiterate peers." *Id.* at 6; Tier 2 2026 NOFO at 7. As "support" for the importance of body literacy, the NOFOs cited multiple journal articles that appear not to exist. Decl. of Kate Talmor ¶¶ 7–12, Dkt. No. 14-6. The administrative record confirms as much: it contains a Klaus article, but it is not the same article cited in the Tier 1 NOFO. *Compare* AR 222, *with* Tier 1 2026 NOFO at 6 n.3. The Hall, Polis, Manhart, and Sinai articles cited in the

[6] The NOFOs also mandated adherence to the broader HHS priorities, *see* Tier 1 2026 NOFO at 44; Tier 2 2026 NOFO at 55, which overlap in many areas with the OASH priorities. *See* HHS Priorities, https://www.hhs.gov/about/priorities/index.html [https://perma.cc/9HWV-6N8B] (last visited July 5, 2026) (stating that HHS will not support "DEI programs"; will "[c]ombat gender ideology"; and will "[r]eaffirm parental authority"); AR 241–49 (HHS Priorities).

[7] Defendants have not disputed that "sexual risk avoidance" education "means an abstinence-only approach to teen pregnancy prevention." *Hennepin County*, 2026 WL 2426300, at *5.

NOFOs are wholly absent from the administrative record. *See* Tier 1 2026 NOFO at 6 nn.1–2, 4; Tier 2 2026 NOFO at 7 nn.1–2.

As part of the "body literacy" mandate, HHS directed recipients to include separate female and male reproductive health modules with novel requirements. Among them, young women must be taught "the advantages and disadvantages of ovarian suppression compared to approaches that address root causes" of menstrual health concerns, while young men must be taught "the physiology of arousal, including normal indicators of hormonal health such as waking erections or nocturnal emissions." Tier 1 2026 NOFO at 10. No citations or evidentiary support were provided for any of these new curricular requirements. HHS went further still, directing awardees—in an approach that appears to promote fertility in a program meant to reduce teen pregnancy—to "[p]romote optimal health" by emphasizing "root-cause understanding of chronic health conditions that may impact overall health and fertility." *Id.* at 1.

The NOFOs also abandoned the TPP Evidence Review (TPPER), which HHS has long used to systematically review research and identify proven-effective programs for replication under Tier 1, without any explanation or guidance as to which existing programs (if any) applicants could run. Compounding that abandonment, the Tier 1 NOFO contemplated that awardees would modify, rather than "replicate," evidence-based programs, by obtaining permission from developers or copyright holders "to make any changes to materials," stating that "[c]hanges may include those to ensure medical accuracy, age-appropriateness, and alignment with [agency] priorities." Tier 1 2026 NOFO at 23. And the NOFOs awarded bonus points to applicants who did not hold active TPP awards or had never received one—penalizing, rather than crediting, the experience the statute promotes. Tier 1 2026 NOFO at 41–42; Tier 2 2026 NOFO at 52.

Further, the NOFOs eliminated any focus on populations most in need, deleting every reference to LGBTQ+ youth and omitting any consideration of the differing teen pregnancy rates

among different populations. *Cf.* Tier 1 2023 NOFO at 6–7. And in the new Tier 1 NOFO, Defendants shifted from the established practice of five-year awards to two-year awards "with an optional competitive third year." Tier 1 2026 NOFO at 1.

**B. HHS effectuates a mass termination of existing cooperative agreements.**

Defendants "did not stop" there. *Hennepin County*, 2026 WL 2426300, at *5. On June 26, 2026—three days after the publication of the NOFOs—HHS further implemented the 2026 Policy (and freed up the funding for awards to be made under the NOFOs) by issuing termination letters to nearly all participants in the 2023 funding cohort, including Awardee Plaintiffs. Johnson Decl., Ex. 2 (Hennepin County Letter); Gerber Decl., Ex. 2 (King County Letter); Miller Decl., Ex. 2 (PPH Letter); *see* AR 300–01, 1534–35, 905–06, 1655–1758.

None of the termination letters in the administrative record suggest that awardees had failed to satisfy the terms of their cooperative agreements. Instead, in boilerplate language, they said the agency "believes that some curricula normalize adolescent sexual activity and are not age appropriate." *E.g.*, Hennepin County Letter at 1; AR 1655. Some letters also claimed that curricula "provide insufficient information on the range of health risks associated with various forms of birth control." *E.g.*, King County Letter at 1; AR 1685.

The termination letters "justified the cancellation of the majority of TPP grants on the basis that they were inconsistent with published OASH priorities." *Hennepin County*, 2026 WL 2426300, at *6. One priority, the letters explained, is a "focus on programs that do not promote material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content, including content that encourages, normalizes or promotes sexual activity for minors." *E.g.*, King County Letter at 1. Another priority is providing "medically accurate and reliable information necessary for informed consent" by ensuring that "medically accurate materials or instructions with pharmaceutical or health-related recommendations include information on the full range of

health risks," *id.*—without any explanation as to why "informed consent" applies to educators, who are not prescribing pharmaceuticals or making individualized health recommendations.

The letters noted the agency's "discretion" to "suspend (rather than decide not to renew) an award to allow the recipient an opportunity to take appropriate corrective action." *Id.* at 2. But the agency "made a programmatic determination regarding continuation funding not to renew the grant," as "[c]urrent program priorities . . . differ fundamentally from prior approaches." *Id.*

The same day, HHS issued several internal "decision memorand[a]" purporting to "document the Office of the Assistant Secretary for Health's (OASH) decision to terminate certain discretionary [TPP] Program awards for no longer aligning with agency priorities." *E.g.*, AR 1759. The memoranda identified several curricular programs that purportedly "normalize adolescent sexual activity," such as by simply discussing condom use, providing instructions on how to use condoms correctly, or engaging in educational roleplay scenarios about fictional characters who are sexually active—including if those characters state that they do not want to have sex again—or who are experiencing pressure to be sexually active. *E.g.*, AR 1765–66, 1774, 1778, 1794, 1803–04, 1813, 1836, 1852–53. The memoranda characterized other programs as improperly referencing topics such as unprotected sex; pregnancy; attempts to conceive; ongoing teen sexual activity; the importance of being tested before engaging in sexual activity; various birth control methods; and abortion access. *E.g.*, AR 1760–61, 1782, 1790, 1816–17, 1853.

The memoranda announced that OASH "will be terminating" any awards featuring the supposedly problematic curricula. *E.g.*, AR 1762. In boilerplate language, they stated: "OASH has determined that it is not possible to modify or partially terminate these awards because this is a situation of reframed agency priorities that is related to the curriculum provided and is unrelated to the conduct of the recipient." *Id.* The memoranda cursorily acknowledged that the terminations "may create short-term impacts for the recipient, subrecipients, and participants." *Id.* But "OASH

believe[d]" that those reliance interests were "outweighed by the agency's substantial interest in preserving the integrity of federally funded public health programs and upholding OASH priorities." *Id.* And the memoranda claimed that OASH "is optimizing the use of TPP . . . award funds on awards that use [other] curricula," providing five examples for Tier 1 and two examples for Tier 2 of purportedly acceptable curricula. *E.g.*, AR 1762–63, 1767. According to the memoranda, these programs "are less explicit" than the identified curricula and "will ensure that the most appropriate, yet effective materials are being used without compromising the TPP Program's statutory mission." *E.g.*, AR 1763, 1767. The memoranda did not offer any explanation as to why those programs are "appropriate" and the terminated curricula are not, or provide any evidence to substantiate HHS's claim that they are "effective" as required by statute.

* * *

Together, the policies laid out in the 2026 NOFOs and the notices terminating awards on near-identical grounds reflect the existence and implementation of the 2026 Policy. Existing awardees were summarily kicked out of the program because their curricula supposedly failed to align with vague agency priorities untethered from the statute. At the same time, the new NOFOs imposed those same priorities as a condition of receiving funding. Through the 2026 Policy, "HHS has made a discernible decision to reorient TPP criteria toward the goals of abstinence and 'body literacy' and away from other forms of pregnancy prevention, as well as DEI, 'gender ideology,' and the 'normalization' of teen sexual activity." *Hennepin County*, 2026 WL 2426300, at *8.

**IV. Plaintiffs are harmed by the 2026 Policy.**

Prior to the implementation of the 2026 Policy, Awardee Plaintiffs were operating their programs in accordance with the terms of their cooperative agreements and HHS's programmatic guidance. For example, Hennepin County's teen pregnancy prevention programming, Better Together Hennepin, was substantially funded through a Tier 1 award. Johnson Decl. ¶ 11. The program has been extremely successful, on track to reach more than 5,000 participants and

consistently receiving positive feedback from program participants, school and clinic partners, and HHS program officers. *Id.* ¶¶ 17–20. The timing of the 2026 Policy "has caused chaos" and thrown the future of the program into serious doubt. *Id.* ¶ 41.

The 2026 Policy has also had a devastating impact on PPH. Defendants terminated PPH's Tier 1 award, which aimed to increase underserved communities' access to inclusive sexual and reproductive health information and resources and decrease teen pregnancy and rates of sexually transmitted infections (STIs). Miller Decl. ¶ 10. PPH has been forced to wind down the project and to lay off ten employees whose salaries were funded in whole or in part by TPP Program funds, including one who has been an educator for PPH for almost thirty years. *Id.* ¶¶ 26–28. Without PPH's program, youth in communities PPH serves "will go without information and resources about sexual and reproductive health." *Id.* ¶ 32.

King County has been harmed by the 2026 Policy too, including through the termination of its Tier 2 award. Gerber Decl. ¶ 30. The award supported an evaluation of the Stepping Stones program, which provides innovative one-to-one health education to improve the sexual health outcomes of young men involved in the legal or child welfare systems. *Id.* ¶ 16. Program staff were confident the study would turn out an evidence-based program that would become eligible for replication under Tier 1, providing an "enormous benefit to the field." *Id.* ¶ 53. Instead, the study has been cut short, and the work of the last three years is likely to go to waste. *Id.* ¶ 49.

Lastly, the Sexuality Information and Education Council of the United States (SIECUS) has been harmed by the 2026 Policy. SIECUS is "a recognized leader in the field of sexuality and sex education" and "works directly with many TPP grantees and sub-grantees to provide technical assistance." Decl. of Calleen Simon ¶¶ 5, 9, Dkt. No. 14-5. Because of the cooperative agreement terminations stemming from the 2026 Policy, SIECUS "expects to collect lower dues" through its

Sex Education Policy Action Council, *id.* ¶ 12, "which counts many TPP Program participants as dues-paying members," *id.* ¶ 9. SIECUS has also diverted resources to counteract Defendants' "inaccurate and misleading claims about the evidence around sexual and reproductive health education" and to "counsel[] TPP Program grantees on the effects of the 2026 Policy." *Id.* ¶ 23.

**V. Plaintiffs file this lawsuit and the Court grants preliminary relief.**

Plaintiffs filed this action on July 14, 2026, alleging that the 2026 Policy is contrary to law, in excess of statutory authority, and arbitrary and capricious. Compl. ¶¶ 79–95, Dkt. No. 1. Plaintiffs also alleged that the 2026 NOFOs are independently unlawful and that the Tier 1 NOFO violates the First Amendment. *Id.* ¶¶ 96–110. The next day, Plaintiffs moved to stay and preliminarily enjoin the 2026 Policy and implementing actions. Dkt. No. 14.

The Court granted Plaintiffs' motion in part. *Hennepin County*, 2026 WL 2426300, at *28. After concluding that all Plaintiffs likely have standing, *id.* at *8–12, the Court addressed Defendants' threshold arguments under the Tucker Act, noting that "substantial uncertainty remains as to whether, and under what circumstances, a cooperative agreement qualifies as a contract under the Tucker Act," *id.* at *15. The Court declined to order interim relief but observed that "Awardee Plaintiffs may very well ultimately persuade the Court that it has jurisdiction to order relief as to the grant terminations." *Id.* The Court also held that the Tucker Act likely "does not divest the Court of jurisdiction over SIECUS's challenge to its members' grant terminations." *Id.* at *16 (emphasis omitted).

On the merits, the Court observed that "[a]spects of the 2026 Policy appear contrary to law and in excess of HHS's authority." *Id.* at *19. But the Court did not reach those arguments because Plaintiffs were "likely to succeed on their arbitrary-and-capricious challenge to the lawfulness of the 2026 Policy and the NOFOs and grant terminations that have implemented it." *Id.* at *24. And the equitable factors favored preliminary relief given the "great and imminent" harm to Awardee

Plaintiffs' operations and the "relatively minor" harms to Defendants. *Id.* at *26. The Court therefore preliminarily enjoined Defendants from "implement[ing] their 2026 Policy, including through the issuance of the FY 2026 NOFOs." *Id.* at *27.

### VI. Defendants obligate TPP Program funds and rescind the NOFOs, while declining to abandon the 2026 Policy.

In the weeks after the issuance of the preliminary injunction, Defendants did not disclose their plans for the outstanding TPP Program funds, which were set to expire on September 30, 2026. *See* Dkt. No. 36 at 2. The Court then ordered that "the statutory lapse of the TPP Program funds at issue in this case is suspended during the pendency of this litigation." Dkt. No. 41 at 4 (internal citation omitted).

Meanwhile, Defendants floated the possibility that they might enter into "competitive contracts" awarding Tier 1 funds and might "supplement existing, non-cancelled awards" for Tier 2 funds. Dkt. No. 38 at 11. In late September, Defendants obligated additional Tier 2 funds to non-terminated awardees—funds that those awardees had never sought or requested. *See* Dkt. No. 42 at 2. Around the same time, following a nonpublic solicitation process, Defendants obligated nearly $70 million in Tier 1 funds to a single contractor with no experience in teen pregnancy prevention. *See id.* at 1–2; *ACF Adolescent Social and Youth Engagement Services*, USASpending, https://perma.cc/9FAW-VYWW (last visited Oct. 27, 2026); *see also $86M in Teen Pregnancy Prevention Funds Diverted to Trump-Linked Contractor*, NPR (Oct. 17, 2026), https://perma.cc/QE8X-N25R.[8]

On October 7, 2026, HHS notified applicants under the 2026 NOFOs that "[g]iven [this] court's [preliminary injunction] order, and the timelines for the awarding of funds, the Department

[8] The government's award of that contract is the subject of an ongoing bid protest filed by Hennepin County in the Court of Federal Claims. *See* Compl., *Hennepin County v. United States*, No. 26-cv-1541 (Fed. Cl. Oct. 14, 2026), Dkt. No. 1.

has made the decision to rescind the FY 2026 [NOFOs]." *View Grant Opportunity, AH-TP1-26-001*, Grants.gov, https://perma.cc/4KKH-MGHM (select "Version History" tab) (last visited Nov. 2, 2026); *View Grant Opportunity, AH-TP2-26-001*, Grants.gov, https://perma.cc/9533-2YXH (select "Version History" tab) (last visited Nov. 2, 2026). HHS stated that "[a]ny future NOFO for Teen Pregnancy Prevention Program funds will be based on updated research." *Id.*

HHS's next steps reflect that it has not abandoned the 2026 Policy. Defendants have begun to pursue research on priorities laid out in the 2026 NOFOs, including "body literacy" and "sexual risk avoidance." In late September, HHS obligated funds for awardees to, among other things, "build[] knowledge on how to incorporate body literacy education and reproductive goals counseling into TPP programs,"[9] "define, measure, and validate adolescent reproductive body literacy and determine how its component domains relate to reproductive health decision-making and protective factors associated with teen pregnancy prevention,"[10] and "address body and reproductive health literacy" and "sexual risk avoidance."[11]

## LEGAL STANDARD

In Administrative Procedure Act (APA) cases, "[s]ummary judgment is the mechanism for deciding whether an agency action was supported by the administrative record and was consistent with the APA standard of review." *Grant Med. Ctr. v. Burwell*, 204 F. Supp. 3d 68, 75 (D.D.C. 2016). Accordingly, "the Rule 56 standard does not apply" to cross motions for summary judgment under the APA. *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 36 (D.D.C. 2017). Instead, the court

---

[9] *Informing Future Strategies to Incorporate Body Literacy and Reproductive Goals Counseling into Teen Pregnancy Prevention Programs*, TAGGS, https://perma.cc/AP3A-4S7L (last visited Oct. 30, 2026).

[10] *Defining Adolescent Reproductive Body Literacy: An Arkansas Evaluation of the Knowledge Domains that Influence Pregnancy Prevention and Reproductive Health Decision-Making*, TAGGS, https://perma.cc/NGC4-5NQW (last visited Oct. 30, 2026).

[11] *Grant Summary*, USASpending, https://perma.cc/SVE3-BVGL (last visited Oct. 30, 2026) (capitalization omitted).

"sits as an appellate tribunal," and "[t]he entire case on review is a question of law." *Id.* (alteration in original) (quoting *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

## ARGUMENT

### I. The Tucker Act does not preclude this Court's jurisdiction.

The Tucker Act does not limit this Court's jurisdiction to consider Plaintiffs' claims. The Tucker Act grants the Court of Federal Claims (CFC) jurisdiction only over "contract suits against the United States." *Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1427 (Fed. Cir. 1997). Although "substantial uncertainty" admittedly remains on some questions arising from the interaction between the APA and the Tucker Act for challenges to cooperative agreement terminations, *Hennepin County*, 2026 WL 2426300, at *15, certain points are clear and suffice to establish this Court's jurisdiction.

First and most importantly, the Tucker Act does not bar consideration of the case because Plaintiff SIECUS is not in privity with the government for these purposes. Second, federal district courts retain jurisdiction to consider APA challenges to "agency guidance," like the 2026 Policy, that "discusses internal policies related to grants," regardless of whether certain related challenges might need to be raised in the CFC. *NIH v. APHA*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring). Third, even if the Court concludes that it still must determine whether it has jurisdiction to vacate the terminations, the test announced in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), remains the governing test in this circuit. Under that test, the claims here are not subject to the Tucker Act: the cooperative agreements at issue are not contracts for Tucker Act purposes, and in any case Plaintiffs' claims are founded on the APA and the 2026 Appropriations Act, not on the text of the cooperative agreements themselves. Nor do Plaintiffs seek any form of contractual relief.

*1. The Tucker Act does not bar SIECUS's claims.*

There is no dispute that SIECUS is not a party to any TPP agreement, whether those agreements are characterized as contracts or not. SIECUS's right to challenge the 2026 Policy, including the award terminations, necessarily "stems from the APA's prohibition on agencies acting contrary to law and arbitrarily" rather than any contract. *Hennepin County*, 2026 WL 2426300, at *15. Because SIECUS is not in privity with the government for these purposes, it cannot sue in the CFC under the Tucker Act. *See Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998). And "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006). As a "growing chorus of courts" has thus recognized, "a lack of contractual privity between a plaintiff and the federal government undermines Tucker Act channeling." *Dallas County v. Kennedy*, No. 25-cv-4242, 2026 WL 2123225, at *9 (D.D.C. July 23, 2026).

At the preliminary relief stage, the easy resolution of the Tucker Act issue as to SIECUS did not lead to vacatur of the terminations because the Court held that SIECUS had not made the requisite showing of irreparable harm. *Hennepin County*, 2026 WL 2426300, at *16. At final judgment, however, the Tucker Act does not interfere with this Court's statutory jurisdiction to fully consider SIECUS's claims and award appropriate relief. The Court's consideration of the Tucker Act need proceed no further.

*2. The Tucker Act does not bar review of agency policies concerning grants.*

The Court should likewise conclude that the Tucker Act does not preclude the consideration of Plaintiffs' challenge to the 2026 Policy or the award of any portion of the requested relief.

The government has conceded that the Tucker Act poses no "impediment to the Court's consideration of HHS's 2026 Policy, as implemented through the FY 2026 NOFOs." *Id.* at *12. That concession was surely right, and it applies with equal force to HHS's implementation of the 2026 Policy; as Justice Barrett's *NIH* concurrence explained, district courts have jurisdiction to consider APA challenges to internal agency guidance relating to grants, even in cases where those grants qualify as contracts for purposes of Tucker Act jurisdiction. *See NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). It is plain that this Court has statutory jurisdiction to vacate and/or enjoin the 2026 Policy and its implementation.

*3. Awardee Plaintiffs satisfy the* Megapulse *test for statutory jurisdiction.*

Finally, even if the Court concludes it must further consider whether it has jurisdiction to issue the relief Plaintiffs seek regarding the award terminations, this Court has recognized that the *Megapulse* test for Tucker Act jurisdiction "still stands as binding precedent to be followed by this Court." *Hennepin County*, 2026 WL 2426300, at *12 (citation omitted). Under the *Megapulse* test, courts evaluating whether "an action against the United States . . . is at its essence a contract claim," and thus subject to the Tucker Act, consider two factors: (1) "the source of the rights upon which the plaintiff bases its claims" and (2) "the type of relief sought (or appropriate)." 672 F.2d at 967–68. Here, both factors confirm that Awardee Plaintiffs' claims are not, at their essence, contract claims.

On the first factor, the source of Plaintiffs' claims "is not the particular agreements but rather the rights conferred by the APA" and the 2026 Appropriations Act. *Urb. Sustainability Dirs. Network v. USDA*, No. 25-cv-1775, 2025 WL 2374528, at *18 (D.D.C. Aug. 14, 2025). Plaintiffs do not claim that Defendants have violated the terms of their awards, but rather that Defendants have attempted to transform the TPP Program into an abstinence-only and otherwise unlawful

program, and have acted arbitrarily and capriciously in violation of the APA. In its preliminary injunction opinion, the Court expressed concern that similar arguments had apparently not persuaded a majority of the Supreme Court in its emergency docket rulings in *NIH* and *Department of Education v. California*, 604 U.S. 650 (2025). But those brief decisions did not mention or purport to apply the *Megapulse* test, and they did not indicate that the Tucker Act applied because the "source of the rights" in either case was contractual rather than statutory. *See Dep't of Educ.*, 604 U.S. at 651; *NIH*, 145 S. Ct. at 2659 (stating that the APA's sovereign immunity waiver did not extend to "claims 'based on' the research-related grants or to . . . relief designed to enforce any 'obligation to pay money' pursuant to those grants" (quoting *Dep't of Educ.*, 604 U.S. at 651)).

Should this Court nevertheless conclude that the "source of the rights" in the case is the text of the terminated cooperative agreements rather than the APA provisions cited in the complaint, it would then have to decide whether those agreements constitute contracts for purposes of the Tucker Act. That inquiry is informed by the definitions set out in the Federal Grant and Cooperative Agreement Act (FGCAA), which provides that an agreement constitutes a contract when "the principal purpose of the instrument is to acquire . . . property or services for the direct benefit or use of the United States Government," whereas the "principal purpose" of a cooperative agreement is "to carry out a public purpose." *Hymas v. United States*, 810 F.3d 1312, 1325 (Fed. Cir. 2016) (quoting 31 U.S.C. §§ 6303, 6305). Courts therefore draw the line between the two based on a "fact-specific determination" of "the principal purpose of the relationship." *Id.* at 1327–28. Here, there can be no real dispute that the "principal purpose" was "to improve sexual and reproductive health outcomes, promote positive youth development, and advance health equity for

adolescents, their families, and communities" through the provision of medically accurate pregnancy prevention programs—quintessential "public purposes." Tier 1 2023 NOFO at 2.[12]

This Court noted that although the Federal Circuit has applied the "principal purpose" test "to determine whether a grant is more like a cooperative agreement or a procurement contract under the FGCAA," "that test may not necessarily apply in evaluating Tucker Act jurisdiction." *Hennepin County*, 2026 WL 2426300, at *15. However, the Federal Circuit has indeed applied the "principal purpose" test in evaluating Tucker Act jurisdiction. In *Hymas*, the Federal Circuit held that "the Claims Court d[id] not possess jurisdiction over" the complaint in that case because the agreements at issue were "cooperative agreements" rather than contracts, based on what the agency "principally intended" in making the agreements. 810 F.3d at 1327, 1330 & n.10. To be sure, as the Court has observed, over two decades before *Hymas*, a CFC opinion questioned whether the FGCAA should inform the scope of Tucker Act jurisdiction, *see Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 418 (1995), and some courts have held that the Tucker Act applies based solely on the grantee's agreement to "comply with an array of requirements attached to the receipt, use, and distribution" of grant funds, *see Vera Inst. of Just. v. DOJ*, 805 F. Supp. 3d 12, 29 (D.D.C. 2025) (citation omitted). But the Federal Circuit confirmed in *Hymas* that the FGCAA's "principal purpose" test delineates the bounds of Tucker Act jurisdiction, and decisions inconsistent with that test are in error. In any event, if mere agreement to terms regarding the use and distribution of grant funds were sufficient to transform a cooperative agreement into a Tucker Act contract, it is

[12] In its preliminary injunction opinion, the Court expressed concern that the parties had failed to "fulsomely parse[] the provisions of the cooperative agreement." *Hennepin County*, 2026 WL 2426300, at *15. But the only provision that could arguably confer a direct benefit on the government rather than advance a public purpose is the one already identified by the government that provides for a royalty-free license for materials developed under the award. *See* Tier 1 2023 NOFO at 52. There can be no serious argument that securing the rights to materials that the award did not even require the awardee to develop was the "principal purpose" of the agreement.

difficult to imagine any cooperative agreement that would not qualify—a result the Federal Circuit has never countenanced.

The Federal Circuit's decision in *Columbus Regional Hospital v. United States*, 990 F.3d 1330 (Fed. Cir. 2021), is not to the contrary. There, the court concluded that an agreement constituted a contract for Tucker Act purposes when the state grantee agreed to perform specific responsibilities of the agency, including collecting erroneously disbursed subgrantee funds and reporting employees who had committed drug offenses. *Id.* at 1340. That result is consistent with the "fact-specific determination" ordained by *Hymas*.[13]

The second prong of the *Megapulse* test confirms that this case is not, at its essence, a contract dispute. As the Court recognized, Plaintiffs "do not ask for money damages or specific performance." *Hennepin County*, 2026 WL 2426300, at *15 (footnote omitted). Those considerations were dispositive at the second prong in *Megapulse* itself. *See* 672 F.2d at 969.

The countervailing considerations the Court noted in its preliminary injunction opinion do not weigh against jurisdiction here. Unlike, for example, the plaintiffs in *U.S. Conference of Catholic Bishops v. U.S. Department of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025), Plaintiffs here are not requesting an order requiring the government to stop withholding grant funds. Rather, Plaintiffs are merely seeking to be returned to the position they were in before the unlawful terminations—with continuation applications pending and the reasonable expectation, but by no means the guarantee, that continuation funds would be awarded. *See, e.g.*, Johnson Decl. ¶ 23.

---

[13] *Columbus Regional Hospital* did not purport to overrule *Hymas*, a case it did not even cite, and in any event could not have done so. *See Metzinger v. Dep't of Veterans Affs.*, 20 F.4th 778, 781 (Fed. Cir. 2021) ("[W]e are bound by prior panel decisions of this court unless and until overturned en banc.").

That relief is substantially more modest than the order to pay funds "forthwith" that Justice Barrett's *NIH* concurrence addressed. 145 S. Ct. at 2661–62 (Barrett, J., concurring).

As the Supreme Court reaffirmed in *Department of Education*, the mere possibility that an order setting aside an agency action "may result in the disbursement of funds" is not enough to trigger the Tucker Act and strip a district court of jurisdiction. 604 U.S. at 651 (citing *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)). That is the case here: an order vacating the award terminations may result in the eventual disbursement of funds under the awards, but that does not transform such relief into an order "to enforce a contractual obligation to pay money." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

The ultimate question under *Megapulse* is whether this case is, at its essence, a contract case. It is not: Plaintiffs assert statutory rights under the APA and the 2026 Appropriations Act; the cooperative agreement awards are not contracts; and the relief sought is not contractual. If the Court reaches the *Megapulse* question, it should thus hold that the Tucker Act does not prevent it from issuing full relief to Awardee Plaintiffs, including an order vacating the award terminations.

## II. The 2026 Policy is unlawful.

### A. The 2026 Policy is final agency action.

Defendants have not disputed the existence of the 2026 Policy or its finality. *See Hennepin County*, 2026 WL 2426300, at *8 (the government "confirms that HHS has decided to impose a new set of programmatic requirements on TPP recipients, driven by policy priorities that the agency has set down on paper"). Final agency actions are those (1) that mark "the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted). An agency's decision "need not be

committed to writing to be final and judicially reviewable." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020).

As Plaintiffs have explained, the 2026 Policy satisfies both *Bennett* prongs. Dkt. No. 14-1 at 16–19. Defendants have taken concrete steps to cancel nearly all existing cooperative agreements, while issuing new funding announcements that abandoned statutory criteria and renounced the Program's longstanding evidence-driven approach. With these steps, Defendants plainly have completed their decisionmaking process. *See NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) ("consummation prong" requires assessment of whether action "represents the culmination of that agency's consideration of an issue" rather than the tentative "ruling of a subordinate official" (citation omitted)); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (decision that "reflect[s] a settled agency position" is final agency action). The Policy also alters the rights of awardees to continued funding and has direct consequences for Awardee Plaintiffs and partner organizations, who have had to lay off staff and abandon planned services. Johnson Decl. ¶¶ 36–47; Miller Decl. ¶¶ 25–30; *see* Gerber Decl. ¶ 57.

**B. The 2026 Policy is contrary to law and exceeds Defendants' statutory authority.**

The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Because HHS is a "creature[] of statute" and "possess[es] only the authority that Congress has provided," *Nat'l Fed'n of Indep. Bus. v. DOL*, 595 U.S. 109, 117 (2022), it cannot transform the TPP Program into one that conflicts with the statutory parameters. Congress provided clear guardrails specifying how the money must be spent: Tier 1 funding "shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." 140 Stat. at 281. Tier 2 funding "shall be" used "for research and

demonstration grants to develop . . . and test additional models and innovative strategies" to accomplish that same goal. *Id.* All programming must be "medically accurate and age appropriate." *Id.* The 2026 Policy jettisons those criteria in favor of the administration's own political priorities and is contrary to law. *See Hennepin County*, 2026 WL 2426300, at *19 ("Aspects of the 2026 Policy appear contrary to law and in excess of HHS's authority.").

First, the 2026 Policy violates the statutory requirement that Tier 1 funds be used to "replicat[e] programs that have been proven effective through rigorous evaluation." 140 Stat. at 281. HHS has recognized that "replication" means "the implementation of an evidence-based program in a new setting or population while maintaining fidelity to its core components." Tier 1 2026 NOFO at 8. But the agency terminated nearly every Tier 1 cooperative agreement that had funded evidence-based programming on the basis that the previously approved curricula were no longer acceptable to HHS, AR 1655–1758, and explicitly limited new applications to curricula meeting criteria that contravene Congress's directive instead. For example, HHS required incorporation of "body literacy" into awardees' curricula, Tier 1 2026 NOFO at 10, even though such programming has never been proven effective as the statute requires. In other words, there are no proven-effective programs awardees could run to satisfy the requirement. *See id.* at 5 (discussing "near absence of body literacy education standards nationwide"); *see also Hennepin County*, 2026 WL 2426300, at *19 ("[A]ccording to the uncontested record, there are no 'curricula/programs that center [on] body literacy and the related topics as described in the NOFO' and 'align' with other eligibility criteria outlined in the notice." (alteration in original) (quoting Simon Decl. ¶ 21)). This violates the statute.

HHS has implicitly admitted its departure from the statute. For instance, the Tier 1 2026 NOFO recognized that awardees needed to modify existing evidence-based programs to align with

HHS's new priorities, stating that applicants should include "any formal, written agreements (e.g., MOUs) from the developer/purveyor/copyright holder of the intervention indicating that you have permission to use and *to make any changes* to materials." Tier 1 2026 NOFO at 23 (emphasis added). And "[c]hanges may include those to ensure medical accuracy, age-appropriateness, and alignment with OASH priorities." *Id.* Similarly, Defendants sought to fund Tier 2 applicants to *test* body literacy and other new program elements. *See, e.g.*, Tier 2 2026 NOFO at 1 ("[t]he goal of this initiative is to identify effective interventions focused on body literacy and ensur[e] transparency and protection of parental rights for future replication"); *id.* (applicants should "[i]mplement and evaluate a proposed intervention that promotes body literacy education and reproductive goals counseling, expanding the knowledge base of such interventions on adolescent optimal health and teen pregnancy prevention outcomes"). This "reinforces that the 'body literacy' framework is incompatible with the Tier 1 statutory mandate." *Hennepin County*, 2026 WL 2426300, at *19.

Requiring applicants to revise effective programs—thereby essentially implementing a new program—violates the statutory command that Tier 1 programs *replicate* programs proven effective. *See Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100, 1113 (9th Cir. 2020) (previous funding announcement "would incorrectly permit grants for programs not proven effective, contrary to the TPPP"); *Multnomah County v. Azar*, 340 F. Supp. 3d 1046, 1067–68 (D. Or. 2018) (vacating previous Tier 1 announcement because HHS "ignore[d] the qualifier that the programs must be 'proven effective by rigorous evaluation'").

Second, the 2026 Policy violates the statute because it shifts both Tier 1 and Tier 2 funding to abstinence-only programming. Award recipients "are expected to incorporate sexual risk avoidance (SRA) education as a component of program delivery." Tier 1 2026 NOFO at 12; Tier

2 2026 NOFO at 9. The NOFOs claimed that "SRA education provides adolescents with clear, evidence-informed information about the health and social benefits of avoiding sexual activity during adolescence." Tier 1 2026 NOFO at 12; Tier 2 2026 NOFO at 9.

The 2026 Policy's abstinence-only requirements violate the funding scheme Congress established. In the 2026 Appropriations Act, Congress appropriated $101 million for "medically accurate and age appropriate programs that reduce teen pregnancy." 140 Stat. at 281. Separately, in the next item of the statute, Congress appropriated a smaller sum for "sexual risk avoidance" education. *Id.* at 281–82 ("$35,000,000 shall be for making competitive grants which exclusively implement education in sexual risk avoidance"). This distinction tracks Congress's intent when it created the TPP Program to expand funding for sexual health education programs beyond those that implement SRA curricula. *Cf. Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 69 (noting Congress shifted away from exclusively abstinence-only education in 2009 to "provide[] funding that could be used for both 'abstinence-only and contraception information/services' approaches" (citation omitted)). Exclusively funding abstinence-only programs violates Congress's clear directive that funds be used for programs proven effective at reducing teen pregnancy, distinct from the funds separately earmarked for abstinence-only education. *See Hennepin County*, 2026 WL 2426300, at *19 ("Congress's creation of a separate pot of abstinence-only funding in last year's appropriations law strongly suggests that TPP funding was *not* meant to fund exclusively such programming.").[14]

Third, the 2026 Policy's prohibition of content that "normalizes" teen sex is inconsistent with Congress's command to fund "medically accurate and age appropriate programs that reduce

[14] The 2026 Policy likewise violates the Purpose Statute, which commands that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). Even where "separate appropriations" "shar[e] similar purposes," appropriations for one purpose cannot be used to fund the other. *Pa. Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 154 (3d Cir. 2012).

teen pregnancy." 140 Stat. at 281. HHS's priorities direct applicants to avoid programs that "includ[e] content that encourages, normalizes or promotes sexual activity for minors." OASH Priorities, *supra*. As the termination letters and decision memoranda make clear, HHS defines those terms so capaciously as to sweep in broad swathes of effective content that educate teens on how to *prevent* pregnancy, as Congress intended. *E.g.*, AR 1765–66, 1774, 1778, 1794, 1803–04, 1813, 1836 (characterizing curricula as improperly normalizing teen sexual activity by discussing condom use or providing instructions on how to use condoms correctly); AR 1760–61, 1782, 1790, 1816–17, 1853 (same for curricula referencing unprotected sex; pregnancy; attempts to conceive; ongoing teen sexual activity; the importance of being tested before engaging in sexual activity; various birth control methods; abortion access; and pressure to engage in sexual activity).

That approach is fundamentally at odds with age-appropriate, medically accurate, effective teen pregnancy prevention. Both "common sense and the record evidence confirm the 'impossi[bility]' of 'implement[ing] a program that targets and seeks to modify sexual behavior' without 'talking about sexual behavior.'" *Hennepin County*, 2026 WL 2426300, at *19 (alterations in original) (quoting Gerber Decl. ¶ 36); *id.* at *22 (noting the "seeming logical impossibility of operating an effective pregnancy prevention program without some discussion of sexual activity"). Awardees cannot effectively implement programs that reduce teen pregnancy while pretending that teen sexual activity does not exist. *See id.* at *19 ("If HHS's new funding notice forbids even the discussion of sexual activity by minors, one wonders how an awardee could possibly *address* the topic of teen pregnancy and related sexual risk behaviors, let alone work to prevent them as the appropriations act necessitates."). The 2026 Policy is thus incompatible with the statute.

**C. The 2026 Policy is arbitrary and capricious.**

The 2026 Policy is also arbitrary and capricious. Under the APA, agency action must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The administrative record demonstrates that the 2026 Policy fails that standard because HHS (1) relied on factors Congress did not intend it to consider, (2) failed to consider important aspects of the issue before it, (3) proffered an explanation that runs counter to the evidence, (4) failed to recognize and reasonably explain its decision to reverse past practice, (5) failed to take into account serious reliance interests, and (6) imposed requirements that are impermissibly vague.

*1. HHS relied on factors Congress did not intend.*

HHS's decision to overhaul the TPP Program relied on factors not intended by Congress and failed to consider how its political priorities would detract from the program's effectiveness. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The statute indicates the "relevant factors to consider when awarding grants are: (1) whether the program is aimed at preventing teenage pregnancy; (2) whether the program is medically accurate and age appropriate; (3) whether the program has achieved proven results; and (4) whether the program represents an innovative strategy for preventing teenage pregnancy." *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 659 (D. Md. 2018). HHS eschewed this guidance when it imposed requirements that undermine Congress's purpose.

For instance, HHS announced an agency priority to "focus on programs that do not promote material that depicts, describes, exposes or presents . . . sexually explicit content, including content that encourages, normalizes or promotes sexual activity for minors." *E.g.*, Hennepin County Letter at 1. It relied on that priority to terminate existing cooperative agreements that replicate rigorously tested, proven programs that Awardee Plaintiffs and their communities relied on to prevent teen pregnancy. Although Congress limited funding to "age appropriate" programs, 140 Stat. at 281,

each of the terminated programs already had been deemed age appropriate through an evidence-based review process; besides, the statutory limitation does not give the agency *carte blanche* to decree programs ineligible because they discuss sex. After all, the "appropriation was not an unrestricted sum of money to use for any purpose that might fall within HHS's broad mandate, but rather directs the agency to use the funds to support proven or innovative medically accurate methods of preventing teenage pregnancy." *Healthy Teen Network*, 322 F. Supp. 3d at 659. HHS's "prohibition on content that it deems 'sexually explicit' . . . fails to consider the seeming logical impossibility of operating an effective pregnancy prevention program without some discussion of sexual activity." *Hennepin County*, 2026 WL 2426300, at *22. Plus, while Congress made clear that separate funding for "sexual risk avoidance" programs should further the statutory goals "without normalizing teen sexual activity," 140 Stat. at 282, it included no such requirement for the TPP Program.

HHS also relied on factors that Congress did not intend by requiring abstinence-only education in all TPP programming. *Cf. Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 69. "[T]hat Congress separately appropriated $35 million to fund 'sexual risk avoidance' programs strongly suggests that it did not intend for HHS to apply the same requirement to the TPP Program writ large." *Hennepin County*, 2026 WL 2426300, at *21 (internal citation omitted). HHS also failed to "address the lackluster evidence base for abstinence-only sexual education," even though Tier 1 requires that "such projects *must*" replicate programs proven effective. *Id.* By bootstrapping an abstinence-only requirement into the TPP Program, Defendants have considered factors Congress did not intend.

HHS also apparently seeks to *promote fertility* through the 2026 Policy—an unexpected goal for a program intended to *reduce* teen pregnancy, but one aligned with this administration's

"pronatalism" policies.[15] Secretary Kennedy has warned of "a fertility crisis in this country right now" that poses "a threat not only to our economy" but also to "our national security."[16] As one strategy for increasing the birth rate, Secretary Kennedy and the "Make America Healthy Again," or "MAHA," movement he leads have championed a concept called "restorative reproductive medicine," a "holistic . . . philosophy" that believes "doctors can identify and treat the root causes of infertility" without resort to in vitro fertilization (IVF).[17] Panelists at an HHS conference on women's health touted the approach, positing that U.S. "[e]ducation has become too hyperfocused on preventing pregnancy" and "coalesc[ing] around the idea that . . . [g]irls do not receive enough education on how to become pregnant or identify the warning signs of infertility."[18]

Secretary Kennedy's agenda is borne out in HHS's decision: for instance, the Tier 1 NOFO directed awardees (in a narrowly disguised incorporation of restorative reproductive medicine principles) to "[p]romote optimal health through an upstream, preventive approach by emphasizing root-cause understanding of chronic health conditions that may impact overall health and fertility." Tier 1 2026 NOFO at 1. Although medically accurate fertility awareness is a component of some evidence-based sexual education programs, *e.g.*, AR 659, 662–64, 1110–11, the 2026 Policy goes further in directing applicants to incorporate the *promotion* of "natural fertility." HHS's "new TPP

---

[15] Caroline Kitchener, *White House Assesses Ways to Persuade Women to Have More Children*, N.Y. Times (Apr. 21, 2025), https://perma.cc/8DWZ-HJV7.
[16] *TRANSCRIPT: President Trump Holds a Maternal Healthcare Event in the Oval Office*, Senate Democrats (May 11, 2026), https://perma.cc/MXU5-75RC.
[17] Aria Bendix, *A Little-Known Approach to Infertility Is Complicating the White House's IVF Push*, NBC News (Aug. 8, 2025), https://perma.cc/R7WM-GWTL. "Restorative reproductive medicine" is not a recognized medical specialty; according to the American Society for Reproductive Medicine, a leading society of fertility specialists, it is "a political rather than a scientific concept." Rachael Robertson, *There Is No 'Alternative' to IVF, Ob/Gyns Warn*, MedPage Today (July 3, 2024), https://perma.cc/E9BK-C4UH.
[18] Amanda Seitz, *Birth Control Skepticism, Teen Fertility Take Center Stage at Trump's Women's Health Summit*, KFF Health News (Mar. 19, 2026), https://perma.cc/W9WE-B3MA.

parameters imply a desire to promote fertility and marital procreation—twin aims that sit uneasily with Congress's decision to" prevent teen pregnancy. *Hennepin County*, 2026 WL 2426300, at *23. Congress plainly did not intend HHS to focus on teaching young women strategies to become pregnant in a pregnancy prevention program.

The 2026 Policy imposes other related requirements Congress did not intend. The Tier 1 NOFO, for instance, focused on supporting the replication of evidence-based programs that "strengthen adolescent body literacy." Tier 1 2026 NOFO at 8; *see also* Tier 2 2026 NOFO at 9. This emphasis on "body literacy" has no apparent connection to the statute's central goal of reducing teen pregnancy through programming proven to be efficacious. The record further confirms this Court's preliminary finding of a "dearth of scientific evidence supporting a 'body literacy' approach," rendering it "an ill-fitting requirement for Tier 1 awardees." *Hennepin County*, 2026 WL 2426300, at *21. Nowhere in the administrative record is there evidentiary support for the existence of rigorously tested, proven-effective body literacy curricula.

Other requirements are even more untethered: for example, it is wholly unclear why Congress would have intended that young men should be warned that "repeated or artificially stimulated arousal may affect neural development and behavior over time." Tier 1 2026 NOFO at 10. There is no apparent connection (in the administrative record or otherwise) between this values-based messaging and reducing teen pregnancy. *See also id.* at 6 (instructing Tier 1 recipients to incorporate "reproductive goals counseling" that includes "goals related to . . . childbearing").

Finally, the 2026 Policy scraps medically accurate content regarding birth control in favor of a policy preference untethered from science and fact that is aligned with Secretary Kennedy's

MAHA movement, which is infamously hostile to contraception.[19] The rejection of birth control is not a factor Congress intended the agency to consider in implementing a teen pregnancy prevention program. But some of HHS's termination letters objected to recipients' use of curricula that discuss "various forms of birth control while failing to identify common side effects, contraindications, or health risks associated with these methods." *E.g.*, King County Letter at 2. The agency would instead require the provision of information "necessary for informed consent" through "medically accurate materials or instructions with pharmaceutical or health-related recommendations [that] include information on the full range of health risks." *Id.* at 1. The NOFOs reflected this same priority. *E.g.*, Tier 1 2026 NOFO at 10 (instruction must "include an overview of approaches to managing menstrual health concerns, including the advantages and disadvantages of ovarian suppression compared to approaches that address root causes").

Congress ordered the agency to make decisions based on efficacy of educational strategies to reduce teen pregnancy—not based on whether programming promotes "informed consent" (among parents, no less) by highlighting the alleged risks of birth control because the administration is opposed to its widespread use. HHS's "insistence on apprising teens of detailed medical information further runs up against the reality that TPP staff are educators, 'not medical providers.'" *Hennepin County*, 2026 WL 2426300, at *22 (citation omitted). HHS acted arbitrarily by injecting alleged safety concerns regarding birth control into the program, particularly when the focus on its purported risks openly jeopardizes the program's effectiveness. *Cf. Nebraska v. Su*, 121 F.4th 1, 16 (9th Cir. 2024) ("policy justifications cannot supersede statutory text").

---

[19] Caroline Kitchener, *The MAHA-Fueled Rise of Natural Family Planning*, N.Y. Times (Nov. 10, 2025), https://perma.cc/9URQ-ZNYH.

*2. The 2026 Policy fails to consider important aspects of the problem.*

HHS's decision also "ignore[d]" the most "important aspect of the problem" before it: ensuring that TPP Program funding continues to effectively prevent teen pregnancy and test additional strategies for doing so. *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (citation omitted). By canceling swathes of programs running proven-effective curricula or testing other such curricula, HHS turned its back on recipients and curricula that demonstrably fulfilled the statutory criteria. The termination letters and decision memoranda show that HHS apparently interprets its prohibition of content it deems "sexually explicit" or to "encourage[], normalize[] or promote[] sexual activity for minors," OASH Priorities, *supra*, so capaciously as to ban providing any real information about sex or even talking about it. But as HHS conceded in its NOFOs, effective sex education requires discussion and acknowledgement of human anatomy and sexual activity. *See* Tier 1 2026 NOFO at 5–6; Tier 2 2026 NOFO at 7–8 (both recognizing need for biological knowledge and that informed sexual decisionmaking requires knowledge of how pregnancy occurs); Tier 1 2026 NOFO at 10; *id.* at 65 (requiring recipients to measure concrete outcomes related to sexual activity, pregnancies, and/or STIs). And the programs HHS terminated incorporated concrete learning outcomes related to anatomy and human sexuality and had been proven effective in randomized trials to decrease incidences of pregnancy and/or STIs. *See, e.g.*, AR 915, 919, 933, 662, 315. HHS acted arbitrarily and capriciously in failing to account for how proven, evidence-based programming could possibly be implemented without acknowledging the reality of sexual activity.

HHS likewise ignored the fact that ordering Tier 1 recipients to modify their programming to comply with this administration's political viewpoints runs afoul of Congress's directive that funding be used to "*replicat[e]* programs that have been proven effective through rigorous

evaluation." 140 Stat. at 281. Through the directives to avoid "normalizing" sexual activity, to focus on "informed consent" related to contraception, and to "emphasiz[e] root-cause understanding of . . . fertility," Tier 1 2026 NOFO at 1, HHS mandated certain content while prohibiting other content without regard to how implementing those changes would deliver programs that reduce teen pregnancy.

The 2026 Policy similarly would force program applicants to comply with a broad and standardless parental opt-out requirement without prior analysis to establish whether such programming is proven effective to achieve the statutory objectives or whether it will result in more teens missing out on content. *E.g.*, Tier 1 2026 NOFO at 1, 7–8, 11–12; Tier 2 2026 NOFO at 8–9. HHS tied these requirements to *Mahmoud v. Taylor*, 606 U.S. 522 (2025)—a decision HHS itself acknowledged "relates to school programs during school hours," Tier 1 2026 NOFO at 7—but failed to explain why that school-centered decision is relevant where TPP programming is decidedly *not* limited to the school setting. And the NOFOs' lack of meaningful guidance would leave the agency with wide discretion to enforce this open-ended requirement. *Cf. Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *24 (discussing lack of guidance as to opt-out requirement).

Similarly, HHS failed to consider how its changes are likely to stigmatize certain communities and eliminate any programming that addresses the gaps in curricula that account for the unique needs of certain populations with the greatest unmet need. The Tier 1 2023 NOFO stated that projects should focus on "communit[ies] and population[s] that are disproportionally affected by unintended teen pregnancy and STIs," including "those that have been adversely affected by persistent poverty and inequality," such as "LGBTQI+ youth." Tier 1 2023 NOFO at 6–7. Yet the new NOFOs deleted all references to LGBTQ+ individuals and omitted any

consideration of the varying teen pregnancy rates among different populations. They also prohibited "denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic." Tier 1 2026 NOFO at 45; Tier 2 2026 NOFO at 55. These statements "appear to reject the existence of intersex and transgender individuals, which would be not only scientifically false (and thus contrary to the statutory requirement of 'medically accurate' programming) but also would seem to inhibit—or at least not advance—the goal of reducing unwanted teen pregnancies." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *27. Defendants' efforts to erase more inclusive content from the TPP Program failed to consider an important aspect of the problem Congress intended to solve.

*3. The 2026 Policy runs counter to the evidence before the agency.*

An agency acts arbitrarily and capriciously by "offer[ing] an explanation for its decision that runs counter to the evidence before" it. *State Farm*, 463 U.S. at 43. HHS violated this black-letter rule when it ignored overwhelming evidence that the programs it terminated have been rigorously evaluated and—by HHS's own standards—determined to have been proven effective, while pivoting new funding toward restrictive abstinence-only programming that mirrors the administration's policy priorities. As discussed above, the TPP Program has a remarkable history of funding evidence-based approaches to reduce teen pregnancy—yet HHS defied the evidence by scrapping tested and effective programs. Indeed, the agency effectively conceded that its new priorities have not been "proven effective" when it proposed *testing* them in new Tier 2 awards. *See* Tier 2 2026 NOFO at 1.

To support its claims about the importance of "body literacy" education, HHS also relied on "evidence" that is nowhere to be found in the record and, in fact, does not exist. Only two of the seven articles HHS cited in the NOFOs are actually in the administrative record. AR 231, 236.

The record also contains *a* study by a Dr. Klaus, *see* AR 222, but it is an entirely different article than the one HHS purported to cite—the title is not remotely similar to the title HHS listed in its NOFO, and it was published years earlier. *Compare id.*, *with* Talmor Decl. ¶ 10. For the other four articles cited by HHS in its public-facing documents, no publications whatsoever by those authors (Hall, Polis, Zabin, Manhart, Aral, Holmes, Foxman, or Sinai) can be found in the administrative record. *See* Tier 1 2026 NOFO at 6 nn.1–2, 4; Tier 2 2026 NOFO at 7 nn.1–2. This is likely because, as Plaintiffs pointed out, their citations were incorrect—meaning no article by the cited author appears in the journals HHS cited. Talmor Decl. ¶¶ 7–9, 11. Given that five out of seven articles cited in the NOFOs are not part of the administrative record, this Court's finding that HHS's reference to "public health studies that appear . . . not to exist" is "a hallmark of AI-generated citations," *Hennepin County*, 2026 WL 2426300, at *21, has been substantiated. By failing to offer a "rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43 (citation omitted), the 2026 Policy violates the APA.

Finally, HHS's grounds for termination of proven-effective programs repeatedly relied on mischaracterizations of the curricula used by awardees. HHS objected to a roleplay exercise from Love Notes, AR 306–07, but rather than the sexually suggestive material the agency portrays, the actual content is an exercise where students discuss how to refuse sexual activity they do not want to engage in, AR 690, 707. Similarly, HHS cherry-picked language to make the curriculum seem as though it normalized pornography use, AR 307, when in reality, it contains an extended discussion about the harms that flow to young adults from pornography use, AR 683–89.

*4. HHS failed to reasonably explain its decision to reverse course.*

HHS has imposed a stark departure from the evidence-based decisionmaking that has been the hallmark of the TPP Program and imposed new dogmatic requirements that run counter to the

evidence, marking a significant change in agency policy. Before undertaking such sweeping actions, agencies must recognize such policy shifts and provide "good reasons" for changing longstanding policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). HHS was not writing "on a blank slate" and was required to "provide a more detailed justification" because it chose to "disregard[] facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16.

HHS failed to provide a sufficiently reasoned explanation for abandoning its longstanding practice and revamping the TPP Program to align with MAHA ideology. The record reveals that the agency did not proffer any cogent rationale for its decision to jettison the rigorously tested programs available for Tier 1 funding in favor of untested strategies. HHS likewise failed to explain how the statutory requirements that programs be medically accurate and age appropriate—and for Tier 1, that they replicate proven-effective programs—can be met without discussing teen sex. It also did not explain why teen pregnancy prevention programs should be responsible for ensuring that *educators*—who are not medical providers and "not appropriately positioned to advise teens about [certain] medical consequences," *Hennepin County*, 2026 WL 2426300, at *22—provide full information about the risks, benefits, and alternatives to contraceptives that teens may obtain through a *healthcare provider* equipped to provide individualized information. Nor did HHS provide any justification for canceling the vast majority of its funding, with no notice, shortly before a new school year, or for the equally catastrophic decision to cancel agreements midstream, both of which mean that recipients must abandon testing models before completion and sacrifice the intended benefits from the evidence already gathered. In lieu of coherent reasoning, HHS wrote several memoranda "to file" that contain boilerplate and conclusory language expressing that "this is a situation of reframed agency priorities that is related to the

curriculum provided" and that its "program priorities . . . differ fundamentally from prior approaches." *E.g.*, AR 1762. This is not reasoned decisionmaking.

HHS failed to explain other abrupt departures from past practice. For example, the Tier 1 2023 NOFO pointed applicants to the TPPER as a tool to assist in the selection of permissible evidence-based programs. Tier 1 2023 NOFO at 10–11. For several years, HHS has used the TPPER to examine studies of teen pregnancy prevention programs and determine which have been proven effective through rigorous evaluation.[20] The new Tier 1 NOFO, however, made no mention of the TPPER and provided no meaningful guidance as to which (if any) programs previously deemed effective qualify under the new criteria. Instead, it stated that all programs must satisfy the criteria in Appendix A. Tier 1 2026 NOFO at 9. But Appendix A would be of little use to applicants searching for a specific program that would comply with Defendants' newly imposed requirements: it simply provided high-level criteria "required for a program to be considered rigorously evaluated." *Id.* at 65. This offers no meaningful guidance to applicants who were already running "rigorously evaluated" and proven successful programs from the TPPER, yet abruptly had their awards terminated, and were expected to guess at how to comply with Defendants' evolving preferences.

Worse still, Defendants' internal memoranda "to file" reveal that, at the time HHS mass terminated recipients' existing cooperative agreements, it had identified five abstinence-only curricula that it thought met its new priorities. *See, e.g.*, AR 308 (agency "optimizing the use of" Tier 1 funds for (1) Promoting Health Among Teens!; (2) Making a Difference!; (3) Heritage Keepers Abstinence Education I; (4) Choosing the Best Journey; and (5) Possessing Your Power). Yet nowhere in the NOFOs or other public-facing materials did HHS *disclose* which programs it

[20] Tollestrup, *Adolescent Pregnancy: Federal Prevention Programs*, *supra* note 4, at 4–6.

deemed acceptable; instead, the agency left awardees to guess at which curricula it might continue to fund. And although the agency deemed these curricula "appropriate, yet effective materials" to meet "the TPP Program's statutory mission," AR 308–09, the record nowhere substantiates that these curricula are rigorously tested, proven effective, replicable programs that TPP Program participants could actually implement. The imposition of secret, unexplained criteria—without any record evidence of efficacy, as required by statute—is the antithesis of reasonable agency action.

Similarly, Defendants did not explain their decision to shift from offering Tier 1 awards on a five-year cycle, Tier 1 2023 NOFO at 2, to a two-year award period "with an optional competitive third year," Tier 1 2026 NOFO at 1. Awardees were expected to "pilot approved programs" within six months of the award's issuance and to "fully implement approved programs" within one year. Tier 1 2026 NOFO at 9. This reduced award period provides less certainty for applicants and beneficiaries alike, especially since HHS previously recognized that a shorter award period does not "allow grantees enough time to form the community relationships, partnerships, and wider engagement and understanding needed to adopt a comprehensive systems-thinking approach."[21] Defendants did not even acknowledge this change in position, let alone offer any persuasive reason for it.

Defendants likewise did not acknowledge in the NOFOs, or even explain anywhere in the record, their decision to treat applicants with existing awards less favorably than applicants new to the program. The NOFOs included "funding priorities" that add bonus points for certain applications: two points are added if an organization "does not hold an active award under this opportunity," and two more points are added if an organization "has never received an award under

[21] OPA, *Delivering Evidence-Based Programs to Prevent Teen Pregnancies and Support Adolescent Health* 54 (Nov. 2024), https://perma.cc/Y4YB-NKX9.

this opportunity." Tier 1 2026 NOFO at 41–42; Tier 2 2026 NOFO at 52. As a result, applicants such as Awardee Plaintiffs—who have participated in the program for years and have a track record of success at implementing programs that reduce teen pregnancy—are at a disadvantage relative to newcomers. Defendants' failure to recognize and reasonably explain their changes in policy is arbitrary and capricious. *See Fox*, 556 U.S. at 515.

*5. HHS failed to take into account serious reliance interests.*

The APA's mandate of reasoned decisionmaking required HHS "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020). HHS defied that requirement by enacting the 2026 Policy while shrugging off the substantial reliance interests of the many stakeholders in this program. Recipients of TPP Program funding—including Awardee Plaintiffs—were about to enter year four of their five-year cooperative agreements. In reliance on funding, they formulated budgets, designed programming, hired staff, and devoted significant resources to forming partnerships with community organizations, while focusing on projects that address unmet needs. *E.g.*, Johnson Decl. ¶¶ 11–15; Miller Decl. ¶¶ 12–15. Tier 2 recipients, including King County, designed rigorous evaluation programs and devoted resources to implementing testing methodologies that will be meaningless if the programs are abruptly terminated. Gerber Decl. ¶ 49. Schools and local communities rely on the TPP Program to deliver effective public health programming, and the imposition of the 2026 Policy right before the start of a new school year "caused chaos." Johnson Decl. ¶ 41. And parents and teens themselves rely on TPP programming to provide medically accurate and appropriate information to help them avoid the impacts of teen pregnancy. Miller Decl. ¶ 35.

HHS's termination letters did not acknowledge these reliance interests in any way. On the contrary, each asserted that the agency has "discretion" to "suspend . . . an award to allow the recipient an opportunity" to correct any issues, but that the agency "made a programmatic determination" to terminate instead because its new "priorities . . . differ fundamentally from prior approaches." *E.g.*, Hennepin County Letter at 2; AR 1656.

And in its internal decision memoranda, the agency conceded that "reliance interests are present" but dismissed them out of hand as "short-term impacts" outweighed by the agency's "substantial interest in preserving the integrity of federally funded public health programs and upholding [agency] priorities." *E.g.*, AR 308. HHS then asserted—without evidence or other substantiation—that "[r]edirecting resources to" the curricula it secretly selected would ensure that teens receive programming that is "developmentally appropriate and respectful of family values." *Id.* This is the opposite of reasoned decisionmaking; these boilerplate, conclusory assertions give short shrift to the very serious reliance interests present here. This failure to weigh reliance interests is reason enough to set aside the 2026 Policy. *Regents of Univ. of Cal.*, 591 U.S. at 33. HHS's assertions also fail to recognize that Congress did not direct the agency to prioritize "family values" in a program created to prevent teenage pregnancy. Nor did the agency provide evidence to support *its own* conclusion that its selected programs are more "developmentally appropriate."

*6. The 2026 Policy is impermissibly vague.*

Finally, an "agency's requirements must be comprehensible and give entities fair notice of what is required of them." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *23. To ensure fair notice, courts consider whether, "by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith" could "identify, with

'ascertainable certainty,' the standards with which the agency expects parties to conform." *Nissan Chem. Corp. v. FDA*, 744 F. Supp. 3d 1, 9 (D.D.C. 2024) (citation omitted).

The 2026 Policy attempts to impose—by different means—several of the same requirements struck down as vague in the 2025 Policy Notice. For example, both NOFOs directed awardees to "implement any funds awarded under this NOFO to effectuate program goals and agency priorities in accordance with the Priorities of the Office of the Assistant Secretary for Health." Tier 1 2026 NOFO at 4; Tier 2 2026 NOFO at 4. Those priorities included "[e]nding diversity, equity, and inclusion (DEI) policies and practices"; ensuring that "medically accurate materials . . . include information on the full range of health risks" of contraception; "[e]nding support for gender ideology"; "[e]nsuring adolescent program materials are age-appropriate," including by ensuring that programs "do not promote harmful ideologies" and deprioritizing content that "encourages, normalizes or promotes sexual activity for minors"; and "[p]rotecting parental rights to direct the religious upbringing of their children." OASH Priorities, *supra*.

All these conditions were included in the 2025 Policy Notice, which was vacated because, among other defects, "[v]irtually every new requirement" it imposed was "fatally vague." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *23. The court observed, for instance, that "[t]he lack of agreed-upon meaning of terms like 'diversity, equity, and inclusion' ('DEI') have led other courts to deem arbitrary and capricious agency actions premised on those concepts where not adequately defined therein." *Id.* at *25 (collecting cases). The Policy Notice also excluded "gender ideology" and "discriminatory equity ideology" "without providing definitions of any of those terms in a workable way connected to TPP programming." *Id.* Similarly, it left "wide open for interpretation precisely . . . what constitutes a 'harmful ideology' that should be removed." *Id.* at *24. As for the prohibition on content that "normalizes" sexual activity, the absence of any

"meaningful direction" to recipients made "compliance and fair enforcement impossible." *Id.* at *25. The parental opt-out requirement likewise provided "no guidance as to what is considered to burden religious exercise or how the opt-out mechanism should function with respect to recipients' programs." *Id.* at *24. And the directive to describe "a full range of health risks" was "up to interpretation" as well. *Id.* at *26.

Defendants did not remedy these vagueness issues. Instead, they repackaged the unlawful 2025 Policy Notice's conditions as "agency priorities" providing the basis for the 2026 Policy. *E.g.*, Tier 1 2026 NOFO at 4; Hennepin County Letter at 1. They offered no guidance as to what activity is prohibited, "leaving plaintiff[s] to guess at what is and is not permissible in the government's view, while already facing the threat of adverse actions during the guessing." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *26 (alteration in original) (citation omitted).

Further, the NOFOs directed awardees to "align" their activities "with . . . executive orders." Tier 1 2026 NOFO at 45; Tier 2 2026 NOFO at 55. But they offered no guidance on how awardees should come into "alignment." Executive orders "are directed toward '*governmental* actors,' and many, such as national security EOs or those renaming public sites, have nothing to do with the TPP program." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *23 (citation omitted). Perhaps for this reason, the administrative record does not contain *any* executive orders. It is thus unclear how awardees could fulfill "the impossible task of divining the connection HHS saw between the executive branch priority and teen pregnancy prevention." *Id.*

As this Court found at the preliminary injunction stage, "the 'sweep' of the agency's bans . . . is 'entirely unclear,'" and "HHS has made no effort in its NOFOs, termination letters, or OASH policy statement to cabin or clarify" its newly imposed requirements to participate in the

TPP Program. *Hennepin County*, 2026 WL 2426300, at *20 (citation omitted). The vagueness problem is significantly exacerbated by the agency's decision to deem only a handful of curricula to meet its new "priorities," but then fail to make that secret list known to applicants. *E.g.*, AR 308. Program participants thus have little hope of ascertaining their compliance with these vague commands. The 2026 Policy is arbitrary and capricious. *See Hennepin County*, 2026 WL 2426300, at *23 ("the government has little to say" when "[f]aced with this mountain of uncontroverted evidence suggesting the arbitrariness of HHS's new TPP requirements").

**III. The Court should grant Plaintiffs' requested relief.**

For all the reasons explained above, Plaintiffs are entitled to summary judgment. Specifically, the Court should issue declaratory relief holding the 2026 Policy unlawful in violation of the 2026 Appropriations Act and the APA. In addition, the Court should vacate and set aside the 2026 Policy and all implementing actions, including vacating the mass terminations of cooperative agreements and placing recipients in the same position they were in before adoption of the unlawful policy. *See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."). That will restore the status quo by reversing the abrupt and unreasoned terminations, thereby requiring Defendants to process continuation applications without relying on the Policy.

The Court should also permanently enjoin Defendants from imposing the requirements of the 2026 Policy going forward. To obtain a permanent injunction, a plaintiff must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Injunctive relief on top of vacatur is warranted where setting aside an agency action

alone is not "sufficient to redress [the plaintiffs'] injury." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). For example, an injunction is warranted where the agency could attempt to take similar action again "as an end-run to the Court's relief." *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024).

Here, injunctive relief is appropriate to prevent Defendants from reimposing substantially similar requirements found in the 2026 Policy through a new NOFO or otherwise. Awardee Plaintiffs have been irreparably harmed by the implementation of the 2026 Policy, which has, among other things, deprived them of funds essential to their programs. *See* Johnson Decl. ¶¶ 36–47; Gerber Decl. ¶¶ 48–61; Miller Decl. ¶¶ 25–46. And the balance of hardships and public interest—which merge in this context—favor a permanent injunction to protect the public's substantial interest in the lawful operation of this vital public health program.

## CONCLUSION

Plaintiffs are entitled to summary judgment on the first four counts of the complaint.[22]

Date: November 2, 2026

Respectfully submitted,

/s/ Michael J. Torcello
Michael J. Torcello (DC Bar No. 90014480)
Kate Talmor (DC Bar No. 90036191)
Carrie Y. Flaxman (DC Bar No. 458681)
Robin F. Thurston (DC Bar No. 1531399)
Skye L. Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
mtorcello@democracyforward.org
ktalmor@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

[22] Plaintiffs are not pursuing summary judgment on the fifth count of the complaint.

*Counsel for Plaintiffs Hennepin County, King County, and SIECUS*

Hannah Klain*
Karen Dunn (DC Bar No. 1002520)
Jeannie Rhee (DC Bar No. 464127)
Dunn Isaacson Rhee LLP
401 9th Street NW
Washington, DC 20004
Phone: (202) 240-2900
hklain@dirllp.com
kdunn@dirllp.com
jrhee@dirllp.com
*Counsel for Plaintiffs*

Cormac Early (DC Bar No. 1033835)
Allison M. Zieve (DC Bar No. 424786)
Stephanie Garlock (DC Bar No. 1779629)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
Phone: (202) 588-1000
cearly@citizen.org
*Counsel for Plaintiffs Hennepin County, King County, and SIECUS*

Emily Nestler (DC Bar No. 973886)
Planned Parenthood Federation of America
1100 Vermont Avenue NW
Washington, DC 20005
Phone: (202) 973-4800
emily.nestler@ppfa.org
*Counsel for Plaintiff Planned Parenthood of the Heartland, Inc.*

Dylan Cowit*
Valentina De Fex*
Planned Parenthood Federation of America
123 William Street, 9th Floor
New York, NY 10038
Phone: (212) 261-4696
dylan.cowit@ppfa.org
valentina.defex@ppfa.org
*Counsel for Plaintiff Planned Parenthood of the Heartland, Inc.*

* Admitted pro hac vice